IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFF FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PNC FINANCIAL SERVICES GROUP, INC., | ) | PLAINTIFF DEMANDS |
| d/b/a/ PNC BANK and d/b/a PNC MORTGAGE | ) | TRIAL BY JURY |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Now comes Plaintiff JEFF FOSTER, by his attorney Wayne B. Giampietro, and

complaining of Defendant PNC FINANCIAL SERVICES GROUP, INC., d/b/a PNC BANK and

PNC MORTGAGE, alleges as follows:

### FACTS COMMON TO ALL COUNTS

1.  Plaintiff is a citizen of the State of Florida.

2.  Defendant PNC FINANCIAL SERVICES GROUP is a Pennsylvania corporation with its

    principal place of business in Pittsburgh, Pennsylvania.

3.  This Court has jurisdiction over this matter based upon 28 U.S.C. 1331, in that this

    dispute involves predominant issues of federal law. Defendant is liable unto Plaintiff

    pursuant to the provisions of the Fair Credit Billing Act, 15 U.S.C. 1666, et. seq., as well

    as other applicable federal and state laws. Further, the matter in controversy between

    Plaintiff and Defendant exceeds the sum of $75,000, exclusive of interest and costs, and

    is between citizens of different states. Accordingly, this Court has subject matter

    jurisdiction over this action pursuant to 28 U.S.C. § 1332. Defendant is also liable to



EXHIBIT

A (1)

Plaintiff pursuant to the laws of the State of Illinois, which claims may be brought under the Supplemental Jurisdiction of this Court. 28 U.S.C. 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that the transactions between Plaintiff and Defendant occurred predominantly in this District, they involve real estate located in this District and Defendant maintains offices and transacts business in this District.

5. In 2003, Plaintiff an Equity Cash Line of Credit with Defendant's Predecessor, which was modified in 2006, resulting in a line of credit available to Plaintiff in the amount of $1,890,000, secured by a mortgage on real estate commonly known as 6201 N. Kilpatrick, Chicago, Illinois, in this district.

6. In or about March, 2009, Plaintiff requested Defendant to modify that line of credit to reduce the interest charged on that loan.

7. At the time he made that request, Plaintiff requested Defendant to provide him with the documents evidencing the then current status of that line of credit.

8. Purportedly in response to Plaintiff's request, Defendant provided to him documents for an Equity Cash Line Mortgage which were for a different transaction in which Plaintiff was not involved.

9. Despite repeated requests by Plaintiff, Defendant has steadfastly failed and refused to provide him with the documents which evidence the current status of the Equity Cash Line of Credit which Plaintiff obtained from Defendant's predecessor.

10. On April 6, 2009, Defendant's predecessor confirmed to Plaintiff that the home equity line of credit had been modified, and set forth the terms of that modification. Plaintiff

2

accepted that modification in writing  A copy of the document setting forth that modification agreement is attached hereto as Exhibit "A" and incorporated by reference

11.     Although Plaintiff timely made payments on the line of credit, Defendant repeatedly failed to credit the payments made by Plaintiff in a timely manner, and falsely reported to various credit reporting agencies that Plaintiff was delinquent on this loan.

12.     Defendant complained of these failure by Defendant, which responded by sending an offer to modify the line of credit in a manner which would double Plaintiff's monthly payments and required him to pay $13,700 in closing costs.

13.     Plaintiff objected to this action in writing on November 16, 2009, and requested Defendant to rectify these errors.  Plaintiff's request is attached hereto as Exhibit "B" and incorporated herein.

14.     Subsequently, on a letter dated February 18, 2010, Defendant offered to allow Plaintiff to pay off the line of credit by paying 60% of the outstanding balance by April, 2011.  A copy of the document constituting that offer is attached hereto as Exhibit "C" and incorporated by reference.

15.     Plaintiff attempted to obtain funds from other lending institutions in order to accept Defendant's offer of February 8, 2010, but was unable to do so because the false information supplied by Defendant to the various credit reporting agencies resulted in false credit reports which stated that Plaintiff was not worthy of obtaining credit from other lending institutions.

16.     After complaining of Defendant's false actions, which prevented him from obtaining funds to take advantage of Defendant's offer, on  June 17, 2011, Defendant sent to

3

Plaintiff a proposed Line of Credit Modification Agreement. A copy of that document is attached hereto as Exhibit "D" and incorporated by reference.

17.   Plaintiff informed Defendant that he would not sign Exhibit "D" because those documents referred to documents allegedly signed in 2006, which had never been signed by Plaintiff, and because the proposed modification called for an increase in the monthly payment on the line of credit, contrary to the premises which had been previously made.

18.   Even though Plaintiff timely made payments on the line of credit, Defendant failed and refused to credit those payments to his account, and continued to falsely report to the various credit reporting agencies that Plaintiff was delinquent in his payments to this account, falsely stating that Plaintiff was 120 days past due on this account. This conduct has continued throughout Plaintiff's relationship with Defendant.

19.   After Plaintiff's complaints to Defendant, Defendant sent to Plaintiff another proposed Line of Credit Modification Agreement on September 22, 2011. A copy of that proposed modification is attached hereto as Exhibit "E" and incorporated by reference.

20.   Plaintiff informed Defendant that he would not sign Exhibit "E" because those documents again referred to documents allegedly signed in 2006 which had never been signed by Plaintiff, and it increased the payments on the line of credit even more, and falsely increased the principal balance on the loan.

21.   On October 13, 2011, Plaintiff complained to Defendant in writing of the foregoing conduct, and the repeated false statements and failure of Defendant to timely credit Plaintiff's payments to his account, and the damage caused by Defendant's wrongdoing. A copy of that complaint is attached hereto as Exhibit "F" and incorporated by reference.

4

22.     As a result of Defendant's failure to properly credit the payments he made to the line of

        credit, Plaintiff repeatedly inquired as to the proper amount due for payments on the

        equity line of credit.  Defendant refused to respond to his requests.

23.     As a result of Defendant's refusal to inform Plaintiff of the proper amount due for the

        monthly payment on the line of credit, and the basis for that amount, Plaintiff again wrote

        to Defendant on January 25, 2012, complaining of Defendant's conduct.  A copy of that

        communication is attached hereto as Exhibit "G" and incorporated herein by reference.

24.     Defendant has failed and refused to respond to Plaintiff's communications, and has failed

        and refused to provide Plaintiff with information regarding the current status of this line

        of credit, and the amount due and owing on that loan.

25.     As a result of Defendant's refusal to provide Plaintiff with a true and correct statement of

        the amount due on this loan, Plaintiff has ceased making payments on the line credit, for

        the reasons set forth in Exhibit "G."

26.     On November 30, 2011, Plaintiff obtained a copy of his credit report from Equifax, which

        report shows the false information reported to Equifax by Defendant.

27.     Plaintiff has attempted to apply for credit to other lending institutions, but has been

        denied credit due to the false information furnished by Defendant to Equifax and the

        other credit reporting agencies.

28.     In addition to this line of credit with Plaintiff, Plaintiff had a mortgage loan with

        Defendant's predecessor secured by a mortgage on real estate located at 56 Fiesta Way,

        Fort Lauderdale, FL.

5

29. On May 19, 2009, Defendant's predecessor sent a forbearance agreement to Plaintiff, which Plaintiff accepted. A copy of this agreement is attached hereto as Exhibit "H" and incorporated by reference.

30. On May 19, 2009, Plaintiff sent a letter to Defendant's predecessor confirming that his loan modification resulting in a 30 year fixed loan at three percent (3%) interest would commence in three months as long as he eliminated his automobile payment of $1945 per month. A copy of that letter is attached hereto as Exhibit "I" and incorporated by reference.

31. Defendant's predecessor acknowledged Plaintiff's communication, in a letter dated May 26,2009, a copy of which is attached hereto as Exhibit "J" and incorporated herein.

32. Contrary to the agreement between the parties, on September 28, 2009, Defendant's predecessor rejected the loan modification in a letter dated September 28, 2009 a copy of which is attached hereto as Exhibit "K" and incorporated by reference.

33. Plaintiff made several inquiries to Defendant's predecessor attempting to determine the reason for the rejection of the loan modification. No person at Defendant's predecessor was able to give Plaintiff any reason for the rejection of the loan modification.

34. On November 24, 2009, Defendant sent a notice to Plaintiff that his loan modification had been rejected because he had failed to return the executed documents. A copy of that notification is attached hereto as Exhibit "L" and incorporated by reference.

35. At no time had Defendant provided defendant with the documents to which reference is made in Exhibit "L", thus Defendant made it impossible for Plaintiff to comply with what

it contended was the reason for the rejection of the loan modification.

36. Subsequent to the notification that Plaintiff's request for a loan modification had been rejected, he was notified that his loan modification had been approved, which modification increased his monthly payment, including escrow, from $6000 to $7409, and required closing costs in the amount of $13,729.34. A copy of that notification is attached hereto as Exhibit "M" and incorporated by reference.

37. Plaintiff refused to agree to this modification.

38. Suddenly, on April 2, 2010, Defendant notified Plaintiff that it could not accept payments Plaintiff was attempting to make, because his monthly payment was $13,199.95. A copy of such notification is attached hereto as Exhibit "N".

39. This claim was totally false, having absolutely no basis in fact whatsoever. Again, Plaintiff was required to notify Defendant of its wrongful conduct. Again, Defendant falsely informed various credit agencies that Plaintiff was delinquent in his payment, knowing full well that this was not true.

40. On February 3, 2011, when Defendant falsely informed Plaintiff that he had not obtained proof of hazard insurance on the property which was collateral for the loan.

41. After receiving this notice, Plaintiff repeatedly communicated with Defendant, providing proof that he had maintained hazard insurance on the property. Defendant finally acknowledged Plaintiff's proof of hazard insurance on the property in a letter dated July 26, 2011, a copy of which is attached hereto as Exhibit "O."

42. Despite acknowledging that Plaintiff had secured that hazard insurance, and stating that any charges to his account due to Defendant's failure to acknowledge the existence of this

insurance, Defendant increased Plaintiff's monthly payment for Eighty ($80.00) per month.

43. Although Plaintiff repeatedly inquired why his monthly payment had been increased, no one affiliated with Defendant could provide him with an explanation of such action.

44. Almost immediately, Defendant informed Plaintiff that he had not secured flood insurance on the property which was collateral for the loan. Defendant finally acknowledged that Plaintiff had secured proper flood insurance.

45. On September 1, 2011, Defendant informed Plaintiff that it could not accept his monthly payment in the amount of $6156.83, because an additional amount of $80.84 was due and owing. Copies of that notification to Plaintiff are attached hereto as Exhibits "O" and "P" and incorporated by reference.

46. This notification was apparently caused by the fact that Defendant had raised the amount of Plaintiff's monthly payment without notice to him.

47. When Plaintiff inquired as to the reason for this increase in his monthly payment, again no one was able to provide him with a reason for this action.

48. On September 16, 2011, Defendant sent a notification to Plaintiff falsely stating that he was delinquent by two monthly payments. A copy of that notification is attached hereto as Exhibit "Q" and incorporated by reference.

49. On September 22, 2011, Defendant returned the amount of $4964.04 to Plaintiff, along with a notification that it would accept no payments from him in any amount less than $6237.67. A copy of that notification is attached hereto as Exhibit "R" and incorporated by reference.

8

50.    On September 29, 2011, after receipt of Exhibits "Q" and "R,"Plaintiff visited
       Defendant's facility in person in Chicago, IL, where he spoke with Defendant's officer,
       Jose Melendez.  Plaintiff offered to make the allegedly delinquent payment, and inquired
       why his payment had been increased, and of the status of his account.

51.    Jose Melendez told Plaintiff that there had been a mistake, and refused to accept his
       payment, stating that he would "fix the problem."

52.    Despite being told that he should not make any further payments, Plaintiff paid the
       amount of $6237 for each month of September, October and November, 2011.

53.    Plaintiff repeatedly made inquiries as to why his monthly payment had been increased,
       and the status of his account.

54.    On or about December 2, 2011, Plaintiff received a letter from Defendant, stating that
       Defendant could not determine the reason for any of the actions taken by Defendant
       regarding Plaintiff's account.  A copy of that notification is attached as Exhibit "S" and
       incorporated herein.

55.    During this time, on November 18, 2011, Defendant sent Plaintiff a notification that since
       he had not obtained Comprehensive Wind coverage, Defendant had purchased such
       coverage for the property at a cost $37,730.   A copy of that notification is attached as
       Exhibit "T" and incorporated herein.

56.    Defendant informed Plaintiff that it had purchased this insurance in August, which was
       totally untrue.

57.    Plaintiff was under no obligation to obtain Comprehensive Wind coverage for the subject
       property.  Defendant's demand that he obtain such coverage, and its purported purchase

9

of such coverage for an amount approximately ten times higher than the true cost of such coverage were unreasonable and totally without foundation, justification or excuse.

58. Nevertheless, even though he was not required to do so, Plaintiff obtained such Comprehensive Wind coverage, and provided Defendant with proof of such insurance.

59. Despite the fact that no Comprehensive Wind coverage was necessary for the property, and despite the fact that Plaintiff had obtained such coverage, Defendant increased Plaintiff's monthly payment through a demand for increased escrow deposits based upon the unnecessary and inflated alleged disbursement of $37,730 for such insurance. A copy of Defendant's notification to Plaintiff dated January 6, 2012, of such increased payments is attached hereto as Exhibit "U" and incorporated by reference.

60. All during this time that it was refusing to accept Plaintiff's monthly payments on this account, and erroneously informing him that he should not make payments, Defendant continued to make reports to credit reporting agencies that Plaintiff was delinquent in his payments, further damaging Plaintiff's credit. A copy of Defendant's acknowledgment dated February 24, 2012 of those facts is attached hereto as Exhibit "V" and incorporated by reference.

61. Finally, after repeated attempts to determine the reason for Defendant's increase of his monthly payments, Defendant finally acknowledged that the reason for the increase of his monthly payments was not valid .

62. At virtually the same time it was acknowledging that Plaintiff's protests that the actions taken by Defendant increasing his monthly payments and declaring his account delinquent were false, Defendant then falsely claimed that Plaintiff had left the property

10

vacant. A copy of that notification dated January 18, 2012, is attached hereto as Exhibit "W" and incorporated by reference.

63.   When Plaintiff responded to Exhibit "W" by calling the number listed in that letter, he discovered that the telephone number was to Defendants' collections department, which insisted that he was delinquent in his payments on this account, and demanded payments from him which were not due.

64.   As a result of Defendant's false claim that the property was vacant, Fireman's Fund, the issuer of Plaintiff's property insurance, cancelled that policy, relying upon Defendant's false statement that the property was vacant. A copy of the notification of such cancellation is attached hereto as Exhibit "X" and incorporated by reference.

## COUNT I–FAIR CREDIT BILLING ACT

65.   Plaintiff incorporates as though fully set forth herein Paragraphs 1 through 64 as Paragraph 65 of Count I.

66.   Although Plaintiff has repeatedly notified Defendant of its numerous billing errors, as required by law, and defendant failed to timely or properly respond, on multiple occasions and each such violation gives rise to a distinct action under the CBA, 15 U.S.C. 1666, et. seq.

## COUNT II–FAIR CREDIT REPORTING ACT

67.   Plaintiff incorporates as though fully set forth herein Paragraph 1 through 64 as Paragraph 67 of Count II.

68.   Defendant has repeatedly falsely reported top various credit reporting agencies that Plaintiff was delinquent in his payments to Defendant, when Defendant knew that said

11

statements were false.

69. Although Plaintiff has repeatedly demanded that Defendant cease making false reports to credit agencies regarding the status of his accounts and his payments thereon, Defendant has refused to correct those reports and has repeated that information which it knows to be false.

70. Defendant's conduct in making such false reports to various credit agencies is a violation of the Fair Credit Reporting Act, as a result of which Defendant is liable to Plaintiff pursuant to the provisions of 15 U.S.C. 1681n.

71. Plaintiff has suffered actual damage by Defendant's conduct in that his credit has been impaired, which has interfered with the operations of his business of buying and selling real estate.

72. Defendant's conduct has been wilful, wanton, intentional and reckless, as a result of which Plaintiff is entitled to punitive damages.

## COUNT III–BREACH OF CONTRACT

73. Plaintiff incorporates as though fully set forth herein Paragraphs 1 through 64 as Paragraph 73 of Count III.

74. Defendant's conduct constitutes a breach if its agreements and contracts with plaintiffs.

75. As a result of Defendant's conduct, Plaintiff has been denied the benefit of agreements he has made with Defendant, and has been forced to make payments to Defendant in amounts which were not due to it.

76. Defendant's breaches were in bad faith, which entitle Plaintiff to punitive damages.

12

## COUNT IV–CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES

77. Plaintiff incorporates as though fully set forth herein Paragraphs 1 through 64 as Paragraph 77 of Count V.

78. The actions of Defendant, particularly the actions in failing to credit payments made by Plaintiff to his account and requiring Plaintiff to make additional deposits into his escrow accounts, were not warranted and constitute unfair and deceptive acts and practices as defined in the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.

## COUNT V–DEFAMATION

79. Plaintiff incorporates as though fully set forth herein Paragraphs 1 through 64 as Paragraph 79 of Count IV.

80. Defendant recklessly, maliciously and/or intentionally, published and disseminated false and inaccurate information concerning plaintiff's credit history, the exact statements being unknown to Plaintiff at the present time, as the statements made by defendant are contained within Defendant's control, and the control of credit reporting agencies, the exact language of which Plaintiff will be able to obtain in discovery in this case.

81. Defendant's publishing of such false and inaccurate credit information has severely damaged the personal reputation of plaintiff, made it impossible for him to obtain credit for virtually any purpose, to operate his business of buying and selling real estate, and has caused him severe humiliation, emotional distress and mental anguish to plaintiffs.

82. Defendant was notified of the inaccuracy and falsity of its statement by plaintiff, however, the defendant continued to issue and/or publish report(s) to third parties which

contained inaccurate credit information about plaintiff.

83. Defendant acted with willful intent and malice to harm plaintiff, for which Plaintiff is entitled to punitive damages.

## COUNT VI–FRAUD

84. Plaintiff incorporates as though fully set forth herein Paragraphs 1 through 64 as Paragraph 84 of Count IV.

85. Defendant repeatedly refused to accept payments made by Plaintiff in a timely manner based on claims that the amount of monthly payment due had increased.

86. Each time Plaintiff challenged those assertions, Defendant assigned a different reason for the increase in monthly payment. Each reason given by Defendant for such increase was false. Nevertheless, Defendant continued to refuse to accept Plaintiff's payments, and charged him with costs and fees which were not due.

87. Defendant repeatedly reduced the amount in Plaintiff's escrow account with no accounting for the reason of such reduction and no evidence that it had made any legitimate payments from that escrow account. Defendant used these unexplained deductions to further demand increases in Plaintiff's monthly payment on the loans with Defendant.

88. Defendant's conduct, as alleged herein, constitutes a systematic scheme to charge and attempt to collect from plaintiff funds which he did not owe, and to unnecessarily force place insurance which was unnecessary and not required by any agreements between Plaintiff and Defendant, at a cost which was far in excess of any amount such insurance would cost.

89.     Defendant's conduct further resulted in fraudulent and false demands from Defendant that Plaintiff make payments to it which were not due.

90.     As a result of Defendant's conduct, Plaintiff has been forced to make payments to Defendant in amounts which were not do to it.

91.     Defendant's conduct was in bad faith, which entitles Plaintiff to punitive damages.

**RELIEF**

As a result of the foregoing, Plaintiff is entitled to the following relief:

A. A temporary and permanent injunction against Defendant's unfair and deceptive acts and practices and attorneys fees pursuant to the provisions of 815 ILCS 502/10a( c).

B. A temporary and permanent injunction requiring Defendant to provide Plaintiff with a home equity line of credit secured by the real estate commonly known as 6201 N. Kilpatrick, Chicago, Illinois in an amount of 60% of the outstanding balance on that loan as of February 8, 2010, at the rate of one percent (1%) per annum.

C. An accounting of each of Plaintiff's accounts with Defendant to determine what amounts have been wrongfully charged to Defendant and what payments and assessments have been wrongfully rejected in order to determine the amounts actually due on Plaintiff's loans with Defendant.

D. Damages in an amount no less than $100,000 for the actual out of pocket monetary damages Plaintiff has suffered, including additional interest paid by Plaintiff which should not have been paid.

E. Punitive Damages in an amount sufficient to punish Defendant for its wrongful conduct

15

**National City.**

Date: 4/6/2009

Re:    Home Equity Line of Credit Account Number: 4489619840201544 ("Account")
       Total Past Amount Due: $3,006.15
       Short Term Repayment Modification Program ("Repayment Program")

Dear **JEFFREY M FOSTER,**

This letter confirms the terms and conditions of the Repayment Program that the Account borrowers (all borrowers collectively "you" or "your") have recently requested and that will apply to your Account.

***Summary of Changes***
The home equity line of credit agreement that governs your Account ("Line Agreement") is modified as set forth below. The provisions below are intended to replace temporarily parts of the sections of your Line Agreement called "Finance Charge for Line and Fixed Rate Lock Advances and During the Repayment Period." As noted below, while these modifications are in place, your interest rate and minimum monthly payment will be reduced.

***Changes to your Line Agreement***

Any capitalized term used in this letter but not defined has the same meaning as in the Line Agreement. Please refer to your Line Agreement while reviewing this letter.

- Your outstanding Line balance (including any unpaid finance charges) as of the date of this letter is **$1,899,439.76**.
- Your outstanding FRL balance (including any unpaid finance charges), which balance does not include any FRL Advance related to the purchase of flood insurance, is **$0.00**.
- If flood insurance was purchased for you, the premium for that insurance will continue to be accounted for on your Account as a separate FRL Advance, and no interest will accrue on this FRL balance. Your separate outstanding FRL balance related to the purchase of flood insurance is **n/a**.
- The **ANNUAL PERCENTAGE RATE**\* applicable to your outstanding Line balance and FRL balance (except, as noted above, any FRL balance related to flood insurance) will be reduced to a fixed rate of **One** percent (**1%**) per annum for **Twenty Four** (24) consecutive billing cycles beginning on **4/6/2009** and ending on **4/7/2011** ("Temporary Repayment Period"). The periodic rate of **FINANCE CHARGE**\*\* for each billing cycle during the Temporary Repayment Period will be **0.08333%**.\*\* During the Temporary Repayment Period, your Line Minimum Payment will be **$3,005.50** and your FRL Minimum Payment will be **$0.00**. Both payments total **$3,005.50** and this total is your "New Payment."
- Your first New Payment will be due on **5/7/2009**, and thereafter, on the date stated on your monthly statement. Complete payment instructions are set out on your monthly statement.
- During the Temporary Repayment Period, you will not be able to obtain Advances on your Line.

Exhibit A

**National City.**

- At the end of the Temporary Repayment Period, all of the original terms and conditions of your Line Agreement will apply. If, at that time, you want to be able to obtain Advances on your Line, you must ask us to reinstate your credit privileges. However, your request may be declined if a condition then exists that would allow us to terminate or suspend your Line. Your request will be declined if your account privileges were terminated before the date of this letter.
- If you fail to comply with the terms of the Repayment Program, you will be in default of your Line Agreement, and the Repayment Program will immediately terminate without any additional notice to you unless required by applicable law.
- If the Repayment Program is terminated because of your default, the original terms and conditions of your Line Agreement will immediately apply, and you will no longer receive the reduced interest rate or be permitted to pay the corresponding New Payment as set out in this letter.
- During the Temporary Repayment Period, except as modified by this letter, all terms and conditions of your Line Agreement remain in effect.
- Your payment of your first New Payment means that you agree with all of the terms and conditions of the Repayment Program.
- If desired, please complete the attached ACH automatic payment debit form and return it to us using the enclosed envelope.

We look forward to working with you. If you have any questions, please feel free to contact us at **1-866-622-2657 ext. 62386**.

Sincerely,

**Nick Keleman**
Homeowners Assistance Negotiator

\* The way in which finance charges are computed on your Line balance will not change.
\*\*The finance charge for each billing cycle is computed at the annual percentage rate (APR) divided by 12.

22564

# National City®

## PLEASE READ CAREFULLY

You will receive a coupon book or statement showing your payment amount and due date. Should this coupon book or statement not arrive prior to your first due date, we ask that you remit the initial coupon (s). **Using the coupon(s) below will ensure proper posting to your account.**

- - - - - - - - - - - - - - - - - - - - - - - *DETACH HERE* - - - - - - - - - - - - - - - - - - - - - - - -

### TEMPORARY COUPON INSTRUCTIONS

Detach **payment coupon** and mail with check or money order. Make all checks payable
To NATIONAL CITY BANK and mail to:    **National City Bank**
**ATTN: Payment Processing**
**P.O. Box 5570, LOC 01-7107**
**Cleveland, OH 44101-0570**

| | |
|---|---|
| **JEFFREY M FOSTER** | Borrower's Name |
| **6201 N KILPATRICK AVE** | Property Address |
| **CHICAGO, IL 60646** | City/State/Zip |
| $1,896,011.61    Loan Amount | 4489619840201544    Loan Number |
| $3,005.50    Payment Amount | 5/7/2009    Due Date |

Payments are due on the due date.

- - - - - - - - - - - - - - - - - - - - - - *DETACH HERE* - - - - - - - - - - - - - - - - - - - - - - - -

### TEMPORARY COUPON INSTRUCTIONS

Detach **payment coupon** and mail with check or money order. Make all checks payable
To NATIONAL CITY BANK and mail to:    **National City Bank**
**ATTN: Payment Processing**
**P.O. Box 5570, LOC 01-7107**
**Cleveland, OH 44101-0570**

| | |
|---|---|
| **JEFFREY M FOSTER** | Borrower's Name |
| **6201 N KILPATRICK AVE** | Property Address |
| **CHICAGO, IL 60646** | City/State/Zip |
| $1,896,011.61    Loan Amount | 4489619840201544    Loan Number |
| $3,005.50    Payment Amount | 6/7/2009    Due Date |

Payments are due on the due date.

22564

## AUTOMATED PAYMENT (ACH DEBIT) AUTHORIZATION FOR
## HOME EQUITY - LOANS / LINES OF CREDIT

I authorize and direct the depository bank where I have my checking/savings account as identified below ("Depository Bank") to make payments to National City Bank for my Home Equity Loan or Home Equity Line of Credit as identified below ("Account") on the Account's payment due date as shown on my monthly billing statement, and to charge by checking/savings account at Depository Bank as designated below:

---

_____         _____
**Depository Account Number**        **Home Equity Loan/Line of Credit Account Number**


_____         _____
**City and State**                   **Routing and Transit Number** (9-digit number at bottom
                                     left of check)

**Type of Account:**                 [ ] Checking  or [ ] Savings*
                                     *There is a limitation of six (6) pre-authorized transfers per
                                     month for savings account.

---

### PLEASE ATTACH A VOIDED CHECK OR A DEPOSIT SLIP FOR VERIFICATION OF
### DEPOSITORY INFORMATION

I understand that if I have a variable rate loan, I will receive prior written notice of any change in my payment amount and when it will go into effect.  National City Bank may, in its discretion, initiate ACH credit entries/adjustments to the Account indicated above in the case of any debit entry initiated in error.

I acknowledge and agree that this Automated Payment (ACH Debit) Authorization will remain in full force and effect until National City Bank receives written notification from me of its termination.  Such notice must be sent at least twenty (20) days in advance of my next payment date to the address noted below.  I further agree that National City Bank shall have a reasonable period of time upon which to act on such instruction and turn off the ACH payment.

### PLEASE CONTINUE TO SEND PAYMENTS AS NOTED IN YOUR BILLING STATEMENT
### UNTIL YOU RECEIVE WRITTEN NOTICE OF ACH PAYMENT SETUP

By signing below, I acknowledge that I understand the terms of this Automated Payment Authorization and that I have received a copy for my records.


_____         _____
Name of Deposit Account Holder       Social Security Number of Deposit Account Holder


_____         _____
Deposit Account Holder's Signature   Date

---

*PLEASE SIGN AND RETURN THIS FORM WITH THE ATTACHED LOAN DOCUMENTS TO
THE ADDRESS NOTED BELOW*

22564

Consumer Loan Services, Locator 01-7118, 6750 Miller Rd., Brecksville, OH 44141



ACHAUTHLOAN_1

# MidAmerica Bank

2650 Warrenville Road, Suite 500 — apt 5.
Downers Grove, Illinois 60515

Loan Servicing (800) 468-3193
Bank-By-Internet www.midamericabank.com

## Summary of Activity

| | |
|---|---|
| STATEMENT DATE | 12/31/07 |
| LOAN NUMBER | 760990989 |
| PREVIOUS BALANCE | $1,900,225.32 |
| ADVANCES & DEBITS | $.00 |
| PAYMENTS & CREDITS | $10,237.43 |
| FINANCE CHARGES | $10,578.68 |
| LATE CHARGES | $.00 |
| NEW BALANCE | $1,900,566.57 |

JEFFREY M FOSTER
6201 N KILPATRICK AVE
CHICAGO IL 60646-5070

## HOME EQUITY CREDIT LINE --- Account #760990989

### Account Summary

| | |
|---|---|
| PREVIOUS DATE | 11/30/07 |
| PREVIOUS BALANCE | $1,900,225.32 |
| + ADVANCES & DEBITS | $.00 |
| - PAYMENTS & CREDITS | $10,237.43 |
| + FINANCE CHARGES | $10,578.68 |
| + LATE CHARGES | $.00 |
| NEW BALANCE | $1,900,566.57 |
| CREDIT LIMIT | $1,890,000.00 |
| AVAILABLE CREDIT | $12.11 |

### Payment Summary

| | |
|---|---|
| AMOUNT PAST DUE | $.00 |
| PRINCIPAL | $.00 |
| FINANCE CHARGES | $10,578.68 |
| OTHER CHARGES | $.00 |
| FEES | $.00 |
| INSURANCE | $.00 |
| LATE CHARGES | $.00 |
| AMOUNT OVER LIMIT | $.00 |
| MINIMUM PAYMENT | $10,578.68 |

Randy and Kathyn                                    November 16, 2009
National City
Loss Mitigation


Dear Randy and Kathyn,


Per my conversation with Randy on Friday, I am requesting additional flexibility on my equity line of credit.

As you recall, I was forced back into traditional real estate sales after National City wiped out my other 2 businesses with inaccurate credit reporting. I was forced to sell projects before completion, was unable to close and capitalize on a million in equity, and my credit was closed down for future pending deals. After being forced to research the error, National City acknowledged the mistakes and fixed the errors that created the illusion I was a bad credit risk.

Unfortunately, after 2 years of fighting with National City to correct the errors, I had to fold the businesses. National City Lawyers told everyone I could always go back to selling real estate. I agreed that was possible, but is difficult when you have already stopped regular contact with past clients and the public. Then, the real estate market started tanking. It couldn't be worse timing.

Additionally, the current banking environment has made it near impossible to sell the type of product I specialized in. The down payment requirements for residential investment properties have all but ruined recovery efforts. Unfortunately, I own two of them as well as sell them. I have been jumping through hoops for 12 months for the Homeowners Assistance Program at National City Mortgage. After doing everything I was told for 7 months, they refused to give me any help. In fact, they recently sent me a modification program to sign that almost doubled my payments and had $13,700 in closing costs! I was speechless for 2 hours after opening the package. They subsequently threatened to foreclose on me if I didn't sign it. I informed her that I wasn't behind 3 payments as her records indicated. After sending in proof of payments, I never heard from her again.

Oh yeah………….did I mention, THEY MARKED MY CREDIT WITH THREE MORE MISTAKES!!! Yes, the nightmare continues.

After sending cancelled checks to prove the payments were made on time, we are in the process of getting the marks removed. So far, they are still on there.

In conclusion, I sold assets for a fraction of the value this year in order to meet the deadlines set by National City Mortgage, only for them to deny the terms they already promised. It is impossible to make money in real estate right now. I have not slept more than 2 hours in a row for 6 months. When my current modification expires, I will not be

Exhibit B

able to make the payments. I am trying to come up with a plan to sell everything and pay my debt. Unfortunately, no plan allows for a payoff of 70 % of the equity line balance, the current modification. The current modification expires in April of 2011.

I have to say, in all fairness, that to this point Nick, Kathyn, and Randy have been very Nice and have been trying to help. I am hoping that I can get a 2 year extension on the current modification terms and payoff agreement. This will allow me to make moves to insure survival, without nearing deadlines prohibiting the plan.

As I have mentioned, my current equity line does not have any signed documents. After many mishaps at the branch, they told me they sent the paper work to my home. I have a copy of the letter saying this.

I appreciate your assistance in this matter. I apologize for the summary of negative events. I just thought it would be helpful for anyone reading this that is not familiar with my situation.

My email and cell phone info is below. Thank you for your understanding in this matter.

Sincerely,

Jeff Foster
(773)983-3595 cell (773)404-3595 office
highlandbreeze@hotmail.com



February 18, 2010

Mr. Jeffrey M. Foster
6201 North Kilpatrick Avenue
Chicago, IL  60646

     Re:  Equity Reserve Line of Credit # 4489619840201544

Dear Mr. Foster,

Please be advised that this is intended as an authorization that PNC Bank will accept 60%
of the outstanding balance on the referenced equity reserve line of credit as a settlement
in full at any time within 24 months of your modification agreement on the line dated
April 6, 2009.  The settlement must be paid in certified funds, the balance will be
accepted as a settlement in full, the credit bureaus will be updated to reflect "settled in
full for less than balance", and the mortgage filed on the property collateralizing the
referenced line of credit will be released at that time, and upon receipt of those monies.

The settlement offer contained in this letter will expire on April 5, 2011.

Very truly yours,

T. L. Bell
Vice-President and HOA Underwriting Manager
PNC Bank

     Exhibit C

 PNCBANK

PNC Bank
6750 Miller Rd.
Brecksville, OH 44141

6/17/2011

JEFFREY M FOSTER

6201 N KILPATRICK AVE
CHICAGO, IL 60646

RE: Modification on Account Number **4489619840201544**

Enclosed you will find the Modification Agreement that you requested.

Please review the terms of the Modification Agreement carefully. Upon your acceptance, please sign and date the Modification Agreement where indicated and return the documents in the enclosed envelope provided within 5 business days of receipt to the following address:

> PNC Bank
> 6750 Miller Road
> Homeowners Assistance Department
> LOC BR-YB58-01-3
> Brecksville, Ohio 44141

Should you have any questions, or require any additional assistance, please contact the mitigation analyst at your earliest convenience at 1-866-622-2657 Monday-Thursday from 8:00 am - 9:00 pm EST, Friday from 8:00 am - 5:00 pm and Saturday 8:00 am - 1:00 pm EST.

Thank you for giving us the opportunity in assisting you with your financial needs.

Respectfully,

PNC Bank

148662

Exhibit D

This document was prepared by Lori Barauskas

**After Recording Return To:**
6750 Miller Road
Homeowners Assistance Department
LOC BR-YB58-01-3
Brecksville, Ohio 44141
Toll-Free: (866) 622-2657

_____ [Space Above This Line For Recording Data] _____

# HOME EQUITY LINE OF CREDIT MODIFICATION AGREEMENT

This Home Equity Line of Credit Modification Agreement (this "Modification Agreement") is made as of **6/17/2011**, between **JEFFREY M FOSTER** (individually and collectively, the "Borrower") and PNC Bank, National Association\*, for itself, its successors and/or assigns, (the "Lender").

If Borrower's representations, acknowledgments, agreements and preconditions to modification in Section 1 continue to be true in all material respects, then this Modification Agreement will, as provided in such Section 1, amend and supplement (1) the home equity line of credit agreement dated **May 31, 2006**, as it may previously have been amended, (the "Agreement" and (2) the Mortgage, Deed of Trust or Security Deed, (the "Security Instrument"), bearing the same date as and securing, the Agreement recorded in Book/Page or Instrument Number 0617308074, of the **COOK** County Records of IL which covers the real and personal property described in the Security Instrument and defined therein as the "Property", commonly known as **6201 N KILPATRICK AVE CHICAGO IL 60646**, the real property described being set forth as follows:
SEE ATTACHED EXHIBIT "A"

The Agreement and Security Instrument together, as they may previously have been amended, are referred to as the "Loan Documents." The Borrower and Lender are sometimes collectively referred to together as the "Parties" and each as a "Party." Capitalized terms used in this Modification Agreement that are not defined herein have the meaning given to them in the Loan Documents.

\*If another lender is identified in the Loan Documents, PNC Bank, National Association is the successor by merger to such lender.

v1.4                                                                                   1

This Modification Agreement will not take effect to modify the Loan Documents unless the preconditions set forth in Section 1 have been satisfied.

Please Note: Items preceded by "☐" are not applicable unless marked "☒" or the equivalent.

    In consideration of the mutual promises and agreements exchanged, and intending to be legally bound, the Parties agree as follows:

1.    **Borrower's Representations, Acknowledgments and Agreements and the Preconditions to Modification.**
    Borrower represents, acknowledges and agrees that:

    a.    Under penalty of perjury, all documents and information provided by Borrower to Lender are true and correct.

    b.    Borrower will sign and return this Modification Agreement as required by the Lender on or before **June 27, 2011.**

    c.    If, prior to the Modification Effective Date (as defined in Section 2), (i) the Lender determines that Borrower's representations in Section 1(a) are no longer true and correct, or (ii) Borrower has not signed and returned this Modification Agreement as required in Section 1(b), the Loan Documents will not take effect, this Modification Agreement will terminate and the Lender will have all of its rights and remedies as provided by the Loan Documents.

    d.    The Loan Documents will not be modified unless and until (i) the Lender has received any title endorsement(s), title insurance product(s), subordination agreement(s) and/or mortgage insurer approval(s) that the Lender deems necessary to ensure that the Security Instrument, as modified, retains the same lien position that it was in prior to the Modification Effective Date and is fully enforceable and that any mortgage insurance policy is fully enforceable and (ii) the Modification Effective Date has passed. The Lender is not required to make any modification of the Loan Documents if the Borrower fails to meet any one of the requirements under this Modification Agreement.

    e.    As of the Modification Effective Date set forth in Section 2, Borrower's ability to obtain loans or Advances under the Agreement is permanently terminated. If Borrower's ability to obtain new loans or Advances was terminated previously, Borrower acknowledges that no additional loans or Advances may be obtained.

    f.    If the Lender has paid costs and expenses to third parties for flood insurance premiums on the Property and/or court costs and attorneys' fees to enforce Lender's rights under the Loan Documents, the total amount of these costs and expenses is included in the New Principal Balance set forth in Section 2(b).

    g.    If Borrower purchased credit insurance or the Line of Credit Protection Plan under the Agreement, such credit insurance or Line of Credit Protection Plan will be cancelled as of the Modification Effective Date set forth in Section 2.

    h.    If the Agreement includes late charges or Other Charges, on the Modification Effective Date set forth in Section 2, Lender will waive all unpaid late charges and Other Charges that remain unpaid under the Agreement. If the Loan Documents are not modified, Lender will not waive the unpaid late charges and Other Charges. Lender reserves the right to charge late charges, Return Check Fees or returned payment fees after the Modification Effective Date, if applicable, under the terms provided in the Agreement.

i.    Borrower has requested that Lender cancel all Fixed Rate Lock Advances and Fixed Rate Parts that Borrower may have obtained and consolidate their outstanding balances into the New Principal Balance as defined in Section 2(b). **The interest rates applicable under this Modification Agreement as set forth in Section 2 may be higher than the interest rate that would have applied to the Fixed Rate Lock Advances and Fixed Rate Parts under the Agreement.**

☐  j.    The Lender has forgiven a portion of the unpaid loans or Advances owing under the Agreement, in the amount of    . The forgiven amount will be reported to the Internal Revenue Service and may have tax consequences. Borrower should seek guidance from a tax professional.

2.    **The Modification.** If Borrower's representations in Section 1 continue to be true in all material respects and the preconditions in Section 1 have been met, the Loan Documents will automatically become modified on **July 2, 2011** (the "Modification Effective Date"). The first modified monthly payment will be due on **July 21, 2011,** and continuing on the payment due dates determined under the Agreement until the Maturity Date. Borrower understands and agrees that:

a.    The date on which all amounts owing under this Modification Agreement are due is called the "Maturity Date". The Maturity Date is **May 21, 2046,** which may have been extended beyond the maturity date in the Loan Documents.

b.    Borrower's new principal balance under this Modification Agreement is **$1,884,944.18** (the "New Principal Balance"). The New Principal Balance includes any amounts that will be past due as of the Modification Effective Date, and consists of: (i) the sum of (A) the unpaid principal balance of the loans or Advances made to Borrower under the Agreement, including any Fixed Rate Lock Advances and Fixed Rate Parts, <u>plus</u> (B) any unpaid finance charges, <u>plus</u> (C) any costs and expenses paid to third parties as described in Section 1(f). **Borrower understands and agrees that by agreeing to include any costs and expenses paid to third parties in the New Principal Balance, such amount will accrue interest based on the interest rates in effect under this Modification Agreement. $0.00 of the New Principal Balance, consisting of the accrued unpaid interest, shall be deferred (the "Deferred Interest") and shall be payable as provided in the last sentence in this section.** Borrower will not pay interest on the Deferred Interest prior to the Maturity Date (unless, as a result of Borrower default, the entire New Principal Balance is due) or make monthly payments on the Deferred Interest. Borrower must pay the Deferred Interest by the earliest of: (i) the date Borrower sells or transfers an interest in the Property; (ii) the date the Borrower pays or is required to pay the entire Interest Bearing Principal Balance (as defined below) or refinances the Property or (iii) the Maturity Date.

c.    The New Principal Balance <u>less</u> the Deferred Interest shall be referred to as the "Interest Bearing Principal Balance", and this amount is **$1,884,944.18.**

d.    Interest at the rate of 1% will begin to accrue on the Interest Bearing Principal Balance as of **July 2, 2011** for the first **5** years. The monthly payment of principal and interest for the first **5** years will be $4,766.20 and the first new monthly payment will be due on the date set forth in the second sentence of this Section 2.

e.    During year 6 and continuing thereafter until the Maturity Date, interest at the rate of **5.25%** will accrue on the Interest Bearing Principal Balance as of **June 22, 2016.** The monthly payment of principal and interest for year 6 and thereafter until the Maturity Date will be approximately **$9,299.22** and the first new monthly payment will be due on **July 21, 2016.**

3

f.  On the Maturity Date, the final payment under this Modification Agreement will be an amount equal to (i) the unpaid balance of the New Principal Balance, plus (ii) all accrued and unpaid interest on the New Principal Balance, plus (iii) any other amounts owed under the Loan Documents.

g.  **The interest rates applicable to the Interest Bearing Principal Balance as set forth in this Section 2 may be higher than the interest rate that would have applied under the Agreement.**

h.  As used in this Modification Agreement, the term "Billing Cycle" means the days between the closing date for the last monthly statement sent to Borrower and the closing date for the Borrower's current statement. Interest charged under this Modification Agreement will be computed on an "average daily balance" basis. The "average daily balance" is calculated by adding all the "daily balances" during the Billing Cycle and then dividing the total by the total number of days in the Billing Cycle. The "daily balance" is calculated by taking the beginning balance of the Interest Bearing Principal Balance each day and subtracting any payments, unpaid interest, late charges, Return Check Fees and returned payment fees. Interest owed under this Modification Agreement will be computed:

   ☒  i.  by multiplying the "average daily balance" for the Billing Cycle by $1/12^{th}$ of the applicable interest rate set forth in Section 2(d) or Section 2(e) above.

   ☐  ii.  by multiplying the "average daily balance" for the Billing Cycle by the number of days in the Billing Cycle and multiplying the product by $1/365^{th}$ (or $1/366^{th}$ in a leap year) of the applicable interest rate set forth in Section 2(d) or Section 2(e) above.

i.  Monthly payments will be applied first to all unpaid interest on the Interest Bearing Principal Balance, then to any unpaid late charges, Return Check Fees and returned payment fees (if applicable under the Agreement) and then to the Interest Bearing Principal Balance. If Borrower makes a partial prepayment of principal, the Lender may apply that partial prepayment to any unpaid late charges, Return Check Fees and returned payment fees (if applicable under the Agreement) and then to the Interest Bearing Principal Balance. To the extent that the principal prepayment is equal to or exceeds the Interest Bearing Principal Balance, the prepayment will be applied to Deferred Interest. Prepayments will not change the due dates or amounts of monthly payments.

j.  If Borrower elected the Automatic Payment Plan under the Agreement or authorized automatic payment of the Agreement from a deposit account ("Automatic Payment Program"), the Borrower may be required to sign a new authorization to continue the Automatic Payment Program once the monthly payment changes under Section 2(d) and Section 2(e). If the Automatic Payment Program is cancelled, that cancellation will not affect the interest rate required to be paid under this Modification Agreement.

k.  Borrower will be in default under this Modification Agreement if: (i) Borrower fails to make any payment under Section 2 of this Modification Agreement when due; (ii) Borrower fails to keep any of Borrower's agreements under Sections 1, 2 or 3 of this Modification Agreement; (iii) Borrower has provided false or misleading information to Lender; or (iv) Borrower's action or inaction adversely affects the Property or Lender's rights in the Property.

l.  In the event of a default under the Loan Documents, as modified by this Modification Agreement, interest will accrue on the unpaid amount of the New Principal Balance, including after the entire balance is declared to be due in full, at the rate set forth in Section 2(d) or Section 2(e) as applicable when the default occurred.

4

m.  If Borrower is in default, in addition to any other rights and remedies Lender has under law and subject to any right Borrower may have to cure the default under applicable law, Lender may do any of the following to the extent permitted by law: (a) require immediate payment of the entire unpaid New Principal Balance in full without demand or notice, unless otherwise required by applicable law and (b) recover all expenses related to retaking, holding, preparing for sale and selling the Property and reasonable collection costs, attorneys' fees and legal expenses as permitted by 11 U.S.C. 506 and any other applicable law.

n.  Borrower's ability to obtain loans or Advances under the Agreement is permanently terminated.

o.  If Borrower purchased credit insurance or the Line of Credit Protection Plan under the Agreement, such credit insurance or Line of Credit Protection Plan is cancelled.

p.  The terms in Section 2 will supersede any provisions to the contrary in the Loan Documents, including, but not limited to, the provisions for a variable interest rate or determination of the amount of any finance charge.

3.  **Additional Agreements.**  Borrower understands and agrees to the following:

a.  All persons who signed the Loan Documents, or their authorized representative(s) have signed this Modification Agreement, unless: (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the Property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the Property need not sign this Modification Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing. Any Borrower who signs this Modification Agreement but did not sign the Agreement is not personally obligated to pay the sums secured by the Security Instrument as modified by this Modification Agreement.

b.  This Modification Agreement supersedes the terms of any modification, forbearance or workout plan that the Borrower has previously entered into with Lender.

c.  Except as expressly modified by this Modification Agreement, Borrower will comply with and is bound by all covenants, agreements, and requirements of the Loan Documents.

d.  The Loan Documents as modified by this Modification Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed and remain in full force and effect. Lender's rights include, but are not limited to, the right to charge late charges, Return Check Fees or returned payment fees if and to the extent provided under the Agreement. If Borrower's monthly statement contains a "billing rights statement," Borrower agrees and understands that such statement is no longer applicable, and the terms and conditions set out in such billing rights statement do not apply to this Modification Agreement.

e.  Nothing in this Modification Agreement will be understood or construed as a satisfaction or release, in whole or in part, of the obligations in the Loan Documents, or to satisfy or release the Security Instrument, in whole or in part.

5

l.  **If Borrower consents to receiving calls as described in this section, please sign below:** Borrower consents to receiving calls, including calls using an automatic telephone dialing system and/or an artificial or prerecorded voice, and text messages from Lender or any of its affiliates, agents or third party representatives at any and all of Borrower's telephone numbers, including, but not limited to, Borrower's wireless (mobile/cellular) number, or any cell phone number Borrower may provide to Lender, for any purpose related to the Borrower's Account, including servicing purposes and debt collection purposes, with respect to this Modification Agreement and the Loan Documents, the Account related to the Loan Documents and any other account at Lender or any of its affiliates. These calls and messages may incur access fees from Borrower's cellular provider. Lender may monitor telephone calls with Borrower to assure quality service.

_____
Borrower signature

_____
Borrower signature

[SIGNATURE PAGES TO FOLLOW]

7

f.  As of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, Lender shall not exercise this option if applicable law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give Borrower notice that all sums secured by the Security Instrument are due in full. The notice will provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay such amount. If Borrower fails to pay the amount owed prior to the expiration of this period, Lender may exercise any remedies permitted by the Security Instrument.

g.  As of the Modification Effective Date, Borrower understands that Lender will only allow the transfer and assumption of the Loan Documents, including this Modification Agreement, to a transferee of the Property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan Documents including this Modification Agreement. Except as noted in this Section 3(g), this Modification Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

h.  Borrower will cooperate fully with Lender in obtaining any title endorsement(s), title insurance product(s) and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the Security Instrument, as modified, retains the same lien position that is in effect prior to the Modification Effective Date and/or is fully enforceable upon modification.

i.  Borrower will execute and deliver such other documents as may be reasonably necessary to either: (i) put into effect the terms and conditions of this Modification Agreement or (ii) correct the terms and conditions of this Modification Agreement if an error is detected after the Modification Effective Date. Borrower understands that a corrected Modification Agreement or letter agreement containing the correction will be provided to Borrower for Borrower's signature. At Lender's option, this Modification Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrected Modification Agreement or letter agreement, the terms of the original Loan Documents shall continue in full force and effect and such terms will not be modified by this Modification Agreement.

j.  Borrower is solely responsible for the payment of any federal, state and/or local taxes with respect to any principal forgiveness, if provided in Section 1(j). Borrower understands, agrees and acknowledges that Lender has not made any representations to the Borrower concerning the taxability and/or non-taxable status of the any such principal forgiveness.

k.  If any document related to the Loan Documents and/or this Modification Agreement is lost, misplaced, misstated, inaccurately reflects the true terms and conditions of the loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary (all such documents are the "Documents"). Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement.

6

In Witness Whereof, the Borrower(s) have executed this Modification Agreement.

_____ (Seal)
Borrower

_____
Date

_____ (Seal)
Borrower

_____
Date

_____ [Space Below This Line For Acknowledgments] _____

STATE OF _____ ) SS

COUNTY OF _____ )

On _____, before me, _____ personally appeared
_____, personally known to me (or proved to me on the basis of
satisfactory evidence) to the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that his/her/their signature(s)
on the instrument to the person(s) or the entity upon behalf of which the person(s) acted executed the instruments.

I certify under PENALTY OF PERJURY under the law of the State of _____ that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
Printed Name: _____
My Commission Expires: _____

8

In Witness Whereof, the Lender has executed this Modification Agreement.

PNC BANK:


By: _____
[

Its: Authorized Representative


_____ [Space Below This Line For Acknowledgments] _____


STATE OF OHIO                                )        ss:

COUNTY OF CUYAHOGA                           )


On this, the _____ day of _____ , _____ before me, a Notary Public, the undersigned officer, personally appeared _____, who acknowledged himself/herself to be an authorized signer of PNC Bank, N.A. and that he/she, as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing on behalf of said bank as such officer.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


Notary Public: _____
Printed Name: _____
My Commission Expires: _____
County of Residence:_____

9

## AUTOMATED PAYMENT (ACH DEBIT) AUTHORIZATION FOR
## HOME EQUITY - LOANS / LINES OF CREDIT

I authorize and direct the depository bank where I have my checking/savings account as identified below ("Depository Bank") to make payments to PNC Bank for my Home Equity Loan or Home Equity Line of Credit as identified below ("Account") on the Account's payment due date as shown on my monthly billing statement, and to charge by checking/savings account at Depository Bank as designated below:

| | |
|---|---|
| _____<br>Depository Account Number | _____<br>Home Equity Loan/Line of Credit Account Number |
| _____<br>City and State | _____<br>Routing and Transit Number (9-digit number at bottom left of check) |
| Type of Account: | [ ] Checking  or [ ] Savings*<br>*There is a limitation of six (6) pre-authorized transfers per month for savings account. |

### PLEASE ATTACH A VOIDED CHECK OR A DEPOSIT SLIP FOR VERIFICATION OF DEPOSITORY INFORMATION

I understand that if I have a variable rate loan, I will receive prior written notice of any change in my payment amount and when it will go into effect.  PNC Bank may, in its discretion, initiate ACH credit entries/adjustments to the Account indicated above in the case of any debit entry initiated in error.

I acknowledge and agree that this Automated Payment (ACH Debit) Authorization will remain in full force and effect until PNC Bank receives written notification from me of its termination. Such notice must be sent at least twenty (20) days in advance of my next payment date to the address noted below.  I further agree that PNC Bank shall have a reasonable period of time upon which to act on such instruction and turn off the ACH payment.

### PLEASE CONTINUE TO SEND PAYMENTS AS NOTED IN YOUR BILLING STATEMENT UNTIL YOU RECEIVE WRITTEN NOTICE OF ACH PAYMENT SETUP

By signing below, I acknowledge that I understand the terms of this Automated Payment Authorization and that I have received a copy for my records.

_____       _____
Name of Deposit Account Holder       Social Security Number of Deposit Account Holder

_____       _____
Deposit Account Holder's Signature       Date

### *PLEASE SIGN AND RETURN THIS FORM WITH THE ATTACHED LOAN DOCUMENTS TO THE ADDRESS NOTED BELOW*

148662



ACHAUTHLOAN_1

Consumer Loan Services, Locator BR-YB58-01-A, 6750 Miller Rd., Brecksville, OH 44141

Signing Instructions:

Customer:

Sign your name as it appears on Page 1 of Modification Agreement

Notary:

Print the Customer's Name exactly as they signed (which should match the 1st page of the modification agreement)

 **PNC BANK**

PNC Bank
6750 Miller Rd.
Brecksville, OH 44141

9/22/2011

**JEFFREY M FOSTER**

**6201 N KILPATRICK AVE
CHICAGO, IL 60646**

RE: Modification on Account Number **4489619840201544**

Enclosed you will find the Modification Agreement that you requested.

Please review the terms of the Modification Agreement carefully. Upon your acceptance, please sign and date the Modification Agreement where indicated and return the documents in the enclosed envelope provided within 5 business days of receipt to the following address:

> PNC Bank
> 6750 Miller Road
> Homeowners Assistance Department
> LOC BR-YB58-01-3
> Brecksville, Ohio 44141

Should you have any questions, or require any additional assistance, please contact the mitigation analyst at your earliest convenience at 1-866-622-2657 Monday-Thursday from 8:00 am - 9:00 pm EST, Friday from 8:00 am - 5:00 pm and Saturday 8:00 am - 1:00 pm EST.

Thank you for giving us the opportunity in assisting you with your financial needs.

Respectfully,

PNC Bank

Exhibit E

148662

LMCOVLT 11/09