# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JEFF FOSTER, | ) | |
| Plaintiff, | ) | **Case No. 12 C 3130** |
| | ) | |
| v. | ) | **Judge Joan B. Gottschall** |
| | ) | |
| PNC BANK, N.A., | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeff Foster has raised numerous claims against defendant PNC Bank relating to five loans that he obtained from PNC Bank and its predecessors. PNC Bank's motion to dismiss portions of Foster's second amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) is before the court. For the following reasons, the motion is granted in part and denied in part.

## I. BACKGROUND[1]

### A. The Loans

As detailed in his 56-page complaint, which is supported by 185 pages of exhibits, plaintiff Jeff Foster obtained five loans from PNC Bank and its predecessors (for clarity, the court will follow the parties' conventions for referring to the loans and related properties):

1. A $1,890,000 home equity line of credit (the "Equity Line") secured by a mortgage on property located at 6201 North Kilpatrick Avenue in Chicago, Illinois (the "Illinois property");

2. A $778,500 loan (the "Magnolia Loan") secured by a mortgage on property located at 2716 North Magnolia Avenue in Chicago, Illinois (the "Magnolia Property");

---

[1] The following facts are drawn from the plaintiffs' complaint and are accepted as true for the purpose of the defendants' motion to dismiss. *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013).

3.     a  $425,000 loan (the "Racine Loan") secured by a mortgage on property located at 2156 North Racine Avenue in Chicago, Illinois (the "Racine Property");

4.     a $351,950 loan (the "Montana Loan") secured by a mortgage on property located at 1022 West Montana Street in Chicago, Illinois (the "Montana Property"); and

5.     a $1,100,000 loan (the "Florida Loan") secured by a mortgage on property located at 56 Fiesta Way in Fort Lauderdale, Florida (the "Florida Property").

## 1.     The Equity Line on the Illinois Property

With respect to the Illinois Property, Foster obtained an equity line of credit from PNC Bank's predecessor in 2003 in the original principal amount of $1.89 million.  Foster alleges that in 2006, PNC Bank orally agreed to refinance the 2003 equity line of credit but that this agreement was never memorialized.  According to Foster, from 2009 to 2012, he made all required payments but PNC Bank failed to credit the payments in a timely manner and submitted false reports to credit reporting agencies despite his complaints.  After PNC Bank refused to give Foster a "true and correct statement of the amount due on this loan," he stopped making payments.  (Sec. Am. Compl. ¶ 68.)

## 2.     The Magnolia, Racine, and Montana Loans

Foster alleges that he made all of the required payments on the Magnolia, Racine, and Montana Loans but that PNC Bank nevertheless reported him as delinquent.  Since Foster resides in the Illinois and Florida Properties, it appears that he rents out the Magnolia, Racine, and Montana Properties.  However, he specifically alleges only that the Montana Property is a rental.  Foster alleges that PNC Bank failed to respond to his complaints about the inaccurate

reports regarding the status of the Magnolia, Racine, and Montana Loans and made false reports to credit reporting agencies about the mortgage payments on these loans.

### 3.     The Florida Loan

Foster "split[s] his time between the Florida Property and the Illinois Property" but describes himself as a Florida citizen.  (*Id*. ¶¶ 5, 154.)  The Florida Loan contains a second home rider.  Foster alleges that PNC Bank falsely claimed that he failed to obtain appropriate insurance (hazard, flood, and comprehensive wind coverage) on the Florida Property.

Foster repeatedly sent proof that he had hazard coverage, but PNC Bank increased his monthly payment anyway.  In 2011, PNC Bank placed flood insurance on the Florida property, even though Foster provided documentation showing that he had flood insurance.  Despite PNC Bank's representations that it would not charge Foster for the flood insurance that PNC Bank stated that it had canceled, it imposed additional charges and rejected payments that did not include those charges.  PNC Bank created a delinquency by raising the amount owed and refusing to accept payments of the base amount.

Later in 2011, PNC Bank placed comprehensive wind insurance on the Florida Property at approximately ten times the actual cost.   It told Foster that this insurance was required, even though it knew it was not.  In an effort to resolve this dispute, Foster obtained his own comprehensive wind coverage at a significantly lower cost.  PNC Bank nevertheless increased Foster's monthly payment and continued to reject his monthly payments of the original base amount.

During this time, PNC Bank falsely told credit reporting agencies that the Florida Loan was delinquent.[2] Moreover, in January 2012, PNC Bank falsely told Foster's insurance carrier that the Florida Property was vacant in a successful effort to get the carrier to cancel Foster's insurance coverage on that property so Foster would be forced to obtain more expensive force-placed insurance through PNC Bank. Eventually, PNC Bank acknowledged that its reasons for increasing the monthly payments were invalid. In the meantime, it stopped sending Foster monthly mortgage statements and did not resume sending statements until January 2014.

**B.** **The Second Amended Complaint**

Foster's complaint against PNC Bank is based on both diversity and federal question jurisdiction. The following claims are the subject of PNC Bank's motion to dismiss portions of Foster's twelve-count second amended complaint:

(1)     the Fair Credit Billing Act ("FCBA") as to the Florida, Magnolia, Racine, and Montana Loans (Count I);

(2)     the Fair Credit Reporting Act ("FCRA") as to all Loans (Count II);

(3)     breach of the implied duty of good faith and fair dealing as to the Florida Mortgage and Loan (Count V);[3]

---

[2] As PNC Bank notes, despite Foster's exceptionally detailed second amended complaint, he does not allege that he reported any dispute to the credit reporting agencies.

[3] Count IV is entitled "Breach of Contract of Florida Mortgage" and Count V is entitled "Breach of Contract – Florida Mortgage – Breach of the Implied Duty of Good Faith and Fair Dealing." It makes no sense to have two counts alleging a breach of the Florida Mortgage, and the body of Count V appears to focus on the implied duty of good faith and fair dealing relating to the Florida Mortgage. Thus, the court will interpret Count IV as a breach of contract claim based on the Florida Mortgage and Count V as a claim for breach of the implied duty of good faith and fair dealing relating to the Florida Mortgage. Confusingly, while PNC Bank expressly states that it is not moving to dismiss Count IV, Foster's response brief defends Count IV and PNC Bank, in fact, appears to be arguing that Count IV should be dismissed. The court discusses Counts IV and V below.

(4)     the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDPA") as to the Florida, Magnolia, Racine, and Montana Loans (Count VI);

(5)     unjust enrichment and disgorgement (Count VIII);

(6)     the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") as to the Florida Loan (Count IX);

(7)     breach of fiduciary duty (Count X); and

(8)     the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et. seq.*, and 12 C.F.R. § 1026.36 (Count XII).

The second amended complaint does not contain a Count XI.  PNC Bank has not moved to dismiss the remaining counts in the second amended complaint:  (1) FCBA as to the Equity Line (Count I); (2) breach of contract as to the Equity Line (Count III); (3) breach of contract as to the Florida Mortgage (Count IV) (this claim is nevertheless discussed below); and (4) fraud (Count VII).  Foster does not contest the dismissal of Count I as to the Magnolia, Racine, and Montana Loans (Pl.'s Resp., Dkt. 90, at 15 n.2.), leaving the portion of Count I that is directed at the Equity Line on the Illinois Property pending.  He also does not contest the dismissal of Count IX.  (*Id.*)

## II.  LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together.").

For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

## III. DISCUSSION

### A. The Fair Credit Billing Act as to the Florida Loan (Count I)

Foster's response to PNC Bank's motion to dismiss the second amended complaint does not address PNC Bank's contention that Count I should be dismissed as to the Florida Loan. The FCBA obligates creditors who offer open-end credit plans to communicate with consumers to resolve billing errors. 15 U.S.C. § 1602(f). An open-end credit plan is a "plan under which the creditor reasonably contemplates repeated transactions . . . . and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602(j). The allegations in the second amended complaint do not show how a $1,100,000 loan secured by a mortgage on real property in Florida is an open-end credit plan. Count I is dismissed with prejudice as to the Florida Loan. The only portion of Count I that may proceed is directed at the Equity Line.[4]

### B. The Florida, Magnolia, Racine, and Montana Loans – The Fair Credit Reporting Act (Count II) and the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VI)

Foster alleges that PNC Bank violated the FCRA by making numerous false reports about all of his loans to credit reporting agencies and refusing to correct those reports. He raises this

---

[4] The court previously denied PNC Bank's motion to dismiss Count I as to the Equity Line. (Dkt. 18 at 4-5.)

same argument under the ICFDPA with respect to the Magnolia, Racine, and Montana Loans. PNC Bank contends that Foster cannot state a claim under the ICFDPA based on the Florida Loan and that Foster's FCRA and ICFDPA claims are time-barred as to the Magnolia, Racine, and Montana Loans. PNC Bank also asks the court to revisit its decision denying its motion to dismiss a version of Foster's FCRA claim raised in a prior complaint based on Foster's failure to allege that PNC Bank received notice of a dispute from a credit reporting agency.

**1.      The Florida Loan – The ICFDPA**

With respect to the Florida Loan, Foster asserts that PNC Bank failed to credit his account with payments that he made, falsely advised him that he needed comprehensive wind coverage, and required him to make unnecessary escrow deposits. PNC Bank seeks to dismiss Foster's ICFDPA claim based on the Florida Loan, arguing that the ICFDPA "does not apply to fraudulent transactions which take place outside Illinois." *De David v. Alaron Trading Corp.*, No. 10 CV 3502, 2015 WL 2208407, at *5 (N.D. Ill. May 7, 2015); *see also Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 850 (Ill. 2005).

In response, Foster argues that the events underlying his ICFDPA claim based on the Florida Loan occurred primarily in Illinois so Illinois law is applicable. The Florida Mortgage, however, contains a choice of law provision that provides that disputes will be governed by "federal law and the law of the jurisdiction in which the Property is located" and further provides that "Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract." (Sec. Am. Compl. Ex. Y, Dkt. 75, at § 16.) A choice-of-law provision can apply to a claim sounding in tort, such s a claim of fraud, when the "claim depends on the contract in which

the choice-of-law clause is found." *Gandhi v. Sitara Capital Mgmt., LLC*, 689 F. Supp. 2d 1004, 1014 (N.D. Ill. 2010) (citing *Birnberg v. Milk Street Residential Assoc. Ltd.*, Nos. 02 C 0978, 02 C 3436, 2003 WL 151929, at *14 (N.D. Ill. Jan. 21, 2003)).  A tort claim depends on a contract when, among other things, it is "closely related to the parties' contractual relationship" and "could not exist without the contractual agreement which contains the choice-of-law provision." *Id.*

Here, as noted above, Foster asserts that PNC Bank did not properly credit his account, made intentionally false representations about the scope of the hazard insurance language in the mortgage, and forced him to make excessive escrow deposits.  None of these claims would be possible without the mortgage.  Thus, the court finds that Foster's ICFDPA claim does not depend on "representations outside the contract."  *See id.*  This means that Foster may not seek relief based on an Illinois statute.  This portion of Count VI is dismissed.

### 2.     The Magnolia, Racine, and Montana Loans – Statute of Limitations

FCRA claims must be brought "not later than the earlier of – (1) two years after the date of discovery by the plaintiff of the violation that is the basis for such  liability; or (2) five years after the date on which the violation that is the basis for such liability occurs."  15 U.S.C. § 1681p.   The ICFDPA has a three-year statute of limitations.  815 Ill. Comp. Stat. § 505/10a(e) ("Any action for damages under this Section shall be forever barred unless commenced within 3 years after the cause of action accrued.").  PNC Bank contends that Foster's FCRA and ICFDPA claims as to the Magnolia, Racine, and Montana Loans are untimely because Foster alleges that he knew about the allegedly inaccurate information by January 2012 at the latest, but first raised FCRA and ICFDPA claims about these loans in his May 2015 second amended complaint.

Under Federal Rule of Civil Procedure 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading" when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). In determining if an amendment relates back, "[t]he key remains adequate notice to the defendant of its potential liability" so the court must determine if the original complaint "clearly placed" a defendant on notice. *In re Safeco Ins. Co. of Am.*, 585 F.3d 326, 334 (7th Cir. 2009). The court must also consider whether "the new claim stems from the same 'conduct, transaction, or occurrence' as was alleged in the original complaint; for relation back to apply, there is no additional requirement that the claim be based on an identical theory of recovery." *Gritters v. Ocwen Loan Servicing, LLC*, No. 14 C 916, 2015 WL 6784352, at *3 (N.D. Ill. Nov. 6, 2015) (quoting *Bularz v. Prudential Ins. Co. of Am.*, 93 F.3d 372, 379 (7th Cir. 1996)).

Foster contends that the following allegations in his much shorter original complaint (a modest 16 pages with 83 pages of exhibits, compared to the 56-page second amended complaint with 185 pages of exhibits) adequately placed PNC Bank on notice of his subsequent FCRA and ICFDPA claims about the Magnolia, Racine, and Montana Loans:

- "Plaintiff has attempted to apply for credit to other lending institutions, but has been denied credit due to the false information furnished by Defendant to Equifax and the other credit reporting agencies. (Doc 1, ¶ 27)"

- "Defendant has repeatedly made false reports to various credit reporting agencies that Plaintiff was delinquent in his payments to Defendant, when Defendant knew that said statements were false." (*Id.* ¶ 68)"

- "Although Plaintiff has repeatedly demanded that Defendant cease making false reports to credit agencies regarding the status of his accounts and his payments thereon, Defendant has refused to correct those reports and has repeated that information which it knows to be false. (*Id.* ¶ 69)"

- "Defendant's conduct in making such false reports to various credit agencies is a violation of the Fair Credit Reporting Act, as a result of which Defendant is liable to Plaintiff.  (*Id*. ¶ 70)"

(Pl.'s Resp. at 6.)

According to Foster, these allegations illustrate his general position that PNC Bank regularly reported inaccurate information about him to credit reporting agencies.  Thus, Foster concludes that PNC Bank should have known that he would contend that it violated the FCRA and the ICFDPA by reporting inaccurate information about the Magnolia, Racine, and Montana Loans.  In support, he asserts that the following allegations in the second amended complaint are based on the "same basic allegations and common conduct" from the original complaint that are summarized above so the new allegations "relate directly back to the original Complaint":

- "Foster stayed current on his loan payments reports  (Complaint, ¶ 70 (Magnolia), ¶ 83 (Racine), and ¶ 91 (Montana))";

- "Defendant made false reports" (*Id*., ¶¶ 71, 84, and 92)";

- "Foster gave Defendant notice and demanded Defendant fix the issue  (*Id*., ¶¶ 72, 87, and 94)";

- "Defendant admitted wrongdoing, promised to correct, and continued reporting false information.  (*Id*., ¶¶ 73, 88, and 95)"; and

- "The false reports made by Bank ruined Foster's credit and made it impossible for Foster to obtain the financing needed to run his business.  As a result of this, Foster was forced to seek hardship assistance from Defendant to modify the terms of the Equity Line, Magnolia Loan, Racine Loan, Montana Loan, and Florida Line, so Foster could continue to meet his obligations on those loans.  (*Id*. ¶¶ 111-112)."

(Pl.'s Resp. at 6-7.)

Foster's attempt to tie the allegations in the second amended complaint to the allegations in his original complaint suffers from a fatal flaw:  the factual allegations in the original

complaint all revolve around alleged delicts by PNC Bank relating to the Equity Line for the Illinois Property and the Florida Loan. *See* Compl., Dkt. 1, ¶¶ 5-27 (Equity Line); ¶¶ 28-64 (Florida Loan). Foster has not pointed to any authority supporting his contention that a claim that PNC Bank purportedly sent inaccurate reports about the Equity Line and the Florida Loan to credit reporting agencies should have put PNC Bank on notice that Foster would later claim that PNC Bank also sent inaccurate reports about three other unrelated loans secured by mortgages on three unrelated properties. *See Hamilton v. O'Connor Chevrolet, Inc.*, No. 02 C 1897, 2003 WL 22953337, at *3 (N.D. Ill. Dec. 12, 2003) (claims did not relate back to the original complaint when they arose out of the same general occurrence (the defendants' sale of a car to the plaintiffs) but were based on different facts (the plaintiffs' signing of a second contract that was not mentioned in the original complaint)).

Thus, the fact that Foster sued PNC Bank for FCRA and ICFDPA violations based on PNC Bank's reports about the Equity Line and the Florida Loan does not allow him to pursue otherwise untimely claims that PNC Bank did the same thing vis-a-vis three other loans. The motion to dismiss the portion of Foster's FCRA and ICFDPA claims based on the Magnolia, Racine, and Montana Loans (parts of Count II and VI) is granted.

### 3.    FCRA (Count II) – Notices of Disputes

The court previously denied PNC Bank's motion to dismiss a version of Foster's FCRA claim in a prior complaint based on the absence of an allegation that PNC Bank received notice of a dispute from a credit reporting agency. With respect to the remaining portions of Count II, PNC Bank asks the court to reconsider its decision to allow the FCRA to proceed in the absence of any allegations about notice. According to PNC Bank, the law regarding the need to allege

notice has changed and is now trending in favor of requiring an allegation that the defendant received notice.

Foster disputes that allegations about notice are necessary but states that if they are, he can amend his complaint to add them. In light of this position, the court will not delve into the level of specificity required for allegations about notice. Foster may amend Count II to address the issue raised in this portion of PNC Bank's motion to dismiss. He may *not* amend any other portion of Count II.

**C.    The Florida Loan — Breach of Contract (Count IV) and Breach of the Implied Duty of Good Faith and Fair Dealing as to the Florida Loan (Count V)**

With respect to the duty to maintain insurance, the mortgage associated with the Florida Loan provides, in pertinent part, that:

> Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably . . . . If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense . . . .

(Sec. Am. Compl. Ex. Y, Dkt. 75, at § 5.) The mortgage further provides that "[i]f Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property Lender's rights under this Security Instrument." (*Id*. at § 9.)

In its memorandum supporting its motion to dismiss, PNC Bank argues that Foster cannot proceed with a stand-alone claim for the breach of the duty of good faith and fair dealing in connection with the Florida Mortgage (Count V) because his underlying breach of contract claim based on the Florida Mortgage (Count IV) fails to state a claim. (Def. Memo., Dkt. 84, at 2, 20-21.) PNC Bank, however, also specifically states that it "is not moving to dismiss . . . Count IV – Breach of Contract of Florida Mortgage." (*Id*. at 2 n.1.) But later in its memorandum, PNC Bank argues that Count V's breach of contract claim (which appears to, in fact, be raised in Count IV) fails to state a claim because the mortgage authorized it to procure insurance that it deemed necessary. Thus, PNC Bank concludes that the breach of contract claim, as well as the dependent claim for breach of the duty of good faith and fair dealing, both fail. (Defs.' Reply, Dkt. 91, at 11-12.)

This presentation is extremely confusing. The court will attempt to address PNC Bank's arguments as presented. The parties agree that Florida law governs Foster's breach of contract claim based on the Florida Mortgage. In Florida, "t[]he elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006). PNC Bank asserts that it cannot be liable for breach of contract because it did exactly what the contract allows: obtain additional insurance that it believed was necessary and that Foster had failed to procure.

In response, Foster contends that the mortgage did not require him to have windstorm coverage and that, in any event, PNC Bank obtained egregiously overpriced windstorm coverage at his expense. He also asserts that PNC Bank breached the Florida Mortgage by failing to give

him unspecified documents, refusing to accept his timely loan payments or to acknowledge his proof of hazard insurance, making unilateral changes to the Florida Loan Documents without notice, increasing his loan payments without notice and without cause, refusing to credit his account for improperly charged amounts, falsely claiming that the Florida Property was vacant to cause his insurer to cancel his insurance, and charging improper escrow amounts to enrich PNC Bank at Foster's expense. Foster does not tie most of these claims to specific portions of the Florida Mortgage and Loan Documents.

Focusing on the windstorm insurance allegations, which are based on § 5 of the Florida Mortgage, a contract that "allows a lender to purchase necessary insurance in the event that a borrower fails to carry such insurance and . . . pass the cost of that insurance on to the borrower . . . . does not obligate a lender to shop around and find the lowest-cost insurance, nor does it preclude a lender from charging a reasonable commission." *Edwards v. Green Tree Servicing, LLC*, No. 5:15CV148-MW/GRJ, 2015 WL 6777463, at *4 (N.D. Fla. Oct. 22, 2015). Nevertheless, at the motion to dismiss stage, the court must accept Foster's claim that the mortgage did not require windstorm coverage as PNC Bank has not pointed to language specifically requiring wind coverage.

It is true that Foster was required to maintain insurance against loss by fire, hazards included within the term "extended coverage" and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance." (Sec. Am. Compl. Ex. Y, Dkt. 75, at § 5.) However, it is not clear that, as a matter of law, this clause mandates windstorm coverage because the court cannot determine that windstorm coverage is "any other hazard[] . . . for which [PNC Bank] require[d] insurance." One can presume that PNC Bank *wanted* Foster to

have windstorm coverage, but was he *required* to do so?  This issue must be resolved based on a fully-developed record.  Similarly, at the motion to dismiss stage, the court cannot determine whether PNC Bank's commission charges associated with the windstorm coverage (presumably, the allegedly excessive escrow charges charged to Foster) were, in fact, reasonable.

Accordingly, regardless of which count contains a breach of contract claim based on the Florida mortgage (Count IV or Count V), that claim survives the motion to dismiss and the court will not consider the litany of other reasons why Foster claims that PNC Bank breached the Florida Mortgage.  Moreover, as the parties appear to agree that the claim for breach of the duty of good faith and fair dealing survives if the underlying breach of contract claim is actionable, the motion to dismiss Count V is denied.

## D.      Unjust Enrichment and Disgorgement (Count VIII)

In Count VIII, Foster alleges that PNC Bank "wrongfully collected significant amounts of money" by charging him excessive rates for unnecessary force-placed insurance.  (Sec. Am. Compl., Dkt. 75,  ¶¶ 256-264.)  He contends that PNC Bank should be required to disgorge these "ill-gotten gains."  (*Id.* ¶ 259.)  PNC Bank argues that Count VIII should be dismissed because the Florida Mortgage authorized it to secure comprehensive wind insurance after Foster did not do so.  PNC Bank further argues that under Florida law, no cause for unjust enrichment exists when the parties' relationship is governed by an express contract.

To state a claim for unjust enrichment under Florida law, a plaintiff must allege that: (1) he conferred a benefit on a defendant who knew about the benefit; (2) the defendant accepted and retained the benefit; and (3) under the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it.  *State Farm Mut. Auto. Ins. Co. & State*

-15-

*Farm Fire & Cas. Co. v. B&A Diagnostic, Inc.*, — F. Supp. 3d —, No. 14-CV-24387-KMM,

2015 WL 7272738, at *7 (S.D. Fla. Nov. 16, 2015). "In Florida, an unjust enrichment claim is

precluded by the existence of an express contract between the parties concerning the same

subject matter." *Edwards v. Green Tree Servicing, LLC*, No. 5:15CV148-MW/GRJ, 2015 WL

6777463, at *7 (N.D. Fla. Oct. 22, 2015) (internal quotations omitted). "Although pleading in

the alternative is generally permitted, an unjust enrichment claim can only be pleaded in the

alternative if one or more parties contest the existence of an express contract governing the

subject of the dispute." *Id.*

     As noted above, the parties dispute whether the Florida Mortgage's language about force-

placed insurance required wind insurance. Foster argues that the Florida Mortgage does not

expressly mention wind insurance so it did not authorize PNC Bank's placement of wind

insurance. Thus, he contends that there is no contract and he may plead in the alternative.

     Numerous cases hold that a plaintiff may not allege an alternative quasi-contract unjust

enrichment claim when a valid contract governs the parties' dispute. *See, e.g., Edwards*, 2015

WL 6777463, at *7; *Bowe v. Pub. Storage*, No. 1:14-CV-21559-UU, 2015 WL 3440418, at *18

(S.D. Fla. May 19, 2015); *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1220 (S.D.Fla. Jan. 6,

2015); *Pierce v. State Farm Mut. Auto. Ins. Co.*, No. 14-22691-CIV, 2014 WL 7671718, at *5

(S.D. Fla. Dec. 17, 2014); *Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm

Mut. Auto. Ins. Co.*, 789 F. Supp. 2d 1311, 1317 (S.D. Fla. 2011). Foster himself cites to

authority recognizing the rule that a plaintiff may plead breach of contract and unjust enrichment

in the alternative only when he asserts that the parties' contract is invalid. *See Williams v. Wells

Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at *11 (S.D. Fla. Sept. 19, 2011)

(allowing a plaintiff to plead breach of contract and unjust enrichment in the alternative when it contended that it was not a party to the applicable contract so "no contract govern[ed] its relationship with Plaintiffs").

Nevertheless, a Florida district court has held that despite the existence of a mortgage agreement, Rule 8 allowed the plaintiff to plead an alternative theory of unjust enrichment based on the lender's procurement of a force-placed casualty policy. *See Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1279 (S.D. Fla. 2009). In support, the court reasoned that if a defendant does not concede that a plaintiff is entitled to recovery under a contract, it is possible that the breach of contract claim could fail and that the plaintiff might be able to recover based on an unjust enrichment theory. *Id*.

PNC Bank asserts that the Florida Mortgage – a contract – authorized it to force-place wind insurance. If the contract authorized PNC Bank to obtain wind coverage, PNC Bank did not breach that contract by obtaining wind coverage and his unjust enrichment claim would necessarily fail. If the Florida Mortgage did not allow PNC Bank to procure wind insurance, however, then Foster might be able to use an unjust enrichment theory to recoup the money he paid to PNC Bank for what would, in that scenario, be wind insurance that the contract did not authorize PNC Bank to charge to Foster. Thus, the motion to dismiss Foster's unjust enrichment claim is denied.

**E.      Breach of Fiduciary Duty (Count X)**

In Count X, Foster contends that PNC Bank owed him a fiduciary duty with respect to the escrow account that PNC Bank used to pay, among other things, insurance premiums for the force-placed comprehensive wind insurance on the Florida property. Foster asserts PNC Bank's

use of the escrow account breached a fiduciary duty because the parties had a special relationship of trust due to PNC Bank's control over the account and the benefits PNC Bank received from that control. PNC Bank contends that Foster has failed to state a claim for breach of fiduciary duty and that this count is actually a duplicative claim for breach of contract.

The parties' briefs addressing Count X rely on Florida law. Under Florida law, "[t]he elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Berlinger v. Wells Fargo, N.A.*, No. 2:11-CV-459-FTM-29CM, 2015 WL 6125529, at *5 (M.D. Fla. Oct. 16, 2015) (quoting *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)). Generally, "an arms-length lender-borrower relationship" does not create a fiduciary duty. *Wilson*, 77 F. Supp. 3d at 1223 (collecting cases). Nevertheless, "special circumstances may give rise to a fiduciary duty, 'includ[ing] where the lender (1) takes on extra services for a customer, (2) receives any greater economic benefit than from a typical transaction, or (3) exercises extensive control.'" *Id*. at 1223-24 (quoting *Mahdavieh v. Suntrust Mortgage, Inc.*, 2014 WL 1365425, at *5 (S.D. Fla. Apr. 7, 2014).

Foster alleges that PNC Bank forced him to pay a grossly inflated price for comprehensive wind insurance and thereby reaped "extravagant" profits. (Sec. Am. Compl., Dkt. 75, ¶ 283.) Setting aside the hyperbole, Foster contends that PNC Bank intentionally acted so it could receive greater than normal profits from the force-placed comprehensive wind insurance. Further discovery may belie Foster's allegations but for now, Count X states a claim for breach of fiduciary duty. Accordingly, the motion to dismiss Count X is denied and the court will not address the parties' other arguments about this count.

**F.    The Real Estate Settlement Procedures Act and Its Accompanying Regulations (Count XII)**

In Count XII, Foster alleges that as of April  16, 2015, PNC Bank held more than $75,000 of his money in an unapplied funds account.  He further alleges that once funds equivalent to a periodic payment on the Florida Loan accumulated in the unapplied funds account, PNC Bank was required to apply those funds to the outstanding amounts due on the Florida Loan the same way it would apply funds received due to a regular periodic payment. According to Foster, PNC Bank violated RESPA because: (1) it had at least one periodic payment's worth of money in the unapplied funds account but refused to apply it to the loan, in violation of 12 U.S.C. § 2605(k)(1)(E) and 12 C.F.R. § 1026.36(c) and (2) it force-placed comprehensive wind insurance on the Florida Property when it had no reasonable basis to believe that Foster had failed to comply with the Florida Mortgage's insurance requirements, in violation of 12 U.S.C. § 2605(k)(l)(A).

12 U.S.C. § 2605 and 12 C.F.R. § 1026.36(c) (a Consumer Financial Protection Bureau ("CFPB") regulation) address loan servicing practices.  They "apply to closed-end consumer credit transactions secured by a consumer's principal dwelling."  12 C.F.R. §§ 1026.36(b), (c). PNC Bank stresses that the Florida Property is not Foster's principal dwelling because it contains a signed second home rider that provides that:

> Borrower shall occupy, and shall only use, the Property as Borrower's second home.  Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person control over the occupancy or use of the Property.

(Sec. Am. Compl., Dkt. 75, at Ex. Y).  PNC Bank also correctly notes that Foster has specifically

alleged that he "splits his time between the Florida Property and the Illinois Property," that the

mortgage for the Florida Property contains a second home rider, and that he is not "physically

present at the Florida Property 365 days a year."  (*Id*. ¶¶ 153-54.)  In response, Foster states

without elaboration or authority that whether the Florida or Illinois Property is his principal

residence for purposes of RESPA is a fact question that cannot be decided at the motion to

dismiss stage.

"[A] party may plead itself out of court . . . when it would be necessary to contradict the

complaint in order to prevail on the merits."  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th

Cir. 2008).  The second amended complaint does not contain any factual allegations that

contradict the plain language of the Second Home Rider, in which Foster agreed to use the

Florida Property as a second home.  The only allegation that comes close is Foster's claim that

he is a Florida citizen.  Foster's contention about his citizenship for the purposes of pleading

diversity jurisdiction, however, provides no factual detail about how the Florida Property could

be Foster's principal residence despite the Second Home Rider, in which Foster agreed that he

would use this property as a vacation home.

Foster might have used the Florida Property as a second home after signing the mortgage

for that property and then breached the Second Home Rider by subsequently using the property

as his principal residence at the relevant time (whatever that may be).  Nevertheless, a plaintiff

must provide "enough fact[s] to raise a reasonable expectation that discovery will reveal

evidence" that supports the allegations.  *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665

F.3d 930, 934 (7th Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).  Foster has not met this

undemanding standard as his argument that he is entitled to proceed with discovery to develop his theory that the Florida Property was his principal residence ignores the Second Home Rider. *See generally Girgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 843 (N.D. Ohio 2010) (dismissing Truth in Lending Act claim where two mortgages with second home riders were at issue because both homes could not simultaneously be the plaintiffs' principal residence and finding that the plaintiff failed to show that his mortgage was secured by a primary residence). Foster's reliance on facts adduced in discovery also lacks the specificity required to "raise [his] right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. Thus, the second amended complaint does not adequately plead a prerequisite to relief under RESPA: that the Florida Property was Foster's principal residence.

In any event, even setting aside this problem, Foster's complaint is still deficient. Foster asserts that PNC Bank violated RESPA by failing to use money belonging to him and held by PNC Bank to satisfy his obligation to make monthly periodic installment payments. In response, PNC Bank observes that it accelerated the loan (Foster says it did so wrongfully but agrees that the loan was accelerated) and argues that it was required only to apply money it held to the loan if it had sufficient funds to satisfy the entire indebtedness (*i.e.*, all principal and interest).

A "periodic payment . . . is an amount sufficient to cover principal, interest, and escrow (if applicable) for a given billing cycle. A payment qualifies as a periodic payment even if it does not include amounts required to cover late fees, other fees, or non-escrow payments a servicer has advanced on a consumer's behalf." 12 C.F.R. § 1026.36(c)(1)(i). As with the principal residence issue, Foster asserts that the amount of a "periodic payment" owed on the Florida Loan is a question of fact. But if Foster agrees that PNC accelerated the Florida Loan

(albeit in an allegedly wrongful way), how could he owe anything less than the remaining principal and interest, which exceeds the amount that PNC Bank held in escrow?  Characterizing the acceleration as wrongful does not erase the fact that acceleration occurred.  At that point, "periodic payments" are not the regular monthly amount.  In sum, Foster's allegation that the Florida Property was his principal residence and that PNC Bank improperly failed to apply periodic payments fail to state a claim.  Count XII is dismissed.

## IV.  CONCLUSION

For the above reasons, PNC Bank's motion to dismiss portions of Foster's second amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) [83] is granted in part and denied in part. Specifically, Foster does not contest the dismissal of Count I (FCBA) as to the Magnolia, Racine, and Montana Loans or Count IX (the Florida Deceptive and Unfair Trade Practices Act) as to the Florida Loan so these claims are dismissed.  With respect to the remaining claims that are the subject of the motion to dismiss, Foster's FCRA and ICFDPA claims based on the Magnolia, Racine, and Montana Loans (part of Counts II and VI, respectively) are dismissed as untimely, and Foster's ICFDPA claim based on the Florida Mortgage (the remainder of Count VI) is dismissed.  Foster may amend Count II to address PNC Bank's argument about its receipt of notices of disputes.  He may *not* amend any other portion of Count II.  Foster's RESPA claim (Count XII) is dismissed, and as the court previously ruled on a motion to dismiss a prior version of the complaint, he may not replead.

PNC Bank's request to dismiss Foster's claim for breach of the implied duty of good faith and fair dealing as to the Florida Mortgage and Loan (Count V), his request for relief based on a theory of unjust enrichment (Count VIII), and his claim for breach of fiduciary duty (Count

X) are denied.  Foster may proceed with these claims, as well as the following claims that were not the subject of the motion to dismiss:  (1) FCBA as to the Equity Line on the Illinois Property (Count I); (2) breach of contract as to the Equity Line on the Illinois Property (Count III); (3) breach of contract as to the Florida Mortgage (Count IV); and (4) fraud (Count VII).  The court notes that the second amended complaint does not contain a Count XI.  Foster's third amended complaint that adds notice allegations to Count II shall be filed by December 28, 2015.  PNC Bank shall answer or otherwise plead as to Count II and answer the counts that survive the motion to dismiss by January 19, 2015.

Date:   December 14, 2015                    _____/s/_____
                                             Joan B. Gottschall
/cc                                          United States District Judge