**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

Jeff Foster

Plaintiff,

vs.                                                    No. 12 CV 3130

PNC Bank, National Association;                        Honorable Joan B. Gottschall

Defendants.

**PNC BANK, NATIONAL ASSOCIATION'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................iii

STANDARD OF REVIEW ...................................................................................................1

I.     PNC IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF
FOSTER'S CLAIMS ON THE FLORIDA LOAN ................................................1

      A.     Foster Executed A Release That Bars any Claims For Conduct
Relating to the Florida Loan that Occurred Before May 20, 2010 ................1

      B.     Foster's Claims for Breach of Contract and Breach of the Implied
Covenant of Good Faith and Fair Dealing Regarding Lender Placed
Insurance Fail As a Matter of Law ....................................................................3

      C.     PNC Serviced the Florida Loan in Accordance with the Florida
Note, Mortgage, and Modification ....................................................................7

      D.     PNC Did Not Violate The Fair Credit Reporting Act ...................................14

      E.     PNC Did Not Make Any False Statement Regarding A Specific
Material Fact Nor Did Foster Rely In Any Way On Any Statement
By PNC ...................................................................................................................16

      F.     PNC Received No Benefit in Connection with Obtaining Lender
Placed Insurance and Foster's Claim for Unjust Enrichment and
Disgorgement Fails as a Matter of Law ..........................................................17

      G.     PNC and Foster's Relationship is that of an Ordinary Borrower and
Lender ....................................................................................................................18

II.    FOSTER'S CLAIMS REGARDING THE ILLINOIS PROPERTY AND
LOAN FAIL ................................................................................................................19

      A.     Foster Cannot Escape His Obligations Under The Illinois Loan and
Mortgage By Claiming, Years After Accepting Its Benefits, That He
Did Not Sign It .....................................................................................................19

      B.     PNC Complied with the Illinois Loan Documents and Foster's Claim
for Breach of Contract Fails ...............................................................................21

      C.     Foster Did Not Comply With the Requirements of The Fair Credit
Billing Act and his Claim Fails as a Matter of Law .......................................22

      D.     Foster's Claim Under The Fair Credit Reporting Act For The Illinois
Loan Fails ..............................................................................................................25

i

III.   FOSTER'S CLAIMS ON THE FLORIDA AND ILLINOIS LOAN FAIL
       BECAUSE HE HAS NO EVIDENCE HE SUFFERED ANY DAMAGES
       AS A RESULT OF ANY CONDUCT OF PNC ...........................................................25

IV.    PNC IS ENTITLED TO SUMMARY JUDGMENT ON ITS
       COUNTERCLAIMS ...............................................................................................26

       A.    Foster Is In Default On The Florida Loan and PNC is Entitled To
             Summary Judgment on its Counterclaim for Foreclosure ...........................26

       B.    Foster Is In Default On The Illinois Loan and PNC is Entitled To
             Foreclose ..........................................................**Error! Bookmark not defined.**

V.     CONCLUSION ......................................................................................................29

TABLE OF AUTHORITIES

Page

**Cases**

*BAC Funding Consortium Inc. ISAOA/ATIMA v. Jean-Jacques*, 28 So. 3d 936 (Fla. 2d DCA 2010)............................................................................................................................28

*Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 682 N.E.2d 118, 224 Ill Dec. 557 (1997) ............22

*Brown v. Trans Union LLC*, No. 03 C 5774, 2005 U.S. Dist. LEXIS 44524 (N.D. Ill. Feb. 23, 2005)............................................................................................................................16

*Butler v. Encyclopedia Britannica, Inc.*, 41 F.3d 285 (7th Cir. 1994)............................20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................1

*Centurion Air Cargo v. United Parcel Service Co.*, 420 F.3d 1146 (11th Cir. 2005) ........................6

*Crabill v. Trans Union, L.L.C.*, 259 F.3d 662 (7th Cir. 2001) ....................................16

*Curtis v. Cenlar FSB*, 2014 U.S. Dist. LEXIS 157172 (N.Y.S.D. Nov. 5, 2014) ........................4

*Fiorito v. JP Morgan Chase Bank, Nat'l Ass'n*, 174 So. 3d 519 (Fla. 4th DCA 2015) ................28

*Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237 (Fla. 2004) ........................18

*Fowler v. Bank of Am.*, No. 10 C 3944, 2011 U.S. Dist. LEXIS 9080 (N.D. Ill. Jan. 28, 2011)..............25

*Gordon v. Chase Home Fin. LLC*, No. 8:11-cv-2001, 2013 U.S. Dist. LEXIS 15461 (M.D. Fla. Feb. 5, 2013)................................................................................................19

*Gracey v. Eaker*, 837 So. 2d 348 (Fla. 2002)............................................................19

*Gulley v. Pierce & Assocs., P.C.*, 436 F. App'x 662 (7th Cir. 2011) ............................15

*Heritage Pullman Bank v. Am. Nat'l Bank and Trust*, 164 Ill. App. 3d 680, 518 N.E.2d 231 (1st Dist. 1988) ..................................................................................................29, 30

*Hill v. Chase Bank USA, N.A.*, No. 2:07-CV-82 RM, 2010 U.S. Dist. LEXIS 1262 (N.D. Ind. Jan. 6, 2010) ..........................................................................................24, 25

*Hold v. Manzini*, 736 So.2d 138 (Fla. Dist. Ct. App. 1999) ......................................2

*Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432 (Fla. 1980)............................................2

*Ihebereme v. Capital One, N.A.*, 933 F. Supp. 2d 86, 110 (N.D. Ill. 2013) ................15

*Int'l Expositions, Inc. v. City of Miami Beach*, 274 So. 2d 29 (Fla. 3d Dist. Ct. App. 1973) ........................3

*Kiefert v. Nationstar Mortg., LLC*, 153 So. 3d 351 (Fla. 1st DCA 2014).......................................27

*Knowles v. C.I.T. Corp.*, 346 So. 2d 1042 (Fla. Dist. Ct. App. 1977) ...........................................8

*Konsulian v. Busey Bank, N.A.*, 61 So. 3d 1283 (Fla. 2d Dist. Ct. App. 2010) ............................3

*Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So.2d 13 (Fla. Dist. Ct. App. 2002) .................17

*Maxwell v. First United Bank*, 782 So. 2d 931 (Fla. Dist. Ct. App. 2001).....................................19

*McCulloch v. PNC Bank, Inc.* 298 F.3d 1217 (11th Cir. 2002) ......................................................19

*Neiman v. Chase Bank, USA N.A.*, No. 13 C 8944, 2014 U.S. Dist. LEXIS 101553 (N.D. Ill. July 25, 2014).................................................................................................................................25

*Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057 (9th Cir. 2002)....................................15

*Northern Trust Co. v. Oxford Speaker Co.*, 109 Ill. App. 3d 433, 440 N.E.2d 968, 65 Ill. Dec. 113 (1982)...........................................................................................................................21

*Okeechobee Resorts, LLC v. E Z Cash Pawn, Inc.*, 145 So. 3d 989 (Fla. 4th Dist. Ct. App. 2014)..............3

*Osuna v. Equifax Credit Info. Servs.*, No. : 02-CV-6465, 2004 U.S. Dist. LEXIS 17124 (N.D. Ill. Jan. 28, 2004)...........................................................................................................16

*Patel v. Specialized Loan Servicing, LLC*, 04 F.3d 1314 (11th Cir. 2018) ................................. 6, 7

*Plumpton v. Cont'l Acreage Dev.Co.*, 830 So. 2d 208 (Fla. Dist. Ct. App. 2002) ...........................2

*Rogers v. First Nat'l Bank of St. George*, 297 F. Supp. 641 (D.S.C. 1969) *aff'd and remanded on other grounds*, 410 F.2d 579 (4th Cir. 1969)...............................................................................28

*Rollins, Inc. v. Butland*, 951 So. 2d 860 (Fla. Dist. Ct. App. 2006)...............................................8

*Rosa v. Deutsche Bank Nat'l Tr. Co.*, 191 So. 3d 987 (Fla. 2d Dist. Ct. App. 2016).....................27

*Sanders v. Mt. Am. Fed. Credit Union*, 689 F.3d 1138 (10th Cir. 2012) ......................................15

*Seagall v. Wachovia Bank*, 192 So. 3d 1241 (Fla. 4th Dist. Ct. App. 2016)..................................28

*Shockley v. Ryder Truck Rental, Inc.*, 74 Ill. App. 3d 89, 392 N.E.2d 675, 30 Ill. Dec. 20 (1978) ............21

*Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732 (Fla. 2002).............................................4

*Wachovia Mortgage, F.S.B. v. Goodwill*, 199 So. 3d 346 (Fla. 4th Dist. Ct. App. 2016) ..............28

*Wells Fargo Bank, N.A. v. Tom Roberts Const. Co. Inc.*, 629 F. App'x 877 (11th Cir. 2015) ......................28

*Westra v. Credit Control of Pinellas*, 409 F.3d 825 (7th Cir. 2005) ........................................ 15, 16

*Whiting v. Harley-Davidson Fin. Servs.*, 534 F. Supp. 2d 823 (N.D. Ill. 2008) ............................................16

*Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202 (S.D. Fla. 2015) ............................................................18

*Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218 (S.D. Fla. 2010) .....................................................18

**Statutes**

12 U.S.C. § 215a(e)...............................................................................................................................28

15 U.S.C. § 1640(e) ..............................................................................................................................25

15 U.S.C. § 1666 ............................................................................................................................24, 25

15 U.S.C. § 1666(a) .......................................................................................................................24, 25

15 U.S.C. § 1666(a)(3)(A).....................................................................................................................24

15 U.S.C. § 1666(a)(3)(B).....................................................................................................................24

15 U.S.C. § 1666(a)-(b).........................................................................................................................24

15 U.S.C. § 1681i(a)(1)..........................................................................................................................15

15 U.S.C. § 1681i(a)(1)-(2) ...................................................................................................................15

15 U.S.C. § 1681s-2(b)(1)......................................................................................................................15

Fair Credit Billing Act .................................................................................................................24, 25, 26

Fair Credit Reporting Act ...............................................................................................................15, 26

Fla. Stat. § 627.712 ..............................................................................................................................4

Fla. Stat. § 673.3011(1).......................................................................................................................27

**Rules**

12 C.F.R. § 226.13(b)(1)...................................................................................................................24, 25

16 C.F.R. § 660.2(c) .............................................................................................................................15

Fed. R. Civ. P. 302................................................................................................................................20

## INTRODUCTORY STATEMENT

Jeff Foster ("Foster"), a self-described real estate professional attempts to blame PNC Bank, National Association ("PNC") for his personal financial problems and his failure to repay his loans on two million dollar plus residences in Chicago and Fort Lauderdale. Foster alleges a litany of claims related to these two properties, but none of the claims have any merit in law or in fact. Foster also has no evidence that he has suffered any damages as a result of any conduct of PNC. Further, because Foster is in default on both the Florida and Illinois loans, PNC is entitled to judgment in its favor on the notes evidencing these loans to the equitable remedy of foreclosure with respect to the mortgage securing the Illinois property.

## STANDARD OF REVIEW

The standard for summary judgment is well-settled. Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## LAW AND ARGUMENT

I.      **PNC IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF FOSTER'S CLAIMS ON THE FLORIDA LOAN (Counts 2, 4, 5, 7, 8, 10)**

A.      **Foster Executed A Release That Bars any Claims For Conduct Relating to the Florida Loan that Occurred Before May 20, 2010**

Foster released all claims, defenses, and causes of action related to the Florida Note, Florida Mortgage, Florida Loan, and Florida Property which are based on conduct that occurred before May 20, 2010. When Foster fell behind on his payments due on the Florida Loan, PNC agreed to modify the Florida Loan to reduce Foster's monthly payment obligations. (SOF ¶ 8.) PNC extended the term of the Florida Loan and reduced the interest rate. (SOF ¶ 9.) As part of PNC's agreement to modify the terms of the Florida Loan, Foster agreed to a general release of PNC. (SOF ¶ 10.)

1

Foster does not dispute that he executed the Florida Modification, which contains the following release:

> 8.  IN CONSIDERATION OF THE TERMS AND CONDITIONS OF THIS AGREEMENT AND LENDER'S PROMISES AND UNDERTAKINGS SET FORTH HEREIN, BORROWER, FOR HIMSELF/HERSELF/THEMSELVES, AND ON BEHALF OF HIS/HER/THEIR SUCCESSORS AND PERMITTED ASSIGNS, DOES HEREBY REMISE, RELEASE, AND FOREVER DISCHARGE LENDER, AND ITS SUCCESSORS AND ASSIGNS, AND ALL AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS, AND EMPLOYEES OF LENDER (COLLECTIVELY, THE "LENDER RELEASED PARTIES") FROM ANY AND ALL OBLIGATIONS, CLAIMS, DEMANDS, COVENANTS, CONTRACTS, PROMISES, AGREEMENTS, LIABILITIES, COSTS, EXPENSES, ATTORNEY'S FEES, EXPERT WITNESS FEES, ACTIONS OR CAUSES OF ACTION OF ANY KIND OR NATURE WHATSOEVER, WHETHER LEGAL, EQUITABLE OR STATUTORY, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR NOT ACCRUED, DIRECT OR INDIRECT, WHICH BORROWER EVER HAD OR NOW HAS, OR CAN, SHALL OR MAY HAVE IN THE FUTURE, UPON OR BY REASON OF ANY EVENT, MATTER, CAUSE OR THING WHATSOEVER AGAINST THE LENDER RELEASED PARTIES OR ANY OF THEM, FROM THE BEGINNING OF THE WORLD TO THE EFFECTIVE DATE ARISING FROM, RELATING TO, OR BASED UPON: (A) THE LOAN DOCUMENTS OR ANY OTHER DOCUMENT RELATED THERETO; (B) ANY LENDER RELEASED PARTIES' PERFORMANCE OF ITS OBLIGATIONS, IF ANY, UNDER THE LOAN DOCUMENTS OR OTHER DOCUMENTS RELATED THERETO; OR (C) ANY ACT OR OMISSION OF ANY OF THE LENDER RELEASED PARTIES IN CONNECTION WITH THE LOAN.

(SOF ¶ 10.)

Florida courts have held that releases of counterclaims, defenses, and claims are valid contracts. Under Florida law, "a general release 'will ordinarily be regarded as embracing all claims or demands which had matured at the time of its execution… .'" *Hold v. Manzini*, 736 So.2d 138 (Fla. Dist. Ct. App. 1999). In construing the terms of a general release, courts are guided by principles of contract construction. *Plumpton v. Cont'l Acreage Dev.Co.*, 830 So. 2d 208, 210 (Fla. Dist. Ct. App. 2002). Where the terms and language of a release are clear and unambiguous, courts cannot construe or interpret its plain meaning. *See Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432, 433 (Fla. 1980).

The release in the Florida Modification is unambiguous and unequivocal. Foster waived any claims, demands, or causes of action against PNC related to the Florida Loan that occurred up to the date of its signing on May 20, 2010. Only those acts which occurred after May 20, 2010 are relevant for evaluating Foster's claims on the Florida Loan.

**B.** **Foster's Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Regarding Lender Placed Insurance Fail As a Matter of Law (Counts 4 and 5)**

Foster complains that PNC's actions regarding obtaining lender placed comprehensive wind insurance and lender placed flood gap insurance breached the Florida Loan Documents. In his Third Amended Complaint ("Complaint") Foster specifies the following conduct as the basis for his claim:

- requirement that Foster obtain Comprehensive Wind Coverage; and
- charging of escrow amounts to Foster that were for the purpose of providing additional profits to PNC rather than to preserve Bank's interest in the property.

(Compl. ¶ 234.) Foster also alleges a claim for breach of the implied covenant of good faith and fair dealing based on alleged inflated premiums charged in connection with PNC obtaining lender placed comprehensive wind insurance. For the reasons below, these claims, based on PNC's contractual right to procure lender placed insurance, fail as a matter of fact and law.

**1.** **The Florida Mortgage requires Foster to maintain insurance on the Florida Property sufficient to secure PNC's interest in the collateral**

The Florida Mortgage permits PNC, as the lender, to specify the types and amounts of insurance a borrower must have for the protection of its collateral. Under Florida law, which governs this dispute, "contracts are construed in accordance with their plain language, as bargained for by the parties." *Konsulian v. Busey Bank, N.A.*, 61 So. 3d 1283, 1285 (Fla. 2d Dist. Ct. App. 2010) (applying this principle to the language of a mortgage). A Court may not "rewrite, alter, or add to the terms of a written agreement between the parties…" *Int'l Expositions, Inc. v. City of Miami Beach*, 274 So. 2d 29, 30-31 (Fla. 3d Dist. Ct. App. 1973). "Rather, it is a court's duty to enforce the contract as plainly written." *Okeechobee Resorts, LLC v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 993 (Fla. 4th Dist. Ct. App. 2014) (citation omitted); *see also Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 735 (Fla. 2002) (An unambiguous contract "must be given effect as written.").

The language of the Florida Mortgage is clear and unambiguous.

> **5.  Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

(SOF ¶ 12.)  (emphasis added).  The Florida Mortgage specifically allows PNC, as the lender, to:

- Determine the types and amounts of coverage necessary to protect its interest in the Florida Property.

- Require Foster to maintain insurance in those amounts it deems necessary.

- Change the types and amounts of insurance required during the period of the Florida Loan.

Wind insurance is encompassed by both the "extended coverage" and "hazard" requirements in the Florida Mortgage.  *See Curtis v. Cenlar FSB*, 2014 U.S. Dist. LEXIS 157172 *11-12 (N.Y.S.D. Nov. 5, 2014) (interpreting identical mortgage provision under Florida law and finding that mortgage permitted lender to require wind insurance on property located in Florida).  There is no doubt that wind is a peril, particularly in Florida.  *See* Fla. Stat §627.712 (requiring wind insurance as part of a homeowner's policy unless the property is located in an excluded area.)  Foster even recognized the benefit of having coverage against wind events because he had comprehensive wind insurance on the Florida Property when the Florida Loan closed in 2004 and from 2009 until the policy was cancelled in 2010.  (SOF ¶ 14.)  In fact, PNC requires wind insurance coverage on all real estate–secured loans. (SOF ¶ 13.)

4

## 2. PNC had authority to obtain lender placed insurance where Foster failed protect PNC's interest in the Florida Property.

The Florida Mortgage is unambiguous that PNC may obtain lender placed insurance if Foster failed to maintain insurance to adequately protect PNC's collateral. Section 5 of the Florida Mortgage describes the circumstances in which a lender may obtain lender placed insurance and the effects of obtaining such coverage on the borrower. (SOF ¶ 12.)

By signing the Florida Mortgage, Foster acknowledged that: (1) PNC may obtain insurance at his expense if he failed to do so, (2) the cost of any lender-placed insurance might be significantly more than insurance he could have obtained independently, and (3) any amounts disbursed for lender placed insurance would become additional debt due and owing by Foster. (SOF ¶ 12.)

When PNC was forced to obtain lender placed insurance to protect its collateral, PNC requested in writing, on two separate occasions that Foster provide proof of comprehensive wind insurance and flood gap insurance. (SOF ¶ 15-23.) Despite PNC's requests, Foster failed to provide such proof of this coverage or sufficient flood insurance. (*Id.*) When PNC obtained lender placed insurance, it advised Foster, in writing of its actions and that the coverage it was obtaining could be substantially more expensive than coverage Foster could obtain on his own. (*Id.*) Foster cannot point to anything in the Florida Mortgage that would prevent PNC from obtaining lender-placed comprehensive wind insurance or flood gap insurance, even if it was at an increased cost to Foster.

## 3. PNC did not receive any commissions or reinsurance in connection with obtaining lender placed comprehensive wind insurance or lender placed flood gap insurance

Foster's claim for breach of the implied duty of good faith and fair dealing also fails because PNC did not receive any reinsurance or kickbacks in connection with obtaining the comprehensive wind insurance or flood gap insurance. Florida law provides that every contract contains an implied covenant of good faith and fair dealing. This covenant requires parties to follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations. *See*

5

*Centurion Air Cargo v. United Parcel Service Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (citation omitted). Foster can offer no evidence that PNC breached this covenant.

Foster has no evidence that PNC acted in bad faith in obtaining comprehensive wind insurance or flood gap insurance. Unlike other lender placed insurance cases that were decided at the motion to dismiss stage, in this case, at the summary judgment stage, the undisputed evidence demonstrates that PNC did not receive any "kickback," "commission" or "reinsurance" in connection with obtaining the lender placed insurance. PNC advanced the full lender placed insurance premium to the entity which provided the lender placed insurance coverage. (SOF ¶ 24.) PNC did not charge Foster any additional fees or interest charges beyond the actual premium due and owing to the insurer. (*Id.*) PNC did not receive any commissions or reinsurance from any entity when it obtained the lender placed insurance for the Florida Property. (*Id.*) Because PNC acted in good faith in connection with the Florida Loan Documents, Foster's claim fails.

4.    **The filed rate doctrine bars Foster's claim for breach of contract and breach of the complied covenant of good faith and fair dealing related to the reasonableness of rates of lender placed insurance.**

The Eleventh Circuit's decision in *Patel v. Specialized Loan Servicing, LLC*, 04 F.3d 1314 (11th Cir. 2018) is dispositive of Foster's claims for breach of contract and breach of the implied covenant of good faith and fair dealing based on the allegation that Foster was charged inflated premiums in connection with the flood gap insurance PNC obtained in 2011 and comprehensive wind insurance PNC obtained in 2015. In *Patel*, borrowers filed a class action complaint alleging that their loan servicers received kickbacks and charged inflated premiums when obtaining lender placed insurance coverage. *Id.* at 1320. The plaintiffs' mortgages required them to maintain certain insurance on the property securing their loans. When the insurance coverage lapsed, and no proof of coverage was received, the loan servicer purchased lender placed insurance on the property. The plaintiffs sued

the loan servicer and the insurer claiming that the loan servicer and the insurer colluded to charge inflated premiums.

The Court held that the plaintiffs' claims based on allegations of kickbacks were attempts to challenge the rates for lender placed insurance and were barred by the filed-rate doctrine, which prohibits a regulated entity from charging rates "for its services other than those properly filed with the appropriate regulatory authority." *Patel* at 1321. Where a charge for a product is filed with and approved by a regulator, rate-payers cannot claim that the rate is improper or unlawful in a civil action, and only the regulator can take action against the company over an improper rate.

Like the plaintiffs in *Patel*, Foster challenges the rates for the lender placed flood gap and comprehensive insurance. American Security Insurance Company, an insurance company licensed to operate in Florida, filed its rates with and secured the approval of the Florida Office of Insurance Regulation ("OIR"). (SOF ¶ 25.) Because the OIR reviewed and approved the rates, the filed rate doctrine prohibits Foster from challenging those rates, or any components of those rates, including the resulting premiums.

### C. PNC Serviced the Florida Loan in Accordance with the Florida Note, Mortgage, and Modification (Count 4)

None of Foster's alleged grievances about the Florida Loan evidence a breach of any agreement between PNC and Foster. To state a breach of contract claim under Florida law, Foster must prove: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach. *See Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. Dist. Ct. App. 1977); *see also Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006). The contracts at issue are the Florida Note, the Florida Mortgage, and the Florida Modification (the "Florida Loan Documents"). Foster does not dispute that he signed these documents. (SOF ¶¶ 6, 8.)

In his Complaint Foster alleges the following acts as the basis of his breach of contract claim on the Florida Loan:

- Failure to acknowledge Foster's proof of hazard insurance;
- Failure to provide proper documentation to Foster;
- Unilateral changes to the Agreement, including increased payments without notice; and
- Failure to accept Foster's timely payments.

(Compl. at ¶ 234.)  None is supported by any evidence.

### 1. PNC never obtained lender placed general hazard insurance for the Florida Property

PNC never obtained lender placed general hazard insurance for the Florida Property from 2010 through 2017.   (SOF ¶ 26.)  From the time of the origination of the Florida Loan, even after he executed the Florida Modification, Foster was responsible for obtaining and paying for his own hazard insurance coverage.[1]  (SOF ¶ 9.)  The Florida Mortgage also required Foster to provide notice to PNC that he maintained hazard insurance, but does not require that PNC take any action with respect to receipt of the notices from Foster. (SOF ¶ 5.)  Because there is no breach of the Florida Loan Documents by PNC, Foster's claim fails.

### 2. Nothing in the Florida Loan Documents Requires PNC to Provide Foster With Certain Documentation

There is no contractual provision of the Florida Note, Mortgage, or Modification that requires PNC to provide Foster with any specific documentation upon demand by Foster.  Foster cannot point to any contractual provision that imposed any duty on PNC, and consequently there can be no breach.

### 3. Changes to the monthly payment amounts due on the Florida Loan were authorized by the Florida Loan Documents.  PNC applied Foster's payments as required by the Florida Loan Documents.

PNC complied with the Florida Loan Documents in collecting and applying payments due under the Florida Loan.  Any change in the monthly payment amount due was contemplated by and expressly permitted by the Florida Loan Documents.

---

[1] Hazard insurance coverage does not include flood insurance, which Foster was required to escrow with PNC because he had an escrow account for his property taxes.  (SOF ¶ 7.)

**a.** **After the 2010 Florida Loan Modification the Florida Loan was current through June 2010**

As part of finalizing the Florida Modification Foster tendered a payment totaling $13,532.04 on June 3, 2010. (SOF ¶ 27.) This payment included amounts for the June 1, 2010 payment as well as the modification closing costs. (*Id.*) PNC then updated its system to reflect the new terms of the modified Florida Loan. (SOF ¶ 28.) As of July 13, 2010, Foster's Loan showed that he was due and owing for the July 1, 2010 payment. (SOF ¶ 30.)

Under the Florida Modification, Foster's monthly payment amount included funds for flood insurance and property taxes. (SOF ¶ 31.) Foster was responsible for separately paying and maintaining hazard insurance on the Florida Property. (SOF ¶ 9.)

As of July 2010, the monthly payment amount due was $6,000.26. (SOF ¶ 28.) Foster made, and PNC applied, the following payments on the Florida Loan. (SOF ¶ 33.) As of December 31, 2010, Foster was current on his payment obligations due under the Loan. (*Id.*)

| Payment Due Date | Payment Amount Due | Amount Remitted By Foster | Date Payment Remitted by Foster | Application of Payment |
|---|---|---|---|---|
| July 1, 2010 | $6,000.26 | $6,001.00 | July 30, 2010 | Applied to Payment Due July 1, 2010 |
| August 1, 2010 | $6,000.26 | $6,000.26 | August 31, 2010 | Applied to Payment Due August 1, 2010 |
| September 1, 2010 | $6,000.26 | $6,000.26 | September 30, 2010 | Applied to Payment Due September 1, 2010 |
| October 1, 2010 | $6,000.26 | $6,000.26 | November 1, 2010 | Applied to Payment Due October 1, 2010 |
| November 1, 2010 | $6,000.26 | $6,001.00 | November 30, 2010 | Applied to Payment Due November 1, 2010 |
| December 1, 2010 | $6,000.26 | $6,001.00 | December 31, 2010 | Applied to Payment Due December 1, 2010 |

**b.** **Effective March 1, 2011, the monthly payment amount increased to cover an escrow shortage determined in connection with an annual escrow account analysis**

Foster's payment due under the Florida Loan increased effective March 1, 2011 as a result of an analysis of Foster's escrow account. (SOF ¶ 34.) Section 3 of the Florida Mortgage governs

funds for escrow items and requires that the lender account for the funds in the escrow account and notify Borrower of any shortages or deficiencies. (SOF ¶ 5.)    PNC sent Foster an escrow analysis disclosure statement dated January 18, 2011, which advised Foster that he had a shortage in his escrow account of $2,348.44. (SOF ¶ 34.)  Foster had the option to pay the shortage over 12 months, which meant his monthly payment would increase to $6,352.52. (*Id.*)  If he paid the escrow shortage in a lump sum, his monthly payment amount would be $6,156.83 beginning March 1, 2011. (*Id.*)  Foster elected to pay the escrow shortage in a lump sum and remitted $2,348.44 to PNC on February 7, 2011. (*Id.*)  Foster made, and PNC applied, the following payments from January 1, 2011 to June 1, 2011. (SOF ¶ 35.)

| Payment Due Date | Payment Amount Due | Amount Remitted By Foster | Date Payment Remitted by Foster | Application of Payment |
|---|---|---|---|---|
| January 1, 2011 | $6,000.26 | $6,000.26 | January 8, 2011 | Applied to Payment Due January 1, 2011 |
| February 1, 2011 | $6,000.26 | $6,000.26 | February 7, 2011 | Applied to Payment Due February 1, 2011 |
| March 1, 2011 | $6,156.83 | $6,156.83 | March 4, 2011 | Applied to Payment Due March 1, 2011 |
| April 1, 20111 | $6,156.83 | $6,156.83 | April 4, 2011 | Applied to Payment Due April 1, 2011 |
| May 1, 2011 | $6,156.83 | $6,156.83 | May 6, 2011 | Applied to Payment Due May 1, 2011 |
| June 1, 2011 | $6,156.83 | $6,156.83 | June 30, 2011 | Applied to Payment Due June 1, 2011 |

**c.    Effective July 1, 2011, the monthly payment increased to cover an escrow shortage resulting from, in part, payment of lender placed flood gap insurance**

In March 2011, PNC sent Foster a letter notifying him that him that his flood insurance was not sufficient under the National Flood Insurance Program ("NFIP") because his coverage was less than $250,000. (SOF ¶ 36.)  PNC requested that by Foster provide proof of sufficient flood insurance coverage or obtain additional flood insurance coverage. (*Id.*)  PNC sent Foster a second letter in April 2011 advising him that it still had not received notification of sufficient flood insurance coverage. (*Id.*)  PNC advised that if it did not receive notice of coverage within 24 days, it

10

would obtain lender placed flood gap insurance to ensure Foster had flood insurance coverage up to $250,000. (SOF ¶ 37.) Foster did not remit proof of sufficient flood insurance to PNC. (SOF ¶ 38.) In May 2011, PNC obtained lender placed flood gap insurance and advanced funds from Foster's escrow account in the amount of $647.28. (*Id.*)

After PNC obtained the lender placed flood gap insurance, it conducted an escrow analysis on Foster's account. (SOF ¶ 39.) The May 18, 2011 Escrow Account Disclosure statement advised Foster that beginning July 1, 2011 his payment would increase to $6,237.67 to account for the change in his escrow amount, which occurred in part, from the payment of the lender placed flood gap insurance. (*Id.*) In July 2011, PNC advised Foster that it had received proof that he had sufficient flood insurance coverage, and PNC refunded the total amount of the lender placed flood gap insurance premium advanced on July 28, 2011. (SOF ¶ 40). There was no change to Foster's payment amount as a result of this refund, but it would be reflected in the next escrow account analysis. (*Id.*)

Foster failed to make the increased payments in July 2011. (SOF ¶ 41.) PNC agreed to accept the short payment in July 2011, even though it was under no contractual obligation to do so. (*Id.*)

| Payment Due Date | Payment Amount Due | Amount Remitted By Foster | Date Payment Remitted by Foster | Application of Payment |
|---|---|---|---|---|
| July 1, 2011 | $6,237.67 | $6,156.83 | July 29, 2011 | Applied to Payment Due July 1, 2011 |
| August 1, 2011 | $6,237.67 | $6,156.83 | August 30, 2011 | Funds applied to outstanding late charges and remaining funds returned to Foster |

In a letter dated September 1, 2011, PNC advised Foster that his payment of $6,156.83, which Foster remitted on August 30, 2011 for the payment due August 1, 2011 was insufficient because the amount to be remitted was $6,237.67. (SOF ¶ 42.) PNC advised that the funds would be held in suspense until September 22, 2011. (*Id.*) If he did not remit the additional $80.84, the

funds would be applied in the following order: negative escrow balance, late charges, returned check fees, property inspection fees, and other fees due. Any remaining funds would be returned to Foster. (*Id.*) Foster did not remit the additional funds by September 22, 2011. (SOF ¶ 43.) PNC applied the funds to the outstanding late fees in the total amount of $1,192.79 and returned $4,964.04 to Foster. (*Id.*) At that point, Foster's Loan was one month past due because no payment was applied to the August 1, 2011 payment. (*Id.*)

Foster remitted the correct payment amount to PNC in September 2011. (SOF ¶ 44.) The funds remitted on September 30, 2011 were applied to the payment due August 1, 2011, and Foster's account remained one month past due. (*Id.*) Because Foster did not make up the missing payment, his account remained one month past due as of yearend 2011. (*Id.*)

| Payment Due Date | Payment Amount Due | Amount Remitted By Foster | Date Payment Remitted by Foster | Application of Payment |
|---|---|---|---|---|
| September 1, 2011 | $6,237.67 | $6,237.67 | September 30, 2011 | Applied to Payment Due August 1, 2011 |
| October 1, 2011 | $6,237.67 | $6,237.67 | October 31, 2011 | Applied to Payment Due September 1, 2011 |
| November 1, 2011 | $6,237.67 | $6,237.67 | November 30, 2011 | Applied to Payment Due October 1, 2011 |
| December 1, 2011 | $6,237.67 | $6,237.67 | December 30, 2011 | Applied to Payment Due November 1, 2011 |

(*Id.*)

### d. Effective February 1, 2012, the monthly payment amount increased to include new escrow amounts after PNC obtained lender placed comprehensive wind insurance

In September 2011, PNC sent Foster a letter notifying him that his hazard insurance policy no longer included comprehensive wind coverage. (SOF ¶ 15.) PNC had received notification from Foster's insurer that the wind insurance policy previously in place had been cancelled. (SOF ¶ 14.) PNC requested that Foster provide proof of comprehensive wind coverage or PNC would obtain the required coverage at Foster's expense. (SOF ¶ 15.) PNC sent Foster a second letter in October

2011 advising him that it still had not received notification of sufficient flood insurance coverage. (SOF ¶ 16.) PNC requested he provide proof of coverage and advised that it secured a temporary binder. (*Id.*) Foster did not remit proof of sufficient wind insurance coverage. (*Id.*) On November 15, 2011, PNC obtained lender placed comprehensive wind coverage and advanced its own funds to cover the premium amount of $37,730 because there were no funds in Foster's escrow account. (SOF ¶ 17.)

After PNC obtained the lender placed comprehensive wind insurance, it conducted an escrow analysis on Foster's account. (SOF ¶ 45.) The November 28, 2011 Escrow Account Disclosure statement advised Foster that beginning February 1, 2012 his monthly payment increased to $12,893.19. (*Id.*)

Foster provided proof to PNC that he obtained comprehensive wind insurance coverage in January 2012. (SOF ¶ 46.) PNC advised Foster that it had received proof of wind insurance for the period of February 22, 2012 to February 22, 2013. (SOF ¶ 47.) PNC refunded the premium in the amount of $20,223.28 for the period Foster provided proof of coverage. (*Id.*) However, Foster had a lapse in coverage from September 5, 2011 to February 22, 2012 and PNC was did not refund the remaining premium of $17,506.72. (*Id.*)

PNC conducted another escrow analysis after the premium was refunded. (SOF ¶ 47.) The February 13, 2012 Escrow Account Disclosure Statement advised Foster that his new payment, effective with the payment due February 1, 2012 was $7,913.66. (*Id.*) Because the payment Foster remitted in March 2012 was less than the amount due, PNC, in accordance with Section 2 of the Mortgage permitting remaining amounts be applied to amounts due under the Mortgage, applied the funds to reduce the escrow advance balance. (SOF ¶ 47.) Up until this point, Foster was a month behind because he never made up for the missed payment from August 2011. (SOF ¶ 43-44.) Now he became two months behind.

| Payment Due Date | Payment Amount Due | Amount Remitted By Foster | Date Payment Remitted by Foster | Application of Payment |
|---|---|---|---|---|
| January 1, 2012 | $6,237.67 | $6,237.67 | January 30, 2012 | Applied to payment Due December 1, 2011 |
| February 1, 2012 | $7,913.66 | $6,237.67 | February 28, 2012 | Applied to payment due January 1, 2012 |
| March 1, 2012 | $7,913.66 | $6,237.67 | March 30, 2012 | Applied to reduce escrow advance balance |

Beginning in April 2012, Foster remitted partial payments in amounts less than the total amount due. (SOF ¶ 48.) PNC returned these funds to Foster. (*Id.*) The Florida Mortgage provides PNC the right to return any payment or partial payment if those payments are insufficient to bring the Loan current. (*Id.*) Beginning in April 2014, PNC ceased returning his monthly tender due to the pending litigation and retained Foster's payments in a suspense account. (SOF ¶ 49.) Today, the Florida Loan remains due and owing for the February 1, 2012 payment and all payments due thereafter. (SOF ¶ 50.)

### D.     PNC Did Not Violate The Fair Credit Reporting Act (Count 2)

The Fair Credit Reporting Act ("FCRA") establishes a comprehensive framework, requiring notice, an opportunity to investigate and an opportunity to correct inaccurate information, with which plaintiff must comply before filing an FCRA Claim. *See Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002); *Sanders v. Mt. Am. Fed. Credit Union*, 689 F.3d 1138, 1147 (10th Cir. 2012). When a consumer disputes the accuracy of his information on his credit report, the consumer is required to report any inaccuracies to the credit reporting agency ("CRA"). 15 U.S.C. § 1681i(a)(1). When the CRA receives the dispute from the consumer, it notifies the furnisher of the information, and both the CRA and the furnisher commence an investigation of the dispute. 15 U.S.C. § 1681i(a)(1)-(2); 15 U.S.C. § 1681s-2(b)(1)(A); *see also Ihebereme v. Capital One, N.A.*, 933 F. Supp. 2d 86, 110-111 (N.D. Ill. 2013) (describing procedures for disputing inaccurate credit reports).

### 1. Foster's direct disputes with PNC about his credit reporting are not actionable under the FCRA

Under the FCRA framework, PNC is a furnisher of information. 16 C.F.R. §660.2(c). A consumer has no private right of action against a furnisher of information, like PNC, where the consumer simply notifies the furnisher of the dispute regarding his credit report. A consumer has a private right of action against a furnisher only where the consumer reporting agency ("CRA"), not the consumer, notifies the furnisher of a dispute. 15 U.S.C. § 1681s-2(b)(1); *Gulley v. Pierce & Assocs., P.C.*, 436 F. App'x 662, 665 (7th Cir. 2011); *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). To the extent Foster lodged disputes directly with PNC, those disputes are not actionable under the FCRA.

### 2. PNC's investigation of Foster's complaint resulted in updates, but determined no inaccuracies in its reporting

PNC conducted a reasonable investigation in accordance with its internal procedures in reviewing the dispute it did receive from a CRA. Upon a notification of a dispute by a CRA, a furnisher is required only to conduct a reasonable investigation. *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) The reasonableness of an investigation "hinges substantially on the amount of information regarding the nature of the customer's dispute that a credit reporting agency relays to the furnisher of the disputed information." *Whiting v. Harley-Davidson Fin. Servs.*, 534 F. Supp. 2d 823, 832 (N.D. Ill. 2008). Some factors a court may consider include if the furnisher contacted the consumer, if the furnisher has procedures in place for investigations, and the time taken to investigate. *Brown v. Trans Union LLC*, No. 03 C 5774, 2005 U.S. Dist. LEXIS 44524, at *7-9 (N.D. Ill. Feb. 23, 2005); *Osuna v. Equifax Credit Info. Servs.*, No. : 02-CV-6465, 2004 U.S. Dist. LEXIS 17124, at *4 (N.D. Ill. Jan. 28, 2004). "Summary judgment is proper if the reasonableness of the defendant's procedures is beyond question." *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (quoting *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001)).

PNC investigated Foster's dispute and modified any information consistent with its internal records. PNC's records indicated that in January 2012, it received disputes from two CRAs, TransUnion and Equifax, regarding the Florida Loan. (SOF ¶ 54.) PNC confirmed that Foster's account was reported as "current" through September 2011. (SOF ¶55.) Foster's account was reported 30-59 days past due from October 2011 through January 2012 (the date of the dispute). (*Id.*) These facts were confirmed to be consistent with PNC's records of payments. (*Id.*) PNC modified the account information based on its investigation and returned information to the CRAs electronically through the E-Oscar system. (*Id.*) Foster has no evidence that PNC failed to act reasonably in reviewing his account.

### E. PNC Did Not Make Any False Statement Regarding A Specific Material Fact Nor Did Foster Rely In Any Way On Any Statement By PNC (Count 7)

There is no evidence that PNC made any false statement to Foster, or that PNC did so to induce Foster's reliance or that Foster was, in any way, injured by any statement PNC made to him. "The essential elements of a fraud claim are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So.2d 13, 15 (Fla. Dist. Ct. App. 2002).[2] Foster's fraud claim is based on allegations that PNC:

- refused to accept timely payments;
- increased monthly payments related to escrow;
- reduced amounts in Foster's escrow account with no accounting for reason;
- force placed unnecessary insurance;
- forced Foster to make payments to Bank in amounts which were not due.

As discussed above PNC had the contractual right to obtain lender placed flood and comprehensive wind insurance. Furthermore, PNC followed the Mortgage in applying payments

---

[2] The fraud claim on the Florida Loan is governed by Florida Law.

and managing Foster's escrow account. Because Foster has no evidence of any false statement made to induce his reliance, Foster's claim fails as a matter of law.

### F. PNC Received No Benefit in Connection with Obtaining Lender Placed Insurance and Foster's Claim for Unjust Enrichment and Disgorgement Fails as a Matter of Law (Count 8)

The obligation to maintain comprehensive wind insurance for the Florida Property is governed by the terms of the Florida Mortgage—an express, written contract between Foster and PNC. To succeed on a claim of unjust enrichment under Florida law a party must establish: (1) a benefit conferred upon a defendant by a plaintiff, (2) defendant's appreciation of that benefit, and (3) defendant's acceptance and retention of the benefit under circumstances that make it inequitable for defendant to retain the benefit without paying the value of the benefit. *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004). Under Florida law, no cause of action for unjust enrichment exists where the parties' relationship is governed by an express contract. *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1227 (S.D. Fla. 2010); *see also Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1220–21 (S.D. Fla. 2015) (dismissing plaintiff's unjust enrichment claim relating to force placement of insurance where dispute was governed by terms of mortgage).

Because PNC is not receiving a benefit outside of an express written agreement, Foster's claim for unjust enrichment fails as a matter of law. The Florida Mortgage specifically provides that PNC may require a borrower to obtain insurance for extended hazards, including comprehensive wind insurance. (SOF ¶ 12.) The Florida Mortgage also provides that the amount and periods for which insurance must be maintained is left to PNC's sole discretion. (*Id.*) If the borrower fails to obtain the required insurance, PNC may exercise the option to obtain coverage sufficient to protect its interest in the property. (*Id.*) The Florida Mortgage also provides that Foster must reimburse PNC for those amounts advanced on his behalf. (*Id.*)

Foster's claim for unjust enrichment also fails because PNC did not receive any benefit from Foster as a result of it having to obtain lender placed comprehensive wind insurance or lender placed flood gap insurance. PNC advanced the full lender placed insurance premium to the entity which provided the lender placed insurance coverage. (SOF ¶ 24.) PNC did not charge Foster any additional fees or interest charges beyond the actual premium. (*Id.*) Moreover, PNC did not receive any commissions or reinsurance from any entity when it obtained the lender placed insurance for the Florida Property. (*Id.*)

### G. PNC and Foster's Relationship is that of an Ordinary Borrower and Lender (Count 10)

PNC did not owe Foster a fiduciary duty. "The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). "Under Florida law, a lender does not ordinarily owe a fiduciary duty to its borrower." *Gordon v. Chase Home Fin. LLC*, No. 8:11-cv-2001, 2013 U.S. Dist. LEXIS 15461 (M.D. Fla. Feb. 5, 2013); *see also Maxwell v. First United Bank*, 782 So. 2d 931, 934 (Fla. Dist. Ct. App. 2001) (relationship between bank and creditor is generally creditor and debtor). An arms-length relationship between a lender and borrower does not give rise to fiduciary duties flowing from the lender to the borrower absent evidence of special circumstances giving rise to such a duty. *McCulloch v. PNC Bank, INc.* 298 F.3d 1217, 1226 n.3 (11th Cir. 2002).

There is no evidence that PNC breached any duty to Foster in connection with administration of his escrow account. To the extent Foster claims that PNC unilaterally utilized escrow funds to purchase lender placed comprehensive wind insurance, Foster had no funds in his escrow account as of November 7, 2011, and PNC advanced its own funds to obtain the lender placed insurance on November 15, 2011. (SOF ¶ 56.) Moreover, PNC did not charge Foster any additional fees or interest charges beyond the actual premium due and owing to the insurer. (SOF ¶

24.)  Further, PNC did not receive any commissions or reinsurance from any entity when it obtained the lender placed insurance for the Florida Property.  (SOF ¶ 24.)

## II.  FOSTER'S CLAIMS REGARDING THE ILLINOIS PROPERTY AND LOAN FAIL (Counts 1, 2, 3)

### A.  Foster Cannot Escape His Obligations Under The Illinois Loan and Mortgage By Claiming, Years After Accepting Its Benefits, That He Did Not Sign It

#### 1.  The Illinois Mortgage Contains A Notary's Certificate And A Presumption of Validity.

Despite the existence of the Illinois Loan Documents which contain Foster's signature, Foster maintains that the Illinois Loan Documents did not contain the terms of their agreement and he did not sign the Illinois Note or the Illinois Mortgage.  (Compl. ¶ 59.)  "[A] notary public's certificate of acknowledgment, regular on its face, carries a strong presumption of validity." *Butler v. Encyclopedia Britannica, Inc.*, 41 F.3d 285, 294-95 (7th Cir. 1994).  A party can overcome this presumption of validity only where the signer of the document presents **clear and convincing evidence** from **a disinterested witness** to establish that the signature is false. *Id.*  Where state law governs the substantive claim (breach of contract and foreclosure), it also governs "the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Civ. P. 302.

The Illinois Mortgage contains a notary's certificate and carries with it a presumption of validity.  Monika Kopec, a notary public, identified herself and included her notarial seal on the Illinois Mortgage.  (SOF ¶ 62.)  The Illinois Mortgage was then recorded with the Cook County Recorder of Deeds.  (SOF ¶ 63.)  Foster has no evidence, much less clear and convincing evidence from a disinterested witness, to establish that his signature is false.  Any claim by Foster that he is not responsible for the obligations due and owing under the Illinois Loan evidenced by the Illinois Note and secured by the Illinois Mortgage fails as a matter of law.

19

      2.      **Foster Is Estopped From Asserting That He is Not Responsible For The Amounts Due On The Illinois Loan.**

Based on his own conduct, Foster is estopped from denying that he is bound by the terms of the Illinois Loan. Equitable estoppel is in effect where the voluntary conduct of a party precludes, at law and in equity, that party from asserting rights against an entity which has, in good faith, relied upon that party's conduct and in reliance changed its position for the worse. *Northern Trust Co. v. Oxford Speaker Co.*, 109 Ill. App. 3d 433, 438-39, 440 N.E.2d 968, 65 Ill. Dec. 113 (1982). Under Illinois law, the party to be estopped does not have to have a fraudulent intent. *Shockley v. Ryder Truck Rental, Inc.*, 74 Ill. App. 3d 89, 92, 392 N.E.2d 675, 30 Ill. Dec. 20 (1978). But the position adopted by that party must reasonably motivate the other party to detrimentally rely upon their actions. *Id.*

Foster insists that he did not execute the Illinois Loan Documents, but his conduct tells a different story. Foster acted as though the Illinois Loan closed when he accepted the payoff of his prior equity line of credit. (SOF ¶ 63.) Foster acted as though the Illinois Loan closed when he drew down over $700,000 on the line of credit from the Illinois Loan within a year of the closing. (SOF ¶ 64.) Foster acted as though the Illinois Loan closed by making payments on the Illinois Loan after oringation. (SOF ¶ 65.) Foster even set up an automatic withdrawal from his checking account for the payments due in 2006. (SOF ¶ 66.) Foster acted as though the Illinois Loan closed when he sought a modification and assistance to make payments due on the Illinois Loan. (SOF ¶ 68.)

PNC acted to its detriment in disbursing the funds and permitting Foster to continue to draw down the entire line of credit from the Illinois Loan. After receiving all of the benefits of the Illinois Loan, Foster cannot now claim that he is not obligated for the amounts due on the Illinois Loan. As a matter of law and equity, Foster should be estopped from arguing that he is not liable for the amounts due and owing under the Illinois Loan.

20

### 3. Foster's Self-Serving Statements Are Contradicted By Unrebutted Expert Testimony

Although he denies that it is his signature on the Illinois Loan Documents, there is unrebutted expert testimony indicating that Foster signed the Illinois Loan Documents. PNC's designated expert, Ellen Mulcrone Schuetzner, a Forensic Document Examiner, provided an expert report in which she concluded that "it is highly probable/probable" that the person who signed the known documents—documents Foster admits to having signed—executed the questioned documents. (Exhibit E – Expert Report of Ellen Mulcrone Schuetzner.) Tellingly, Foster has offered no expert testimony to rebut Ms. Schuetzner's conclusions and expert report. (SOF ¶ 74.)

### B. PNC Complied with the Illinois Loan Documents and Foster's Claim for Breach of Contract Fails (Count 3)

The essential elements of a claims for breach of contract under Illinois law include: "(1) an offer and acceptance, (2) consideration, (3) definite and certain contractual terms, (4) the plaintiff's performance of his contractual obligations, (5) the defendant's breach of the contract, and (6) damages resulting from the breach." *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 175 682 N.E.2d 118, 224 Ill Dec. 557 (1997).

Foster alleges the following conduct as the basis of his claim:

- Failure to provide Foster with documentation regarding the status of the line of credit;
- Failure to accept payments on the Equity line; and
- Failure to correctly and timely credit Foster's payments.

### 1. PNC had no contractual duty to provide any documents to Foster.

Foster cannot point to any portion of the Illinois Loan Documents that impose an actual duty on PNC to provide any specific documents to Foster in regards to his request for a status of the Illinois Loan. If there is no contractual duty, there can be no claim for breach of contract.

      2.     **PNC was not required to accept amounts less than those due under the Illinois Loan Documents and applied payments received in accordance with the terms of the Illinois Loan Documents**

Foster's payments obligations are governed by the written Illinois Loan Documents. The Illinois Note requires Foster to make the minimum payment listed on each monthly billing statement. (SOF ¶ 67.) When Foster advised PNC that he was having difficulty making his monthly payments on the Illinois Loan, PNC offered, and Foster accepted, a written Short Term Repayment Modification Program ("Repayment Program"). (SOF ¶ 68.) The Repayment Program contemplated that Foster would make reduced payments of $3,005.50 for 24 consecutive billing cycles beginning on April 6, 2009 and ending on April 7, 2011. (*Id.*) PNC advised Foster, in writing that his monthly account payment would return to being calculated according to the normal terms of the original contract after April 7, 2011. (SOF ¶ 69.)

Any contention that PNC orally agreed to accept a reduced amount cannot form the basis of a claim for breach of contract. Foster claims that PNC failed to accept and properly apply four payments in the amount of $3,006.00 on the Illinois Loan in June 2011, July 2011, August 2011, and September 2011. (SOF ¶ 70.) However, PNC accepted and applied these payments to the monthly amounts due. (SOF ¶ 71.) The Illinois Note specifically provided that the minimum payment (and certainly an amount less than the minimum payment) would not reduce the principal amount due under the Line of Credit. (SOF ¶ 71.) Based on this evidence, Foster's claim for breach of contract fails as a matter of law.

**C.    Foster Did Not Comply With the Requirements of The Fair Credit Billing Act and his Claim Fails as a Matter of Law (Count 1)**

      1.     **PNC Made No Billing Error**

Foster's claim of a "billing error" rests on his assertion that he did not sign the Illinois Note and Illinois Mortgage. For the reasons discussed above, however, Foster can offer no evidence to support that claim; his bare, uncorroborated, self-serving assertion, in the face of a notarized

document, is insufficient as a matter of law. PNC made no "billing error" in billing Foster in accordance with the terms of the Illinois Note.

### 2. Foster Did Not Provide PNC Written Notice of Any Billing Errors

There is no evidence that Foster ever provided written notice to PNC of any billing errors contained in any billing statement as required under the Fair Credit Billing Act ("FCBA"). The FCBA provides the statutory obligations and timeframes for creditors addressing a billing error. 15 U.S.C. § 1666 imposes certain duties upon creditors only after the creditor receives (1) written notice of a (2) billing error. 15 U.S.C. § 1666(a). A billing error is defined by the statute to include:

- o A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.

- o A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

- o The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.

- o A computation error or similar error of an accounting nature of the creditor on a statement.

A creditor's statutory duty to respond to an allegation of a billing error is triggered only when the borrower sends the creditor a **written notice** of an alleged billing error. *See* 12 C.F.R. § 226.13(b)(1); *see also* 15 U.S.C. § 1666(a)-(b). If a borrower does not send the written notice within 60 days after a creditor transmits the billing statement with the error, the creditor has no obligation to respond to the consumer. *See Hill v. Chase Bank USA, N.A.*, No. 2:07-CV-82 RM, 2010 U.S. Dist. LEXIS 1262 at *17 (N.D. Ind. Jan. 6, 2010) ("Without a valid and timely notice of billing error, there's no duty to comply with § 1666(a)(3)(A) and (B), and no violation of those sections.") (citations omitted).

Foster has no evidence of any written communication showing that he notified PNC **in writing** of a **billing error** within 60 days after PNC sent him a billing statement that contained an

23

alleged error. Written notice is mandated and that notice must identify the error on a ***specific billing statement*** that is the subject of the complaint. Under the FCBA, it would not be enough if Foster merely advised PNC by telephone of alleged errors in applications of his payments. *See Fowler v. Bank of Am.*, No. 10 C 3944, 2011 U.S. Dist. LEXIS 9080 at *10 (N.D. Ill. Jan. 28, 2011) (acknowledging that written notice is required to state a claim under FCBA). The letter Foster attaches as Exhibit G to his Complaint, in addition to being time barred, does not constitute sufficient notice to PNC because it does not contain any description of an error on a billing statement. Without a writing referencing an error on a specific billing statement, he cannot sustain a claim under the FCBA.

### 3. Foster's contention that he did not sign the Illinois Loan Documents is time barred under the FCBA

Any argument by Foster that his alleged failure to sign the Illinois Loan Documents gives rise to a FCBA claim is barred by the statute of limitations. To trigger a creditor's obligation to investigate a disputed billing statement, a consumer must send *written notice* within 60 days of the creditor's transmission of the statement containing the alleged error. § 1666(a). Regulation Z specifies that the 60-day period begins to run after the creditor has transmitted the first periodic statement that reflects the alleged billing error. 12 C.F.R. § 226.13(b)(1). Section 1666 has a one year statute of limitations. 15 U.S.C. §1640(e); *Neiman v. Chase Bank, USA N.A.*, No. 13 C 8944, 2014 U.S. Dist. LEXIS 101553 *9 (N.D. Ill. July 25, 2014). This statute of limitations runs at the time that the creditor fails to satisfy its compliance duties within the timeframe proscribed by the statute. *Hill v. Chase Bank USA, N.A.*, No. 07-cv-82, 2010 U.S. Dist. LEXIS 1262 *6 (N.D. Ind. Jan. 6, 2010).

Even had Foster notified PNC of the "error" related to the alleged wrongfully closed loan on the first billing statement in July 2006, and even had he submitted written notice of the dispute, which he did not, any violation would have occurred at the latest, 90 days from the July 2006

24

statement giving Foster until October 2007 to file a claim under the FCBA. Because Foster did not file this lawsuit until April 2012, any claim under the FCBA relating to issues with the origination of the Illinois Loan is time barred.

> **D.** **Foster's Claim Under The Fair Credit Reporting Act For The Illinois Loan Fails (Count 2)**

Like the Florida Loan, Foster's direct disputes to PNC are not actionable under the FCRA. Foster's FCRA claim on the Illinois Loan also fails because PNC complied with its internal procedures in reviewing the dispute it received from the CRA. In January 2012, PNC received a single notice of dispute from a CRA regarding the Illinois Loan. (SOF ¶ 72.) The CRA notified PNC that the customer stated that inaccurate information was on his account, but the CRA did not provide PNC details as to a more specific dispute. (*Id.*) Upon a review of Foster's account history for the Illinois Loan, PNC confirmed that the balance reported was accurate and updated the amount of the last payment. (*Id.*) PNC also determined Foster was 180 days past due (not 150) and updated the account to reflect this information. (*Id.*) PNC's conduct to investigate the non-specific dispute was reasonable, and more to the point, PNC had reported no inaccurate information. Foster's FCRA claim as to the Illinois Loan fails as a matter of law.

**III.** **FOSTER'S CLAIMS ON THE FLORIDA AND ILLINOIS LOAN FAIL BECAUSE HE HAS NO EVIDENCE HE SUFFERED ANY DAMAGES AS A RESULT OF ANY CONDUCT OF PNC (Counts 1, 2, 3, 4, 5, 7, 8, 10)**

Foster's claims all fail as a matter of law because Foster has no evidence that he suffered any damages. Foster alleges three main categories of damages: (1) inability to obtain credit; (2) business losses; and (3) losses related to payments on the Florida and Illinois Loans. There is no evidence that Foster applied and was turned down for any extension of credit, or that he was turned down for a loan because of his credit score, or that if he was turned down, that adverse result was the result of anything PNC wrongfully did. (SOF ¶ 73.) As to his business losses, Foster has offered no expert testimony to support his claimed damages and relies on self-serving testimony about the extent of

his financial losses. There is no evidence that his business losses even occurred or if they did occur that any such losses are attributable to the conduct of PNC. Foster has no evidence to demonstrate that his loss residential real estate business was not caused by the well-documented downturn in the economy rather than PNC's conduct. These claimed losses are speculative at best. All of Foster's other claimed damages relating to losses for his loans are not damages because he was contractually obligated to make those payments.

Without evidence of damages, and without proof that those damages were caused by PNC's conduct, all of Foster's claims fail as a matter of law.

## IV.      PNC IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIMS

### A.      Foster Is In Default On The Florida Loan and PNC is Entitled To Summary Judgment on its Counterclaim for Foreclosure

The holder of a promissory note can enforce that instrument. Fla. Stat. § 673.3011(1). "A plaintiff alleging standing as a holder 'must prove not only physical possession of the original note but also, if the plaintiff is not the named payee, possession of the original note endorsed in favor of the plaintiff or in blank (which makes it bearer paper).'" *Rosa v. Deutsche Bank Nat'l Tr. Co.*, 191 So. 3d 987, 988 (Fla. 2d DCA 2016) (quoting *Kiefert v. Nationstar Mortg., LLC*, 153 So. 3d 351, 353 (Fla. 1st DCA 2014)).

There are a number of ways in which standing can be established under Florida law. *See, e.g., BAC Funding Consortium Inc. ISAOA/ATIMA v. Jean-Jacques*, 28 So. 3d 936, 939 (Fla. 2d Dist. Ct. App. 2010) (finding a plaintiff may prove standing "through evidence of a valid assignment, proof of purchase of the debt, or evidence of an effective transfer"). One way a party "can establish standing to foreclose [is] based upon a merger." *Seagall v. Wachovia Bank*, 192 So. 3d 1241 (Fla. 4th Dist. Ct. App. 2016). When doing so "the surviving entity [must] prove that it 'acquired all of [the absorbed entity's] assets, including [the] note and mortgage, by virtue of the merger.'" *Id.* (quoting *Fiorito v. JP Morgan Chase Bank, Nat'l Ass'n*, 174 So. 3d 519, 521 (Fla. 4th Dist. Ct. App. 2015)).

Mergers of national banks are governed by federal law, rather than state law. *Rogers v. First Nat'l Bank of St. George*, 297 F. Supp. 641, 645 (D.S.C. 1969) *aff'd and remanded on other grounds*, 410 F.2d 579 (4th Cir. 1969). Federal law provides that a succeeding national bank is the same corporation as its predecessor. 12 U.S.C. § 215a(e). When national banking corporations merge, so do their property rights and interests. *See Wachovia Mortgage, F.S.B. v. Goodwill*, 199 So. 3d 346, 348 (Fla. 4th DCA 2016). Thus, if the holder of a note merges into another entity, that entity becomes the holder of the note. No proof of transfer, such as a deed or indorsement, is necessary; the merger itself suffices. *See* 12 U.S.C. § 215a(e); *see also Wells Fargo Bank, N.A. v. Tom Roberts Const. Co. Inc.*, 629 F. App'x 877, 880 (11th Cir. 2015).

Under federal law, PNC, National City Bank, and MidAmerica Bank are "deemed to be the same corporation" following the merger of the entities. 12 U.S.C. 215a(e); *see Goodwill,* 199 So. 3d at 348. As of November 6, 2009, by operation and effect of 12 U.S.C. § 215a(e), everything owned or held by National City Bank vested in PNC thus giving Plaintiff the standing required to enforce the Florida Loan Documents. (SOF ¶ 1.)

Foster defaulted under the Florida Note and Modification for failure to make the monthly payment due on February 1, 2012 and all subsequent payments. (SOF ¶ 50.) The Florida Note provides that in the event of a default under the Florida Note, PNC is entitled to accelerate the sums due under the Florida Note and pursue damages against Foster for all amounts due. In accordance with paragraph 7(c) of the Florida Note, PNC sent a letter dated April 17, 2012 to Foster via first class mail providing notice of the default and intent to accelerate the Florida Loan unless the default was cured. (SOF ¶ 51-52.) To date, Foster has remitted $341,787.30 to PNC, but those funds are not sufficient to cure the default. (SOF ¶ 58.) Based on the Affidavit of Dorothy Thomas, filed in support of this Motion, PNC is due $1,754,030.15, in connection with the Florida Note and Modification as of May 31, 2019 and judgment should be entered against Foster in the amount of

$1,754,030.15.  (SOF ¶ 53.)

**B.** **Foster Is In Default On The Illinois Loan And PNC is Entitled To Judgment On The Illinois Note and Foreclosure of the Illinois Mortgage**

Under Illinois law, a mortgagee may foreclose its interest in real property upon "either the debt's maturity or default of condition in the instrument."  *Heritage Pullman Bank v. Am. Nat'l Bank and Trust*, 164 Ill. App. 3d 680, 685, 518 N.E.2d 231 (1st Dist. 1988).  Illinois mortgage foreclosure law states, in relevant part:

> 15-1506. Judgment.  (a) Evidence.  In the trial of a foreclosure, the evidence to support the allegations of the complaint shall be taken in open court, except:
>
> (1)     where an allegation of fact in the complaint is not denied by a party's verified answer or verified counterclaim, or when a party pursuant to subsection (b) of Section 2-610 of the Code of Civil Procedure states, or is deemed to have stated in its pleading that it has no knowledge of such allegation sufficient to form a belief and attaches the required affidavit, a sworn verification of the complaint or a separate affidavit setting forth such fact, is sufficient evidence thereof against such party and no further evidence of such fact shall be required; and
>
> (2)     where all the allegations of fact in the complaint have been proved by verification of the complaint or affidavit, the court upon motion supported by affidavit stating the amount which is due the mortgagee, shall enter a judgment of foreclosure as requested in the complaint.

735 ILCS 5/15-1506(a).  Because Foster defaulted on his obligations under the Illinois Note and Mortgage, and because PNC is the holder of the Note and the Mortgagee under Illinois law, PNC is entitled to foreclose its interest in the Illinois Property.

PNC sent Foster a Grace Period Notice dated October 19, 2011, notifying Foster that the Illinois Loan was more than 30 days past due.  (SOF ¶ 75.)  PNC sent Foster a Notice of Default dated April 24, 2012.  (SOF ¶ 76.)  The Notice of Default provided Foster 30 days to cure the default.  (SOF ¶ 76.)  Foster failed to cure the default on the Illinois Note by remitting the amounts due.  (SOF ¶ 78.)

The undisputed evidence demonstrates that Foster failed to repay his debt and is in default on his obligations under the Illinois Note and Illinois Mortgage. The Illinois Loan is currently due for $1,910,557.77 (SOF ¶ 78.)

The undisputed evidence demonstrates that PNC is the mortgagee and is entitled to foreclose on the Property. A mortgagee may foreclose its interest in real property upon "either the debt's maturity or default of condition in the instrument." *Heritage Pullman Bank v. Am. Nat'l Bank and Trust*, 164 Ill. App. 3d 680, 685, 518 N.E.2d 231, 235 (1st Dist 1988). A mortgagee is defined by statute as "(i) the holder of an indebtedness or obligee of a non-monetary obligation secured by a mortgage or any person designated or authorized to act on behalf of such holder and (ii) any person claiming through a mortgagee as successor." 735 ILCS 5/15-1208. PNC has physical possession of the Illinois Note and had possession of the Illinois Note at the time it filed its claim for foreclosure. Accordingly, PNC is the holder and therefore is the "Mortgagee" as defined by Illinois law.

The undisputed evidence establishes Foster failed to make his payments when due under the Illinois Note, which is a condition of default under the Illinois Mortgage, and PNC accelerated the amount due under the Illinois Note. (SOF ¶ 77.) Consequently, there is no genuine issue of material fact that Foster is in default and PNC, as Mortgagee, is entitled to: (i) judgment against Foster for all amounts due in connection with the Illinois Note and (ii) entry of a judgment allowing the foreclosure of the Illinois Mortgage on the Illinois Property, to be submitted after judgment is entered in favor of PNC.

## V. CONCLUSION

PNC is entitled to summary judgment on each of Foster's remaining claims against PNC in his Third Amended Complaint as a matter of fact and law. Foster has no evidence that PNC acted in any way that was not expressly permitted by the parties' contractual documents or Foster suffered any damages.

PNC is entitled to summary judgment on Counts 1 through 3 of its counterclaim against Foster, including judgment against Foster based on his default under the Florida Note (Count I of the Counterclaim), judgment against Foster based on his default under the terms of the Illinois Note (Count III of the Counterclaim) and judgment of Foreclosure on the Illinois Mortgage (Count II of the Counterclaim, and for such relief as this court deems reasonable.

Respectfully submitted,

PNC BANK, NATIONAL ASSOCIATION

By:      /s/ Marcel C. Duhamel
One of its Attorneys

Marcel C. Duhamel, Esq. (Ohio Bar No. 0062171 *pro hac vice*)
Lindsay Doss Spillman (Ohio Bar No. 0086849 *pro hac vice*)
Vory's Sater, Seymour & Pease, LLP
200 Public Square, Suite 1400
Cleveland, OH 44114
(216) 479-6100
MCDuhamel@vorys.com
ldspillman@vorys.com

James M. Crowley, Esq. (ARDC 6182597)
John F. Sullivan, Esq.  (ARDC 6205900)
Plunkett Cooney, PC
221 N. LaSalle Street, Suite 1550
Chicago, IL 60601
(312) 670-6900
jcrowley@plunkettcooney.com
jsullivan@plunkettcooney.com