# FOSTER'S AFFIDAVIT WITH ACCOMPANYING EXHIBITS

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Jeff Foster, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2012 cv 3130 |
| | ) | |
| PNC Bank, National Association d/b/a PNC Mortgage, | ) | Honorable Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF JEFF FOSTER IN SUPPORT OF
### PLAINTIFF'S OPPOSITION TO PNC'S MOTION FOR SUMMARY JUDGMENT

I, Jeff Foster, declare that I have personal knowledge of the facts set forth herein.

1.      I am over eighteen years of age and submit this Affidavit in support of the Opposition to PNC's Motion for Summary Judgment being submitted on my behalf in this litigation.

**A.      Background.**

**1.      Education.**

2.      I graduated from Illinois State University in 1983 with a degree in marketing and finance.  In 1990, I earned a MBA from DePaul University.

3.      While in college, I became a licensed real estate broker, first getting my license in 1983.  I have continued to hold a real estate broker license ever since and am now licensed as a managing broker.

4.      I also earned designations as a chartered financial consultant and a fellow in insurance, both of which I earned in the 1980s while working at Allstate Insurance.

2. **Real Estate Experience.**

5.     In the early 1990s, I began working in real estate full time and became an independent contractor at ReMax.

6.     I began investing in real estate myself in the 1980s, acquiring condominiums, land, and other properties that I would buy and eventually resell.  The properties I acquired were primarily located on the north side of Chicago, though I also purchased properties in Wheeling, Illinois, and Florida.

7.     Utilizing a carefully crafted investment strategy, I initially bought and sold properties for investors, generally residential properties that I would rehabilitate, often doing the work myself and then rent the properties.

8.     Through this work, I acquired the experience and capital to build my own portfolio, which I began doing in the late 1980s, early 1990s.  I developed a strong knowledge of land values, zoning, and current and potential rents in specific areas of the city to find the right opportunities for my strategy.  The rental income generated from the properties I purchased generally covered the costs of ownership, enabling me to hold properties as their value appreciated.  When, in my evaluation, the time was right, I would sell properties and, using the proceeds to purchase new properties, begin the process again.

9.     In 1990, I bought my first multi-unit building and quit my corporate job as Senior Marketing Manager at the Signature Group to devote all of my time to building my real estate portfolio.  I have worked full-time in the real estate industry, as both a real estate agent/broker and an investor/developer ever since.

10.     Over the years, I have held seminars for potential real estate investors interested in learning from my experiences and was often invited to give similar seminars at mortgage offices.

One large bank – not involved in this litigation – invited me to speak, but I declined to avoid any perception of conflicts of interest.

11.     Since I began investing in real estate, I have owned approximately 30 properties in total, generally owning somewhere between 5 and 15 properties at any one time depending on market conditions and other factors.  For each property, I would obtain a bank loan and often would refinance a loan at least once during the time I owned a property.  All told, I estimate that I have closed at least 20 refinances.  Other than issues with PNC and its predecessors, I never had a property be foreclosed on or otherwise had a lender accuse me of defaulting on a loan.

12.     Currently, I own five properties, including the homes located at 6201 Kilpatrick Avenue in Chicago, Illinois (the "Kilpatrick Home") and 56 Fiesta Way in Fort Lauderdale, Florida (the "Fiesta Way Home").  I split my time between these two homes.

13.     In addition, I currently own three properties in Chicago that generate rental income:

- 3716 N. Magnolia, Chicago, Illinois;

- 2156 N. Racine, Chicago, Illinois; and

- 1022 W. Montana, Chicago, Illinois.

As a result of the mergers among MidAmerica, National City, and PNC, PNC is now the lender for all five of the properties I currently own. [1]

14.     Due to the issues with my credit created National City and PNC, I have owned these five properties without any changes since 2008 and have not purchased a new property since 2004.

---

[1] I dealt with three banks related to the loans that are at issue in this litigation:  MidAmerica Bank, FSB, National City Bank, and PNC Bank, National Association.  During the time I was dealing with these three banks, MidAmerica first merged into National City, and then National City merged into PNC.  For the sake of clarity, in this affidavit I attempt to refer to the bank with whom I was actually dealing at the time of the events described.

This 11 year period of continuous ownership of the same portfolio of properties is the longest I have had in my career.

15.     I generally purchase properties using a combination of my own capital and bank loans.  As a result, a key to my business was my credit rating.  Because of my credit rating and the number of loans I would originate, I was an attractive borrower that lenders sought out.

16.     Given its importance to my business, I was keenly aware of the need to maintain a good credit rating and did regular checks to make sure there were no issues with my credit rating.

17.     I used my credit rating to get multiple loans that enabled me to purchase multiple properties and regularly refinance those loans when advantageous.

18.     Though I had numerous loans from multiple lenders, I never had a negative credit mark from any creditor – other than National City and PNC.

19.     I also cultivated relationships with lenders that made obtaining loans easier because the lender knew me, my business, my history, and, as a result, my creditworthiness.  Through the combination of these relationships and my credit rating, I could walk into multiple banks in the Chicago area and get a loan commitment based on little more than a conversation about the property that would secure the loan.

### 3.     Professional Successes.

20.     Through my hard work and real estate savvy, I accumulated significant wealth. From 2000 to 2006, I was able to generate income of over $4,500,000 from my real estate businesses.  Copies of my tax returns from this period were produced at FOSTER0003434-70; FOSTER0002360-88;     FOSTER0003500-25;     FOSTER0002415-46;     FOSTER0002447-74; FOSTER0003586-604; FOSTER0003605-24.

21.     My hard work, and the successes and wealth they brought, enabled me to buy many nice things, including collectible sports cars, art, and antiques.

22.     As a result of my hard work, I achieved my goal of being a multi-millionaire and was well on my way towards my goal of retiring young, allowing me to spend time with my family, instead of having to work as hard as I did as I worked my up.

**B.     The Kilpatrick Home.**

23.     In 1998, my hard work enabled me to buy a dream home:  a six bedroom, five-and-a-half bath, over 5,000 square feet house originally built in the 1930s.  The house is on a large lot located at 6201 N. Kilpatrick in Chicago's Sauganash neighborhood.  In this Affidavit, I will call this house the "Kilpatrick Home."  After purchasing it, I oversaw an extensive renovation of the Kilpatrick Home, doing much of the work myself.

24.     I purchased the Kilpatrick Home using a combination of cash obtained from the sale of a high-rise condominium and a line of credit from a bank predecessor of MidAmerica.

25.     In 2002, I refinanced the then-existing loan on the Kilpatrick Home to increase the amount of the line of credit, getting an equity line of credit for $1.2 million from National City Bank.

26.     A year later, in 2003, I refinanced the loan for the Kilpatrick Home again, this time moving the loan from National City Bank to MidAmerica and increasing the amount of the line of credit to $1.89 million.

27.     I currently estimate that the Kilpatrick Home is worth over $2 million, while real estate websites like Trulia and Zillow estimate it is worth between approximately $1.4 and $1.5 million.  A copy of the estimates from Trulia and Zillow are attached as Exhibits 1 and 2.

**1.     The Attempted 2006 Refinance.**

28.     In 2006, through my relationships with lenders, I determined that the existing loan for the Kilpatrick Home was not competitive.  Before moving the loan to another lender, I contacted MidAmerica to see if they would be willing to improve the terms for the loan to keep it.

5

In particular, I wanted to lower the interest rate and remove a "basement" on the floating interest rate that would have prevented the rate from going below 3.5%. These changes were the key reasons for me seeking to modify the terms of the existing loan.

29.    In discussing the situation with MidAmerica, they indicated that they would be willing to modify the terms of the loan to keep it at MidAmerica. We reached an agreement on the new terms for the loan: it would continue to be an equity line of credit for a total amount of $1,890,000. MidAmerica agreed that the interest rate would now be -1% below the index rate (meaning if the index rate was 5%, the rate for the loan for the Kilpatrick Home would be 4%) and that there would be no "basement," meaning no matter how low the index rate might go, the rate for my loan would continue to drop.

30.    After reaching agreement on the terms for the refinance, MidAmerica put together the loan documents and eventually scheduled a closing for May 31, 2006 at MidAmerica's branch at 6333 N. Milwaukee in Chicago.

31.    On May 31, 2006, I appeared at the MidAmerica branch as scheduled for what I expected was going to be a closing for the refinance of the loan for the Kilpatrick Home. The closing, however, did not happen for a few reasons. First, MidAmerica did not have a closer available and possibly also a notary. While I am not sure if a notary was available, I am sure that I did not see or interact with a notary at the branch on May 31, 2006.

32.    Second, in reviewing the draft documents that had been prepared for the closing, I noticed that the loan documents had not removed the "basement" on the floating interest rate and included the wrong rate, as it was not -1% from the index rate. As a result of these two issues, not all of the loan documents were signed on May 31, 2006 and the closing was not completed.

6

33.     I say not all of the documents were signed because while I was at the branch on May 31, 2006, I was asked if I would start signing the documents for the closing. Having attended many closings, and knowing how many documents get signed as part of a loan for real estate, I was not surprised by this request and was willing to start signing documents. One of the documents that I believe I signed on May 31, 2006 is the Compliance Agreement that I understand PNC produced at PNC002915. A copy of that document is attached as Exhibit 3. I did not, though, sign the key documents for the loan, in particular I was certain not to sign either the note or the mortgage, especially since the note did not have the correct terms. I have not signed either the note or the mortgage at any time and I dispute that the pages bearing my signature on which PNC now relies were signed by me at any time when attached to the documents to which those pages are now attached.

34.     Because of the issues that prevented it from proceeding on May 31, 2006, the closing was rescheduled for June 5, 2006, again at the MidAmerica branch on North Milwaukee.

35.     That day I again appeared at the MidAmerica branch, expecting to proceed with the closing. Once again, MidAmerica did not arrange for both a closer and notary to attend. As a result, the loan again did not close.

36.     As with the May 31, 2006 closing, the draft documents were available and, once again, I was asked to review them. I again did that and in the course of that review I signed the Universal Residential Loan Application. I got a copy of this document from PNC in the course of my efforts to address the issues that gave rise to this litigation and produced it in this litigation at FOSTER0000077-83, and a copy of it is attached as Exhibit 4. This was the only document that I remember signing on June 5, 2006 and I am certain that, as was true with the original attempt at closing, I made sure not to sign either the note or the mortgage.

37.     The closing was rescheduled again, this time for June 6, 2006, still at the same MidAmerica branch on North Milwaukee.

38.     On June 6, 2006, I again appeared for the closing.  Amazingly, MidAmerica again failed to have both a closer and a notary appear, and so the closing did not happen again.  This saga was very frustrating and so this latest failure angered me.  As a result, I did not even sit down that day and I do not remember signing any of the loan documents, though MidAmerica had once again prepared new versions of the documents, this time dated June 6, 2006.  Examples of the drafts dated June 6, 2006 were produced at PNC008172, FOSTER0009442-3, FOSTER0002972, FOSTER0009444, FOSTER0009453, FOSTER0002974 and are attached as Exhibits 5 to 10.

39.     While PNC has produced a Signature / Name Affidavit dated June 6, 2006 that bears a signature that looks like mine, I did not sign that document, or any others, on June 6, 2006.  A copy of the document produced by PNC is attached as Exhibit 11.  Even though I did not sign this document, I did note that it contains both a Loan Number and an Application Number and the Application Number matches the number on the Application I signed on June 5, 2006 while the note that PNC claims I signed on May 31, 2006 contains neither number.  (*Compare* Ex. 11 *and* Ex. 4 *with* Morris Aff., Doc. 157-2, Ex. 1.)

40.     I have told people connected with PNC about this issue many times.  One example of this occurred at the Dempster branch of National City in late summer or early Fall 2006, when I spoke with the branch manager, whose name I do not remember, about the issue.  A second example is a March 10, 2009 letter I sent to Nick Keleman of what was then National City.  A copy of that letter is attached as Exhibit 12.  Though I have relayed this information to PNC multiple times for years, PNC has never proposed a resolution to me that did not require me to wrongly acknowledge having signed documents as part of the 2006 refinance that never closed.

41.     For reasons I cannot explain, even though the closing did not occur at any of the three attempted closings in 2006, MidAmerica sent me the cancelled loan documents from the existing loan for the Kilpatrick Home showing that the note was paid and the mortgage released. A copy of the released 2003 loan documents were produced at FOSTER0000951-60 and are attached as Exhibit 13.

42.     Later in 2006 or 2007, I further drew down on the loan for the Kilpatrick Home. Since the prior loan had been for the same amount as the refinanced loan would have been, I did not see any reason why I could not draw down on the loan.

43.     Throughout 2006, and going forward for years, I continued to make regular payments towards the loan on the Kilpatrick Home. For nearly every payment, I would go to a branch of the bank and make the payment to a teller so that I would get a receipt for the payment. I never set up automatic withdrawals for the Kilpatrick Home, or any other loan I have ever had, be it with MidAmerica, National City, PNC, or any other lender. Examples of the receipts were produced at FOSTER0007859, FOSTER0007894-901, FOSTER0007904-6, FOSTER0007908-31, FOSTER000117-19 and are attached in Exhibit 14.

44.     After the three attempts to close the refinancing of the loan for the Kilpatrick Home failed and the modification was not completed, I continued to receive statements from MidAmerica for the loan on the Kilpatrick Home. The amounts shown for the payments did not match the terms of the 2006 refinance that had not closed or the 2003 loan that had been in place, and so I was not sure what the terms of the loan were at this point. But knowing that I had received the money from MidAmerica, I continued to make the requested payments, believing that doing so was a good faith way for me to both maintain a good relationship with MidAmerica and protect my credit. I also made the payments to MidAmerica because at the time, I was in the midst of dealing with the

9

issues that National City had raised with the 2003 refinance for the Kilpatrick Home in which National City was claiming that its loan, which was paid off as part of that refinance, had not been fully repaid. These issues are described further below. In 2006, those issues had reached the point that I had filed a lawsuit against National City. Since that lawsuit was about the 2003 refinance and was still in progress, I was especially concerned about creating new issues with MidAmerica, and so I made the payments it requested and figured that any issues with the MidAmerica loan, including the fact that there were no loan documents, could be worked out once the issues with National City were resolved.

45.     In all of this and continuing until shortly before I initiated this litigation, it never occurred to me that MidAmerica, National City, and/or PNC were treating the loan for the Kilpatrick Home as though the 2006 refinance had actually closed. That thought never occurred to me since I knew that, despite the three scheduled closings, the loan had not actually closed.

**2.     Seeking assistance with the loan for the Kilpatrick Home.**

46.     Starting in 2008, the global economic downturn had a significant impact on real estate generally and I saw great opportunity for me if I could get the financing necessary to buy new properties. At the time, I had reduced my real estate portfolio to three properties, plus my two homes, and so I was ready to purchase new properties to replenish my portfolio. I had even identified properties in which I was interested and planned to build the number of properties in my portfolio back up to around 15 properties. Examples of listings for some of the properties are attached as Exhibit 72. The purchase of additional properties also would have created real estate commission income for me.

47.     To be ready to pursue this strategy, I was in regular contact with mortgage brokers and other lenders with whom I had cultivated relationships, including Mike Ruston, Frank Sommese, and contacts at banks including the Northern Trust, Chase, Republic Bank, and UBS

Mortgage as well as mortgage brokers. I was also working with Mike Ruston, who was president of his own mortgage company, to monitor my credit score and do whatever was possible to gt me loans despite the issues created with my credit history by National City. These lenders told me that, due to the uncertainty created by the economic downturn, lending standards had become more restrictive, which I certainly knew. They further explained that this meant that they could not make loans to me because of issues on my credit history.

48.     Until September 2008, these issues included reporting from National City that arose out of a dispute between it and, ironically, MidAmerica related to the 2003 refinance in which the loan was moved from National City back to MidAmerica. In this dispute, National City claimed that an audit had revealed that its loan was not fully paid off at the closing of the 2003 refinance, and so it claimed it was still owed additional money – approximately \$8,000.00; MidAmerica, on the other hand, claimed that it had paid National City the amount indicated on its payoff letter, meaning it had done nothing wrong, and so nothing it could do to resolve the situation. I was left stuck in the middle and National City began making negative reports to the credit reporting agencies, negatively impacting my credit history. I even offered to pay National City the additional money it claimed it was owed, but could not get National City to agree to accept the payment. A summary of those issues can be found in the June 6, 2005 letter from MidAmerica that is attached as Exhibit 15. While these issues were resolved through a lawsuit against National City that settled in January 2007, National City did not correct its reporting until September 2007.[2]

---

[2] While I realize that these issues are not part of this litigation, they are nonetheless part of the story here and my history of problems with the banks that are now PNC, and so I have included them. To be clear, I am not pursuing any claims or damages in this litigation related to these events.

49.     As a result of the more restrictive lending standards that followed from the global economic downturn, I was afraid that negative credit reports would make it impossible for me to get the loans I would need to take advantage of the opportunities in the market. The more restrictive standards made a borrower's credit score matter most and mine was not what it should have been due to the issues I had been having with National City. At the same time, realizing that MidAmerica and National City had now merged and National City was preparing to merge with PNC, I was beginning to worry that I may have trouble getting credit in the future and in making all of the payments required under my various loans. At this time, I had five loans, with one each for the Kilpatrick Home, the Fiesta Way Home, and each of the Magnolia, Montana, and Racine rental properties.

50.     Ideally, I would have refinanced the loans with a different lender to avoid any further issues with the what would become PNC. Unfortunately, due to the negative history being reported at the time by National City and later by PNC, I was not able to obtain loans from any lenders, and so could not refinance away from PNC. I went so far as to write to Nick Keleman at National City, explaining the history of my issues, all in the hope that he would be sympathetic and help me get the issues resolved. A copy of that March 10, 2009 letter was produced at FOSTER0000961-2 and is attached as Exhibit 12.

51.     Further complicating things, the mergers between MidAmerica, National City, and PNC resulted in multiple services being assigned my loans, sometimes with as many as three servicers in a year. Each time this occurred, issues would occur that required my attention as part of my ongoing effort to maintain my credit history. In one instance, a servicer claimed I had not made a payment that had been made to the bank itself, and so to avoid any issues I made payments to both the servicer and the bank.

52.     Always seeking to be proactive and mindful of the impact that defaulting on a loan could have on my ability to obtain loans in the future, I contacted National City regarding the loan for the Kilpatrick Home and spoke with Mr. Keleman.

53.     During these conversations, Mr. Keleman noted that he did not see any loan documents related to the loan for the Kilpatrick Home.  I told him that there were no documents for the loan, and so he would not find any.  Mr. Keleman asked if he should request the loan documents anyway and I responded that it would be interesting to see what happened if he did.

54.     On March 24, 2009, I received documents from Jeff Hespas of National City from a 2006 loan made to a Jeff Foster.  The documents, however, were not for the Kilpatrick Home, and instead appeared to be for a loan with a different person who also happened to be named "Jeffrey Foster."  Copies of these documents were produced at FOSTER0004286-4292 and are attached as Exhibit 16.

55.     When I told Mr. Keleman that the only documents that I received from National City were for someone else, Mr. Keleman said that National City could not find any documents corresponding with a loan for the address of the Kilpatrick Home.

56.     On March 31, 2009, I received a letter from National City's T.L. Bell that offered to accept 70% of the outstanding balance on the loan for the Kilpatrick Home as a settlement in full at any time within two years beginning April 6, 2009 through April 5, 2011.  The letter was produced at FOSTER0000970 and is attached as Exhibit 17.

57.     After receiving this offer, I immediately tried to get the financing necessary to take advantage of it.  At the time, however, National City (which was in the process of merging with PNC) had placed a number of erroneous credit reports on my credit history that prevented me from being able to obtain the needed financing.

58.     Around this time, I was in regular contact with Randy Holland and Tom Bell at National City/PNC about these issues and my efforts to take advantage of PNC's offer, most often speaking with them by telephone. In the course of these conversations, Mr. Bell would emphasize to me that he was with a different part of the bank from the division that was placing the credit marks on my credit history, and so his ability to do anything about those marks was limited. Mr. Bell went so far as to suggest that I should take action against the mortgage division that was placing the negative marks on my credit history.

59.     On February 18, 2010, Mr. Bell wrote to me and, now on behalf of PNC following its merger with National City, again made the offer to resolve the amounts owed on the loan for the Kilpatrick Home, now at 60% of the outstanding balance. That letter is at PNC001359 and attached as Exhibit 18. I called Mr. Bell in response and told him that I had every intention of accepting this offer, but was still working to clear up my credit reporting. Once again, Mr. Bell suggested that I take action against the mortgage division of National City/PNC that was creating these issues.

60.     I understand that in this litigation, PNC has produced versions of the two letters from Mr. Bell that are different than the letters I actually received. First, at PNC001356, PNC produced a different letter dated March 31, 2009 and signed by Mr. Bell. That version of the letter shows that it was sent on PNC letterhead and offers to accept 60% of the outstanding balance. A copy of the letter produced by PNC at PNC001356 is attached as Exhibit 74. PNC has also produced a letter dated May 12, 2010 and sent on PNC letterhead that offers to accept 70% of the outstanding balance as settlement in full of any time within a one year period beginning April 6, 2011 and concluding April 5, 2012. A copy of that letter was produced at PNC001357 and is attached as Exhibit 19. I never received either of these letters and cannot explain why they are

different than the letters that I did receive from Mr. Bell. (*Compare* Exs. 17 and 18 *with* Exs. 74

and 19. Also confirming that National City and PNC sent the letters I received, and not the letters

that PNC has produced in this litigation, I sent a letter to Mr. Bell on November 16, 2009 in which

I ask him, on behalf of PNC, to agree to a two-year extension of the then-existing modification

and his offer to fully resolve the loan for 70% of its balance. A copy of my letter was produced at

FOSTER0000041-2 and is attached as Exhibit 20. While Mr. Bell declined my request in a letter

dated November 20, 2009, the fact that he responded further demonstrates that he sent the lettes I

received, and not the versions that PNC has produced in this litigation. A copy of Mr. Bell's letter

was produced at PNC001358 and is attached as Exhibit 21.

61. I very much wanted to take advantage of these offers from PNC, and so made

numerous efforts to figure out how I could get the financing I needed, coming up with a number

of scenarios to work around the issues with my credit created by PNC. This included going to a

number of lenders, including UBS Mortgage, Republic Bank, Prestige Mortgage, Northern Trust,

and Chase.

62. I also attempted to sell the Montana Property to raise the funds needed to take

advantage of PNC's offers. To make this possible, I did not rent out the Montana Property, losing

much needed income.

### 3. The Repayment Program.

63. In 2009, National City offered me and I eventually accepted a Short Term

Repayment Modification Program ("Repayment Program"). Under the Repayment Program, the

payment for the loan on the Kilpatrick Home was reduced to $3,005.50 for 24 consecutive billing

cycles beginning with the May 7, 2009 payment. The Repayment Program that I signed includes

a reference the home equity line of credit agreement that governed my account at the time, but did

not define or identify the specific document and I did not read that reference as being to the

documents that I saw, but did not sign, in the attempts to close the refinancing in 2006. I even verified this with Mr. Keleman, who was aware of the issue from our prior discussions.

64.     After agreeing to the Repayment Program, I made sure to make all of the 24 required payments. I made the last payment in April 2011.

65.     Beginning in February 2011, I began to contact PNC about the upcoming end of the Repayment Program. I wanted to get agreement on the modification that had been discussed with me when I began the Repayment Program. In response to these inquiries, PNC's Randy Holland told me that I had to wait until the Repayment Program was completed before a modification could be requested.

66.     After finishing the Repayment Program and having made all of the 24 reduced payments of $3,005.50, I again contacted PNC to talk about the modification and reducing my payments. During the negotiations with PNC, Mr. Holland and Paige Martin told me that PNC would continue to accept the reduced payments. Examples of them telling me this can be found at FOSTER0000143-4, FOSTER0005262, FOSTER005921, which are attached as Exhibits 22 through 24.

67.     Even though I had been trying to get them to agree to a modification already, PNC wrote me a letter dated April 25, 2011 telling me that the monthly account payment would return to being calculated according to the normal terms of the original contract after April 7, 2011. I understand that a copy of this letter is Exhibit 5 to the Morris Affidavit that PNC submitted. (Doc. 157-2.)

68.     By this time, though, I had already contacted PNC and Mr. Holland and Ms. Martin had told me PNC would accept a lesser amount than the amount that otherwise would be due. PNC could not, however, tell me the amount that I should pay, saying that they still needed to determine

that.  As a result, Mr. Holland and Ms. Martin told me to continue paying the amount I had been paying, $3,005.50.

69.    Relying on PNC's instructions, I made a payment of $3,005.50 in May 2011 and continued to do so through September 2011.  Though it accepted these payments, PNC did not properly apply them to the loan for the Kilpatrick Home.

70.    Though Mr. Holland and Ms. Martin suggested that they would be able to refinance the loan for the Kilpatrick Home so that the monthly payments would remain around $3,000, I was unable to get a final agreement from PNC to do so.

71.    This was because I refused to sign documents for the modification that referred to the note that I supposedly signed in 2006.  While PNC kept sending draft documents, seemingly hoping to wear me down, I refused to sign each of them because each one contained the acknowledgement of the May 31, 2006 documents that I knew I had not signed the note and that the closing of that refinancing had never happened.

72.    In September 2011, both Mr. Holland and Mr. Bell from PNC were trying to convince me to sign modification documents that stated that the 2006 closing had occurred and told me that if I signed the modification agreement, and in the process acknowledged the 2006 loan documents, they would correct the wrong information on my credit history.

73.    Unwilling to just trust someone from PNC at this point, I refused to sign the agreement, and no modification occurred in 2011.

74.    PNC stopped sending me statements for the loan on the Kilpatrick Home in November 2011.  As a result, since then it has been nearly impossible for me to know what amounts PNC thinks I should be paying on the loan for the Kilpatrick Home.

### 4. Discrepancies with the May 31, 2006 documents.

75. In this litigation, PNC claims that a note that it calls the Illinois Note and that is dated May 31, 2006 is enforceable. There are a number of discrepancies with this document, which I understand is attached as Exhibit 1 to the Morris Affidavit that PNC submitted with its Motion for Summary Judgment. (Doc. 157-2.)

76. First and foremost, as explained earlier, I did not sign a note at the unsuccessful closing on May 31, 2006.

77. Second, the Illinois Note that PNC is trying to enforce contains the "basement" provision that was one of the key provisions that was being removed as part of the refinance. That provision appears on page 3 of the Illinois Note, in the section labeled Minimum / Maximum Annual Percentage Rate and prevents the rate from going below 4.06%. (Morris Doc 157-2, Ex. 1.)

78. Third, at the top of the first page of the document, there is a section where the loan number would go. While there are numbers there in the Illinois Note, the loan number is shown as 0000000000.

79. Fourth, the note that PNC claims I executed on May 31, 2006 does not have my initials on any of the other pages. At the time, it was MidAmerica's practice to have borrowers initial each page of promissory notes. I know this from the multiple notes I executed with MidAmerica around this time. Examples of this can be found on the notes for my properties on Montana and Racine, which were shown to me as Exhibits 59 and 61 at my deposition and are attached as Exhibits 25 and 26.

80. Finally, if the closing occurred on May 31, 2006, there would have been no reason for closings to be scheduled for June 5, 2006 and June 6, 2006. But closings were scheduled for

both of those days and, confirming this, MidAmerica prepared draft documents dated for each of those scheduled closings. Examples of those draft documents are in Exhibits 5 to 10.

81. I have seen that the Illinois Mortgage that PNC relies upon was notarized by a notary public named Monika Kopec. I do not remember ever meeting anyone by that name or seeing anyone by that name notarize any documents I signed on May 31, 2006, June 5, 2006, or June 6, 2006. Also, I never signed a mortgage for the loan on the Kilpatrick Home at any of the three attempted closings in 2006.

82. The first time that I ever saw the note and mortgage that PNC claims were signed on May 31, 2006 was on June 29, 2011, when Randy Holland of PNC faxed documents that I supposedly signed on May 31, 2006 to me. Mr. Holland then faxed me documents again on June 30, 2011, though they differed from the documents sent me the prior day. After I asked for the documents to be mailed to me, Mr. Holland mailed documents to me on July 5, 2011 and they also differed from the documents he had faxed. Prior to this, I had asked MidAmerica and National City about the loan documents and while both had tried to provide me with copies of the loan documents, neither provided the documents that PNC now relies on and claims are the Illinois Note and the Illinois Mortgage.

82A. In October 2011, an attorney wrote to PNC on my behalf regarding its erroneous efforts to enforce the May 31, 2006 documents. A copy of that letter was produced at FOSTER0005024-5025 and is attached as Exhibit 27.

### C. The Fiesta Way Home.

83. In 2004, my continued hard work enabled me to buy what I thought could be another dream home following renovations that I planned to do, this time in Ft. Lauderdale, Florida. This home is a five bedroom, five bath, over 5,000 square foot home originally built in

1991 that is located on the canals just inland from the Intercoastal Waterway. In this Affidavit, I will call this house the "Fiesta Way Home."

84.     I purchased the Fiesta Way Home using a mortgage from MidAmerica. In 2010, I entered into a loan modification with PNC for the Fiesta Way Home. The documents for the modification were signed at the successful closing on May 20, 2010 and it is these documents, which I understand were attached to the Affidavit of Dorothy Thomas as Exhibits 4 through 6 that control issues related to the Fiesta Way Home. (Doc. 157-1, Exs. 4-6.)

85.     To be clear, there is no dispute about the fact that I signed these documents, as I fully acknowledge having done so for both the original loan and the modification.

86.     Under the terms of the original loan documents for the Fiesta Way Home, I opted not to escrow money for paying the property taxes or hazard insurance, and instead paid for them directly myself. After the 2010 modification, money was escrowed for property taxes and hazard insurance.

87.     The exception for this is flood insurance, which was always required to be escrowed, and so MidAmerica, then National City, and finally PNC have paid for the flood insurance for the Fiesta Way Home, using money I paid into an escrow account for the loan through a portion of my payments towards the loans.

88.     After buying it, I began upgrading the Fiesta Way Home. Like with the Kilpatrick Home, I did a lot of the work myself. After a year of work and investing $500,000 into the property, the house was valued as high as $4.6 million.

89.     I currently estimate that the Fiesta Way House is worth approximately $3 million , while real estate websites like Trulia and Zillow estimate its value at approximately $2.8 million. A copy of the estimates from Trulia and Zillow are attached as Exhibits 28 and 29.

### 1. 2009 Misapplied Payments

90.     While issues with the loan for the Fiesta Way Home had been ongoing prior to then, the issues escalated in the second half of 2009.  On August 27, 2009, I became aware that National City claimed I was two payments behind on the loan for the Fiesta Way Home.

91.     After becoming aware of this, I immediately contacted National City by phone. During the phone conversation with PNC on, I believe, August 27, 2009, National City's Mr. Capers, told me that two payments I made – one made on June 30, 2009 and the other on July 14, 2009 – had been misapplied by National City and should show up as made payments soon.

92.     Confirming this, National City sent me a letter dated September 16, 2009 that acknowledged that I may not have received proper credit for my mortgage payments. A copy of the letter, produced as PNC001406, is attached as Exhibit 31.

93.     After receiving this letter, I called National City again.  This time the National City representative told me that the issues PNC admitted in its letter were due to PNC's errors.  Based on my experience with errors like this and the previous assurances from National City, including from Mr. Capers, I believed that the payments would eventually get straightened out, just as they had done in the past when similar issues arose.

94.     As expected, National City did just this for the June 30, 2009 payment, giving me proper credit for that payment at some point in September 2009.  A copy of the portion of the September 10, 2009 mortgage statement showing this was produced as FOSTER0007863 and is attached as Exhibit 32.  At that time, however, PNC did not resolve the errors it had acknowledged having made regarding the July 14, 2009 payment.

95.     I continued to follow up regarding the issues with the July 14, 2009 payment. Eventually, I was told that the check did not clear the federal reserve and asked to provide a copy

of the canceled check.  A copy of the letter from PNC was produced at FOSTER0000116 and .is attached as Exhibit 33.

96.     PNC never credited me for the July 2009 payment.  As a result, PNC continued to contend that I had missed a payment, continued to report this to the Credit Rating Agencies, and my credit continued to be negatively impacted by that reporting.

### 2.     The 2010 Modification.

97.     The 2008 global economic downturn and its impact on me also resulted in concerns regarding the payments on the loan for the Fiesta Way Home because I was now forced to earn income only through traditional real estate sales.  As a result, in 2009, I discussed with National City representatives possible modifications to the loan for the Fiesta Way Home.  Over the course of 2009, I provided National City with documents for it to assess a modification more than 20 times and still was twice rejected for modifications because National City said I had not returned the required documents.  Finally, in December 2009, National City, which was in the midst of merging with PNC, sent me modification documents that I did not accept because that modification would have actually raised, rather than reduced, the monthly payments I would have to make by nearly $2,500 per month.

98.     By April 2010, I had continued discussing things with National City and we had agreed to a modification for the loan for the Fiesta Way Home.  The closing for that modification occurred on May 20, 2010 and, here again, there is no dispute about the loan documents having been signed by me on that date.  I refer to the modification as the Fiesta Way Modification in this Affidavit.

99.     Under the modification, the loan term was extended to 40 years and the interest rate was reduced.  Also as part of the terms of the Fiesta Way Modification, I was required to escrow

payments for property taxes and continue the escrow for flood insurance. I was, though, still responsible paying for hazard insurance coverage.

100.     Also under the modification, all escrow shortages were going to be resolved and I understood that, barring unexpected events, there would not be changes to the payment amounts for at least one year.

101.     PNC sent me a letter that summarized the terms of the modification. That letter indicated that the first monthly payment due under the modification would be $13,532.04, consisting of a first month's payment of $6,730.55, "loan modification closing costs (Title Fee)" of $6,401.49, and an appraisal fee of $400.00. A copy of the letter was produced at PNC002236-7 and is attached as Exhibit 34.

### 3.     Issues with loan payments after the Modification.

102.     After the Fiesta Way Modification became final on May 20, 2010, the initial payment due under the Loan Modification was for $13,532.04 and it was due on June 1, 2010.

103.     **[INTENTIONALLY BLANK]**

104.     I made the payment on June 3, 2010 and so understood that the loan on the Fiesta Way Home was current as of that date.

105.     PNC never informed me that the first payment would include amounts that would go to reduce an escrow shortage. Actually, I understood just the opposite, as it was my understanding from PNC that the Fiesta Way Modification would resolve any issues regarding the escrow shortages that PNC had claimed and that everything would start over after the modification, with the payments being the amounts agreed to as part of the modification process, at least for the first year until escrows needed to be recalculated. PNC even confirmed as much after the modification closed when, on July 28, 2010, PNC's Brandy Treadway wrote to me regarding issues on four of my loans with PNC. In that email, Ms. Treadway wrote: "There is no escrow shortage

because it seems as if that was somehow rolled into the modification." A copy of the email from Ms. Treadway was produced at FOSTER0004891 and is attached as Exhibit 35. Ms. Treadway said the same thing in a later email sent internally within PNC, writing that another loan of mine had also had an escrow shortage taken care of at the closing of a loan modification. A copy of Ms. Treadway's other email was produced at FOSTER0005153 and is attached as Exhibit 36.

106.    PNC sent me an escrow analysis dated July 9, 2010 showing that my payment was set at $6,000.26 beginning June 1, 2010. A copy of the escrow analysis I received was produced at FOSTER0007679 and is attached as Exhibit 37.[3] While I was surprised that PNC had done this escrow analysis so soon after the Fiesta Way Modification, the information provided appeared correct to me and so I began planning to pay it on a monthly basis as required. This information was also confirmed by Ms. Treadway's July 28, 2010 email, which, in addition to saying that there was no escrow shortage, confirmed that the payment amount was $6,000.26, with $3,412.22 going towards principal and interest and $2,514.04 being escrowed for taxes and $47.00 being escrowed for flood insurance. (Ex. 35, 7/28/10 Treadway Email.)

107.    Based on the amounts that PNC had previously provided for the June payment, this new payment amount meant that I had paid an additional $730.29 that PNC seemingly had not accounted for and so I began asking where that money went. I raised the missing $730.29 with Ms. Treadway during our communications on the various issues for which she was assisting me. On the missing $730.29, Ms. Treadway could not actually tell me where the payment went. This email was produced at FOSTER0005153 and is attached as Exhibit 36.

---

[3] I understand that PNC attached an escrow analysis to its motion as Exhibit 18 to the Thomas Affidavit that it claims is the analysis sent me. I have reviewed that exhibit and did not receive it nor have I ever seen that version of the analysis before.

108.     I did, though, learn from Ms. Treadway that by August of 2010, PNC showed that it had $2,833.93 that I had paid sitting in a suspense account associated with the loan for the Fiesta Way Home and Ms. Treadway as asking what this was left over from, thinking it should probably be applied somewhere.  (Ex.36.)

109.     While I understand that PNC has since said that there was an escrow shortage and that the $730.29 was applied to that escrow shortage, I was not told anything like that at the time and do not know what escrow shortage existed at the time.  I also am not aware of any documentation showing that PNC applied $730.29 to the escrow account associated with the Fiesta Way Modification.  In fact, I believe that the first time I learned that PNC had taken the position that it had applied $730.29 to the escrow account in July 2010 to clear an escrow shortage was in the briefing on PNC's current motion.

110.     In July 2010, I was in regular communication with PNC regarding the payments for loan for the Fiesta Way home as I understood I had made all necessary payments, but they had not all been credited to my account.  In these communications, PNC told me that the payments that had not been credited to my account during the modification would be credited to the account once the modification was completed.

111.     Consistent with the escrow analysis that PNC sent me in July 2010, I made payments of $6,000.26 or $6,001.00 (rounded up from the $6,000.26 shown on the escrow analysis) through the remainder of 2010.  Because of the issues that began in August 2009 and were made worse in July 2010 regarding the accounting for the payments made during and right after the Fiesta Way Modification was completed, it appeared that PNC did not properly credit these payments.  This meant that PNC applied my payments to the wrong month's payment, making it appear as though I was regularly paying at the end of the month in which the payment

25

was due, and not the just before the month started (meaning, for example, PNC would apply a payment made on December 31st to the December payment, and not the January payment that I believed it should apply towards). As a result, I would get letters from PNC about issues with the payments, even though I was paying the amount that PNC told me to pay.

112.    For instance, PNC sent me a letter dated July 30, 2010 that indicated that its records showed I had a balance of $2,833.93 for the loan for the Fiesta Way Home because the monthly payment was $6,000.26. A copy of the letter was produced as FOSTER0003967 and is attached as Exhibit 38. PNC therefore requested that I send them an additional $3,166.33, indicating that the $2,833.93 that it had already received would be held in a suspense account until August 20, 2010.

113.    At the time, I had no idea why PNC would think that I had made a partial payment and disputed how PNC was accounting for my payments, which, after the large June payment, were for $6,001 every month.

114.    I continued to try to follow up on this for months. On December 2, 2011, PNC sent me a letter in which it said that my new payments after the 2010 Modification were supposed to be $6,730.55 and that payments were supposed to resume on July 1, 2010. A copy of this letter was produced as PNC002258 and is attached as Exhibit 39. This further confused things since the payments had resumed in June, not July, 2010, and then the payment amount had been changed by the July 2010 escrow analysis.

115.    In January 2011, PNC conducted another escrow analysis and sent me a disclosure that said there was an escrow shortfall on the loan for the Fiesta Way Home of $2,348.44. A copy

of this escrow analysis was produced at FOSTER0007681-7682 and is attached as Exhibit 40.[4] This surprised me, since PNC had sent me a check in September 2010 in that same amount and said it was an escrow refund. A copy of the PNC letter sending me that check was produced at FOSTER0008771 and is attached as Exhibit 41. I have no idea why PNC was sending me money in one month, and then a few months later sending me a notice that it needed that same amount of money.

116. Everything about the escrow refund was confusing. In its letter, PNC told me that the check was being returned because the loan was past due and the check was not sufficient to reinstate the loan. (*Id.*) I do not know why PNC took the position in September 2010 that the loan on the Fiesta Way Home was past due. I also do not know why PNC said it could not accept the payment, because it did, though it later decided to return part of that payment as the escrow refund. As the January escrow analysis would show, at the time that PNC refused to accept the payment, I had an escrow balance at the time of the analysis of $5,321.35. (Ex. 40.)

117. Despite all of the confusion, in an attempt to make sure there were no further issues, I paid the supposed escrow shortage by sending PNC a check for $2,348.44 that it cashed on February 7, 2011. As a result, per the January escrow analysis, this meant that my monthly payment was going to be $6,156.83 beginning in March 2011.

118. I continued to make the required payments of $6,000.26 in January and February and in March began paying $6,156.83 each month through June 2011. Unfortunately, PNC continued to have issues properly applying these payments.

---

[4] Here again, the analysis I received is different from the analysis that I understand PNC attached to its motion as Exhibit 19 to the Thomas Affidavit. I have reviewed that exhibit and did not receive it nor have I ever seen that version of the analysis before.

### 4. Flood Gap Insurance

119.    On March 11, 2011, I was notified by FEMA that the flood insurance on the Fiesta Way Home had been underpaid by $82.00. A copy of the letter from FEMA was produced at FOSTER0010973 and is attached as Exhibit 42.

120.    I immediately attempted to contact PNC regarding the issue, calling PNC at extension 9040930157 and talking with a PNC representative named Ari, but was not able to obtain a response from PNC.

121.    I then worked to resolve the issue myself, contacting the insurer to confirm that I had the required flood insurance coverage, and learning that the payment made by PNC from the escrow for the Fiesta Way Home had been in the wrong amount ($529.00, not $611.00), leaving an $82.00 shortfall.

122.    To resolve the situation as promptly as possible, I paid the additional $82.00 directly to the insurance company to make sure that there was sufficient flood insurance on the Florida Property. Documents showing that payment was received by the insurance company on April 5, 2011 were produced as FOSTER010976-977, and are attached as Exhibit 43.

123.    After I made the payment for the portion of the premium that PNC failed to pay, PNC continued to contend that I had insufficient flood insurance on the Florida Property and sent me a letter dated April 14, 2011 stating its belief that the flood insurance for the Florida Property was insufficient and requesting proof of sufficient coverage within 24 days. I did not receive the April 14, 2011 letter.

124.    Because I did not receive PNC's April 14, 2011 letter, I was unaware that PNC still contended that there was insufficient flood insurance on the Florida Property and had asked for proof of sufficient coverage. As a result, I did not provide the proof of coverage.

125.    PNC sent another letter dated May 18, 2011 informing me that it had obtained this insurance, but I again did not receive the letter from PNC and so continued not to know of the issue or that PNC had obtained this insurance.  Regardless, by this time I had provided proof of flood insurance to PNC, speaking with PNC on at least two occasions regarding the issue and my resolution of it.

### 5.    The Flood Gap Insurance Creates Issues With Payments Amounts.

126.    Beginning in May 2011, new issues arose regarding the payment amount for the loan on the Fiesta Way Home.  This time, the issues related to the flood gap insurance problems.

127.    In May 2011, PNC sent me an Annual Escrow Account Disclosure that said the payment for the loan on the Fiesta Way Home would be $6,237.67 starting July 1, 2001.  A copy of the escrow analysis that made this calculation and informed me of it was produced at FOSTER007683-7684 and is attached as Exhibit 44.[5]

128.    This analysis, however, was wrong because it included amounts related to the flood insurance that PNC incorrectly and unnecessarily placed on the property, and so resulted in an incorrect payment amount.  This can be seen in the projections on the first page of the analysis which shows that PNC expected to pay for the flood insurance out of the escrow in January and then pay for the force-placed flood insurance as "MISC INS" in February.  (Ex. 44.)  The information PNC analyzed included the payment that PNC erroneously made in May of 2011 for the unnecessary lender-placed flood insurance that PNC obtained due to its error in underpaying for the insurance I had obtained.  (Ex. 44.)

---

[5] Once more, the analysis I received is different from the analysis that I understand PNC attached to its motion, this time as Exhibit 23 to the Thomas Affidavit.  I have reviewed that exhibit and did not receive it nor have I ever seen that version of the analysis before.

129.    When I contacted PNC to point out this latest error and inquire about the reasons for the increase in my payment, I was given conflicting information as PNC was not able to determine that the flood gap insurance was the reason for this increase in the monthly payments. Eventually, PNC told me that the increase in my payments that PNC calculated in May 2011 to go into effect with the July 1, 2011 payment was the result of the forced placed wind insurance. A copy of that communication was produced at FOSTER0005457 and is attached as Exhibit 45.

130.    By the end of July 2011, I wore PNC down and it acknowledged, as I had been telling it for months, that I had sufficient flood insurance. As a result, on July 26, 2011, PNC sent a letter saying that, as a result, it would be refunding the total amount of the flood insurance it had gotten. At the same time, however, PNC refused to change the payment amount as a result of this refund, claiming that it would be reflected in the next escrow account analysis. PNC also said that it would refund the total amount of the lender placed flood gap insurance premium on July 28, 2011, but the records from that time do not show that the refund was made.

131.    Though PNC acknowledged I had sufficient flood insurance, and so it should not have gotten a policy of its own and I should not have to pay for that policy, PNC did not recalculate the amount of my loan payments even though it had calculated those payments based, in part, on the cost of the unnecessary insurance it got. I was able, though, to get PNC to agree to try to set up the account to accept a lower payment for July and August. While I do not remember with whom I spoke about this, I have seen confirmation of this in the emails that PNC produced in this litigation, including PNC004611, attached as Exhibit 47. Unfortunately, PNC messed up the "lower" payment amount, and instead input the amount that included the cost of the unnecessary insurance.

132.     After I received a statement in July 2011 showing that the payment PNC expected remained $6,237, I contacted PNC on July 21, 2011 at approximately 11:30 a.m. and spoke with PNC representatives Barbara Edwards, Jennifer Ivory, and Alice Habens.  In discussing the issues regarding the correct amounts for the payments around this time, the PNC representatives told me that the reason for differences in the payments was because of lender-placed flood insurance and that I should continue to make payments at the previous amount, $6,156.83, while they researched the issue.

133.     When I did not hear back from PNC, I went to the Fullerton branch in Chicago and spoke to Jose Melindez, who also told me not to pay the increased amount because that would only confuse things.  Based on these instructions from multiple PNC employees, I made a payment of $6,156.83 in July 2011.

134.     After I received a statement in August 2011 showing that the payment PNC expected remained $6,237, I again went to PNC's Fullerton branch and again spoke with Mr. Melindez.  Mr. Melindez again told me to pay the amount I had been paying – $6,156.83 – and that Mr. Melindez would straighten it out.  After asking Mr. Melindez to repeat this in front of a PNC teller whose number was WWS0402E, I made the payment to that teller.

135.     As a result of PNC's refusal to recalculate the payment amounts, PNC classified my July and August 2011 payments as short.  (*See, e.g.*, SOF,, ¶ 41.)  It also resulted in PNC returning part of the August 2011 payment which resulted in PNC reporting my payments as late to the credit bureaus, impacting my credit.

136.     Because of PNC's refusal to do an updated escrow analysis, I did not know the correct amount of the payment I should be making.  As a result, I made numerous inquiries

regarding the correct amount for payments and the reasons for the increase remaining in place, with the issue persisting into 2012.

137.    In January 2012, PNC's Mortgage Executive Office wrote to me regarding the payment amount.  In that communication, PNC explained that the increase in payments effective as of July 2011 was "because of the additional flood gap coverage that was added to your mortgage."  In that communication, PNC also acknowledged that on July 28, 2011 it received the refund for the flood gap insurance.  PNC then explained that because I followed instructions from multiple PNC employees and continued to pay the amount I had been paying prior to the increase, this caused my escrow shortage to increase. A copy of this letter was produced as FOSTER0005801 and is attached as Exhibit 48.

138.    In response, I demanded that PNC fix the account since the entire issue was created by its mistakes regarding the flood insurance.  PNC refused.  (Ex. 48.)

139.    In a letter dated September 1, 2011, PNC wrote me that the $6,156.83 payment I made on August 30, 2011 was insufficient because I was supposed to pay $6,237.67.  A copy of PNC's letter is Exhibit 25 to the Thomas Affidavit.  (Doc. 157-1, Ex. 25.)  I had made the payment for $6,156.83 per the instructions I got from multiple PNC employees, who told me not to pay the higher amount that PNC calculated using the two payments for flood insurance.

140.    PNC's letter told me to pay them another $80.84 – the difference between the two amounts – by September 22, 2011.  But because the additional funds should not have been necessary, I did not send the additional payments.  I then got part of the payment back from PNC, receiving a check for $4,964.04 in late September.

141.    After getting part of the payment back, I attempted to follow up with Mr. Melindez at the PNC branch on Fullerton, stopping there to talk with three times between September 30,

2011 and October 3, 2011 about my efforts to straighten things out. While I was not able to talk with him on those visits, I reached Mr. Melindez by phone on October 10, 2011 and learned that he had not been able to figure out the issue. When I asked him to email me the results of his efforts, but Mr Melindez responded that he was not allowed to put such information in emails.

142.     I then contacted PNC's Phil Cordova on October 11, 2011. Mr. Cordova responded to me, leaving a voicemail that indicated that Mr. Melindez was correct that PNC's policy was not to email information like I had requested and recommended that I contact Mary Beth Roar at PNC to figure out the ongoing issues.

143.     While I continued to try to work through these issues with PNC, I paid the full amount that PNC claimed was owed, $6,237.67 starting in September 2011 and continuing through December 2011, even though it was incorrectly calculated. I did this to avoid further exacerbating the issues created by PNC's errors. Once again, though, PNC did not properly apply these payments and continued to report my payments as late to the credit reporting agencies, resulting in negative marks on my credit history.

144.     As part of my continuing effort to resolve the payment issues, on November 18, 2011, PNC's Executive Office sent me a letter regarding the loan for the Fiesta Way Home in which it told me that it may take some time to gather the information needed to accurately respond to my inquiry and committing to send me the results by December 18, 2011. A copy of the letter from PNC was produced at PNC001439 and is attached as Exhibit 50.

### 6.     Wind Insurance Issues.

145.     In November 2011, I learned for the first since the start of the loan for the Fiesta Way Home that PNC now contended I was required to have wind insurance. Prior to this letter, I had never received a communication from PNC, or from National City or MidAmerica before it,

indicating that PNC (or its predecessors) believed that wind insurance was required for the Fiesta Way Home.

146.    From time to time, I voluntarily obtained wind insurance for the Fiesta Way Home. I generally did this when I was doing a rehab project that left the property more exposed than it otherwise would have been.  One of those policies was a policy I obtained and that was in effect from September 5, 2010 to September 5, 2011.

147.    While PNC has indicated that this policy was reported cancelled in September 2010, it was not cancelled and remained in effect until September 5, 2011.  I have no idea why PNC received a report that it was cancelled.

148.    In September 2011, when the wind insurance policy lapsed, I did not realize it and did not think about it because I had not previously been required to obtain wind insurance.

149.    While I understand that PNC claims to have sent a letter dated September 9, 2011 informing me that the wind insurance I had lapsed, I never received that letter.[6]  As a result, I did not have reason to believe that there was any issue relating to wind insurance.

150.    I understand that PNC also claims to have sent a second letter regarding wind insurance dated October 11, 2011.  I also did not receive that letter, and so still had not reason to believe there was any issue relating to wind insurance.  Having not received the two letters, and having no reasons to believe there was any insurance relating to wind insurance, I could not respond to the letters or provide the information they requested.

---

[6] Though I received countless communications from PNC and its predecessors regarding my loans and issues with them, I somehow did not receive *all* of those communications, a problem that was difficult for me to manage because I could not know what I was not receiving.  As a result, there were a number of important communications that PNC's records show it sent, but that I never received.

151.    The first I learned of the issues regarding wind insurance was when I received a letter from PNC dated November 18, 2011.  In that letter, PNC notified me that I was required to have comprehensive wind coverage and that it had obtained force-placed insurance for the Fiesta Way Home at a premium of $37,730.

152.    I was surprised by both the requirement to have wind insurance and the cost of the insurance that PNC had obtained.  The November 18, 2011 letter stated that I was required to have comprehensive wind coverage, but did not identify a provision in the documents for the loan for the Fiesta Way Home that required the coverage.  While PNC has since written me numerous letters indicating that my mortgage required me to maintain insurance coverage for damage from "all types of wind and hail, including coverage for hurricanes, tornadoes, or named tropical storms ('Comprehensive Wind')," I cannot find any such language actually in the mortgage for the Fiesta Way Home.

153.    Upon learning of this issue, I quickly contacted Mr. McHone at PNC.  I had been working with Mr. McHone on other issues regarding the Fiesta Way Home Property and so now I contacted him to inquire about both the lack of notice and the comprehensive wind insurance requirement.  During that conversation, I asked Mr. McHone to send me copies of the notice letters that PNC said it had sent me.  Mr. McHone was unable to provide an immediate answer and did not contact me again for three weeks, all the while the alleged lapse continued.  In December, I received a letter from Insurance Administration at PNC that referenced the letters PNC previously sent, but that neglected to include the actual letters.

154.    Aware of the issue, I tried to get wind insurance as quickly as I could and, in January 2012, I succeeded in getting wind insurance coverage that was scheduled to go into effect on February 22, 2012.  Had I received the letters that PNC claims to have sent me or gotten proper

notice and a timely response to my inquiries to folks like Mr. McHone, I would have obtained comprehensive wind insurance earlier.

155.     The policy I got was for a year and cost much, much less than the policy that PNC told me they had obtained – $4,457 as opposed to $37,730.

156.     After I got wind insurance, PNC informed me that it would be refunding me for a portion of the wind insurance it had obtained, $20,223.28, leaving $17,506.72 charged to me for the insurance.  The difference in cost between the insurance I obtained ($4,457 for a year) and the insurance that PNC obtained ($37,730 for a year), meaning the PNC insurance cost more than 8 times as much as the insurance I got, demonstrates that PNC's insurance was unreasonably priced. On a per day basis, the difference in the two policies was over $90, with the policy obtained by PNC costing $103.37 per day ($37,730 / 365 = $103.37) while the policy that I got was only $12.18 per day ($4,457/365 = $12.18) – a difference of over $90 per day.

157.     In subsequent years, I continued to dispute that I was required to get wind insurance and so did not purchase coverage myself.  Both PNC and I did, though occasionally receive information from the company that had provided the 2010-2011 policy I purchased and those quotes were always for under $6,000 annually while the cheapest policy PNC obtained was over $15,000 and the rest were at least twice as much.  Information regarding the quotes I received can be found at PNC006388, FOSTER0004917, FOSTER0004958, attached as group in Exhibit 51.

158.     This was not the end of the issues related to wind insurance.  I understand that PNC claims to have sent additional letters regarding wind insurance dated March 15, 2013 that reported that my homeowner's insurance excluded windstorm and/or hail coverage and April 15, 2013.  I did not receive those letters either, and so did not respond to either.

159.    The next year, the same thing happened, as PNC claims to have sent me a letter dated January 20, 2014 telling me that the policy it got the year before was going to expire and the coverage would be maintained.  Once again, I did not get PNC's letter.

### 7.    Hazard Insurance Issues.

160.    Numerous times since 2010, PNC has claimed that the hazard insurance for the Fiesta Way Home was somehow deficient.  Letters from PNC about these deficiencies are dated February 5, 2010 (PNC002732), February 3, 2011 (PNC002771), March 6, 2012 (PNC002735 -7, and February 15, 2016 (FOSTER0008566), and attached together as Exhibit 52.

161.    Each time I got one of these letters, I provided information to PNC that demonstrated PNC was incorrect about the claimed deficiencies.

162.    Further, in acknowledging the information I provided, PNC told me that any temporary coverage it had obtained has been cancelled without charge to my account and apologize for any inconvenience caused by the process.  Examples of these letters, from March 27, 2012 and February 23, 2016, were produced at PNC002738-9 and FOSTER0008569 and can be found at Exhibits 53 and 54.

### 8.    PNC reports the Fiesta Way Home as vacant.

163.    I split my time between my Kilpatrick and Fiesta Way Homes, and am not physically residing at either property at all times.  To make sure this was acceptable, the loan documents for the Fiesta Way Home include a "Second Home Rider" that makes clear that the home may not be occupied at all times.  (Doc. 157-1, Ex. 5.)

164.    For reasons I do not know, on January 18, 2012, while I was working to correct the numerous errors on my loans, PNC informed me that it believed the Fiesta Way Home was vacant. A copy of the letter from PNC was produced as PNC001445 and is attached as Exhibit 55.  When I got the letter, I immediately called PNC at the number on the letter and spoke with Jerry, whose

ID code was "VMS." Jerry was unwilling to talk with me be about the vacancy issue, telling me that the letter was accurate, that I had not been maintaining my property, and that PNC would be taking over. Instead, he only wanted to talk about the payment that PNC claimed I owed. On January 24, 2012, I emailed PNC's executive office about the letter and my call with Jerry and a copy of that email was produced at FOSTER0006818 and is attached as Exhibit 56. The executive office responded a couple of days later, acknowledging that the Fiesta Way Home was not vacant. A copy of that email is was produced at FOSTER0005454-5 and is attached as Exhibit 57.

165.    At the same time PNC sent the notice to me, it also sent a notice that the Fiesta Way Home was vacant to my insurance company, Fireman's Fund. A copy of that letter was produced at PNC001444 and is attached as Exhibit 58. PNC made these reports even though a January 16, 2012 report from Safeguard Properties state that the exterior of the property was in good condition, the grass mowed, no for sale sign, the garage and outbuilding secure, nothing was boarded or broken, and both the electricity and water were on. A copy of that report was produced as PNC002728 and is attached as Exhibit 59.

166.    As a result of PNC's report that the Fiesta Way Home was vacant, Fireman's Fund cancelled my insurance policy effective as of June 1, 2012. A copy of the cancellation notice was produced at FOSTER0004318 and is attached as Exhibit 60. Fortunately, I was able to demonstrate that PNC's information was incorrect and Fireman's Fund did not cancel the policy.

167.    PNC's claims about the Fiesta Way Home being vacant also resulted in an investigation by Broward County Property Appraiser's office that endangered the homestead exemption I had for that home. The investigation began when I found a business card for Sam J. Frusterio, an Investigator with the Broward County Property Appraiser's Office, in the door of the Fiesta Way Home. A copy of that business card was produced at FOSTER0000859 and is attached

as Exhibit 61. When I called him, Mr. Frusterio relayed to me that they had received an anonymous phone call stating that the Fiesta Way Home was vacant and that I really lived in Chicago with a business and buildings there. Mr. Frusterio further relayed that when he asked how the caller knew this, the caller told him the caller was with one of Foster's mortgage companies. At the time, PNC was the only company with whom I had mortgages. Over the course of a four-month investigation, I was able to submit documentation demonstrating that the homestead exemption was being properly claimed for the Fiesta Way Home. Copies of some of the documents I submitted were produced at FOSTER0008615-20 and are attached as Exhibit 62.

### 9. The Issues With Force-Placed Insurance Creates Problems For Payments In 2012.

168. After PNC obtained the lender placed comprehensive wind insurance in November 2011, it conducted an escrow analysis on my account and sent me another escrow disclosure. A copy of that disclosure was produced at FOSTER0007685-6 and is attached as Exhibit 63.[7] This disclosure said that beginning February 1, 2012 my monthly payment would increase to $12,893.19. This analysis, however, occurred before I got wind insurance myself, and so overstated the payment amount – by a lot. It also included the incorrect information regarding flood insurance discussed above.

169. Despite this, the January mortgage statement that PNC sent me showed that the payment due in January was supposed to be for $12,893.19. A copy of that statement was produced

---

[7] This is another instance of the analysis I received being different from the analysis that I understand PNC attached to its motion, this time as Exhibit 26 to the Thomas Affidavit. Once more, I have reviewed that exhibit and did not receive it nor have I ever seen that version of the analysis before.

as FOSTER0007799 and is attached as Exhibit 64.  I immediately called PNC to find out why this was and was told to continue paying the $6,237 I had been paying, which is what I did.

170.    After I got the wind insurance, PNC conducted another escrow analysis.  A copy of that disclosure was produced at FOSTER0007689-90 and is attached as Exhibit 65.[8]  This analysis reported that the new payment, effective with the payment due February 1, 2012, was $7,913.66.  The analysis, though, was dated February 13, 2012, meaning I did not know what payment PNC expected for February until then.  Also, this analysis again included the incorrect information regarding flood insurance discussed above.

171.    I also did not receive a statement in February, and so did not know what amount PNC was expecting for the March payment, and so I again paid the $6,237 I had been paying.

172.    Around this time, I was continuing to communicate with PNC about the various issues with my loans, including the loan for the Fiesta Way Home.  In these communications, I was getting conflicting information from different departments within PNC and PNC still could tell me why the payment had increased back in July 2011 but that they were still researching it.

173.    Despite this uncertainty, I was still trying to make every payment, including for the loan for the Fiesta Way Home.  To do this, I would contact PNC's corporate offices and call lines to ask what amounts I should be paying towards the loan for the Fiesta Way Home.

174.    Initially, PNC would return the payments I made to it each month, claiming that they were not for the right amounts, even though each payment was for the amount that I was told to pay by someone at PNC.

---

[8] This is the last instance of the analysis I received being different from the analysis that I understand PNC attached to its motion, this time as Exhibit 27 to the Thomas Affidavit.  Like the others, I have reviewed that exhibit and did not receive it nor have I ever seen that version of the analysis before.

175.     Starting in April 2014, PNC stopped returning the payments to me.  Instead, PNC told me that it was holding the payments in a suspense account associated with the loan for the Fiesta Way Home.  Even after PNC began placing my payments in this suspense account, I continued to make payments on the loan.  Around this time, PNC also stopped sending me statements, meaning it was that much more difficult for me to know what amounts to pay each month and otherwise understand what PNC contended was happening with the loan for the Fiesta Way Home.

176.     Despite this, I continued to make payments each month that PNC is holding and has not applied to any of the amounts it claims it is owed.  As I understand, in the materials submitted with its Motion for Summary Judgment, PNC reports that the total amount it is currently holding is $341,787.30.  (Doc 159, ¶ 58.)

**D.     PNC's Multiple Incorrect Reports To The Credit Reporting Agencies.**

177.     Throughout the time that I was dealing with PNC (and its predecessors) to correct the issues with my loans, I was also having to deal with the reporting that PNC did about those loans.  Most of the time, if PNC got something wrong with one of my loans with it, that same error would be reported to the credit reporting agencies, and so I would have to try to address that as well.

178.     For instance, PNC repeatedly miscalculated and misrepresented the payments on both loans, and then would report its incorrect information to the credit reporting agencies, telling them my payments were late or incorrect, effectively ruining my credit.  Examples of the negative reporting on my credit are in Exhibit 66.

179.     Because the reporting issues followed from the issues on the accounts, I focused first on getting the information on the accounts right.  Once that occurred, I would ask PNC to correct the reporting, which it would do – eventually, usually after a months-long battle.  As a

result, I did not make a filing with one of the credit reporting agencies each time something incorrect was reported. This does not mean, though, that PNC was correctly reporting my credit history. Instead, it was regularly repeating the mistakes it made in its own records with the credit reporting agencies.

180. On numerous occasions – I believe that the number is at least 17 – PNC acknowledged that it had incorrectly reported information on a number of my loans with it to the credit reporting agencies. Examples of these occasions include:

- A September 16, 2009, letter PNC sent me indicating I may not have received proper credit for my mortgage payment. (Exhibit 31, PNC001406.)

- An October 20, 2009 communication in which PNC told me that it was correcting information previously sent to the credit reporting agencies. This was produced at PNC001411 and is attached as Exhibit 67.

- A December 18, 2009 correction that PNC sent to the credit reporting agencies, this time removing delinquent reporting through November 30, 2009. This was produced at FOSTER000036 and is attached as Exhibit 68.

- An April 19, 2010 correction that PNC sent to the credit reporting agencies removing all negative reporting for March 2010. This was produced at PNC001421 and is attached as Exhibit 69.

- A May 26, 2010 letter placing 30-day stop on credit reporting. This was produced at PNC002297 and is attached as Exhibit 70.

- A July 28, 2011 letter re removal of all negative reporting. This was produced at PNC001432 and is attached as Exhibit 71.

181. While these acknowledgements stopped as time went on, that was not because the errors and incorrect reporting did. Rather, it was because PNC stopped acknowledging its errors in writing to me.

182. After PNC stopped even considering correcting its errors around the end of 2011, I submitted disputes to the credit reporting agencies regarding the loans for the Kilpatrick and Fiesta Way Homes.

183.    In January 2012, I submitted a notice of dispute regarding the loan for the Kilpatrick Home, noting that PNC's reporting on the loan was not accurate.

184.    While PNC confirmed the information was accurate, reporting the balance on the account and that it was more than 150 days past due, this was not correct as explained in this Affidavit.  In January 2012, I was continuing to make timely payments to PNC towards the loan for the Kilpatrick Home.

185.    Also in January 2012, I submitted disputes to TransUnion and Equifax regarding the reporting on the Fiesta Way Home.

186.    While PNC responded to that dispute that its reporting was accurate, reporting the loan for the Fiesta Way Home as current through September 2011 and 30-59 days past due from October 2011 through January 2012, as explained in this Affidavit, this was not correct.  PNC should have reported the loan current through December 2011 since the only reason I would have been past due was PNC's inability to correctly calculate the payment amounts as a result of the various errors discussed earlier.

**E.    My Damages.**

187.    As a result of PNC's actions, I have suffered extensive harm and damages resulting from PNC's errors on the loans for the Kilpatrick and Fiesta Way Homes and the subsequent incorrect credit reporting that followed.

188.    Though I had achieved my lifelong goal of being a multimillionaire, PNC's actions have almost bankrupted me.

189.    While I have managed to hold on to the five properties I still own, I have had to sell many of the other things that I acquired following my successes, including much of the contents of my homes.  And while the rents from the Magnolia, Montana, and Racine properties has been

crucial to my ability to fight off PNC's efforts, I have not been able to pull any equity out of any of the real estate I own as I am not able to obtain new loans.

190.    PNC's actions caused my credit score to drop significantly, preventing me from being able to obtain new loans.  As a result of PNC's numerous adverse reports to the credit reporting agencies, many of which PNC withdrew and apologized for after I provided details showing them to erroneous, my credit rating dropped.  My credit score was generally in the high 700s, close to 800.  The negative reports from National City and PNC, which were the only negative reporting on my credit history, caused it to drop.  After many years of negative reports, which I eventually fended off and got National City to correct, I had managed to my score back up to 715 in March of 2009.  By November 30, 2011, with PNC's erroneous reporting, my score had decreased to 521.  (Ex. 66.)

191.    Following the drop in my credit score related to the negative reporting from PNC, I was no longer an attractive borrower that lenders would seek out.  Also following the drop, I was no longer able to use the relationships I had cultivated with lenders to help get loan commitments. Lenders would tell me that they wished that they could help me with a loan, but with, my score what it was, they just couldn't.  Hearing that from people I knew made me work even harder to fix the issues that PNC created.

192.    Among the potential lenders with whom I discussed my situation and talked about possibly getting loans from are UBS Mortgage, Republic Bank, Prestige Mortgage, and Northern Trust.  Each time, the lender indicated that a loan was not going to be possible due to my credit score.  Given that information, I did not waste the lender's time putting together an application that we both knew was going to be turned down.  I actually thought that doing so would further harm me in the eyes of those lenders, who otherwise knew me to be a practical, experienced real

estate investor. I would (and still do), though, call and check in with them from time to time to see if there were any new programs or options that might help me get a loan.

193. This meant that I could not purchase new properties as I had in the past. I have identified multiple properties that I would have worked to purchase had I been able to obtain loans as I had been able to do in the past, including a four-story property on the same block as the Racine property I own that has increased in value significantly since it was available in 2011 as well as the properties 933 Newport Ave., 2638 N. Magnolia, 321 N. Seminary Ave., 3634 N. Fremont Ave., 1306 W. Cornelia Ave., 853 W. Newport Ave., 3706 N. Magnolia St., 2249 N. Magnolia, 2136 N. Racine Ave., 2157 N. Magnolia, 2142 N. Magnolia Ave., 3214 N. Seminary Ave., 1026 W. George St., and 3817 N. Fremont St. The listings for these properties was produced at FOSTER0000011-32 and are attached as Exhibit 72.

194. Quantifying the damage done by PNC is not easy, but I have attempted to do so, using my knowledge of and experience in the real estate industry as well as my knowledge of the belongings I had acquired and sold over the years.

195. The damage negatively impacted my earnings. Based on my average income from 2000 to 2006, I was earning, on average, $670,164 per year before PNC's actions, with the last three years – 2004, 2005, and 2006 – higher, at approximately $897,000 per year. This is based on the income reported on my tax returns for those years. Of that, on average, $333,270 over the seven-year period and $622,000 over the last three years resulted from capital gains on real estate that I invested in and approximately $100,000 to $150,000 in commissions were related to my own real estate investments. This means, during the six years prior to the issues with PNC arising, I earned, on average, approximately $433,270, or approximately $722,000 for the last three years, from my real estate investments and related activities.

45

196.     After PNC's actions, my income dropped significantly, with the capital gains from the sale of assets eliminated and the related commission income dropping as well.  As a result, my income from real estate investment and related activities dropped to, on average, approximately $70,000 in real estate commissions per year from 2006 through 2018, meaning my income, on average, dropped by at least $350,000 per year or $680,000 from the last three years.  This, in turn, shows that my lost income as a result of PNC's actions from 2009 through 2018 is at least $3,500,000 and could be as much as $7,480,000.

197.     My inability to obtain new loans also prevented me from being able to take advantage of opportunities offered by PNC to resolve issues with the loans it made to me, including the opportunity to pay off the loan for the Kilpatrick Home at 60% or 70% of the amount of the loan.  I estimate that this resulted in me being damaged by $756,000.00, or 40% of the $1.89 million balance on the loan.

198.     Trying to raise the cash needed to take advantage of the offer from PNC, I attempted to sell the Montana Property in Chicago.  To do this, I had to stop renting the property, meaning I had to give up the rental income that would have resulted.  Based on the rental history for the Montana Property, I estimate that this resulted in me being damaged by $172,000.

199.     I also could not refinance the existing loans on my properties, resulting in higher interest rates on those loans.  Indeed, the rates on my loans have gone from between 2.25% and 3% in 2012 to between 3.2% and 5.5% today.  I estimate that the increases in the rates on my loans has resulted in damages of over $80,000 per year.

200.     Once the issues with PNC began, I did everything I could to make payments to PNC for the loans I had with it, even though I believed that the amounts that PNC was demanding

for those payments was incorrect. To do this, I sold many of my valuable possessions, including collectible sports cars, art, and antiques for less than their value.

201. For instance, at I sold a valuable Maserati collectible sports car quickly to raise cash to deal with issues created by PNC, losing about $30,000 in that sale. I also sold a Lamborghini for $135,000 even though the car it was likely worth $275,000 at the time and last year was likely worth $350,000. I did this because National City told me that I needed to eliminate the payment I was making for a loan on the car to get a loan modification finalized. A copy of a letter I sent to National City regarding this on May 19, 2009 was produced at FOSTER0009473 and is attached as Exhibit 73.

202. In addition, I sold art and collectible antiques at low prices to raise money to make the payments that PNC was demanding.

203. All told, I estimate that these quick sales of valuable collectibles resulted in me being damaged by over $500,000.00.

204. In addition to these monetary damages, I believe that PNC's actions demonstrate that I am entitled to punitive damages and I intend to request an award of such damages if I am allowed to do so.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 2, 2019

Jeff Foster

# Exhibit 1

**trulia**　　Chicago, IL　🔍　☰

← **Back to Search**



OFF MARKET

# 6201 N Kilpatrick Ave

Chicago, IL 60646　Sauganash

🛏 6 Beds　🛁 4 Baths　🏠 5,625 sqft

## $1,396,606

Trulia Estimate ⓘ

as of Jul 29, 2019



## Homes for Sale Near 6201 N Kilpatrick Ave



**$550,000**
🛏 4bd　🛁 4ba　🏠 3,700 sqft
6433 N Kenton Ave
Lincolnwood, IL



**$749,900**
🛏 5bd　🛁 4ba　🏠 3,940 sqft
6517 N Longmeadow Ave
Lincolnwood, IL



**$759,900** ↓
🛏 4bd　🛁 4ba　🏠 3,814 sqft
5824 N Kilbourn Ave
Sauganash, Chicago, IL



**Map View**
Explore the area around 6201 N Kilpatrick Ave.

**Street View**
Take a virtual walk around the neighborhood.

**Schools**
1 Elementary School
2 Middle Schools
2 High Schools

**Crime**
Lowest crime relative to the rest of Cook county.

**Commute**
84% of reside
commute by

## Description

This property is no longer available to rent or to buy.

This single-family home is located at 6201 N Kilpatrick Ave, Chicago, IL. 6201 N Kilpatrick Ave is in the Sauganash neighborhood in Chicago, IL and in ZIP code 60646. This property has 6 bedrooms, 4 bathrooms and approximately 5,625 sqft of floor space. This property has a lot size of 0.47 acres and was built in 1938.

## Home Details for 6201 N Kilpatrick Ave

• 6 Beds

• 5,625 sqft

• $189/sqft

• Built in 1938

• Tax Rate Code Area: 71128

• 4 Baths

• Single Family Home

• 0.47 acres lot size

• County: Cook

See All

## Price History for 6201 N Kilpatrick Ave

| Date | Price | Event | |
|------|-------|-------|---|
| 11/24/1998 | $1,065,000 | Sold | ⌄ |

Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page 53 of 209 PageID #:3573

**trulia**

Chicago, IL

| | |
|---|---|
| Year | 2017 |
| Tax | $19,427 |
| Assessment | |
|   Land | $28,565 |
|   Improvements | $61,385 |
|   Total | $89,950 |

## Price Trends

For homes in 60646

*Based on the Trulia Estimate ⓘ

 **$283**
Average Price/sqft
This home: $248 **12% below***

 **$425,000**
Median Sale Price
This home: $1,396,606 **229% above***

 **9% below list**
Avg Sale Price vs. Avg List Price

## Comparable Sales Near 6201 N Kilpatrick Ave



Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page 54 of 209 PageID #:3574

# trulia

Chicago, IL



## Address

| | |
|---|---|
| 4950 Fitch Ave, Skokie, IL | ⌄ |
| 3600 N Avers Ave, Chicago, IL | ⌄ |
| 8350 Monticello Ave, Skokie, IL | ⌄ |
| 5303 Coyle Ave, Skokie, IL | ⌄ |
| 5717 W Grover St, Chicago, IL | ⌄ |
| 6632 N Hiawatha Ave, Chicago, IL | ⌄ |
| 7017 N Kenton Ave, Lincolnwood, IL | ⌄ |
| 6839 N Kilpatrick Ave, Lincolnwood, IL | ⌄ |
| 6705 N Kostner Ave, Lincolnwood, IL | ⌄ |
| 5814 N Forest Glen Ave, Chicago, IL | ⌄ |

## Assigned Schools

These are the assigned schools for 6201 N Kilpatrick Ave.



### Hope College Prep High School

9-12 • PUBLIC • 195 Students
City Of Chicago School District 299

**1**/10
GreatSchools Rating

★★★☆☆
Parent Rating Average

This is by far the worse school I have ever been in. The children fight, curse, listen to music, and talk on



### Sauganash Elementary School

K-8 • PUBLIC • 586 Students
City Of Chicago School District 299

**9**/10
GreatSchools Rating

★★★★☆
Parent Rating Average

Excellent school! Teachers are great. Both of my kids really love this school.



### Taft High School

7-12 • PUBLIC • 3243 Students
City Of Chicago School District 299

**8**/10
GreatSchools Rating

★★★★☆
Parent Rating Average

1/2 the teachers do not give homework. This is high school. There should be homework. There is no help

Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page: 55 of 209 PageID #:3575

# trulia

Chicago, IL    🔍    ☰

GreatSchools ratings are based on test scores and additional metrics when available.

Check with the applicable school district prior to making a decision based on these schools. Learn more.

## Neighborhood Overview



### Sauganash

🏠 41 Homes For You

🏷️ Buy: $262k - $2m

**See Local Highlights**

## What Locals Say about Sauganash

At least 38 Trulia users voted on each feature.

| 👍 93% | 🚶 There are sidewalks |
| 👍 88% | 🛒 Yards are well-kept |
| 👍 86% | Ⓟ Parking is easy |
| 👍 84% | 🪁 Kids play outside |
| 👍 81% | 💡 Streets are well-lit |
| 👍 79% | 🚗 Car is needed |

See All

Learn more about our methodology.

## Local Legal Protections

Do legal protections exist for the LGBT community at the state level in Illinois?

**Learn More** ⓘ



## Affordability

### Calculate your monthly mortgage payments
Your est. payment: $8,138/month



| | |
|---|---|
| **Home Price** | $1,396,606 |
| **Down Payment** | $279,321   20% |
| **Interest Rate** | 3.73% |
| **Loan Type** | 30-year fixed |



$8,138
/month

| | |
|---|---|
| 🔵 Principal & Interest | $5,162 |
| 🔵 Property Taxes | $2,491 |
| 🟡 Home Insurance | $75 |

 

Chicago, IL

Refinance Your Home

or

See today's mortgage rates

## Additional Cost

## Contact an Agent

Name

Phone

Email

Message

I'm interested in selling my home at 6201 N Kilpatrick Ave, Chicago, IL 60646

**Request Info**

By pressing Request Info, you agree that Trulia and real estate professionals may contact you via phone/text about your inquiry, which may involve the use of automated means. You are not required to consent as a condition of purchasing any property, goods or services. Message/data rates may apply. You also agree to our Terms of Use Trulia does not endorse any real estate professionals

7/29/2019    Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page 58 of 209 PageID #:3578




**trulia**    Chicago, IL    🔍    ☰





**$1,350/mo**    **$1,550/mo**    **$2,200/mo**

🛏 2bd  🛁 1ba  🏠 1,000 sqft    🛏 3bd  🛁 1ba    🛏 4bd  🛁 2ba

4935 Hull St #2S    7904 Lamon Ave #2S    3763 N Kostner Ave #2

Skokie, IL    Skokie, IL    Old Irving Park, Chicago, IL



6201 N Kilpatrick Ave, Chicago, IL 60646 is a 6 bedroom, 4 bathroom, 5,625 sqft single-family home built in 1938.
6201 N Kilpatrick Ave is located in Sauganash, Chicago. This property is not currently available for sale. 6201 N
Kilpatrick Ave was last sold on Nov 24, 1998 for $1,065,000. The current Trulia Estimate for 6201 N Kilpatrick Ave is
$1,396,606.

**Nearby Real Estate**
Houses for Sale Near Me | Houses for Sale Near Me by Owner | Open Houses Near Me | Land for
Sale Near Me | More
**Chicago Neighborhoods**
Illinois Medical District | Wrigleyville | Stony Island Park | East Pilsen | More
**Chicago Property Types**
Single Family Homes | Condos | Townhomes | Co-Ops | More
**Real Estate and Mortgage Guides**
Chicago Real Estate Guide | Chicago Schools | Newest Homes for Sale in Illinois | Newest Rentals in
Illinois | More

About Trulia  About Zillow Group  Careers  Newsroom  Investor Relations  Advertising
Terms  Privacy  Terms of Use  Listings Quality Policy  Subscription Terms  Help  Ad Choice

Copyright © 2019 Trulia, LLC. All rights reserved. Equal Housing Opportunity. Have a Question? Visit our Help Center to find the answer.

# Exhibit 2



**6201 N Kilpatrick Ave,**
**Chicago, IL 60646**

6 beds · 4.5 baths · 5,625 sqft

● OFF MARKET

Zestimate®: $1,496,192

Rent Zestimate®: $8,644 /mo

EST. REFI PAYMENT

Est. Refi Payment:
$6,341/mo

6201 N Kilpatrick Ave, Chicago, IL is a single family home that contains 5,625 sq ft and was built in 1938. It contains 6 bedrooms and 4.5 bathrooms. This home last sold for $1,065,000 in November 1998.

The Zestimate for this house is $1,496,192, which has decreased by $8,366 in the last 30 days. The Rent Zestimate for this home is $8,644/mo, which has decreased by $739/mo in the last 30 days. The property tax in 2017 was $19,427. The tax assessment in 2017 was $89,950.

## Facts and Features

**Type**
Single Family

**Year Built**
1938

**Heating**
No Data

**Cooling**
No Data

**Parking**
3 spaces

**Lot**
0.47 acres

INTERIOR FEATURES

**Bedrooms**
Beds: 6

**Other Interior Features**
Fireplace

**Flooring**
Floor size: 5,625 sqft

SPACES AND AMENITIES

**Size**
Unit count: 0

https://www.zillow.com/homedetails/6201-N-Kilpatrick-Ave-Chicago-IL-60646/3621721_zpid/?print=true&view=public  1/4

# Home Value

## Zestimate

## $1,496,192



**ZESTIMATE RANGE**
$1.29M - $1.72M

**LAST 30 DAY CHANGE**
-$8,366 (-0.6%)

**ONE YEAR FORECAST**
$1,479,285 (-1.1%)

# Owner Dashboard



Do you own this home? See your Owner Dashboard.

# Price / Tax History

| DATE | EVENT | PRICE | $/SQFT | SOURCE |
|------|-------|-------|--------|--------|
| 11/24/98 | Sold | $1,065,000 | $189 | |

# Neighborhood: Sauganash

**MEDIAN ZESTIMATE**

## $405,200

 **-3.6%**
Past 12 months

Zillow predicts will increase 0.7% next year, compared to a 3% increase for Chicago as a whole. Among Sauganash homes, this home is valued 251.8% more than the midpoint (median) home, but is valued 4% less per square foot.

🚶 Walk Score ® **62** (Somewhat Walkable)    🚌 Transit Score ™ **36** (Some Transit)

NEIGHBORHOOD MAP



NEARBY HOMES



# Nearby Schools in Chicago

| GREATSCHOOLS RATING | | GRADES | DISTANCE |
|---|---|---|---|
| **7** out of 10 | Rutledge Hall Elementary | 3-5 | 1.3 mi |
| **9** out of 10 | Sauganash Elementary | K-8 | 0.2 mi |
| **NR** | Northside Learning Center | 9-12 | 1.5 mi |

Data by GreatSchools.org ⓘ

**About the ratings:** Historically, GreatSchools ratings have been based solely on a comparison of standardized test results for all schools in a given state. As of September 2017, the GreatSchools ratings also incorporate additional information, when available, such as college readiness, academic progress, advanced courses, equity, discipline and attendance data. GreatSchools ratings are designed to be a starting point to help parents compare schools, and should not be the only factor used in selecting the right school for your family.

**Disclaimer:** School attendance zone boundaries are provided by a third party and subject to change. Check with the applicable school district prior to making a decision based on these boundaries.

## Similar Homes for Sale



● **FOR SALE**
$1,599,000
5 beds, 5.0 baths, 6000 sqft
6087 N Kirkwood Ave, Chicago



● **FOR SALE**
$1,099,000
4 beds, 4.0 baths, 3855 sqft
5900 N Kilpatrick Ave, Chicago



● **FOR SALE**
$1,849,900
7 beds, 10.0 baths, 8798 sqft
6455 N Sauganash Ave, Linco

## Nearby Similar Sales

● **SOLD: $754,995**
Sold on 10/31/2018
5 beds, 3.5 baths, 4342 sqft
6080 N Sauganash Ave, Chicago, IL 60646

● **SOLD: $760,000**
Sold on 12/5/2018
4 beds, 3.5 baths, 3122 sqft
6128 N Keating Ave, Chicago, IL 60646

● **SOLD: $780,000**
Sold on 3/12/2019
4 beds, 3.0 baths, 2900 sqft
6161 N Lemont Ave, Chicago, IL 60646

● **SOLD: $795,000**
Sold on 5/2/2019
5 beds, 3.0 baths, 3742 sqft
5957 N Knox Ave, Chicago, IL 60646

● **SOLD: $944,504**
Sold on 9/20/2018
5 beds, 4.5 baths, 4559 sqft
6110 N Sauganash Ave, Chicago, IL 60646

# Exhibit 3

 **MidAmerica Bank**

COMPLIANCE AGREEMENT

LENDER:  Mid America Bank, fsb.

BORROWER(S):  JEFFREY M FOSTER

PROPERTY ADDRESS:  6201 N KILPATRICK AVE
CHICAGO, IL 60646
LOAN NUMBER:  0000000000

## COMPLIANCE AGREEMENT

The undersigned borrower(s) for and in consideration of the above-referenced Lender this date funding the closing of this loan agrees, if requested by Lender or Closing Agent for Lender, to fully cooperate and adjust for clerical errors, any or all loan closing documentation, or to supply any additional documents including but not limited to

if deemed necessary or desirable in the reasonable discretion of Lender to enable Lender to sell, convey, seek guaranty or market said loan to any entity, including but not limited to an investor, Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Housing Authority or the Veterans Administration, within 30 days of request by Lender.

The undersigned borrower(s) do hereby so agree and covenant in order to assure that this loan documentation executed this date will conform and be acceptable in the marketplace in the instance of transfer, sale or conveyance by Lender of its interest in and to said loan documentation.

The undersigned borrower(s) further agree that borrower(s) failure to comply with the terms of this Compliance Agreement may be deemed an event of default as described in the loan documents, and Lender, as its sole discretion, may declare borrower(s) in default under the terms of the Mortgage, and may accelerate the debt and declare the entire loan due and payable, without further notice.

DATED effective this    31ST    day of  MAY    2006



_____          _____
Borrower  JEFFREY M FOSTER          Borrower

_____          _____
Borrower                            Borrower

W1134 (rev. 07/01)

"01 113401"

Exhibit 4

08/05/2006 13:08 FAX      EFS ST CHARLES      ☒ 008

0694141445

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower" as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower _____      Co-Borrower _____

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA   ☒ Conventional   ☐ Other (explain): ☐ FHA   ☐ USDA/Rural Housing Service | Agency Case Number | Lender Case Number |
|---|---|---|---|

| Amount $ 1,890,000.00 | Interest Rate 7.000 % | No. of Months 240 | Amortization Type ☐ Fixed Rate ☐ Other (explain): ☐ GPM   ☒ ARM (type): |
|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

Subject Property Address (street, city, state & ZIP)
6201 N KILPATRICK AVE, CHICAGO, IL 60646      No. of Units 1

Legal Description of Subject Property (attach description if necessary)      Year Built 1936
LOTS 112, 173, 174 AND THE SOUTHERLY 1/2 OF LOT 175 IN GEORGE F. FOSTER AND CO'S SECOND ADDITION TO
(LEGAL DESCRIPTION CONTINUED ON LAST PAGE)

| Purpose of Loan | ☐ Purchase   ☐ Construction   ☒ Other (explain): ☐ Refinance   ☐ Construction-Permanent | Property will be: ☒ Primary Residence   ☐ Secondary Residence   ☐ Investment |
|---|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

Complete this line if this is a refinance loan.

| Year Acquired 1996 | Original Cost $ | Amount Existing Liens $ 1,150,625.75 | Purpose of Refinance INTEREST RATE REDUCTION | Describe Improvements ☐ made ☐ to be made Cost: $ | |
|---|---|---|---|---|---|

Title will be held in what Name(s)
JEFFREY M FOSTER      Manner in which Title will be held INDIVIDUAL      Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date)

Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|

Borrower's Name (include Jr. or Sr. if applicable)
JEFFREY M FOSTER      Co-Borrower's Name (include Jr. or Sr. if applicable)

| Social Security Number XXX-XX-2284 | Home Phone (incl. area code) (773) 283-7518 | DOB (mm/dd/yyyy) 12/26/1960 | Yrs. School 20.00 | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|

| ☐ Married ☒ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Co-Borrower) no.   Ages | ☐ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Borrower) no.   Ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) 6201 N KILPATRICK AVE CHICAGO, IL 60666 | ☒ Own ☐ Rent _ 09.04 No. Yrs. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. |
|---|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent _____ No. Yrs. |
|---|---|

Uniform Residential Loan Application
—The Compliance Source, Inc.—
www.compliancesource.com

Freddie Mac Form 65 7/05; Fannie Mac Form 1003 7/05
63001 &4954 07003 REV., 07/05
©2004, The Compliance Source, Inc.
W1007 Page 1 of 4 (10/05)

08/05/2006 13:09 FAX        EFS ST CHARLES       ☑011

## IV. EMPLOYMENT INFORMATION

| Borrower | | Co-Borrower | |
|---|---|---|---|
| Name & Address of Employer ☑ Self Employed | Yrs. on this job 16.00 | Name & Address of Employer ☐ Self Employed | Yrs. on this job |
| FOSTER HOLDING INC | Yrs. employed in this line of work/profession | | Yrs. employed in this line of work/profession |
| RE/MAX | 16.00 | | |
| CHICAGO, IL 60646 | | | |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| REAL ESTATE AGENT REAL ESTATE | (773) 283-7515 | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer ☐ Self Employed | Dates (from–to) | Name & Address of Employer ☐ Self Employed | Dates (from–to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name & Address of Employer ☐ Self Employed | Dates (from–to) | Name & Address of Employer ☐ Self Employed | Dates (from–to) |
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 27,000.00 | $ | $ 27,000.00 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | | 11,025.00 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 0.08 |
| Dividends/Interest | | | | Real Estate Taxes | | |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 27,000.00 | $ | $ 27,000.00 | Total | $ | $ 11,025.08 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income    Notice: Alimony, child support or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amt |
|---|---|---|
| B | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.    Completed ☐ Jointly ☑ Not Jointly

| ASSETS | Cash or Market Value | Liabilities and pledged assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Description | | | | |
| Cash deposit toward purchase held by: | $ | | | |
| | | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| List checking and savings accounts below | | | | |
| Name and Address of Bank, S&L, or Credit Union | | Name and Address of Company | $ Payment/Months | $ |
| | | MID AMERICA BANK | | TO BE PAID OFF |
| | | | | |
| Acct. no. | $ | Acct. no. 760609985 | 11,390.00/167 | 1,150,625.75 |

Uniform Residential Loan Application — THE COMPLIANCE SOURCE, INC. www.compliancesource.com

Freddie Mac Form 65 7/05  Fannie Mae Form 1003 7/05
©2004, The ComplianceSource, Inc.   W1007 Page 3 of 4 ID 59.3)

FOSTER0000078



08/03/2006 13:08 FAX       EFS ST CHARLES       ☒007

VII. ASSETS AND LIABILITIES (cont.)

| Name and Address of Bank, S&L, or Credit Union | | Name and Address of Company | $ Payment/Months | $ |
|---|---|---|---|---|
| | | GREAT LAKES CR UN | 1,455.00/050 | |
| Acct. no. | $ | Acct. no. 550386600800 | | 71,559.00 |
| Name and Address of Bank, S&L, or Credit Union | | Name and Address of Company | $ Payment/Months | $ |
| | | CHRYSLER FINANCIAL | 548.00/044 | |
| Acct. no. | $ | Acct. no. 1010808865 | | 23,651.00 |
| Name and Address of Bank, S&L, or Credit Union | | Name and Address of Company | $ Payment/Months | $ |
| | | MBNA AMERICA | 396.00/046 | |
| Acct. no. | $ | Acct. no. 8984 | | 18,159.00 |
| Stocks & Bonds (Company name/number description) | $ | Name and Address of Company | $ Payment/Months | $ |
| | | PEOPLES ENGY | I 210.00/001 | NOT INCLUDED |
| | | Acct. no. 1500034662396 | | 210.00 |
| Life insurance net cash value Face Amount: $ | $ | Name and Address of Company | $ Payment/Months | $ |
| Subtotal Liquid Assets | $ | MID AMERICA FEDERAL S&L | I 11,390.00/167 | NOT INCLUDED |
| Real estate owned (enter market value from schedule of real estate owned) | $ 2,950,000.00 | | | |
| Vested interest in retirement fund | $ | Acct. no. 45076060 | | 1,801,025.00 |
| Net worth of business(es) owned (attach financial statement) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Automobiles owned (make and year) | $ | | | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 46,069.00 | |
| Total Assets a. | $ 12,950,000.00 | | $ 6,305,813.25 | Total Liabilities b. $6,744,186.75 |

Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Prpty | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 6291 N KILPATRICK AVE CHICAGO IL 60646 | 1 | $2,400,000.00 | $1,130,635.75 | $ | $11,390.00 | $ | $ |
| 56 FIESTA WAY FORT LAUDERDALE FL 33330 | H 1 | 3,500,000.00 | 1,077,670.00 | | 4,857.00 | | |
| 3716 MAGNOLIA CHICAGO IL 60657 | H 3 | 1,500,000.00 | 747,230.60 | | 4,226.00 | | |
| Totals | | $2,950,000.00 | $9,728,002.75 | $ | $30,578.00 | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |
| | | |

Uniform Residential Loan Application
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Freddie Mac Form 65 7/05; Fannie Mae Form 1003 7/05
00214 MU84 07/00 Rev. 07/05
©2005, The Compliance Source, Inc.
07/1007 Page 3 of 5 (10/05)

FOSTER0000079

08/05/2006 13:09 FAX                    EFS ST CHARLES                          @010

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|
| | | If you answer "Yes" to any questions a through i, please use a continuation sheet for explanation. | Yes | No | Yes | No |
| a. Purchase price | $ | a. Are there any outstanding judgments against you? | ☐ | ☒ | ☐ | ☐ |
| b. Alterations, improvements, repairs | | b. Have you been declared bankrupt within the past 7 years? | ☐ | ☒ | ☐ | ☐ |
| c. Land (if acquired separately) | | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☒ | ☐ | ☐ |
| d. Refinance (include debts to be paid off) | 1,150,625.75 | d. Are you a party to a lawsuit? | ☐ | ☒ | ☐ | ☐ |
| e. Estimated prepaid items | | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | ☐ | ☒ | ☐ | ☐ |
| f. Estimated closing costs | 737.00 | | | | | |
| g. PMI, MIP, Funding Fee | | (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name, and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | | | |
| h. Discount (if Borrower will pay) | | | | | | |
| i. Total Costs (add items a through h) | 1,151,362.75 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ | ☒ | ☐ | ☐ |
| j. Subordinate financing | | | | | | |
| k. Borrower's closing costs paid by Seller | | g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☒ | ☐ | ☐ |
| l. Other Credits (explain) | | h. Is any part of the down payment borrowed? | ☐ | ☒ | ☐ | ☐ |
| | | i. Are you a co-maker or endorser on a note? | ☐ | ☒ | ☐ | ☐ |
| m. Loan Amount (exclude PMI, MIP, Funding Fee financed) | 1,890,000.00 | j. Are you a U.S. citizen? | ☒ | ☐ | ☐ | ☐ |
| | | k. Are you a permanent resident alien? | ☐ | ☒ | ☐ | ☐ |
| n. PMI, MIP, Funding Fee financed | | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☒ | ☐ | ☐ | ☐ |
| o. Loan Amount (add m & n) | 1,890,000.00 | m. Have you had an ownership interest in a property in the last three years? | ☒ | ☐ | ☐ | ☐ |
| p. Cash from/to Borrower (subtract j, k, l, & o from i) | - 738,637.25 | (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| | | (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

**IX. ACKNOWLEDGEMENT AND AGREEMENT**

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | | Date | Co-Borrower's Signature | | Date |
|---|---|---|---|---|---|
| X | | 6/5/06 | X | | |

Uniform Residential Loan Application
The COMPLIANCE SOURCE, INC.
www.compliancesource.com

Freddie Mac Form 65 7/05; Fannie Mae Form 1003 7/05
02201 MORG 07/00 Rev. 07/05
©2005, The Compliance Source, Inc.
W3007 Page 4 of 4 (10/05)

FOSTER0000080

08/05/2006 13:05 FAX      EFS ST CHARLES      @006

## INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | | CO-BORROWER | ☐ I do not wish to furnish this information | |
|---|---|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino | ☒ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native | ☐ Asian   ☐ Black or African American | Race: | ☐ American Indian or Alaska Native | ☐ Asian   ☐ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander | ☒ White | | ☐ Native Hawaiian or Other Pacific Islander | ☐ White |
| Sex: | ☐ Female | ☒ Male | Sex: | ☐ Female | ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | | Name and Address of Interviewer's Employer |
|---|---|---|---|
| This application was taken by: ☐ Face-to-face interview ☐ Mail ☒ Telephone ☐ Internet | JUSTIN MCLOUGHLIN | | MIDAMERICA BANK |
| | Interviewer's Signature | Date | 2650 WARRENVILLE ROAD |
| | | | SUITE 500 |
| | Interviewer's Phone Number (incl. area code) | | DOWNERS GROVE, IL 60515-1721 |
| | 630-663-3328 | | |

Uniform Residential Loan Application
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Freddie Mac Form 65 7/05; Fannie Mae Form 1003 7/05
00200 MU04 07/05 Rev. 7/05
©2005, The Compliance Source, Inc.

W1007 Page 5 of 6 (10/05)

FOSTER0000081

08/05/2006 13:08 FAX       EFS ST CHARLES       ☒ 003

## CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: JEFFREY M FOSTER | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: 0606241445 |

| ADDITIONAL LIABILITIES | ACCOUNT # | PMT/MOS | UNPAID BAL |
|---|---|---|---|
| MID AMERICA FEDERAL SA | 500531107228 | 4,857.00 / 222 I | 1,077,879.00 NOT INCLUDED |
| NATIONAL CITY MORTGAGE | 4132306034 | 6,229.00 / 177 I | 747,220.00 NOT INCLUDED |
| MID AMERICA FEDERAL SA | 900530720572 | 3,017.00 / 169 I | 506,862.00 NOT INCLUDED |
| NATIONAL CITY MORTGAGE | 4132308010 | 2,198.00 / 186 I | 408,796.00 NOT INCLUDED |
| MID AMERICA FEDERAL SA | 500530720505 | 3,338.00 / 168 I | 392,723.00 NOT INCLUDED |
| NATIONAL CITY MORTGAGE | 4132307941 | 1,799.00 / 187 I | 336,487.00 NOT INCLUDED |
| COUNTRYWIDE HOME LOANS | 121474535 | 741.00 / 137 I | 161,206.00 NOT INCLUDED |
| NATL CITY | 431298801800 | 420.00 / 21 I | 8,409.00 NOT INCLUDED |
| PEOPLES ENGY | 1500008786416 | 300.00 / 1 I | 300.00 NOT INCLUDED |
| PEOPLES ENGY | 1500040954346 | 171.00 / 1 I | 171.00 NOT INCLUDED |

TOTAL OF PRINTED ITEMS:       3,378,857.00

TOTAL PRINTED LIABILITIES:       3,578,857.00

| ADDITIONAL REO ITEMS | S | TYPE | MARKET VALUE | MORT/ LIENS | GROSS RENT | PAYMENTS | INS/TAX/ MISC | NET RENT |
|---|---|---|---|---|---|---|---|---|
| 1616 MELROSE | | | | | | | | |
| CHICAGO, IL 60657 | N | 3 | 1,300,000.00 | 506,862.00 | .00 | 3,017.00 | .00 | .00 |
| 2156 RACINE | | | | | | | | |
| CHICAGO, IL 60614 | N | 3 | 1,300,000.00 | 408,796.00 | .00 | 2,198.00 | .00 | .00 |
| 1414 MELROSE | | | | | | | | |
| CHICAGO, IL 60657 | N | 3 | 850,000.00 | 392,723.00 | .00 | 2,338.00 | .00 | .00 |
| 1922 MONTANA | | | | | | | | |
| CHICAGO, IL 60657 | N | 1 | 2,300,000.00 | 435,887.00 | .00 | 2,540.00 | .00 | .00 |

TOTALS OF PRINTED ITEMS:       5,750,000.00   2,744,268.00       10,093.00

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et. seq.

| Borrower's Signature X | Date 6/5/06 | Co-Borrower's Signature X | Date |
|---|---|---|---|

Uniform Residential Loan Application
—The CompliAnce Source, Inc.—
www.compliancesource.com

Freddie Mac Form 65 7/05, Fannie Mae Form 1003 7/05
04301 mu44 07/00 Rev. 07/05
©2001, The CompliAnce Source, Inc.
U/1207 Page 6 of 6 (10/05)

FOSTER0000082

08/05/2008 13:09 FAX            EFS ST CHARLES                    ☒012

LEGAL DESCRIPTION CONTINUED        JEFFREY W FOSTER          0604141445

SAUGANASH, A SUBDIVISION IN CALDWELL'S RESERVE IN TOWNSHIP 40 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MARCH 15, 1928 AS DOCUMENT 9956617, IN COOK COUNTY, ILLINOIS.

FOSTER0000083

# Exhibit 5



**SIGNATURE / NAME
AFFIDAVIT**

APP #: 0604141445

Loan Number: 760990989

Date: 06/06/06

Signature Affidavit

This is to certify that my legal signature is as written and typed below.
This signature must exactly match signatures on the Note and Mortgage
(or Deed of Trust).

☐ I further certify that the signature below will match any Equity Cashline checks that
may be written and signed by me in the future.

Signature JEFFREY M FOSTER

Name Variation (complete if applicable)

This is to certify that I, JEFFREY M FOSTER                          , am one
and the same person as, JEFFREY FOSTER

who executed documents in connection with a mortgage with MidAmerica Bank.

Borrower JEFFREY M FOSTER

Subscribed and sworn to before me this _____ day of _____ ,

_____
Notary Public in and for the

State of _____

County of _____

My Commission Expires: _____

SECTION 1010 OF TITLE 18, U.S.C., "FEDERAL HOUSING
ADMINISTRATION TRANSACTION," PROVIDES; "WHOEVER, FOR THE
PURPOSE OF--INFLUENCING IN ANY WAY THE ACTION OF SUCH
ADMINISTRATION--MAKES, PASSES, UTTERS OR PUBLISHES ANY
STATEMENT, KNOWING THE THE SAME TO BE FALSE--SHALL BE FINED
NOT MORE THAN $5,000 OR IMPRISONED NOT MORE THAN TWO YEARS,
OR BOTH." OTHER FEDERAL STATUTES PROVIDE SEVERE PENALTIES
FOR ANY FRAUD AS INTENTIONAL MISREPRESENTATION MADE FOR THE
PURPOSE OF INFLUENCING THE ISSUANCE OF ANY GUARANTY OR
INSURANCE OR THE MAKING OF ANY LOAN BY THE ADMINISTRATOR FOR
VETERANS AFFAIRS.

1323 (01/04)

*01 132301*

PNC008172

# Exhibit 6

# MidAmerica Bank

**PERSONAL INFORMATION PRIVACY POLICY DISCLOSURE**

LOAN NUMBER: 0604141445
DATE: 06/06/2006
BORROWER NAME: JEFFREY M FOSTER

Protecting the privacy and confidentiality of your personal information is one of our highest priorities. We value your business and the trust you put in us. To help you better understand how your personal information is protected by us, we are providing you with the following statement describing our practices and policies with respect to the privacy of customer information. In the event you choose to close your account(s) or become an inactive customer, we will continue to adhere to the practices and policies described in this notice.

## Information The Bank Collects

Because the privacy of our customers' information is very important, we limit the information we collect. We collect, retain, and use personal information about individual customers, as allowed by law, to offer you financial products and services. This personal information, not available publicly, comes from such sources as:

Information you provide to us when you fill out an application, complete a form, or make a request for services. For example, your name, address, Social Security number, and financial information;

Information we obtain at your request, such as your fax number, or information we need to complete a transaction that you authorized;

Information about your transactions and experiences with us, such as your account balance, account usage, and loan history;

Information we receive from a consumer reporting agency such as credit history and employment history;

Information we receive from others, such as specialized marketing information firms.

We use the information you have provided on account applications and the information we receive from consumer reporting agencies as part of the process of establishing your account relationship with us. For example, your information may be used to evaluate your eligibility for a loan or other service, to understand what financial services may be of interest to you, to improve our accounts and services, or to protect you from fraud. We also use certain information to verify your identity as required by the USA Patriot Act.

## Sharing Information with Affiliates of MidAmerica Bank

We may share information about you with our wholly owned subsidiaries, MidAmerica Insurance Agency and MidAmerica Investment Services, and with affiliated registered representatives of Invest Financial Corporation, with whom we have a joint marketing agreement, which enables us to understand your financial needs and offer you additional financial products and services of which you may not be aware. This information may include any of the categories of information described above in the section captioned "Information The Bank Collects".

## Marketing Partners

On occasion, we may share customer information with financial service providers such as insurance companies with whom we have joint marketing agreements so that we may offer you additional financial services and products. The information we provide is limited to customer contact information, such as a listing of customer names, addresses, and phone numbers. We may ask commercial loan customers for their permission to provide additional information from their loan applications to an insurance agency that offers business insurance coverage. When we enter a marketing agreement with another financial service provider, a confidentiality agreement limits the other party's use of the customer information we provide. It can use the information only to offer the financial products and services agreed to and cannot use the information for any other purpose.

## Customer Preferences

You have the right to instruct us not to share certain non-experience information we receive from you or from third parties among our corporate family and marketing partners. Non-experience information is received from applications or outside sources, such as credit reporting agencies. You may notify us of your preference at any time.

If you do not want us to share this information about you, simply call us at the following toll-free number, 1-877-622- 8700, or send a written request with your name, address, Social Security number, and account number(s) to:

MidAmerica Bank
Attn: Customer Service Privacy Department
55th & Holmes
Clarendon Hills, IL 60514-1500

If you have already recorded your preferences with us, there is no need to do so again. Your preference will apply to all accounts linked to your Social Security number. For joint accounts, any account holder may express a privacy preference on behalf of the other joint account holders.

W141901 Page 1 of 2 (208)

Confidential Under Protective Order

FOSTER0009442

**Sharing Information with Nonaffiliated Third Parties**
We also disclose customer information to companies that help us service existing accounts. For example, this may include check printing companies, data processing companies, or companies that enable us to provide on-line banking services. These companies with whom we do business are legally obligated to comply with strict standards regarding security and confidentiality and are restricted from using this information for any other purpose other than the service we have requested the company to perform.

**Other Situations**
In addition, we disclose information to consumer reporting agencies. This is permitted by law and is a necessary part of our working relationships with consumer reporting agencies.

As permitted by law, we may be required to disclose information in order to prevent fraud, in response to a subpoena, or to comply with a legally permitted inquiry by a government agency or federal regulator.

We may also share customer information when authorized by you.

**Direct Marketing Companies**
Because we recognize the sensitive nature of the information you provide us, we do not sell or provide customer information to outside companies for the purposes of marketing non-financial products.

**Public Records**
Because each mortgage is recorded in the county in which the property is located, certain information about your mortgage loan with us is available to the public. Your name and address and original loan amount are available from the county to anyone who wishes to use that information.

**Confidentiality and Security**
We limit access to nonpublic personal information about you to those employees who need to know that information to provide products or services to help you meet your financial needs. We educate our employees to reinforce the importance of confidentiality and customer privacy. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

**Accurate Information**
We strive to keep your customer and financial information accurate. If you become aware of any records that are incorrect or if your personal information changes, please notify us as soon as possible by contacting us at 708-410-4444 so we can make the necessary changes.

**Protecting Your Identity**
If you suspect that someone has had unauthorized access to your account with us, or access to your personal identifying information such as your Social Security number, please notify us immediately so we can take action to protect you. Call our Loss Prevention area at 630-271-8740. In addition you should also report the incident to your local law enforcement agency and to the Federal Trade Commission (FTC). To speak with a trained FTC telephone counselor, call toll-free 1-877-IDTHEFT (1-877-438-4338). More information about preventing and reporting identity theft can be found at www.consumer.gov/idtheft/.

Your business is important to us and we are committed to providing you with quality customer service. If you have any questions, please contact the Branch Manager at any MidAmerica or St. Francis office. We are also committed to the protection of customer information on our website. Our website privacy policy can be found at www.midamericabank.com.

This notification replaces all previous statements of our personal information privacy policy. We reserve the right to amend this disclosure at any time upon proper notice to you.

This Privacy Policy applies to the affiliates listed below:
MidAmerica Bank, fsb
St. Francis Bank, a division of MidAmerica Bank, fsb
MidAmerica Insurance Agency
MidAmerica Investment Services
SF Insurance Services Corporation

Confidential Under Protective Order

FOSTER0009443

# Exhibit 7



# CONSUMER LOAN
# DISBURSEMENT INSTRUCTIONS

Date: 06/06/2006

Loan Number: 0760990989
Borrower(s): JEFFREY M FOSTER

Address: 6201 N KILPATRICK AVE
CHICAGO, IL 60646

Consumer Loan Closer: SOMMERS, KARI

## Equity Loan (Fixed):

On the date of disbursement of my fixed rate loan, please have the proceeds or balance thereof handled in the following manner:

☐ Please send a check to me/us in the amount of $ _____

☐ Please deposit the amount of $ _____ into my MidAmerica Bank account # _____

☐ I/We will pick up the check on the date of disbursement **AFTER 12:00 P.M. (NOON)** at a MidAmerica branch.
Branch Location: _____

## Equity Cashline (Line of Credit):

On the date of disbursement of my Equity Cashline Loan, please have $ _____ drawn from the above account. Please let this notice serve as authorization to draw the funds and apply as follows:

☐ No disbursements at this time. Please leave money available for later use. Mail account checks to us for later use.

☐ Please send a check to me/us in the amount of $ _____

☐ Please deposit the amount of $ _____ into my MidAmerica Bank account # _____

☐ I/We will pick up the check on the date of disbursement **AFTER 12:00 P.M. (NOON)** at a MidAmerica branch.
Branch Location: _____

☒ This loan requires a minimum draw amount of $10,000. If no disbursement option is selected above, the minimum draw amount will be disbursed from your account and will be sent to you in the form of a check.

Special instructions: _____
_____

_____        _____
Borrower                           Borrower

_____        _____
Borrower                           Borrower

## Please complete this form in its entirety for proper disbursement.

W4065CL 11/05


*01 406501*

FOSTER0002972
Confidential Under Protective Order

Exhibit 8

**SERVICING DISCLOSURE STATEMENT**

Lender: MID AMERICA BANK, FSB.

**NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGEMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.**

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the date of the transfer. The new loan servicer must also send you notice within 15 days after the date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15-day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, whether or not your loan servicing is transferred. If you send a "qualified written request" to your loan servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates by Lender**

1. The following is the best estimate of what will happen to the servicing of your mortgage loan:

   __X__ We may assign, sell or transfer the servicing of your loan while the loan is outstanding.
   We are able to service your loan, and we ____ will, ____ will not, __X__ haven't decided whether to service your loan.
   OR

   _____ We do not service mortgage loans, and we have not serviced mortgage loans in the past three years. We presently intend to assign, sell or transfer the servicing of your mortgage loan, You will be informed about your servicer.
   OR

   _____ We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors. This loan may be funded through the Mortgage Partnership Finance Program of the Federal Home Loan Bank of Chicago. For the loan program you have applied for, we expect to retain all of the mortgage servicing.

2. For all the mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of such loans for which we will transfer servicing is between:

   __X__ 0 to 25%     _____ 26 to 50%     _____ 51 to 75%     _____ 76 to 100%

   [This estimate _____ does __X__ does not include assignments, sales or transfers to affiliates or subsidiaries.] This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. _____ This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

   | Year | Percentage of Loans Transferred (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
   |------|------|
   | 2003 | 0 TO 25 % |
   | 2004 | 0 TO 25 % |
   | 2005 | 0 TO 25 % |

   [This information _____ does __X__ does not include assignments, sales or transfers to affiliates or subsidiaries.]

   JUNE 6, 2006                                          MID AMERICA BANK, FSB
   Date                                                  Lender

**Acknowledgement of Mortgage Loan Applicant**
I/We have read this disclosure form, and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.

Applicant  JEFFREY M FOSTER          Date          Applicant          Date

Applicant                            Date          Applicant          Date

W115801 01/01
(1158) UREV 02/04

*01 115801*

Confidential Under Protective Order

FOSTER0009444

Exhibit 9

**MidAmerica Bank**

CONSUMER LOAN CLOSING
PACKAGE TRANSMITTAL

DATE: JUNE 6, 2006
BRANCH:
APPLICATION NUMBER: 0604141445
LOAN NUMBER: 0760990989

TO: MAB DEVON

RE: JEFFREY M FOSTER

**PLEASE OBTAIN THE FOLLOWING CONDITIONS FROM THE CUSTOMER:**

[X] Homeowner's Insurance Policy showing MidAmerica Bank as 2nd Mortgagee

[ ] Waiver of Homestead to be signed by spouse.
***Note to Personal Banker: Must be signed by spouse of borrower and notarized.***

[ ] Trust Documents to be signed by Trust Company.
***Note to Personal Banker: Borrower must take Mortgage, Note, ALTA's (>$250K), and signed Letters of Direction to Trust Company for signatures to be returned by rescission date.

**Legal Documentation:**

| | ENCLOSED | DISPOSITION | |
|---|---|---|---|
| X | Mortgage and Rider(s), if applicable | To be signed by borrower(s); return original | *all* |
| | Condo or PUD Rider, if applicable | To be signed by borrower(s); return original | |
| X | Note and Rider(s), if applicable | To be signed by borrower(s); return original | *all* |
| | Truth in Lending | To be signed by borrower(s); return original | *fixed* |
| X | Disbursement Statement | To be signed by borrower(s); return original | *all* |
| X | HUD-1 Settlement Statement | To be signed by borrower(s); return original | *all* |
| X | Right of Rescission Form(s) | To be signed by borrower(s); return original *Two copies to be signed by each borrower* | *all* |
| X | Compliance Agreement | To be signed by borrower(s); return original | *all* |
| X | Signature Card | To be signed by borrower(s); return original | *all* |
| X | Form W-9 | To be signed by borrower(s); return original | *all* |
| X | Program Disclosure / Statement of Billing | To be signed by borrower(s); return original | *all* |
| | Payment Disclosure Notice | To be signed by borrower(s); return original | *all* |
| X | MSP Authorization | To be signed by borrower(s); return original | *all* |
| | Equity CashLine Initial Disbursement | To be signed by borrower(s); return original | *adj* |
| | Payments to your Equity CashLine | To be signed by borrower(s); return original | *adj* |
| | Consumer Loan Prepayments | To be signed by borrower(s); return original | *fixed* |
| | Fixed Rate Equity Loan Disbursement Instructions | To be signed by borrower(s); return original | *fixed* |
| | Equity Loan Automatic Payment Agreement | To be signed by borrower(s); return original | *fixed MSP* |
| | Form 4506 and Tax Returns | To be signed by borrower(s); return original | *tax* |
| | Automatic Payment Plan Authorization | To be signed by borrower(s); return original | *all MSP* |
| | Notice to Borrower | To be signed by borrower(s); return original | *p/o* |
| | Letter to Borrower re: Trust Documents | To be given to borrower(s) with Trust Docs | *land trust* |
| | Letter to Land Trust re: Trust Documents | To be given to borrower(s) with Trust Docs | *land trust* |
| | Letter of Direction (*triplicate*) | To be signed by borrower(s); return original | *land trust* |
| | Personal Guarantee | To be signed by borrower(s); return original | *land trust* |
| | Revocable Trust Rider | To be signed by Trustee(s); return original | *living trust* |
| | Living Trust Addendum | To be signed by Trustee(s); return original | *living trust* |
| | ALTA | To be signed by borrower(s); return original | *>$250K* |
| | Agreement to Furnish Insurance | To be signed by borrower(s); return original | *orig* |
| | Federal Right of Rescission Form | To be signed by borrower(s); return original | *orig* |
| | Consumer Loan Application | To be signed by borrower(s); return original | *orig* |
| | Initial Truth in Lending | To be signed by borrower(s); return original | *orig* |
| | Borrower Certification and Authorization Form | To be signed by borrower(s); return original | *orig* |
| | Business Arrangement and Affiliated Business Arrangement | To be signed by borrower(s); return originals | *orig* |
| | Initial Program Disclosure | To be signed by borrower(s); return original | *orig* |
| X | Copy of Appraisal | To be given to borrower(s) | *orig* |

PLEASE RETURN CLOSING PACKAGE TO CORRIDORS III ATTENTION: CLOSING DEPT IMMEDIATELY AFTER CLOSING. **If you have any questions regarding the enclosed package, please contact (630) 493-6343 or _____ .

I/we understand that under the USA Patriot Act, the Title Company is obligated to verify the identity of each borrower who executes documents for the mortgage loan. I/we understand and agree that if the Title Company is not able to verify the identity of all borrowers, the Bank will not be able to fund the mortgage loan.

** Title Agents/Personal Bankers, by acknowledging below you are stating that all loan fees have been reviewed with the borrower that are disclosed on the Note and correspond with all fees on the HUD-1 Settlement Statement.

SOMMERS, KARI

_____         _____
Personal Banker                    Personal Banker Reviewed    CL4660 07/03

*01 480001*

Confidential Under Protective Order

FOSTER0009453

# Exhibit 10



**SIGNATURE / NAME
AFFIDAVIT**

APP #: 0604141445

Loan Number: 760990989

Date:   06/06/06

Signature Affidavit

This is to certify that my legal signature is as written and typed below.
This signature must exactly match signatures on the Note and Mortgage
(or Deed of Trust).

☐ I further certify that the signature below will match any Equity Cashline checks that
may be written and signed by me in the future.

Signature JEFFREY M FOSTER

Name Variation (complete if applicable)

This is to certify that I,   JEFFREY M FOSTER                    , am one
and the same person as,   JEFFREY FOSTER

who executed documents in connection with a mortgage with MidAmerica Bank.

Borrower   JEFFREY M FOSTER

Subscribed and sworn to before me this        day of           ,

Notary Public in and for the

State of _____

County of _____

My Commission Expires: _____

SECTION 1010 OF TITLE 18, U.S.C., "FEDERAL HOUSING
ADMINISTRATION TRANSACTION," PROVIDES; "WHOEVER, FOR THE
PURPOSE OF--INFLUENCING IN ANY WAY THE ACTION OF SUCH
ADMINISTRATION--MAKES, PASSES, UTTERS OR PUBLISHES ANY
STATEMENT, KNOWING THE THE SAME TO BE FALSE--SHALL BE FINED
NOT MORE THAN $5,000 OR IMPRISONED NOT MORE THAN TWO YEARS,
OR BOTH." OTHER FEDERAL STATUTES PROVIDE SEVERE PENALTIES
FOR ANY FRAUD AS INTENTIONAL MISREPRESENTATION MADE FOR THE
PURPOSE OF INFLUENCING THE ISSUANCE OF ANY GUARANTY OR
INSURANCE OR THE MAKING OF ANY LOAN BY THE ADMINISTRATOR FOR
VETERANS AFFAIRS.

1329 (01/04)

*01 132901*

FOSTER0002974
Confidential Under Protective Order

# Exhibit 11



SIGNATURE / NAME
AFFIDAVIT

APP #: 0604141445

Loan Number: 760990989

Date: 06/06/06

Signature Affidavit

This is to certify that my legal signature is as written and typed below.
This signature must exactly match signatures on the Note and Mortgage
(or Deed of Trust).

☐ I further certify that the signature below will match any Equity Cashline checks that
may be written and signed by me in the future.

Signature JEFFREY M FOSTER

Name Variation (complete if applicable)

This is to certify that I, JEFFREY M FOSTER , am one

and the same person as, JEFFREY FOSTER

who executed documents in connection with a mortgage with MidAmerica Bank.

Borrower JEFFREY M FOSTER

Subscribed and sworn to before me this          day of

Notary Public in and for the

State of _____

County of _____

My Commission Expires: _____

SECTION 1010 OF TITLE 18, U.S.C., "FEDERAL HOUSING
ADMINISTRATION TRANSACTION," PROVIDES; "WHOEVER, FOR THE
PURPOSE OF--INFLUENCING IN ANY WAY THE ACTION OF SUCH
ADMINISTRATION--MAKES, PASSES, UTTERS OR PUBLISHES ANY
STATEMENT, KNOWING THE THE SAME TO BE FALSE--SHALL BE FINED
NOT MORE THAN $5,000 OR IMPRISONED NOT MORE THAN TWO YEARS,
OR BOTH." OTHER FEDERAL STATUTES PROVIDE SEVERE PENALTIES
FOR ANY FRAUD AS INTENTIONAL MISREPRESENTATION MADE FOR THE
PURPOSE OF INFLUENCING THE ISSUANCE OF ANY GUARANTY OR
INSURANCE OR THE MAKING OF ANY LOAN BY THE ADMINISTRATOR FOR
VETERANS AFFAIRS.

1323 (01/04)

*01 132301*

Exhibit 12

*866  622 - 2657*
*x 62386*

Nick Keleman                                                     March 10, 2009
National City Bank


Re: Loan modification of heloc for 6201 N Kilpatrick, Chicago, Il 60646



Mr. Keleman,


Thank you for taking the time to try to help me with my loans. The following is a brief
description of how I ended up in a hardship situation.


I n 2003, I refinanced a heloc loan from National Cit bank to Mid America bank. After
the loan closed, National City bank got into a dispute with Mid America Bank on whether
or not enough money was transferred for the payoff. About four months after my
refinance, I was turned down for credit. After looking at my credit report, I was
astonished to find a mortgage default on my credit from National City. After contacting
the bank, they told me the payoff wasn't enough.

I spent the next two years providing copies of the payoff statement and cancelled check
from Mid America, statements, etc., trying to convince them to clear it up. They refused.
My credit score dropped into the mid 500's. All of my credit was cut off. I was in the
middle of construction projects and had to withdraw from very lucrative investments. I
had to fold the company, sell 4 of my buildings to pay off creditors, and try to revamp a
straight real estate sales career that I previously pulled back on. I asked National City that
if I paid them the $8400 discrepancy, would they remove the default. They said no.

I finally filed a law suit to force National City to research the problem. After a year of
legal fees, National City admitted to the mistake. Actually, they changed the story 5 times
as to why the loan was not paid off. The last one was that I wrote a check after the payoff
was issued. When that was proven to be untrue, National was forced to take the mark off.
It turned out that an employee who botched it up was trying to cover up the mistake.
National City promised to remove the mark immediately, but actually didn't for 7
months. It cost me another $100,000 or so. Instead of being a guy with millions in
reserve, I was wiped out.

FOSTER0000961

As soon as the mark was removed from my credit, my score jumped back to 750. But it was too late. The real estate market was in decline. I could not reach the levels I was at and had no reserve.

Major reason #2

National City refinanced my HELOC and increased to limit to $1,890,000. After numerous attempts to go through the paperwork, and three visits to the branch, the bank was not prepared. One visit to go through the paperwork was cancelled due to the person forgetting about the appointment and was said to be at lunch. They finally faxed the loan documents to me. They were not signed by me or notarized. Unknown to me, a floor of 4% was put in the note that was not in there before. As we speak, I am paying $3000 or so a month more because of this provision. Without it, my rate would be 2.25%. ( I have prime – 1 ).

During the last year, medical bills and a Tornado eliminated any money saved. The real estate market is all but gone. My rental income and fractional real estate income leaves me short every month. I am $650,000 upside down on my house. I have been selling cars, antiques, etc. to stay current on my mortgages. I have sold them for much less than they are worth ( I will provide documents to prove it if you want).

I have been in your pipeline for about two months. The first documents were sent at the end of December and detailed documents on January 15th. I am told that the mortgage area has everything they need but was disappointed to learn your department (for the heloc) did not have anything. So I am rushing this over to you as fast as I can. I am out of options to continue the current situation.

I have faxed over the documents requested. Please tell me what you need to help me and I will provide it immediately. My cell is (773) 983-3595. Home (773) 283-7515

I am looking forward to your helping me get my life back on track.


Sincerely,

Jeff Foster

Exhibit 13

THIS INSTRUMENT WAS PREPARED BY:
KENNETH KORANDA
1823 CENTRE POINT CIRCLE
P. O. BOX 3142
NAPERVILLE, IL 60566-7142

HE 8165544CRC



Doc#: 0334446321
Eugene "Gene" Moore Fee: $38.00
Cook County Recorder of Deeds
Date: 12/10/2003 03:27 PM Pg: 1 of 8

74 0609985

# EQUITY CASH LINE MORTGAGE

THIS MORTGAGE is made this        15TH        day of        NOVEMBER        , 2003 ,
between the Mortgagor, JEFFREY M FOSTER, AN UNMARRIED PERSON

(herein "Borrower"), and the Mortgagee, **Mid America Bank, fsb,**

(herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of ONE MILLION EIGHT HUNDRED Dollars,
NINETY THOUSAND AND NO/100
which indebtedness is evidenced by Borrower's Equity Agreement and Promissory Note (herein "Note") providing for
periodic payments as called for therein, with the balance of the indebtedness, if not sooner paid, due and payable on
NOVEMBER 1, 2013.

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon, the
payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this
Mortgage, and the performance of the covenants and agreements of Borrower herein contained, Borrower does
hereby mortgage, grant and convey to Lender the following described property located in the County of COOK  ,
State of Illinois:

LOTS 132, 133, 134 AND THE SOUTHERLY 1/2 OF LOT 135 IN GEORGE F. KOESTER AND CO'S
SECOND ADDITION TO SAUGANASH, A SUBDIVISION IN CALDWELL'S RESERVE IN TOWNSHIP 40
NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF
RECORDED MARCH 15, 1928 AS DOCUMENT 9956617, IN COOK COUNTY, ILLINOIS.

P.I.N. #: 13-03-113-023-0000
which has the address of 6201 N KILPATRICK, CHICAGO, IL 60646

(herein "Property Address");

1860CL Page 1 of 6 5/03

FOSTER0000951

Together with all improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereof, shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are herein referred to as the "Property".

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, that the Property is unencumbered and that Borrower will warrant and defend generally the title to the property against all other claims and demands, subject to any declarations, easements or restrictions listed in a schedule of exceptions to coverage in any title insurance policy insuring Lender's interest in the Property.

Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal of and interest on the indebtedness evidenced by the Note, and late and other applicable charges as provided in the Note.

2.   **Application of Payments.** The borrower must pay to the Bank at least the minimum payment due in each billing cycle. Payment of more than the minimum payment in any billing cycle will not relieve the borrower from paying the minimum payment in any other billing cycle.

Payments received will be applied in the following order when posted – (1) accrued interest, if any; (2) late charges, if any; (3) annual service fee and/or other charges, if any; and (4) principal reduction.

The CashLine requires interest, late fees (if any) and annual service fee (if applicable) as monthly payments. Any additional monies sent will immediately reduce the outstanding balance by that amount. Interest only payments cannot be paid in advance. Principal reduction payments cannot be made until all accrued interest, late charges, and annual service fees are satisfied.

3.   **Charges: Liens.** Borrower shall pay all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents if any, by Borrower making payment, when due, directly to the payee thereof. Borrower shall promptly furnish to Lender all notices of amounts due under this Paragraph and in the event Borrower shall make payment directly, Borrower shall promptly furnish to Lender receipts evidencing such payments. Borrower shall promptly discharge any such lien which has priority over this Mortgage; provided, that Borrower shall not be required to discharge any such lien so long as Borrower shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Lender, or shall in good faith contest such lien by, or defend enforcement of the lien or forfeiture of the Property or any part thereof.

4.   **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as Lender may require and in such amounts and for such periods as Lender may require; provided, that Lender shall not require that the amount of such coverage exceed that amount of coverage required to pay the sums secured by this Mortgage.

The Insurance Carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided that such approval shall not be unreasonably withheld. All premiums on insurance policies shall be paid by Borrower making payment, when due, directly to the insurance carrier.

All insurance polices and renewals thereof shall be in form acceptable to Lender and shall include a standard mortgage clause in favor of and in form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of said premiums. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

1860CL Page 2 of 6 5/03

FOSTER0000952

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, provided such restoration or repair is economically feasible or if the security of this Mortgage is not thereby impaired. If such restoration or repair is not economically feasible or if the security of this Mortgage would be impaired, the insurance proceeds shall be applied to the sums secured by this Mortgage, with the excess, if any, paid to Borrower. If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the property or to the sums secured by this Mortgage.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not exceed or postpone the due date of the periodic payments referred to in Paragraph 1 hereof or change the amount of such payments. If under Paragraph 18 hereof the Property is acquired by Lender, all right, title and interest of Borrower in and to any insurance policies and in and to the proceeds thereof resulting from damage to the Property prior to the sale or acquisition shall pass to Lender to the extent of the sums secured by this Mortgage immediately prior to such sale or acquisition.

**5. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents. If a condominium or planned unit development rider is executed by Borrower and recorded together with this Mortgage the covenants and agreements of such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider were a part hereof.

**6. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, including, but not limited to eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Lender at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums and take such action as is necessary to protect Lender's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property to make repairs.

Borrower shall faithfully and fully comply with and abide by every term, covenant and condition of any superior mortgage or mortgages presently encumbering the Property. A default or delinquency under any superior mortgage or mortgages shall automatically and immediately constitute a default under this Mortgage. Lender is expressly authorized at its option to advance all sums necessary to keep any superior mortgage or mortgages in good standing, and all sums so advanced, together with interest shall be subject to the provisions of this Paragraph 6 of this Mortgage. Borrower agrees not to make any agreement with the holder of any superior mortgage that in any way shall modify, change, alter or extend any of the terms or conditions of that superior mortgage nor shall Borrower request or accept any future advances under that superior mortgage, without the express written consent of Lender.

Any amounts disbursed by Lender pursuant to this Paragraph 6, with interest thereon, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof and shall bear interest from the date of disbursement at the rate payable from time to time on outstanding principal under the Note unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible under applicable law. Nothing contained in this Paragraph 6 shall require Lender to incur any expense or take any action hereunder.

**7. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that in this Paragraph 6 shall require Lender to incur any expense or take any action hereunder.

1860CL Page 3 of 6 3/02

**8.   Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Mortgage, with the excess, if any, paid to Borrower.  In the event of a partial taking of the Property, unless Borrower and Lender otherwise agree in writing, there shall be applied to the sums secured by this Mortgage such proportion of the proceeds as is equal to that proportion which the amount of the sums secured by this Mortgage immediately prior to the date of taking bears to the fair market value of the Property immediately prior to the date of taking with the balance of the proceeds paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date such notice is mailed, Lender is authorized to collect and apply the proceeds at Lender's option, either to restoration or repair of the Property or to the sums secured by this Mortgage.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of the periodic payments referred to in Paragraph 1 hereof or change the amount of such payments.

**9.   Borrower Not Released.**  Extension of the time for payment or modification of payment of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest.  Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify payment of sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest.

**10.   Forbearance by Lender Not a Waiver.**  Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be waiver of or preclude the exercise of any such right or remedy.  The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Mortgage.

**11.   Remedies Cumulative.**  All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage or afforded by law or equity, and may be exercised concurrently, independently or successively.

**12.   Successors and Assigns Bound; Joint and Several Liability; Captions.**   The covenants and agreements herein contained shall bind, and the rights hereunder shall insure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 16 hereof.  All covenants and agreements of Borrower shall be joint and several.  The captions and headings of Paragraphs of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

**13.   Notice.**  Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail, return receipt requested, to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein.  Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in this manner designated.

1860CL Page 4 of 6 3/02

FOSTER0000954

and **(b)** Borrower takes such action and pays all expenses as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**20. Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under Paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under Paragraph 18 hereof or abandonment of the Property and at any time prior to the expiration of any period of redemption following judicial sale, Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of the costs of management of the Property and collection of rents, including, but not limited to receiver's fees, premiums on receiver's bonds and reasonable attorney's fees and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only for those rents actually received.

**21. Release.** Upon payment of all sums secured by this Mortgage on the Expiration Date of the Note, or upon the written request of Borrower (if prior to the final due date with all sums having been paid) Lender shall release this Mortgage without charge to Borrower, Borrower shall pay all costs of recordation, if any.

**22. Waiver of Homestead.** Borrower hereby waives all right of homestead exemption in the Property.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

_____     Borrower
JEFFREY M FOSTER

_____     Borrower


STATE OF ILLINOIS    )
                     ) SS
COUNTY OF Cook       )

I, the undersigned, a Notary Public in and for said County and State do hereby certify that JEFFREY M FOSTER, AN UNMARRIED PERSON

personally known to me to be the same person(s) whose name(s) is/are subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that       he       signed and delivered the said instrument as       his       free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal this       day of

My commission expires: 3/26/05

_____
Notary Public

1860CL Page 6 of 6 3/02

WHEN RECORDED RETURN TO:
MID AMERICA BANK, fsb.
1823 CENTRE POINT CIRCLE
P. O. BOX 3142
NAPERVILLE, IL  60566-7142

"OFFICIAL SEAL"
MERRY LYNNE S. GRAY
Notary Public, State of Illinois
My Commission Expires 3-26-2005

FOSTER0000955

[Space Above This Line For Recording Data]

## 1-4 FAMILY RIDER

Assignment of Rents

THIS 1-4 FAMILY RIDER is made this 15TH day of NOVEMBER , 2003 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

MID AMERICA BANK, FSB. (the "Lender")

date and covering the Property described in the Security Instrument and located at:

6201 N KILPATRICK, CHICAGO, IL 60646
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Uniform Covenant 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Uniform Covenant 18 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is

Fannie Mae / Freddie Mac Uniform Instrument FNMA 3170 9/90

MULTISTATE 1-4 FAMILY RIDER
W100101 7/03 Page 1 of 2
317001 (10/01)


*02 317001*

FOSTER0000956

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family

_____ Seal
                                  -Borrower

_____ Seal
                                  -Borrower

_____ Seal
                                  -Borrower

_____ Seal
                                  -Borrower

_____ Seal
                                  -Borrower

_____ Seal
                                  -Borrower

MULTISTATE 1-4 FAMILY RIDER
Fannie Mae / Freddie Mac Uniform Instrument FNMA 3170 9/90

W1001 (01/01) Page 2 of 2
317002 (10/01)

FOSTER0000957



Doc#: 0407915038
Eugene "Gene" Moore Fee: $28.50
Cook County Recorder of Deeds
Date: 03/19/2004 10:44 AM Pg: 1 of 3

<u>Prepared by and after recording mail to:</u>

*Stewart Mortgage Information*
*Attn. Sherry Doza*
*P.O. Box 540817*
*Houston, Texas 77254-0817*
*Tel. (800) 795-5263*



**Illinois**

**County of Cook**      **ID: 920**

| | |
|---|---|
| **Loan #:** | 20002767 |
| **Index:** | 7361 |
| **JobNumber:** | 141_2401 |

## RELEASE OF MORTGAGE

KNOWN ALL MEN BY THESE PRESENTS that MidAmerica Bank, fsb holder of a certain mortgage, whose parties, dates and recording information are below, does hereby acknowledge that it has received full payment and satisfaction of the same, and in consideration thereof, does hereby cancel and discharge said mortgage.

| | |
|---|---|
| **Original Mortgagor:** | JEFF FOSTER |
| **Property Address:** | 6201 N KILPATRICK AVE, CHICAGO, IL 60646 |
| **Date of DOT:** | 12/16/1999 |
| **Doc. / Inst. No:** | 09191349 |
| **PIN:** | 13 03 113 023 |
| **Legal:** | See Exhibit 'A' |

IN WITNESS WHEREOF, MidAmerica Bank, fsb , has caused these presents to be executed in its corporate name and seal by its authorized officers this 18th day of February 2004 A.D. .

MidAmerica Bank, fsb

Ann Oie , Vice President



FOSTER0000958

STATE OF ILLINOIS
COUNTY OF WILL

On this 18th day of February 2004 A.D. , before me, a Notary Public, appeared Ann Oie to me personally
known, who being by me duly sworn, did say that (s)he is the Vice President of MidAmerica Bank, fsb ,
and that said instrument was signed on behalf of said corporation by authority of its Board of Directors,
and said Ann Oie acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first
above written.

**This instrument was prepared by:**
**Sherry Doza**
**Stewart Mortgage Information**
**3910 Kirby Drive, Suite 300**
**Houston, Texas 77098**

OFFICIAL SEAL
**CHERYL E. HASSELBRING**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-9-2004

FOSTER0000959

# EXHIBIT 'A'

**JOB #:** 141-2401
**LOAN #:** 20002767
**INDEX** 7361

LEGAL DESCRIPTION:

LOTS 132, 133, 134 AND THE SOUTHERLY ½ OF LOT 135 IN GEORGE F. KOESTER AND COMPANY'S SECOND ADDITION TO SAUGANASH, A SUBDIVISION IN CALDWELL'S RESERVE IN TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED 3/15/28 AS DOCUMENT 9956617, IN COOK COUNTY, ILLINOIS.

PERMANENT INDEX NUMBER:

13-03-113-023

FOSTER0000960

# Exhibit 14

## National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00578                CSR/CB ID: 04

Time: 11:14 A.M.

Calendar Date: 05/30/09        Business Date: 06/01/09

Mortgage Loan Payment
**Transaction Number: 116***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                      $4,981.03
Check Amount 1:        $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

## National City®

1640 West Fullerton Avenue
Chicago, IL 60614

Branch ID: 00187                CSR/CB ID: 01

Time:  2:57 P.M.

Calendar Date: 06/30/09        Business Date: 06/30/09

Mortgage Loan Payment
**Transaction Number: 33***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                      $4,981.03
Check Amount 1:        $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

## National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00578                CSR/CB ID: 07

Time: 1:56 P.M.

Calendar Date: 07/14/09        Business Date: 07/14/09

Mortgage Loan Payment
**Transaction Number: 141***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                      $4,981.03
Check Amount 1:        $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

## National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00578                CSR/CB ID: 03

Time: 5:03 P.M.

Calendar Date: 08/28/09        Business Date: 08/31/09

Mortgage Loan Payment
**Transaction Number: 28***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                      $4,981.03
Check Amount 1:        $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

Confidential Under Protective Order

FOSTER0007859

# National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00576                    CSR/CB ID: 07

Time: 5:34 P.M.

Calendar Date: 01/09/09 | Business Date: 01/12/09

**Mortgage Loan Payment**
**Transaction Number: 37***
Region:                          0056
Account Number: XXXXXXXX86
Amount:              $6,358.73
Check Amount 1:      $6,358.73

Please take a brief survey to tell us about your
experience today and enter for a chance to win
500,000 points from National City.
Call 1-866-388-5797 or visit
www.NationalCityListens.com

alternate methods of entry, visit
www.NationalCityListens.com.
No purchase necessary. Winner of monthly drawing
may choose to receive a $1,000 National City Visa Gift
Card in lieu of points. You must be a U.S. citizen or
resident alien 18 years of age or older to win.
Sweepstakes ends 12/31/2009. Ask us for details.
All transactions are subject to proof and

Thank-you for Banking With Us!

# National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00576                    CSR/CB ID: 04

Time: 5:05 P.M.

Calendar Date: 02/27/09 | Business Date: 03/02/09

**Mortgage Loan Payment**
**Transaction Number: 12***
Region:                          0056
Account Number: XXXXXXXX86
Amount:              $6,358.73
Check Amount 1:      $6,358.73

Please take a brief survey to tell us about your
experience today and enter for a chance to win
500,000 points from National City.
Call 1-866-388-5797 or visit
www.NationalCityListens.com

For Official Sweepstakes Rules, including
alternate methods of entry, visit
www.NationalCityListens.com.
No purchase necessary. Winner of monthly drawing
may choose to receive a $1,000 National City Visa Gift
Card in lieu of points. You must be a U.S. citizen or
resident alien 18 years of age or older to win.
Sweepstakes ends 12/31/2009. Ask us for details.

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!



Confidential Under Protective Order

FOSTER0007894

# National City®

1830 W. Fullerton Ave.
Chicago, IL 60614

Branch ID: 00574                CSR/CB ID: 05
Time: 12:40 P.M.

Calendar Date: 03/16/09        Business Date: 03/16/09

**Mortgage Loan Payment**
**Transaction Number: 84***
Region:                        0056
Account Number: XXXXXXXX86
Amount:                  $4,981.03
Check Amount 1:          $4,981.03

Please take a brief survey to tell us about your
experience today and enter for a chance to win
500,000 points from National City.
Call 1-866-388-5797 or visit
www.NationalCityListens.com

For Official Sweepstakes Rules, including
alternate methods of entry, visit
www.NationalCityListens.com
No purchase necessary. Winner of monthly drawing
may choose to receive a $1,000 National City Visa Gift
Card in lieu of points. You must be a U.S. citizen or
resident alien 18 years of age or older to win.
Sweepstakes ends 12/31/2009. Ask us for details.

All transactions are subject to proof and
verification by Bank.

**Thank-you for Banking With Us!**
PCM



# National City®

1830 W. Fullerton Ave.
Chicago, IL 60614

Branch ID: 00574                CSR/CB ID: 02
Time: 1:12 P.M.

Calendar Date: 04/30/09        Business Date: 04/30/09

**Mortgage Loan Payment**
**Transaction Number: 49***
Region:                        0056
Account Number: XXXXXXXX86
Amount:                  $4,981.03
Check Amount 1:          $4,981.03

Please take a brief survey to tell us about your
experience today and enter for a chance to win
500,000 points from National City.
Call 1-866-388-5797 or visit
www.NationalCityListens.com

For Official Sweepstakes Rules, including
alternate methods of entry, visit
www.NationalCityListens...

Confidential Under Protective Order

FOSTER0007895

# National City

5033 Dempster
Skokie, IL 60077

Branch ID: 0057/060    CSR/CB ID: 04
Time: 11:24 A.M.

Calendar Date: 05/30/09    Business Date: 06/01/09

Mortgage Loan Payment
Transaction Number: 116*
Region:                      0056
Account Number: XXXXXXXX86
Amount:                  $4,981.03
Check Amount 1:          $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

# National City ®

1640 West Fullerton Avenue
Chicago, IL 60614

Branch ID: 00187    CSR/CB ID: 01
Time: 2:57 P.M.

Calendar Date: 06/30/09    Business Date: 06/30/09

Mortgage Loan Payment
Transaction Number: 33*
Region:                      0056
Account Number: XXXXXXXX86
Amount:                  $4,981.03
Check Amount 1:          $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

Confidential Under Protective Order

FOSTER0007896





FOSTER0007897

Confidential Under Protective Order



# National City
1401 W. Fullerton Ave.
Chicago, IL 60614
Branch ID: 00574          CSR/CB ID: 02
Time: 12:53 P.M.

Calendar Date: 09/30/09     Business Date: 09/30/09

Mortgage Loan Payment
Transaction Number: 186*
Region:                    0056
Account Number: XXXXXXXX86
Amount:              $4,981.03
Check Amount:        $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank you for Banking With Us!

# National City®
1830 W. Fullerton Ave.
Chicago, IL 60614
Branch ID: 00574          CSR/CB ID: 04
Time: 4:01 P.M.

Calendar Date: 10/30/09     Business Date: 10/30/09

Mortgage Loan Payment
Transaction Number: 158*
Region:                    0056
Account Number: XXXXXXXX86
Amount:              $4,982.04
Check Amount:        $4,982.04

All transactions are subject to proof and
verification by Bank.

Thank you for Banking With Us!

Confidential Under Protective Order

FOSTER0007898

## National City

Store II 0002

Branch ID: 00570                                CSR/CO ID: 04
Time: 3:06 P.M.

Calendar Date: 11/30/09        Business Date: 11/30/09

Mortgage Loan Payment
Transaction Number: 308*
Region:                              0056
Account Number: XXXXXXXX86
Amount:                        $4,981.03
Check Amount 1:             $4,981.03

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

## National City

Store II 0002

Branch ID: 00570                                CSR/CO ID: 05
Time: 1:51 P.M.

Calendar Date: 12/31/09        Business Date: 12/31/09

Mortgage Loan Payment
Transaction Number: 98*
Region:                              0056
Account Number: XXXXXXXX86
Amount:                        $4,982.04
Check Amount 1:             $4,982.04



All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

Confidential Under Protective Order

# National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00578                      CSR/CB ID: 07
Time: 12:26 P.M.

Calendar Date: 01/30/10     Business Date: 02/01/10

**Mortgage Loan Payment**
**Transaction Number: 199\***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                     $4,982.04
Check Amount 1:         $4,982.04

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC



---

# National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00578                      CSR/CB ID: 07
Time: 12:26 P.M.

Calendar Date: 01/30/10     Business Date: 02/01/10

**Mortgage Loan Payment**
**Transaction Number: 201\***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                     $4,982.04
Check Amount 1:         $4,982.04

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC



---

# National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00578                      CSR/CB ID: 04
Time: 10:45 A.M.

Calendar Date: 02/16/10     Business Date: 02/16/10

**Mortgage Loan Payment**
**Transaction Number: 158\***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                     $4,982.04
Check Amount 1:         $4,982.04

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC



---

# National City®

5033 Dempster
Skokie, IL 60077

Branch ID: 00578                      CSR/CB ID: 04
Time: 10:49 A.M.

Calendar Date: 03/31/10     Business Date: 03/31/10

**Mortgage Loan Payment**
**Transaction Number: 62\***
Region:                              0056
Account Number: XXXXXXXX86
Amount:                     $4,437.33
Check Amount 1:         $4,437.33

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC



Confidential Under Protective Order

FOSTER0007900

# National City ®

5033 Dempster
Skokie, IL 60077

Branch ID: 00570          CSR/CB ID: 04

Time:  4:30 P.M.

Calendar Date: 04/29/10          Business Date: 04/30/10

Mortgage Loan Payment
Transaction Number: 17*
Region:                    0056
Account Number: XXXXXXXX86
Amount:                 $4,437.33
Check Amount 1:      $4,437.33

All transactions are subject to proof and
verification by Bank.

Thank-you for Banking With Us!
FDIC

# PNCBANK

071
LINCOLN PARK - FULLERTON (767)
1640 WEST FULLERTON AVENUE
CHICAGO IL 60614
Cashbox 03 AM

* Mortgage Loan Payment
16:44          JUL 30 2010
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount          $6,001.00
Check Amt 1          $6,001.00

W/S ID WWS03FA0    Sequence Number 00076
Batch 900



This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.




# PNCBANK

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE IL 60077
Cashbox 04 AM

* Mortgage Loan Payment
14:58          AUG 31 2010
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount          $6,000.26
Check Amt 1          $6,000.26

W/S ID WWS039C9    Sequence Number 00072

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



# PNCBANK

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE IL 60077
Cashbox 02 AM

* Mortgage Loan Payment
14:49          SEP 30 2010
Account Number    XXXXXXXXXXXXXX1586
Tran Amount          $6,000.26
Check Amt 1          $6,000.26

W/S ID WWS039C7    Sequence Number 00135

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



Confidential Under Protective Order

FOSTER0007901





```
              071
           SKOKIE (878)
          5033 DEMPSTER
         SKOKIE IL 60077
          Cashbox 04 PM
```

```
* Mortgage Loan Payment
16:53P         NOV 1 2010
Account Number   XXXXXXXXXXXXXXXX1586
Tran Amount          $6,000.26
Check Amt 1          $6,000.26

W/S ID WWS0453A    Sequence Number 00016
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.





```
              071
   LINCOLN PARK-FULLERTON (767)
    1640 WEST FULLERTON AVENUE
         CHICAGO IL 60614
          Cashbox 02 AM
```

```
* Mortgage Loan Payment
13:44          NOV 30 2010
Account Number   XXXXXXXXXXXXXXXX1586
Tran Amount          $6,001.00
Check Amt 1          $6,001.00

W/S ID WWS0402E    Sequence Number 00024
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.





```
              071
           SKOKIE (878)
          5033 DEMPSTER
         SKOKIE IL 60077
          Cashbox 04 AM
```

```
* Mortgage Loan Payment
11:25          DEC 31 2010
Account Number   XXXXXXXXXXXXXXXX1586
Tran Amount          $6,001.00
Check Amt 1          $6,001.00

W/S ID WWS0453A    Sequence Number 00058
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



Confidential Under Protective Order

FOSTER0007904



## PNC BANK

```
071
SKOKIE (878)
5033 DEMPSTER
SKOKIE IL 60077
Cashbox 02 AM
```

Mortgage Loan Payment
JAN 18 2011
Account Number    XXXXXXXXXXXXXXXX1588
Tran Amount           $6,000.26
                      $6,000.26

W/S ID WWS03967    Sequence Number 00040

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

## PNC BANK

```
071
SKOKIE (878)
5033 DEMPSTER
SKOKIE IL 60077
Cashbox 04 AM
```

Mortgage Loan Payment
14:12    FEB 7 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount           $6,000.26
Check Amt 1           $6,000.26

W/S ID WWS0453A    Sequence Number 00254

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



## PNC BANK

```
071
SKOKIE (878)
5033 DEMPSTER
SKOKIE IL 60077
Cashbox 04 AM
```

Mortgage Loan Payment
11:30    FEB 22 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount           $2,348.44
Check Amt 1           $2,348.44

W/S ID WWS0453A    Sequence Number 00062
Escrow                 $2,348.44

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

## PNC BANK

```
071
SKOKIE (878)
5033 DEMPSTER
SKOKIE IL 60077
Cashbox 04 AM
```

Mortgage Loan Payment
12:25    MAR 4 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount           $6,156.83
Check Amt             $6,156.83

W/S ID WWS0453A    Sequence Number 00052

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.




Confidential Under Protective Order



**⊘PNCBANK**

```
            071
  LINCOLN PARK-FULLERTON (767)
    1640 WEST FULLERTON AVENUE
        CHICAGO IL 60614
        Cashbox 02 AM

* Mortgage Loan Payment
11:55            APR 4 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount            $6,156.83
Check Amt 1            $6,156.83

W/S ID WWS0402E    Sequence Number 00042
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

**⊘PNCBANK**

```
            071
          SKOKIE (628)
        5033 DEMPSTER
      SKOKIE IL 60077
        Cashbox 02 AM

* Mortgage Loan Payment
09:49            MAY 16 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount            $6,156.83
Check Amt 1            $6,156.83

W/S ID WWS03967    Sequence Number 00205
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



**⊘PNCBANK**

```
            071
  LINCOLN PARK-FULLERTON (767)
    1640 WEST FULLERTON AVENUE
        CHICAGO IL 60614
        Cashbox 04 AM

* Mortgage Loan Payment
14:19            JUN 30 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount            $6,156.83
Check Amt 1            $6,156.83

W/S ID WWS0402E    Sequence Number 00095
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



Confidential Under Protective Order



```
                071
       LINCOLN PARK-FULLERTON (767)
        1640 WEST FULLERTON AVENUE
            CHICAGO IL 60614
             Cashbox 05 AM

* Mortgage Loan Payment
14:12            AUG 30 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount            $6,156.83
Check Amt 1            $6,156.83

W/S ID WWS03F3E    Sequence Number 00074


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```

```
                071
       LINCOLN PARK-FULLERTON (767)
        1640 WEST FULLERTON AVENUE
            CHICAGO IL 60614
             Cashbox 07 AM

* Mortgage Loan Payment
14:16            SEP 30 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
Check Amt 1            $6,237.67

W/S ID WWS0402E    Sequence Number 00080


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```



```
                071
            SKOKIE (878)
            5033 DEMPSTER
            SKOKIE IL 60077
             Cashbox 03 AM

* Mortgage Loan Payment
13:58            OCT 31 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
Check Amt 1            $6,237.67

W/S ID WWS0453A    Sequence Number 00228


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```

```
                071
            SKOKIE (878)
            5033 DEMPSTER
            SKOKIE IL 60077
             Cashbox 02 AM

* Mortgage Loan Payment
14:40            NOV 30 2011
Account Number    XXXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
Check Amt 1            $6,237.67

W/S ID WWS03967    Sequence Number


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```

Confidential Under Protective Order



# PNC BANK

```
                071
            SKOKIE (878)
           5033 DEMPSTER
          SKOKIE IL 60077
          Cashbox 04 AM
```

```
* Mortgage Loan Payment
16:08              DEC 30 2011
Account Number     XXXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
Check Amt 1            $6,237.67
```

```
W/S ID WWS05018    Sequence Number 00082
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.

Confidential Under Protective Order

FOSTER0007909



```
          071
      SKOKIE (878)
     5033 DEMPSTER
     SKOKIE IL 60077
      Cashbox 02 AM

* Mortgage Loan Payment
23:47          JAN 30 2012
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
C      1               $6,237.67

      Sequence Number 00132
```

Deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.





```
          071
      SKOKIE (878)
     5033 DEMPSTER
     SKOKIE IL 60077
      Cashbox 06 AM

* Mortgage Loan Payment
16:48          FEB 28 2012
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
Check Amt 1            $6,237.67

W/S ID WWS05018   Sequence Number 00146
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.







```
          071
      SKOKIE (878)
     5033 DEMPSTER
     SKOKIE IL 60077
      Cashbox 03 AM

* Mortgage Loan Payment
14:01          MAR 30 2012
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
Check Amt 1            $6,237.67

W/S ID WWS0453A   Sequence Number 00027
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



```
          071
      SKOKIE (878)
     5033 DEMPSTER
     SKOKIE IL 60077
      Cashbox 06 AM

* Mortgage Loan Payment
13:55          APR 30 2012
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount            $6,237.67
Check Amt 1            $6,237.67

W/S ID WWS05018   Sequence Number 00153
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



Confidential Under Protective Order

FOSTER0007910

**⊘ PNCBANK**

```
              071
          SKOKIE (878)
         5033 DEMPSTER
        SKOKIE IL 60077
         Cashbox 06 AM

* Mortgage Loan Payment
11:31        MAY 30 2012
Account Number   XXXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS05018   Sequence Number 00053
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



**⊘ PNCBANK**

```
              071
          SKOKIE (878)
         5033 DEMPSTER
        SKOKIE IL 60077
         Cashbox 07 AM

* Mortgage Loan Payment
14:31        JUN 29 2012
Account Number   XXXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS09422   Sequence Number 00129
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.






**⊘ PNCBANK**

```
                071
        ASHLAND & ADDISON (895)
          3556 N. ASHLAND AVE
          CHICAGO IL 60657
           Cashbox 02 AM

* Mortgage Loan Payment
13:47         JUL 31 2012
Account Number   XXXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS08507   Sequence Number 00077
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



**⊘ PNCBANK**

```
                071
        ASHLAND & ADDISON (895)
          3556 N. ASHLAND AVE
          CHICAGO IL 60657
           Cashbox 04 AM

* Mortgage Loan Payment
11:07         AUG 31 2012
Account Number   XXXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS08525   Sequence Number 00047
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.





**PNCBANK**

```
              071
    NILES TOUHY AVENUE (022)
        5727 W. TOUHY AVE
          NILES IL 60714
         Cashbox 02 AM

* Mortgage Loan Payment
17:36               SEP 28 2012
Account Number   XXXXXXXXXXXXXXX1586
Tran Amount              $6,237.67
Check Amt 1              $6,237.67

W/S ID WWS06DF5    Sequence Number 00027
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

```
              071
    NILES TOUHY AVENUE (022)
        5727 W. TOUHY AVE
          NILES IL 60714
         Cashbox 02 AM

* Mortgage Loan Payment
12:38               OCT 30 2012
Account Number   XXXXXXXXXXXXXXX1586
Tran Amount              $6,237.67
Check Amt 1              $6,237.67

W/S ID WWS06DF5    Sequence Number 00033
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.




**PNCBANK**

```
              071
    NILES TOUHY AVENUE (022)
        5727 W. TOUHY AVE
          NILES IL 60714
         Cashbox 03 AM

* Mortgage Loan Payment
15:30               NOV 29 2012
Account Number   XXXXXXXXXXXXXXX1586
Tran Amount              $6,237.67
Check Amt 1              $6,237.67

W/S ID WWS06DF6    Sequence Number 00056
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

**PNCBANK**

```
              071
    NILES TOUHY AVENUE (022)
        5727 W. TOUHY AVE
          NILES IL 60714
         Cashbox 04 AM

* Mortgage Loan Payment
17:46               DEC 28 2012
Account Number   XXXXXXXXXXXXXXX1586
Tran Amount              $6,237.67
Check Amt 1              $6,237.67

W/S ID  06DF7      Sequence Number 00094
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



Confidential Under Protective Order



```
                    071
         NILES TOUHY AVENUE (022)
            5727 W. TOUHY AVE
              NILES IL 60714
              Cashbox 03 AM

* Mortgage Loan Payment
14:13          JAN 31 2013
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS06DF6   Sequence Number 00048
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



```
                    071
               SKOKIE (878)
              5033 DEMPSTER
             SKOKIE IL 60077
              Cashbox 03 AM

* Mortgage Loan Payment
16:38          FEB 27 2013
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS09422   Sequence Number 00039
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

```
                    071
         NILES TOUHY AVENUE (022)
            5727 W. TOUHY AVE
              NILES IL 60714
              Cashbox 05 AM

* Mortgage Loan Payment
17:39          MAR 29 2013
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS06DF5   Sequence Number 00030
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

```
                    071
         NILES TOUHY AVENUE (022)
            5727 W. TOUHY AVE
              NILES IL 60714
              Cashbox 05 AM

* Mortgage Loan Payment
12:12          APR 30 2013
Account Number    XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS06DF5   Sequence Number 00047
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

Confidential Under Protective Order

 

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES IL 60714
Cashbox 05 AM

＊ Mortgage Loan Payment
13:10          MAY 6 2013
Account Number   XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS06DF5    Sequence Number 00101

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES IL 60714
Cashbox 01 AM

＊ Mortgage Loan Payment
16:14          JUN 6 2013
Account Number   XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS06DF8    Sequence Number 00034

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

Confidential Under Protective Order



**PNCBANK**

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO IL 60657
Cashbox 02 AM

* Mortgage Loan Payment
15:35                JUL 31 2013
Account Number      XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS08507    Sequence Number 00084

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



56

**PNCBANK**

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES IL 60714
Cashbox 04 AM

* Mortgage Loan Payment
12:06                AUG 30 2013
Account Number      XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS06DF7    Sequence Number 00036

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

**PNCBANK**

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO IL 60657
Cashbox 04 AM

* Mortgage Loan Payment
12:02                SEP 30 2013
Account Number      XXXXXXXXXXXXXXX1586
Tran Amount          $6,237.67
Check Amt 1          $6,237.67

W/S ID WWS08525    Sequence Number 00016

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

**PNCBANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL 60077
Cashbox 04

Business Date          OCT 31, 2013
Calendar Date          OCT 31, 2013

Payment                    15.11
Transaction Number        00 16
Account Type       Mortgage Loan Regular
Account Number        XXXXXX1586
Transaction Amount    $     6,237.67
Check Amount          $     6,237.67

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

Confidential Under Protective Order

FOSTER0007915

 **PNCBANK**

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES, IL, 60714
Cashbox 04

| | |
|---|---|
| Business Date | NOV 25, 2013 |
| Calendar Date | NOV 25, 2013 |

| | | |
|---|---|---|
| **Payment** | | 15:49 |
| Transaction Number | | 00262 |
| Account Type | Mortgage Loan Regular | |
| Account Number | | XXXXXX1586 |
| Transaction Amount | $ | 6,237.67 |
| Check Amount | $ | 6,237.67 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

 **PNCBANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 03

| | |
|---|---|
| Business Date | DEC 6, 2013 |
| Calendar Date | DEC 6, 2013 |

| | | |
|---|---|---|
| **Payment** | | 15:10 |
| Transaction Number | | 00258 |
| Account Type | Mortgage Loan Regular | |
| Account Number | | XXXXXX1586 |
| Transaction Amount | $ | 6,237.67 |
| Check Amount | $ | 6,237.67 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

FOSTER0007916

 **PNCBANK**

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES, IL, 60714
Cashbox 04

| Business Date | JAN 9, 2014 |
|---|---|
| Calendar Date | JAN 9, 2014 |

| Payment | 14:06 |
|---|---|
| Transaction Number | 00076 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,237.67 |
| Check Amount | $ 6,237.67 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

**PNCBANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 07

| Business Date | FEB 3, 2014 |
|---|---|
| Calendar Date | FEB 3, 2014 |

| Payment | 17:08 |
|---|---|
| Transaction Number | 00371 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

 **PNCBANK**

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES, IL, 60714
Cashbox 03

| Business Date | MAR 4, 2014 |
|---|---|
| Calendar Date | MAR 4, 2014 |

| Payment | 13:37 |
|---|---|
| Transaction Number | 00135 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

Confidential Under Protective Order

 **PNCBANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 01

| | |
|---|---|
| Business Date | MAY 8, 2014 |
| Calendar Date | MAY 8, 2014 |
| Payment | 16:26 |
| Transaction Number | 00205 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.





---

 **PNCBANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 01

| | |
|---|---|
| Business Date | APR 9, 2014 |
| Calendar Date | APR 9, 2014 |
| Payment | 14:32 |
| Transaction Number | 00286 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



---

 **PNCBANK**

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 03

| | |
|---|---|
| Business Date | JUL 10, 2014 |
| Calendar Date | JUL 10, 2014 |
| Payment | 15:36 |
| Transaction Number | 00125 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



---

**PNCBANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 03

| | |
|---|---|
| Business Date | JUN 9, 2014 |
| Calendar Date | JUN 9, 2014 |
| Payment | 16:54 |
| Transaction Number | 00450 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



Confidential Under Protective Order



### PNC BANK

```
              071
        SKOKIE (878)
        5033 DEMPSTER
      SKOKIE, IL, 60077
         Cashbox 01
```

Business Date                SEP 5, 2014
Calendar Date                SEP 5, 2014

Payment                            10:22
Transaction Number                 00041
Account Type       Mortgage Loan Regular
Account Number              XXXXXX1586
Transaction Amount   $        6,145.72
Check Amount         $        6,145.72

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.





### PNC BANK

```
              071
        SKOKIE (878)
        5033 DEMPSTER
      SKOKIE, IL, 60077
         Cashbox 04
```

Business Date                AUG 6, 2014
Calendar Date                AUG 6, 2014

Payment                            15:31
Transaction Number                 00165
Account Type       Mortgage Loan Regular
Account Number              XXXXXX1586
Transaction Amount   $        6,145.72
Check Amount         $        6,145.72

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.





### PNC BANK

```
              071
   NILES TOUHY AVENUE (022)
       5727 W. TOUHY AVE
        NILES, IL, 60714
         Cashbox 21
```

Business Date                NOV 10, 2014
Calendar Date                NOV 10, 2014

Payment                            16:47
Transaction Number                 00049
Account Type       Mortgage Loan Regular
Account Number              XXXXXX1586
Transaction Amount   $        6,145.72
Check Amount         $        6,145.72

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



### PNC BANK

```
              071
        SKOKIE (878)
        5033 DEMPSTER
      SKOKIE, IL, 60077
         Cashbox 07
```

Business Date                OCT 9, 2014
Calendar Date                OCT 9, 2014

Payment                            13:58
Transaction Number                 00097
Account Type       Mortgage Loan Regular
Account Number              XXXXXX1586
Transaction Amount   $        6,145.72
Check Amount         $        6,145.72

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

Confidential Under Protective Order



### PNC BANK

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 01

| | |
|---|---|
| Business Date | JAN 12, 2015 |
| Calendar Date | JAN 10, 2015 |
| | |
| Payment | 12:06 |
| Transaction Number | 00104 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount $ | 6,145.72 |
| Check Amount $ | 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.





### PNC BANK

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES, IL, 807
Cashbox 05

| | |
|---|---|
| Business Date | DEC 4, 2014 |
| Calendar Date | DEC 4, 2014 |
| | |
| Payment | 16:55 |
| Transaction Number | 00121 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount $ | 6,145.72 |
| Check Amount $ | 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



### PNC BANK

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 07

| | |
|---|---|
| Business Date | MAR 13, 2015 |
| Calendar Date | MAR 13, 2015 |
| | |
| Payment | 16:08 |
| Transaction Number | 00115 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount $ | 6,145.72 |
| Check Amount $ | 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



### PNC BANK

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 01

| | |
|---|---|
| Business Date | FEB 6, 2015 |
| Calendar Date | FEB 6, 2015 |
| | |
| Payment | 15:38 |
| Transaction Number | 00024 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount $ | 6,145.72 |
| Check Amount $ | 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



Confidential Under Protective Order



## PNC BANK

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 01

| | |
|---|---|
| Business Date | JAN 12, 2015 |
| Calendar Date | JAN 10, 2015 |
| Payment | 12:06 |
| Transaction Number | 00104 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



## PNC BANK

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES, IL, 807[illegible]
Cashbox 05

| | |
|---|---|
| Business Date | DEC 4, 2014 |
| Calendar Date | DEC 4, 2014 |
| Payment | 16:55 |
| Transaction Number | 00121 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



## PNC BANK

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 07

| | |
|---|---|
| Business Date | MAR 13, 2015 |
| Calendar Date | MAR 13, 2015 |
| Payment | 16:08 |
| Transaction Number | 00115 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



## PNC BANK

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 01

| | |
|---|---|
| Business Date | FEB 6, 2015 |
| Calendar Date | FEB 6, 2015 |
| Payment | 15:38 |
| Transaction Number | 00024 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



Confidential Under Protective Order



071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 03

| | |
|---|---|
| Business Date | APR 6, 2015 |
| Calendar Date | APR 4, 2015 |
| | |
| Payment | 12:21 |
| Transaction Number | 00099 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 03

| | |
|---|---|
| Business Date | MAY 12, 2015 |
| Calendar Date | MAY 12, 2015 |
| | |
| Payment | 14:25 |
| Transaction Number | 00138 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,145.72 |
| Check Amount | $ 6,145.72 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



071
LINCOLNWOOD (220)
3636 WEST TOUHY AVE
SKOKIE, IL, 60076
Cashbox 06

| | |
|---|---|
| Business Date | JUN 10, 2015 |
| Calendar Date | JUN 10, 2015 |
| | |
| Payment | 17:00 |
| Transaction Number | 00076 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 6,697.70 |
| Check Amount | $ 6,697.70 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

Confidential Under Protective Order



```
                  071
       ASHLAND & ADDISON (895)
         3556 N. ASHLAND AVE
          CHICAGO, IL, 60657
             Cashbox 04

Business Date              JUL 10, 2015
Calendar Date              JUL 10, 2015

Payment                         17:26
Transaction Number              00254
Account Type       Mortgage Loan Regular
Account Number             XXXXXX1586
Transaction Amount  $        6,697.70
Check Amount        $        6,697.70


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```



```
                  071
       ASHLAND & ADDISON (895)
         3556 N. ASHLAND AVE
          CHICAGO, IL, 60657
             Cashbox 01

Business Date              AUG 7, 2015
Calendar Date              AUG 7, 2015

Payment                         12:04
Transaction Number              00091
Account Type       Mortgage Loan Regular
Account Number             XXXXXX1586
Transaction Amount  $        6,697.70
Check Amount        $        6,697.70


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```



```
                  071
            SKOKIE (878)
          5033 DEMPSTER
          SKOKIE, IL, 60077
             Cashbox 07

Business Date              SEP 14, 2015
Calendar Date              SEP 12, 2015

Payment                         11:46
Transaction Number              00099
Account Type       Mortgage Loan Regular
Account Number             XXXXXX1586
Transaction Amount  $        6,697.70
Check Amount        $        6,697.70


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```



```
                  071
       ASHLAND & ADDISON (895)
         3556 N. ASHLAND AVE
          CHICAGO, IL, 60657
             Cashbox 03

Business Date              OCT 6, 2015
Calendar Date              OCT 6, 2015

Payment                         17:13
Transaction Number              00203
Account Type       Mortgage Loan Regular
Account Number             XXXXXX1586
Transaction Amount  $        6,697.70
Check Amount        $        6,697.70


This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.
```

Confidential Under Protective Order

 

|  |  |
|---|---|
| 071 | 071 |
| SKOKIE (878) | NILES TOUHY AVENUE (022) |
| 5033 DEMPSTER | 5727 W. TOUHY AVE |
| SKOKIE, IL, 60077 | NILES, IL, 60714 |
| Cashbox 03 | Cashbox 05 |

| | | |
|---|---|---|
| Business Date | NOV 10, 2015 | |
| Calendar Date | NOV 10, 2015 | |
| | | |
| **Payment** | | 14:05 |
| Transaction Number | | 00144 |
| Account Type | Mortgage Loan Regular | |
| Account Number | XXXXXX1586 | |
| Transaction Amount | $ | 6,697.70 |
| Check Amount | $ | 6,697.70 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.

| | | |
|---|---|---|
| Business Date | DEC 7, 2015 | |
| Calendar Date | DEC 7, 2015 | |
| | | |
| Payment | | 16:01 |
| Transaction Number | | 00210 |
| Account Type | Mortgage Loan Regular | |
| Account Number | XXXXXX1586 | |
| Transaction Amount | $ | 6,697.70 |
| Check Amount | $ | 6,697.70 |

his deposit or payment is accepted subject to
ification and to the rules and regulations of
bank.  Deposits may not be available for
diate withdrawal.  Receipt should be held
verified with your statement.

Confidential Under Protective Order

**Chase Online**

CHASE PREMIER PLAT (...6881)

Check Number: 257    Post Date: 03/10/2016    Amount of Check: $6,697.70





receipt has in that is too light; so here is the cancelled check

Need help printing or saving this check?





Need help printing or saving this check?

© 2016 JPMorgan Chase & Co.



mpAb

PNCBANK

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 03

| | |
|---|---|
| Business Date | FEB 9, 2016 |
| Calendar Date | FEB 9, 2016 |
| Payment | 15:30 |
| Transaction Number | 00083 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $  6,697.70 |
| Check Amount | $  6,697.70 |

This deposit or payment is accepted subject to verification and to the rules and regulations of this bank. Deposits may not be available for immediate withdrawal. Receipt should be held until verified with your statement.



PNCBANK

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 01

| | |
|---|---|
| Business Date | JAN 7, 2016 |
| Calendar Date | JAN 7, 2016 |
| Payment | 13:21 |
| Transaction Number | 00030 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $  6,697.70 |
| Check Amount | $  6,697.70 |

This deposit or payment is accepted subject to verification and to the rules and regulations of this bank. Deposits may not be available for immediate withdrawal. Receipt should be held until verified with your statement.



Confidential Under Protective Order

Chase Online

CHASE PREMIER PLAT (...6881)

Check Number: 278    Post Date: 07/13/2016    Amount of Check: $7,280.3



Need help printing or saving this check?



Need help printing or saving this check?

© 2016 JPMorgan Chase & Co.



071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 04

Business Date                     JUN 13, 2016
Calendar Date                     JUN 13, 2016

**Payment**                                    12:43
Transaction Number                   00229
Account Type          Mortgage Loan Regular
Account Number                      X XXX1586
Transaction Amount    $              280.35
Check Amount          $            7,280.35

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



# PNC BANK

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 02

Business Date                     MAY 16, 2016
Calendar Date                     MAY 16, 2016

**Payment**                                    13:28
Transaction Number                   00064
Account Type          Mortgage Loan Regular
Account Number                     XXXXXX1586
Transaction Amount    $            6,697.70
Check Amount          $            6,697.70

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



# PNC BANK

001
SUNRISE AND FEDERAL (261)
1100 NORTH FEDERAL HIGHWAY
FT. LAUDERDALE, FL, 33304
Cashbox 04

Business Date                     APR 11, 2016
Calendar Date                     APR 9, 2016

Payment                                    12:26
Transaction Number                   00024
Account Type          Mortgage Loan Regular
Account Number                     XXXXXX1586
Transaction Amount    $            6,697.70
Check Amount          $            6,697.70

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



# PNC BANK

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 05

Business Date                JUL 13, 2016
Calendar Date                JUL 13, 2016

**Payment**                                      12:11
Transaction Number                             00052
Account Type          Mortgage Loan Regular
Account Number                       XXXXXX1586
Transaction Amount     $          7,280.35
Check Amount           $          7,280.35

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



| nt<br>ate<br>016 | Next Payment<br>Amount Due<br>$7,280.35 | Past Due<br>Amounts<br>$356,010.77 | Total<br>Amount Due<br>$363,291.12 |
|---|---|---|---|

Regular Payment
Additional Principal
Unpaid Late Charges
Other Fees
**Total Amount Enclosed**

15184600000000006

Confidential Under Protective Order

FOSTER0007927



**PNCBANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 04

Business Date                    AUG 8, 2016
Calendar Date                    AUG 8, 2016

**Payment**                               14:30
Transaction Number                       00244
Account Type        Mortgage Loan Regular
Account Number                      XXXXXX1586
Transaction Amount    $        7,280.35
Check Amount          $        7,280.35

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

| | Next Payment Amount Due | Past Due Amounts | Total Amount Due |
|---|---|---|---|
| Regular Payment | $7,280.35 | | |
| Additional Principal | | | |
| Unpaid Late Charges | | | |
| Other Fees | | | |
| Total Amount Enclosed | | $363,306.12 | $370,586.47 |



081381000000009

Avg8

**PNCBANK**

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES, IL, 60714
Cashbox 03

Business Date                    SEP 12, 2016
Calendar Date                    SEP 12, 2016

**Payment**                               15:57
Transaction Number                       00200
Account Type        Mortgage Loan Regular
Account Number                      XXXXXX1586
Transaction Amount    $        7,280.35
Check Amount          $        7,280.35

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

| | Next Payment Amount Due | Past Due Amounts | Total Amount Due |
|---|---|---|---|
| Regular Payment | $7,280.35 | | |
| Additional Principal | | | |
| Unpaid Late Charges | | | |
| Other Fees | | | |
| Total Amount Enclosed | | $370,601.47 | $377,881.82 |



810916000000000

sept



**PNC BANK**

071
ASHLAND & ADDISON (895)
3556 N. ASHLAND AVE
CHICAGO, IL, 60657
Cashbox 01

| | |
|---|---|
| Business Date | OCT 7, 2016 |
| Calendar Date | OCT 7, 2016 |
| Payment | 12:48 |
| Transaction Number | 00096 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 7,280.35 |
| Check Amount | $ 7,280.35 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

| Regular Payment | Next Payment Amount Due | Past Due Amounts | Total Amount Due |
|---|---|---|---|
| | $7,280.35 | $377,911.82 | $385,192.17 |

1951000000001

OcT

**PNC BANK**

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE, IL, 60077
Cashbox 07

| | |
|---|---|
| Business Date | NOV 14, 2016 |
| Calendar Date | NOV 14, 2016 |
| Payment | 12:00 |
| Transaction Number | 00087 |
| Account Type | Mortgage Loan Regular |
| Account Number | XXXXXX1586 |
| Transaction Amount | $ 7,280.35 |
| Check Amount | $ 7,280.35 |

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



No ✔



**PNC BANK**

```
            071
        SKOKIE (878)
       5033 DEMPSTER
      SKOKIE, IL, 60077
         Cashbox 07
```

Business Date
Calendar Date                    DEC 9, 2016
                                 DEC 9, 2016

**Payment**
Transaction Number                     15:36
Account Type                           00100
Account Number        Mortgage Loan Regular
Transaction Amount    $           XXXXXX1586
Check Amount          $             7,280.35
                                    7,280.35

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



**PNC BANK**

```
              071
     ASHLAND & ADDISON (895)
       3556 N. ASHLAND AVE
       CHICAGO, IL, 60657
          Cashbox 04
```

Business Date                    JAN 12, 2017
Calendar Date                    JAN 12, 2017

**Payment**                            11:26
Transaction Number                     00024
Account Type          Mortgage Loan Regular
Account Number                    XXXXXX1586
Transaction Amount    $             7,280.35
Check Amount          $             7,280.35

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

Make che|

00057

JEFFREY M FOSTER

PNC MORTGAGE™

P.O. Box 6534
Carol Stream, IL 60197-6534

⑆5000⑈000 ⑆: 000577⑆586⑆

Confidential Under Protective Order



PNC BANK

071
NILES TOUHY AVENUE (022)
5727 W. TOUHY AVE
NILES, IL, 60714
Cashbox 06

Business Date                FEB 13, 2017
Calendar Date                FEB 13, 2017

**Payment**                            16:20
Transaction Number                   00076
Account Type       Mortgage Loan Regular
Account Number              XXXXXX1586
Transaction Amount    $      7,280.35
Check Amount          $      7,280.35

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

0091000000007

| | ent late 2017 | Next Payment Amount Due $7,280.35 | Past Due Amounts $407,093.22 | Total Amount Due $414,373.57 |
|---|---|---|---|---|
| egular Payment | | | | |
| lditional Principal | | | | |
| ipaid Late Charges | | | | |
| her Fees | | | | |
| tal Amount Enclosed | | | | |

Confidential Under Protective Order                                           FOSTER0007931

**PNC BANK**

```
            071
        SKOKIE (878)
       5033 DEMPSTER
      SKOKIE IL 60077
       Cashbox 04 AM

* Install/LOC/Credit Card Loan Pmt
11:48        DEC 18 2010
Account Number   XXXXXXXXXXXXXXXX1544
Tran Amount         $3,006.00
Check Amt 1         $3,006.00

W/S ID WWS0453A  Sequence Number 00055
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.

**PNC BANK**

```
               071
    LINCOLN PARK-FULLERTON (767)
     1640 WEST FULLERTON AVENUE
         CHICAGO IL 60614
         Cashbox 01 AM

* Install/LOC/Credit Card Loan Pmt
14:29        NOV 9 2010
Account Number   XXXXXXXXXXXXXXXX1544
Tran Amount         $3,006.00
Check Amt 1         $3,006.00

W/S ID WWS03F3E  Sequence Number 00053
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.

**PNC BANK**

```
            071
        SKOKIE (878)
       5033 DEMPSTER
      SKOKIE IL 60077
       Cashbox 04 AM

* Install/LOC/Credit Card Loan Pmt
11:31        FEB 22 2011
Account Number   XXXXXXXXXXXXXXXX1544
Tran Amount         $3,005.50
Check Amt 1         $3,005.50

W/S ID WWS0453A  Sequence Number 00063
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



**PNC BANK**

```
               071
    LINCOLN PARK-FULLERTON (767)
     1640 WEST FULLERTON AVENUE
         CHICAGO IL 60614
         Cashbox 02 AM

* Install/LOC/Credit Card Loan Pmt
16:26        JAN 19 2011
Account Number   XXXXXXXXXXXXXXXX1544
Tran Amount         $3,006.00
Check Amt 1         $3,006.00

W/S ID WWS0402E  Sequence Number 00051
```

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank.  Deposits may not be available for
immediate withdrawal.  Receipt should be held
until verified with your statement.



Exhibit #1

## PNCBANK

071
SKOKIE (878)
5033 DEMPSTER
SKOKIE IL 60077
Cashbox 04 AM

Due 4/24/11

* Install/LOC/Credit Card Loan Pmt
15:09          APR 22 2011
Account Number    XXXXXXXXXXXXXXXX1544
Tran Amount            $3,005.50
Check Amt 1           $3,005.50

check #1172

W/S ID WWS0453A  Sequence Number 00095

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.

## PNCBANK

071
LINCOLN PARK-FULLERTON (767)
1640 WEST FULLERTON AVENUE
CHICAGO IL 60614
Cashbox 04 AM

* Install/LOC/Credit Card Loan Pmt
12:25          MAR 21 2011
Account Number    XXXXXXXXXXXXXX1544
Tran Amount            $3,005.50
Check Amt 1           $3,005.50

W/S ID WWS03F4F  Sequence Number 00109

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



Due 5/24/11  5/14/2011  MOD
cleared 5/12  pmt # 1202  0156

Exhibit #2

Due 5/24/11
clear #1218
cleared 4/3/11

Exhibit #3

first pmt was
due on 7/25/11
She Told
me to
pay 3005.50
By end
of
months

## PNCBANK

071
LINCOLN PARK-FULLERTON (767)
1640 WEST FULLERTON AVENUE
CHICAGO IL 60614
Cashbox 05 AM

* Install/LOC/Credit Card Loan Pmt
               JUL 29 2011
Account Number    XXXXXXXXXXXXXX1544
Tran Amount            $3,006.00
Check Amt 1           $3,006.00

W/S ID WWS03F3E  Sequence Number 00098

Current
Still Working mod
not
pri-up
to modifan

...ment is accepted subject to
...to the rules and regulations of
...posits may not be available for
...withdrawal. Receipt should be held
until verified with your statement.

Balance
cleared 8/1/11

## PNCBANK

071
LINCOLN PARK-FULLERTON (767)
1640 WEST FULLERTON AVENUE
CHICAGO IL 60614
Cashbox 04 AM

* Install/LOC/Credit Card Loan Pmt
15:53          JUN 2 2011
Account Number    XXXXXXXXXXXXXX1544
Tran Amount            $3,006.00
Check Amt 1           $3,006.00

W/S ID WWS03F4F  Sequence Number 00137

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.



FOSTER0000119

# Exhibit 15



2650 Warrenville Road
Suite 500
Downers Grove, Illinois 60515-1721
(630) 420-8100

www.midamericabank.com

June 6, 2005

Mr. Jeff Foster
6201 N. Kilpatrick Avenue
Chicago, IL 60646

Dear Mr. Foster,

After having spoken on June 3rd, I recognize that you are still frustrated with the situation that exists with your mortgage loan. I hope that by putting, in writing, the chain of events that we discussed, you are compelled to take your claims of unfair treatment to your previous lender, National City Bank.

As you know, National City Bank issued a payoff letter to be used to close your credit facility. That facility was to be replaced by our mortgage. It wasn't until after settlement that National City suggested to you that the amount the title company sent to them wasn't sufficient to satisfy their debt. Incidentally, I did verify that the title company did remit the amount indicated on the National City payoff letter.

I can only imagine how upsetting it was to learn that National City committed this error. Unfortunately, concerns over privacy matters make it impossible for MidAmerica Bank to attempt to prove your case on your behalf. I urge you to take your case to them and persuade National City that their audit of your account was incorrect.

While I very much wish to see you become a satisfied MidAmerica Bank client, we are not in a position to pay National City the amount they feel they are owed by you to settle your account.

Sincerely,

Stephen T. DiMarco
First Vice President
Director of Mortgage Sales

STD/mg

*Paying a higher rate of attention®*

| Berwyn | Burbank | Burr Ridge | Chicago | Cicero | Clarendon Hills | Downers Grove | Franklin Park |
| Joliet | LaGrange Park | Naperville | Niles | Norridge | Plainfield | Riverside | Romeoville |
| St. Charles | Schaumburg | Skokie | Tinley Park | Westchester | Western Springs | Wheaton | **FDIC Insured** |

# Exhibit 16

**National City**

**Direct Banking Center**
P.O. Box 3038
Kalamazoo, Mi 49003-3038

March 24, 2009

Jeffrey Foster
6201 N Kilpatrick Ave
Chicago, IL 60646
|ı||ı||ıı||ı||ı|ı|ı||ı|ı|ı|ı|

RE:  Acct ending in 1544

Dear Jeffrey Foster:

Meeting your banking needs is important to us!  Recently, you contacted National City regarding a request for service.  We value your banking relationship with us and are dedicated to making certain you are satisfied with the services that National City provides.

Enclosed please find Equity Line Documents

Please call customer service at 800-925-9259 if you have any questions or concerns.

Sincerely,

Jeff Haspas
Retail Direct Inbound
Solution Center

FOSTER0004286

WHEN RECORDED RETURN TO:
MID AMERICA BANK, FSB.
2650 WARRENVILLE ROAD
SUITE 500
DOWNERS GROVE, IL 60515-1721

2006K023499

**2006K023499**

SANDY WEGMAN
RECORDER - KANE COUNTY, IL
RECORDED:03/06/2006 09:40AM
REC FEE: 26.00 RHSPS FEE:10.00
PAGES: 5

THIS IS A JUNIOR MORTGAGE.

# EQUITY CASH LINE MORTGAGE

THIS MORTGAGE is made this        21st        day of    February, 2006            , between the Mortgagor,

JEFFREY R FOSTER, AND BRIDGETT M FOSTER, HUSBAND AND WIFE

(herein "Borrower"), and the Mortgagee,
MidAmerica Bank. Fsb., (herein "Lender") a corporation organized and existing under the laws of the United States of America,
whose address is    2650 WARRENVILLE ROAD. SUITE 500, DOWNERS GROVE, IL 60515-1721

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $    86,500.00          , which
indebtedness is evidenced by Borrower's Equity Agreement and Promissory Note (herein "Note") providing for periodic payments
as called for therein, with the balance of indebtedness, if not sooner paid, due and payable on  February 1st, 2026

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all
other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of
the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender the
following described property located in the County of   Kane                                        ,
State of Illinois:
LOT 54 IN UNIT NO. 2, NATIVE PRAIRIE, BLACKBERRY TOWNSHIP, KANE COUNTY, ILLINOIS, IN
THE TOWNSHIP OF BLACKBERRY, KANE COUNTY, ILLINOIS

Parcel ID#:11-04-427-012-0000
which has the address of   42W053 NORTHWAY DR,     Elburn
                                               [Street]
Illinois        60119              (herein "Property Address");
         [ZIP Code]                            [City]

IL Equity Cash Line Mortgage-FNMA.FHLMC Uniform Instrument

Chicago Title Insurance Co.
1795 W. State Street
Geneva, IL 60134    01/04 Page 1 of 5
                                 W487001

FOSTER0004287

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property".

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2. **Application of Payments.** The borrower must pay to the Bank at least the minimum amount due in each billing cycle. Payment of more than the minimum payment in any billing cycle will not relieve the borrower from paying the minimum payment in any other billing cycle. Payments received will be applied in the following order when posted – (1) accrued interest, if any; (2) late charges, if any; (3) annual service fee and/or other charges, if any; (4) principal reduction.

3. **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

4. **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien, which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

5. **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

6. **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorney's fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

FOSTER0004288

**7. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

**8. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**10. Remedies Cumulative.** All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage or afforded by law or equity, and may be exercised concurrently, independently or successively.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs", "expenses" and "attorney's fees" include all sums to the extent not prohibited by applicable law or limited herein.

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement, which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

FOSTER0004289

**17. Obligatory Advances.** This mortgage secures the repayment of certain sums advanced to the borrower under the Equity Agreement and Promissory Note. Provided Borrower is not in default with respect to any covenant or agreement under the terms of this Mortgage, and the Equity Agreement and Promissory Note, including the covenants to pay when due any sums secured by this Mortgage, Lender is obligated from time to time and upon demand of the Borrower to advance such additional sums requested by Borrower up to the total face amount of this Mortgage.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**18. Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorney's fees and costs of documentary evidence, abstracts and title reports.

**19. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to entry of a judgment enforcing this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in paragraph 18 hereof, including, but not limited to, reasonable attorney's fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**20. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 18 here of or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Mortgage. The receiver shall be liable to account only for those rents actually received.

**21. Release.** Upon payment of all sums secured by this Mortgage, Lender shall release this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

**22. Waiver of Homestead.** Borrower hereby waives all right of homestead exemption in the Property.

FOSTER0004290

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

X _____ (Seal)
JEFFREY R FOSTER

X _____ (Seal)

_____ (Seal)

_____ (Seal)

*(Sign Original Only)*

**STATE OF ILLINOIS,**                                    County ss:

I,

a Notary Public in and for said county and state do hereby certify that
JEFFREY R FOSTER, AND BRIDGETT M FOSTER, HUSBAND AND WIFE

, personally known to me to be the same person(s) whose name(s)
subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that    he
signed and delivered the said instrument as    his     free and voluntary act, for the uses and purposes therein set
forth.

Given under my hand and official seal, this    21    day of    Feb    2006

My Commission Expires:                              _____
                                                    Notary Public

THIS INSTRUMENT WAS PREPARED BY:
KENNETH KORANDA
2650 WARRENVILLE ROAD
SUITE 500
DOWNERS GROVE, IL 60515-1721

"OFFICIAL SEAL"
KATHY P. SWIMS
Notary Public, State of Illinois
My Commission Expires 1-2-2007

IL Equity Cash Line Mortgage-FNMA.FHLMC Uniform Instrument     W487005    01/04 Page 5 of 5

_[signature]_ _[signature]_
John Gallucci

_[signature]_
Caroline Gallucci

**SETTLEMENT AGENT CERTIFICATION**

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

_[signature]_ 07/31/07
Settlement Agent                              Date

**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar forms. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

John Rachoy

Trisha Rachoy

_[handwritten text]_

Previous Editions are Obsolete                    Page 3                    form HUD-1 (3/86)
                                                                          Handbook 4305.2

FOSTER0004292

# Exhibit 17

**National City.**

National City Bank
P.O. Box 5570
Cleveland, OH 44101-0570

*7p*

March 31, 2009

Mr. Jeffrey M. Foster
6201 North Kilpatrick Avenue
Chicago, IL 60646

Re:    ER Line of Credit #4489619840201544

Dear Mr. Foster,

Please be advised that this is intended as an authorization that National City will accept 70% of the outstanding balance on the referenced equity reserve line of credit as a settlement in full at any time within two years beginning April 6, 2009. The settlement must be paid in certified funds, the balance will be accepted as a settlement in full, the credit bureaus will be updated to reflect "settled in full for less than balance", and the mortgage filed on the property collateralizing the referenced line of credit will be released at that time.

The settlement offer contained in this letter will expire on April 5, 2011.

Best Regards,

T. L. Bell
Vice President, HOA Underwriting Manager
National City

Notice: See Reverse Side for Important Information

FOSTER0000970

# Exhibit 18

# ⊗ PNC BANK

February 18, 2010

Mr. Jeffrey M. Foster
6201 North Kilpatrick Avenue
Chicago, IL 60646

Re: Equity Reserve Line of Credit # 4489619840201544

Dear Mr. Foster,

Please be advised that this is intended as an authorization that PNC Bank will accept 60% of the outstanding balance on the referenced equity reserve line of credit as a settlement in full at any time within 24 months of your modification agreement on the line dated April 6, 2009. The settlement must be paid in certified funds, the balance will be accepted as a settlement in full, the credit bureaus will be updated to reflect "settled in full for less than balance", and the mortgage filed on the property collateralizing the referenced line of credit will be released at that time, and upon receipt of those monies.

The settlement offer contained in this letter will expire on April 5, 2011.

Very truly yours,

T. L. Bell
Vice-President and HOA Underwriting Manager
PNC Bank

*Please scan to raise credit on this too line.*

**Notice: See Reverse Side for Important Information**

PNC001359

Exhibit 19

 **PNC BANK**

May 12, 2010

Mr. Jeffrey M. Foster
6201 North Kilpatrick Avenue
Chicago, IL 60646

      Re:    ER Line of Credit #4489619840201544

Dear Mr. Foster,

Please be advised that this is intended as an authorization that National City will accept 70% of the outstanding balance on the referenced equity reserve line of credit (or any equity line of credit number or installment loan number resulting from a modification of the referenced account number) as a settlement in full at any time within a one year period of time beginning April 6, 2011 and concluding April 5, 2012. The settlement must be paid in certified funds, the balance will be accepted as a settlement in full, the credit bureaus will be updated to reflect "settled in full for less than balance", and the mortgage filed on the property collateralizing the referenced line of credit will be released at that time.

Best Regards,

T. L. Bell
Vice President, HOA Underwriting Manager
PNC Bank

**Notice: See Reverse Side for Important Information**

PNC001357

# Exhibit 20

Randy and Kathyn                                              November 16, 2009
National City
Loss Mitigation


Dear Randy and Kathyn,


Per my conversation with Randy on Friday, I am requesting additional flexibility on my
equity line of credit.

As you recall, I was forced back into traditional real estate sales after National City wiped
out my other 2 businesses with inaccurate credit reporting. I was forced to sell projects
before completion, was unable to close and capitalize on a million in equity, and my
credit was closed down for future pending deals. After being forced to research the error,
National City acknowledged the mistakes and fixed the errors that created the illusion I
was a bad credit risk.

Unfortunately, after 2 years of fighting with National City to correct the errors, I had to
fold the businesses. National City Lawyers told everyone I could always go back to
selling real estate. I agreed that was possible, but is difficult when you have already
stopped regular contact with past clients and the public. Then, the real estate market
started tanking. It couldn't be worse timing.

Additionally, the current banking environment has made it near impossible to sell the
type of product I specialized in. The down payment requirements for residential
investment properties have all but ruined recovery efforts. Unfortunately, I own two of
them as well as sell them. I have been jumping through hoops for 12 months for the
Homeowners Assistance Program at National City Mortgage. After doing everything I
was told for 7 months, they refused to give me any help. In fact, they recently sent me a
modification program to sign that almost doubled my payments and had $13,700 in
closing costs! I was speechless for 2 hours after opening the package. They subsequently
threatened to foreclose on me if I didn't sign it. I informed her that I wasn't behind 3
payments as her records indicated. After sending in proof of payments, I never heard
from her again.

Oh yeah………..did I mention, THEY MARKED MY CREDIT WITH THREE MORE
MISTAKES!!! Yes, the nightmare continues.

After sending cancelled checks to prove the payments were made on time, we are in the
process of getting the marks removed. So far, they are still on there.

In conclusion, I sold assets for a fraction of the value this year in order to meet the
deadlines set by National City Mortgage, only for them to deny the terms they already
promised. It is impossible to make money in real estate right now. I have not slept more
than 2 hours in a row for 6 months. When my current modification expires, I will not be

FOSTER0000041

able to make the payments. I am trying to come up with a plan to sell everything and pay my debt. Unfortunately, no plan allows for a payoff of 70 % of the equity line balance, the current modification. The current modification expires in April of 2011.

I have to say, in all fairness, that to this point Nick, Kathyn, and Randy have been very Nice and have been trying to help. I am hoping that I can get a 2 year extension on the current modification terms and payoff agreement. This will allow me to make moves to insure survival, without nearing deadlines prohibiting the plan.

As I have mentioned, my current equity line does not have any signed documents. After many mishaps at the branch, they told me they sent the paper work to my home. I have a copy of the letter saying this.

I appreciate your assistance in this matter. I apologize for the summary of negative events. I just thought it would be helpful for anyone reading this that is not familiar with my situation.

My email and cell phone info is below. Thank you for your understanding in this matter.

Sincerely,

Jeff Foster
(773)983-3595 cell (773)404-3595 office
highlandbreeze@hotmail.com

# Exhibit 21



November 20, 2009


Mr. Jeffrey Foster
6201 N. Kilpatrick Avenue
Chicago, IL 60646

> **Re:** **Equity Reserve Line of Credit 4489619840201544**

Dear Mr. Foster,

The following is furnished in regard to the Equity Line of Credit Referenced above. It is my understanding that you have inquired from PNC Bank's Homeowners' Assistance department as to the treatment options available to you upon completion of the current Line Modification, due to expire 12 months from now in December , 2010.

While, as I am sure you can understand, it is impossible for me to <u>assure</u> you that a similar program would be made available to you at that time, I can assure you that PNC Bank would <u>entertain</u> <u>an</u> <u>application</u> for a similar product at that time. The approval of that product (modification) would be dependent upon the application at the time of maturity of the existing modification. If the application reflected a similar financial standing on your part e.g. a similar debt to income ratio, an additional 24-month modification would be made available. For quite obvious reasons, the interest rate that would be applicable on that modification is not currently available, as is the case with the payment amount and what the outstanding balance would be at that time. We simply are not a position to guarantee an approval, but every effort would be made to assist you to remain in your home. PNC Bank's preference is never to pursue other remedies of collection, and is always to assist homeowners when possible to remain in their homes.

I hope I have provided the information you are requesting, and would be happy to discuss the content of this letter with you at your convenience. You may reach me directly at 440-546-6744 after November 30th. I will be on vacation the week of Thanksgiving.


Best Regards,


T. L. Bell
Vice President, Homeowners' Assistance Underwriting Manager
PNC Bank

PNC001358

Exhibit 22

Outlook.com Print Message

Page 1 of 1

<u>Print</u>

<u>Close</u>

# 4489619840201544

From: **paige.martin@pnc.com**
Sent: Fri 7/22/11 12:13 PM
To: highlandbreeze@hotmail.com
Cc: randy.holland@pnc.com

Hello Jeff,

I am sending you a test email to make sure that this gets to you. I also have Randy CC'd on this so that he can start correspondence with you. I have confirmed with him that a payment of 3006.00 will be a sufficient payment amount for the month of July for what Randy calls a "good faith" payment while you work on this modification with him. It is important that if you take it to the branch that they provide you with a reciept so that you can have that for your own records. You may also do a payment by phone with Randy or I, we just want you to be comfortable with whatever you do. Being that PNC mortgage on your 1st mortgage is a different location and branch in PNC all together from us, I can research some information to you to contact them but I dont have any information at my immediate disposal. Again I do apologize for the goings on that have happened recently and I hope that you will feel comfortable enough to correspond freely through email with both Randy and me.

Regards,

*Paige Martin*

Consumer Default Management
PNC Bank
6750 Miller Rd (BR- YB58-01-3)
Brecksville, OH 44141

Ph: 1-866-622-2657 EXT 47624
E-mail: Paige.Martin@pnc.com
www.pnc.com

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US Law. The postal address for PNC is 249 Fifth Avenue, Pittsburgh, PA 15222. If you do not wish to receive any additional advertising or promotional messages from PNC at this e-mail address, click here to unsubscribe. https://pnc.p.delivery.net/m/u/pnc/uni/p.asp By unsubscribing to this message, you will be unsubscribed from all advertising or promotional messages from PNC. Removing your e-mail address from this mailing list will not affect your subscription to alerts, e-newsletters or account servicing e-mails.

FOSTER0000143

Print

Close

# Re: 4489619840201544

From: **randy.holland@pnc.com**
Sent: Fri 7/22/11 12:59 PM
To: paige.martin@pnc.com
Cc: highlandbreeze@hotmail.com

Hi Jeff—I concur
**Randy Holland**
Underwriting Specialist
Lending Services-Consumer default

PNC Bank
6750 Miller Road Locator: BR-YB58-01-3
Brecksville, Ohio 44141

440-546-6843 (Office)
866-641-2691 (FAX)

| | |
|---|---|
| From: | Paige Martin/TPS/CLE/PNC |
| To: | highlandbreeze@hotmail.com |
| Cc: | Randy Holland/TPS/CLE/PNC@PNC |
| Date: | 07/22/2011 01:13 PM |
| Subject: | 4489619840201544 |

Hello Jeff,

I am sending you a test email to make sure that this gets to you. I also have Randy CC'd on this so that he can start correspondence with you. I have confirmed with him that a payment of 3006.00 will be a sufficient payment amount for the month of July for what Randy calls a "good faith" payment while you work on this modification with him. It is important that if you take it to the branch that they provide you with a reciept so that you can have that for your own records. You may also do a payment by phone with Randy or I, we just want you to be comfortable with whatever you do. Being that PNC mortgage on your 1st mortgage is a different location and branch in PNC all together from us, I can research some information to you to contact them but I dont have any information at my immediate disposal. Again I do apologize for the goings on that have happened recently and I hope that you will feel comfortable enough to correspond freely through email with both Randy and me.

Regards,

FOSTER0000144

Exhibit 23

| | |
|---|---|
| **To:** | paige.martin@pnc.com[paige_martin@pnc.com] |
| **Cc:** | highlandbreeze@hotmail.com[highlandbreeze@hotmail.com] |
| **From:** | randy.holland@pnc.com |
| **Sent:** | Fri 7/22/2011 5:59:34 PM |
| **Subject:** | Re: 4489619840201544 |

Hi Jeff---I concur

**Randy Holland**

Underwriting Specialist

Lending Services-Consumer default


PNC Bank

6750 Miller Road Locator: BR-YB58-01-3

Brecksville, Ohio  44141


440-546-6843 (Office)

866-641-2691 (FAX)


| | |
|---|---|
| From: | Paige Martin/TPS/CLE/PNC |
| To: | highlandbreeze@hotmail.com |
| Cc: | Randy Holland/TPS/CLE/PNC@PNC |
| Date: | 07/22/2011 01:13 PM |
| Subject: | 4489619840201544 |

---

Hello Jeff,

I am sending you a test email to make sure that this gets to you.  I also have Randy CC'd on this so that he can start correspondence with you.  I have confirmed with him that a payment of 3006.00 will be a sufficient payment amount for the month of July for what Randy calls a "good faith" payment while you work on this modification with him.  It is important that if you take it to the branch that they provide you with a reciept so that you can have that for your own records.  You may also do a payment by phone with Randy or I, we just want you to be comfortable with whatever you do.  Being that PNC mortgage on your 1st mortgage is a different location and branch in PNC all together from us, I can research some information to you to contact them but I dont have any information at my immediate disposal.  Again I do apologize for the goings on that have happened recently and I hope that you will feel comfortable enough to correspond freely through email with both Randy and me.



Regards,


*Paige Martin*

Consumer Default Management

PNC Bank

6750 Miller Rd (BR- YB58-01-3)

Brecksville, OH 44141


Ph: 1-866-622-2657 EXT 47624

E-mail: Paige.Martin@pnc.com

www.pnc.com

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US Law. The postal address for PNC is 249 Fifth Avenue, Pittsburgh, PA 15222. If you do not wish to receive any additional advertising or promotional messages from PNC at this e-mail address, click here to unsubscribe. https://pnc.p.delivery.net/m/u/pnc/uni/p.asp By unsubscribing to this message, you will be unsubscribed from all advertising or promotional messages from PNC. Removing your e-mail address from this mailing list will not affect your subscription

FOSTER0005262

Exhibit 24

**To:** jeffrey foster[highlandbreeze@hotmail.com]
**From:** paige.martin@pnc.com
**Sent:** Fri 9/9/2011 2:42:30 PM
**Subject:** Hey Jeff

Hey Jeff,

I'm emailing just to touch base with you and give you a few updates on your account with us.  I was informed that there will be new paperwork sent out that should get to you by Monday or Tuesday of next week.  For some reason the original paperwork went missing somewhere in between your sending it and FedEx delivering it to us.  I'm relaying the message so that everything can go smoothly and we can get this taken care of once and for all so that you don't have to worry about it.  Its important to get the new package in immediately, there's a 5 day expiration period on the package and hopefully FedEx will deliver it to us this time.  And of course there's the payment that needs to be made, which you already know about, I've been quoted the amount of $3464.21, however I'm not 100% sure on that amount and will get back to you ASAP with the actual number.  I'll be here today until 1pm today, but Cozetta Brown will be available as well in case you need to speak with her.  Her ext is 41681.  I will also try to give you a quick call today, but I know sometimes its easier to get a hold of you by email.  I hope you're doing great and I hope you have a great weekend.

*Paige Martin*

**Consumer Default Management**
**PNC Bank**
**6750 Miller Rd (BR- YB58-01-3)**
**Brecksville, OH 44141**

**Ph: 1-866-622-2657 EXT 47624**
**E-mail: Paige.Martin@pnc.com**
**www.pnc.com**

| | |
|---|---|
| From: | jeffrey foster <highlandbreeze@hotmail.com> |
| To: | <paige.martin@pnc.com> |
| Date: | 08/24/2011 11:32 AM |
| Subject: | RE: check |

Yes, Mary Izia called me again. I left a message for her this morning again. I asked that she give me more info as to why she is calling other than " It is in my best
interest to call her back immediately".

And yes, the funds are still there because they never re submitted the check. I do not want a 30 day late so please tell me what to do. Should I make it again or wait.

Thanks, Jeff

To: highlandbreeze@hotmail.com
Subject: Re: check
From: paige.martin@pnc.com
Date: Wed, 24 Aug 2011 09:39:33 -0400

Hey Jeff,

FOSTER0005921

Exhibit 25

0002307941

# ADJUSTABLE RATE NOTE
### (1 Year Treasury Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

**June 17, 2003**          **CHICAGO**                      **ILLINOIS**
[Date]                     [City]                          [State]

**1022 W MONTANA ST, CHICAGO, Illinois 60614**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    **350,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is

**NATIONAL CITY MORTGAGE CO**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     **4.625**     %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my payment on the first day of each month beginning on     **August 1 2003**    .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on     **July 1, 2033**    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $     **1,799.49**     . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - ARM 5-2 - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-2/5-2/6-2 ARM

-822N (0202)

Form 3502 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4                Initials 

FOSTER0000521

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
   The interest rate I will pay may change on the first day of   July 2006   , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

   **(B) The Index**
   Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
   If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

   **(C) Calculation of Changes**
   Before each Change Date, the Note Holder will calculate my new interest rate by adding
   THREE AND ONE QUARTER   percentage points (   3.250   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
   The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

   **(D) Limits on Interest Rate Changes**
   The interest rate I am required to pay at the first Change Date will not be greater than   6.625   % or less than   3.250   %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than   10.625   %.

   **(E) Effective Date of Changes**
   My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

   **(F) Notice of Changes**
   The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**
   I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
   I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
   If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from

FOSTER0000522

me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A) Late Charges for Overdue Payments**

    If the Note Holder has not received the full amount of any monthly payment by the end of       **15**    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     **5.00**    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B) Default**

    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C) Notice of Default**

    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D) No Waiver By Note Holder**

    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E) Payment of Note Holder's Costs and Expenses**

    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

    Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

    This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note,

Initials:

FOSTER0000523

protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
JEFF M FOSTER                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                        -Borrower

*[Sign Original Only]*

-822N (0202)                     Page 4 of 4                     Form 3502  1/01

FOSTER0000524

# Exhibit 26

0002308010

# ADJUSTABLE RATE NOTE
(1 Year Treasury Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

June 17, 2003                    CHICAGO                    ILLINOIS
[Date]                           [City]                     [State]

2156 N RACINE AVE, CHICAGO, Illinois 60614
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $    427,500.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is

NATIONAL CITY MORTGAGE CO

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    4.625    %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on    August 1 2003    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    July 1, 2033    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $    2,197.95    . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**MULTISTATE ADJUSTABLE RATE NOTE - ARM 5-2 - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Fannie Mae 4-2/5-2/6-2 ARM**

-822N (0202)          Form 3502 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4          Initials

FOSTER0000562

4. **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) **Change Dates**

The interest rate I will pay may change on the first day of        July 2006                    , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) **The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index.".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) **Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding

**THREE AND ONE QUARTER**                     percentage points (          3.250          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) **Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than           6.625          % or less than      3.250      %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    10.625       %.

(E) **Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) **Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5. **BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6. **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from

FOSTER0000563

me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of      15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note,

FOSTER0000564

protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)            _____ (Seal)
JEFF M FOSTER                  -Borrower                                        -Borrower

_____ (Seal)            _____ (Seal)
                               -Borrower                                        -Borrower

_____ (Seal)            _____ (Seal)
                               -Borrower                                        -Borrower

_____ (Seal)            _____ (Seal)
                               -Borrower                                        -Borrower

*[Sign Original Only]*

-822N (0202)                    Page 4 of 4                    Form 3502   1/01

FOSTER0000565

# Exhibit 27

VOELKER
LITIGATION GROUP

**VIA E-MAIL AND U.S. MAIL**

October 13, 2011

Mr. Thomas Bell
Vice President
Loss Mitigation
PNC Bank
6750 Miller Road
Brecksville, Ohio 44141
thomas.bell@pnc.com

*Re: Home Equity Loan/Jeffery M. Foster, 6201 N. Kilpatrick Avenue, Chicago,*
*Illinois 60646-5070, Account Number 4489619840201544*

Dear Mr. Bell:

This is a follow-up to our correspondence to you dated September 30, 2011, in the above-referenced matter. As you know, we represent Jeffrey M. Foster, a current borrower of PNC Bank ("PNC").

We have now had an opportunity to review the file materials provided to us by Mr. Foster. These materials evidence, in excruciating detail, the history of his former banking relationship with National City Bank ("National City"), as well as his current relationship with PNC. We understand that PNC acquired the assets of National City in December 2008, including loans to Mr. Foster.

The file provided to us by Mr. Foster reveals what can only be described as a pattern of continuous and outrageous conduct on the part of both National City and PNC. In the course of this two-year long struggle with PNC, Mr. Foster has been repeatedly and falsely accused of, and reported to the credit bureaus for, making late or incomplete payments and has seen his credit score plummet by as much as 250 points. Mr. Foster has received no less than ten (10) letters from National and PNC apologizing for their conduct and promising to rectify the same. Notwithstanding those letters, PNC has continued to engage in the same conduct again and again.

PNC has also misrepresented Mr. Foster's loan balances and continues to do so. PNC has also been unable to adequately document a home equity loan and PNC currently shows a loan number of #0000000000; obviously an invalid loan number. There are valid questions about the terms of the actual loan at issue.

This inaccurate and irresponsible record-keeping and reporting has made it all but impossible for Mr. Foster to refinance his loans currently with PNC. Mr. Foster has

311 W. Superior Street, Suite 500 – Chicago, Illinois 60654 – W 312 870 5430 – F 312 870 5431 – C 312 254 7666 – dvoelker@voelkerlitigationgroup.com

VOELKERLITIGATIONGROUP.COM

FOSTER0005024

Page 2
October 13, 2011
Mr. Thomas Bell
*Re: Home Equity Loan/Jeffery M. Foster, 6201 N. Kilpatrick Avenue, Chicago,*
*Illinois 60646-5070, Account Number 4489619840201544*

repeatedly sold assets at a fraction of their fair market value to qualify to modify or refinance his loans with PNC only to be told after the fact by PNC, or by PNC's loan-servicer, that the deal was no longer on the table, or erroneously that he had failed to qualify. Indeed, when PNC did follow through and process an agreed-upon loan modification, PNC changed, at the eleventh-hour, the agreed terms and sought to require Mr. Foster to make payments which he was obviously financially incapable of making and demanding exorbitant "closing costs" in excess of $13,000.

Apparently acknowledging the severity of its actions and the economic harm that Mr. Foster has sustained as the result therefrom, by correspondence to Mr. Foster dated February 18, 2010, PNC offered to "accept 60% of the outstanding balance on the referenced equity reserve line of credit as a settlement in full at any time within 24 months of your modification agreement on the line dated April 6, 2009." While Mr. Foster accepted this offer, he was unable to act on it as PNC had so badly damaged his credit that he was unable to obtain financing, even at a 60% level. Of course, under Illinois law, one party to an agreement cannot make the other's performance impossible (*See YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 6 (1st Dist. 2010), citing *Leonard v. Autocar Sales & Service Co.,* 392 Ill. 182, 187 (1945)).

Mr. Foster would like to bring this matter to conclusion once and for all. As such, he has authorized us to offer to resolve all of his disputes with PNC in exchange for PNC's agreement to refinance the home equity line of credit at sixty (60) percent of the current loan balance, with an interest rate of one (1) percent fixed over a forty (40) year term. Of course, the parties would exchange mutual releases for all conduct occurring prior to the date of this agreement with PNC, preserving, of course, claims related to the existing loans on a go-forward basis.

Please let us know within ten (10) days whether this proposal is acceptable.

Very truly yours,
Voelker Litigation Group

Daniel J. Voelker

cc: Mr. Jeffrey M. Foster

FOSTER0005025

# Exhibit 28

## trulia

Fort Lauderdale, FL 🔍 ☰

← **Back to Search**



OFF MARKET

# 56 Fiesta Way

Fort Lauderdale, FL 33301  **Nurmi Isles**

🛏 4 Beds 🛁 5 Baths 📐 5,134 sqft

## $2,820,848

**Trulia Estimate** ⓘ
as of Jul 29, 2019



## Homes for Sale Near 56 Fiesta Way



**$2,595,000**
🛏 5bd 🛁 5ba 📐 5,025 sqft
2101 Sunrise Key Blvd
Sunrise Key, Fort Lauderdale, FL



**$3,000,000**
🛏 4bd 🛁 4ba 📐 4,627 sqft
2323 Delmar Pl
Seven Isles, Fort Lauderdale, FL



**$2,799,000**
🛏 4bd 🛁 5ba 📐 4,990 sqft
615 Coral Way
Las Olas Isles, Fort Lauderdale...

7/29/2019

 

## trulia

Fort Lauderdale, FL

    

**Map View**
Explore the area around 56 Fiesta Way.

**Street View**
Take a virtual walk around the neighborhood.

**Schools**
1 Elementary School
1 Middle School
1 High School

**Crime**
Lowest crime relative to the rest of Broward county.

**Commute**
85% of reside commute by c

## Description

**This property is no longer available to rent or to buy. This description is from February 07, 2014**

Notice of Default. This property has started the foreclosure process because a loan secured by the property is in default. The borrower/homeowner still has the opportunity to stop the foreclosure by catching up on defaulted payments or paying off the entire loan balance usually by refinancing or selling the property. Homeowners in default are often motivated sellers who want to avoid losing their property at public foreclosure auction. Please register for a free trial with RealtyTrac to access complete information for this property, including full address, foreclosure details, owner and lender information, and more.

## Home Details for 56 Fiesta Way

• Single Family Home

• Lot Size: 10,200 sqft

• Built in 1991

## Price History for 56 Fiesta Way

| Date | Price | Event | |
|------|-------|-------|---|
| 01/30/2004 | $1,765,000 | Sold | ∨ |
| 12/05/2000 | $1,700,000 | Sold | ∨ |
| 08/06/1996 | $1,100,000 | Sold | ∨ |
| 01/01/1992 | $29,142,857 | Sold | ∨ |

56 Fiesta Way Fort Lauderdale FL Single Family Home | Trulia.com



Fort Lauderdale, FL

 

| | |
|---|---|
| Year | 2018 |
| Tax | $30,713 |
| Assessment | |
|   Land | $0 |
|   Improvements | $0 |
|   Total | $1,718,840 |

## Price Trends ⌃

For 4 bedroom homes in 33301

*Based on the Trulia Estimate ⓘ



**$391**
Average Price/sqft
This home: $549 **41% above***



**$1,330,000**
Median Sale Price
This home: $2,820,848 **112% above***



**43% below list**
Avg Sale Price vs. Avg List Price

## Comparable Sales Near 56 Fiesta Way ⌃

| Address | |
|---|---|
| 210 Nurmi Dr, Fort Lauderdale, FL | ⌄ |
| 1259 N Rio Vista Blvd, Fort Lauderdale, FL | ⌄ |
| 3120 NE 47th St, Fort Lauderdale, FL | ⌄ |
| 92 Fiesta Way, Fort Lauderdale, FL | ⌄ |

Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page 188 of 209 PageID #:3708



**trulia** | Fort Lauderdale, FL | 🔍 | ☰

56 Fiesta Way, Fort Lauderdale, FL ⌄

2511 Barcelona Dr, Fort Lauderdale, FL ⌄

2319 Desota Dr, Fort Lauderdale, FL ⌄

1670 SE 7th St, Fort Lauderdale, FL ⌄

1 S Victoria Park Rd, Fort Lauderdale, FL ⌄

1 S Gordon Rd, Fort Lauderdale, FL ⌄

## Assigned Schools

These are the assigned schools for 56 Fiesta Way.



### Fort Lauderdale High School

9-12 • PUBLIC • 2007 Students
Broward

**7**/10
GreatSchools Rating

★★★☆☆
Parent Rating Average

My child of 10 grade he is doing great ,he loves to be at this Magnet program Cambridge ,he is already

👤 **Parent Review**
3y ago

45 Reviews



### Sunrise Middle School

6-8 • PUBLIC • 1249 Students
Broward

**5**/10
GreatSchools Rating

★★★★☆
Parent Rating Average

Extremely happy with my son completing his education there and my daughter currently

👤 **Parent Review**
11mo ago

32 Reviews



### Harbordale Elementary School

PK-5 • PUBLIC • 463 Students
Broward

**7**/10
GreatSchools Rating

★★★★☆
Parent Rating Average

It's ok for my son because all his friends are in this school. But this year with teacher it's been a bad experience

👤 **Parent Review**
2mo ago

14 Reviews

GreatSchools ratings are based on test scores and additional metrics when available.

Check with the applicable school district prior to making a decision based on these schools. Learn more.

## Neighborhood Overview



### Nurmi Isles

📅 11 Homes For You



Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page 190 of 209 PageID #:3710



| | |
|---|---|
| ● Principal & Interest | $10,489 |
| ● Property Taxes | $2,797 |
| ● Home Insurance | $75 |
| ● Mortgage ins. & other | $0 |

or

See today's mortgage rates

## Additional Cost

## Contact an Agent

Name

Phone

Email

Message

Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page 191 of 209 PageID #:3711

 

trulia | Fort Lauderdale, FL

---

**Request Info**

By pressing Request Info, you agree that Trulia and real estate professionals may contact you via phone/text about your inquiry, which may involve the use of automated means. You are not required to consent as a condition of purchasing any property, goods or services. Message/data rates may apply. You also agree to our Terms of Use. Trulia does not endorse any real estate professionals.

## Homes for Rent Near 56 Fiesta Way

  

PET FRIENDLY

**$2,100/mo**  |  **$1,900/mo**  |  **$1,775/mo**

3bd  2ba  919 sqft  |  3bd  1ba  1,056 sqft  |  3bd  1ba  1,300 sqft

Address Not Disclosed  |  2727 NE 6th Ln  |  622 SW 5th Ave #1

Victoria Park, Fort Lauderdale,...  |  Wilton Manors, FL  |  Tarpon River, Fort Lauderdale, ...

---

56 Fiesta Way, Fort Lauderdale, FL 33301 is a 4 bedroom, 5 bathroom, 5,134 sqft single-family home built in 1991. 56 Fiesta Way is located in Nurmi Isles, Fort Lauderdale. This property is not currently available for sale. 56 Fiesta Way was last sold on Jan 30, 2004 for $1,765,000 (28% lower than the asking price of $2,257,775). The current Trulia Estimate for 56 Fiesta Way is $2,820,848.

---

### Nearby Real Estate

Houses for Sale Near Me | Houses for Sale Near Me by Owner | Open Houses Near Me | Land for Sale Near Me | More

### Fort Lauderdale Neighborhoods

Case: 1:12-cv-03130 Document #: 166 Filed: 08/02/19 Page 192 of 209 PageID #:3712

 

Fort Lauderdale, FL

Single Family Homes | Condos | Townhomes | Co-Ops | More

**Real Estate and Mortgage Guides**

Fort Lauderdale Real Estate Guide | Fort Lauderdale Schools | Newest Homes for Sale in Florida | Newest Rentals in Florida | More

About Trulia   About Zillow Group   Careers   Newsroom   Investor Relations   Advertising

Terms   Privacy   Terms of Use   Listings Quality Policy   Subscription Terms   Help   Ad Choice

Copyright © 2019 Trulia, LLC. All rights reserved. Equal Housing Opportunity. Have a Question? Visit our Help Center to find the answer.

# Exhibit 29

✉ **SHARE**

`City, State, or Zip` 🔍

**56 Fiesta Way, Fort Lauderdale, FL 33301**



# 56 Fiesta Way,
## Fort Lauderdale, FL 33301

**4 beds · 5 baths · 5,134 sqft**

● OFF MARKET

Zestimate®: **$2,880,403**

Rent Zestimate®: $18,210 /mo

EST. REFI PAYMENT

**Est. Refi Payment:**
**$10,951/mo**

🖩 ▾

56 Fiesta Way, Fort Lauderdale, FL is a single family home that contains 5,134 sq ft and was built in 1991. It contains 4 bedrooms and 5 bathrooms. This home last sold for $1,765,000 in January 2004.

The Zestimate for this house is $2,880,403, which has decreased by $10,317 in the last 30 days. The Rent Zestimate for this home is $18,210/mo, which has decreased by $205/mo in the last 30 days. The property tax in 2018 was $30,713. The tax assessment in 2018 was $1,718,840, an increase of 2.1% over the previous year.

## Facts and Features

🏠 **Type**
Single Family

📅 **Year Built**
1991

🌡 **Heating**
No Data

❄ **Cooling**
Central

🅿 **Parking**
2 spaces

◻ **Lot**
10,200 sqft

INTERIOR FEATURES

**Bedrooms**
Beds: 4

**Flooring**
Floor size: 5,134 sqft

Flooring: Concrete, Tile

**Heating and Cooling**
Cooling: Central

SPACES AND AMENITIES

**Size**
Unit count: 0

**Spaces**
Hot Tub/Spa

Pool

## Home Value

Zestimate

# $2,880,403



**ZESTIMATE RANGE**
$2.68M - $3.14M



**LAST 30 DAY CHANGE**
-$10,317 (-0.4%)



**ONE YEAR FORECAST**
$2,908,631 (+1.0%)

## Owner Dashboard



Do you own this home? See your Owner Dashboard.

## Price / Tax History

| DATE | EVENT | PRICE | | $/SQFT | SOURCE |
|------|-------|-------|--------|--------|--------|
| 01/30/04 | Sold | $1,765,000 | +3.8% | $343 | |
| 12/05/00 | Sold | $1,700,000 | +54.5% | $331 | |
| 08/06/96 | Sold | $1,100,000 | -96.2% | $214 | |
| 01/01/92 | Sold | $29,142,856 | | $5,676 | |

## Neighborhood: Nurmi Isles

Zillow predicts will increase 0.4% next year, compared to a 0.7% rise for Fort Lauderdale as a whole. Among 33301 homes, this home is valued 472.5% more than the midpoint (median) home, and is valued 68.5% more per square foot.

🚶 Walk Score ® **28** (Car-Dependent)    🚌 Transit Score ™ **28** (Some Transit)

NEIGHBORHOOD MAP



NEARBY HOMES



⊖ OFF MARKET: ZESTIMATE
**$1,991,727** 3 bds · 3 ba · 3,510 sqft
62 Fiesta Way, Fort Lauderdale, FL

⊖ OFF MARKET: ZESTIMATE
**$3,131,959** 4 bds · 4.1 ba · 4,820 sqft
48 Fiesta Way, Fort Lauderdale, FL

# Nearby Schools in Fort Lauderdale

| GREATSCHOOLS RATING ⓘ | | GRADES | DISTANCE |
|---|---|---|---|
| **8** out of 10 | Virginia Shuman Young Elementary | PK-5 | 0.9 mi |
| **5** out of 10 | Sunrise Middle | 6-8 | 1.3 mi |
| **7** out of 10 | Fort Lauderdale High | 9-12 | 2.1 mi |

Data by GreatSchools.org ⓘ

**About the ratings:** Historically, GreatSchools ratings have been based solely on a comparison of standardized test results for all schools in a given state. As of September 2017, the GreatSchools ratings also incorporate additional information, when available, such as college readiness, academic progress, advanced courses, equity, discipline and attendance data. GreatSchools ratings are designed to be a starting point to help parents compare schools, and should not be the only factor used in selecting the right school for your family.

**Disclaimer:** School attendance zone boundaries are provided by a third party and subject to change. Check with the applicable school district prior to making a decision based on these boundaries.

## Similar Homes for Sale



🔴 **FOR SALE**
$2,775,000
5 beds, 7.0 baths, 6585 sqft
83 Royal Palm Dr, Fort Laude



🔴 **FOR SALE**
$2,249,000
4 beds, 3.0 baths, 3575 sqft
58 Nurmi Dr, Fort Lauderdale



🔴 **FOR SALE**
$2,700,000
4 beds, 4.0 baths, 4308 sqft
34 Pelican Dr, Fort Lauderdal



🔴 **FOR SALE**
$3,487,000
6 beds, 6.0 baths, 5893 sqft
319 Coral Way, Fort Lauderda



🔴 **FOR SALE**
$3,795,000
6 beds, 9.0 baths, 7745 sqft
42 Nurmi Dr, Fort Lauderdale

## Nearby Similar Sales

🟡 **SOLD: $2,045,000**
Sold on 4/1/2019
6 beds, 5.0 baths, 4591 sqft
68 Fiesta Way, Fort Lauderdale, FL 33301

🟡 **SOLD: $2,150,000**
Sold on 1/9/2019
4 beds, 5.0 baths, 4190 sqft
1 S Gordon Rd, Fort Lauderdale, FL 33301

🟡 **SOLD: $2,150,000**
Sold on 10/8/2018
4 beds, 5.5 baths, 4118 sqft
16 Pelican Dr, Fort Lauderdale, FL 33301

🟡 **SOLD: $2,180,000**
Sold on 1/31/2019
5 beds, 5.5 baths, 5700 sqft
2519 Sea Island Dr, Fort Lauderdale, FL 33301

🟡 **SOLD: $2,200,000**
Sold on 4/9/2019
5 beds, 4.5 baths, 7210 sqft
1 S Victoria Park Rd, Fort Lauderdale, FL 33301

Exhibit 30

Intentionally Omitted

Exhibit 31

```
10-03-09                    MSP LETTERWRITER ACTIVITY FOR MONTH OF 09-09                    PAGE254,382

LOAN= 0005771586    DATE=09-16 USER=HTN KEY=PS059 VERS=012 TITLE=Research: Need Check Copy    lc FORM=IVR1 PRINTER=SZVZ SECURITY=4
LINES-PER-PAGE=NO CONDITIONS=0
```

September 16, 2009


Jeffrey M Foster
6201 N Kilpatrick Ave
Chicago IL 60646



Re:  Loan No. 0005771586

Dear Customer:

It has come to our attention that you may not have received
proper credit for one or more mortgage payments on the referenced
loan number.

To complete our research and ensure proper credit to your mortgage
loan, please send to us cashed copy front/back of check
#1743 for $4981.03 for the research
of your missing payment.

We apologize for any inconvenience this may have caused.  If you
have any questions, please call one of our Customer Service
Representatives at 1-800-822-5626.  If you are internet active,
visit us online at www.ncmc.com to view up-to-date loan information
24 hours a day, 7 days a week!

Sincerely,

Payment Services Department

Enclosure


PS059
HTN

PNC001406

Exhibit 32

# National City
## Mortgage

P.O. Box 1820
Dayton, Ohio 45401-1820

**Mortgage Statement**

Statement Date 09/10/09

### Contact Information

**Customer Service: 1-800-822-5626**
For mortgage account information:
Monday - Thursday, 8am - 9pm (ET),
Friday 8am - 5pm (ET), Saturday 9am - 2pm (ET)

**Correspondence Address Only:**
National City Mortgage
Attn: Customer Service Research
P.O. Box 1820
Dayton, OH 45401-1820

**Online Payment:** www.ncmc.com
Click on Pay Online and Other Payment Options


31000-0017075-004-1-000-100-000-000

JEFFREY M FOSTER
6201 N KILPATRICK AVE
CHICAGO IL 60646-5070

**Important Information for Customers Paying By Check:** When you make a payment with a personal check, **you authorize us to use information from your check to make a one-time electronic transfer from your account or to process the payment as a check transaction.** This means your account could be debited as early as the same day the payment is received. Your check will no longer be sent to your bank for processing, it will be destroyed and a copy will be retained. Therefore you will no longer receive the original or a copy of your check back from your bank. Also, the way in which the transaction appears on your bank statement will change. Your statement will now show a line item for an electronic entry initiated by National City Bank and will include the check number, payee and the check amount. If you have any questions or do not want us to use information on your check to create a one-time electronic transfer from your account, please contact Customer Service at 1-800-822-5626.

### Payment Summary

| | |
|---|---|
| Payment Effective | 09/01/09 |
| Principal & Interest* | $4,981.03 |
| Escrow Payment | $0.01 |
| Regular Payment Due | $4,981.04 |
| Other Fees ** | $9.00 |
| Unpaid Late Charges | $1,133.98 |
| Total Past Due | $9,962.08 |
| **TOTAL AMOUNT DUE** | **$16,086.10** |

\* Principal not included for Interest Only loans.
\*\* Other fees may include Speedpay, property inspection and document fees.

### Loan Information

**ACCOUNT NUMBER**     **0005771586**
**PROPERTY ADDRESS**   56 FIESTA WAY
FORT LAUDERDALE FL 33301

**INTEREST RATE**     **4.5000%**

**BALANCES AS OF 09/10/09**

| | |
|---|---|
| Principal Balance* | $1,047,291.78 |
| Escrow Balance | ($35,843.34) |
| Unpaid Late Charges | $1,133.98 |

\* The Principal Balance is not the total required to pay your loan in full.

**YEAR TO DATE**

| | |
|---|---|
| Interest Paid | $31,108.18 |
| Taxes Paid | $31,506.70 |

SEE REVERSE SIDE FOR ADDITIONAL IMPORTANT INFORMATION

### Transaction Activity

Payments received after 09/10/09 are not reflected in this statement.

| Date | Due Date | Description | Amount Received | Principal | Interest | Escrow | Late Charges/ Other Fees | Misc |
|---|---|---|---|---|---|---|---|---|
| 08/12/09 | 7/1 | Beginning Balances | $0.00 | $0.00 | $0.00 | ($50.00) | $50.00 | $0.00 |
| 08/12/09 | | Misc. Esc. Disb. | ($4,286.64) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/12/09 | | County Tax Disb. BROWARD COUNTY T/C | | | | ($31,506.70) | | |
| 08/12/09 | 7/1 | Escrow Advance | $35,843.34 | $0.00 | $0.00 | $35,843.34 | $0.00 | $0.00 |
| 09/01/09 | 7/1 | Payment | $4,981.03 | $1,049.75 | $3,931.28 | $0.00 | $0.00 | $0.00 |

### IMPORTANT MESSAGES

Please note the payments disbursed from your escrow account:
08/09     County Tax Disb.     BROWARD COUNTY T/C     ($31,506.70)

**DETACH AND RETURN BOTTOM PORTION WITH YOUR PAYMENT**

Confidential Under Protective Order

# Exhibit 33



January 21, 2010

Jeffrey M Foster
6201 N Kilpatrick Ave
Chicago IL  60646

> RE:  Loan No. 0005771586
> Property Address:  56 Fiesta Way, Fort Lauderdale, FL 33301

Dear Mr. Foster:

This letter is confirmation that we have placed a credit bureau block on the referenced loan which will expire on January 31, 2010.  Your loan is currently due for the December 2009 payment.

We received a faxed copy of the payment receipt dated July 14, 2009; however, we were advised the check never cleared the Federal Reserve; therefore, the credit for that payment was reversed from your loan on July 16, 2009.

We need a copy of the front and back of cancelled check number 1743 faxed to 937-913-7512.  Upon receipt of the cancelled check, we can research further to obtain your proper credit for the payment.  Please keep in mind that we need a copy of your cancelled check by January 31, 2010.  If proof of payment is not received by that date, the negative information will be reported to the major credit bureaus.

In addition, as advised in our August 12, 2009 correspondence (copy enclosed), we received notification that your real estate property taxes were delinquent and we set up an escrow account to pay them.  Your escrow account will be analyzed this month for a payment change effective with the March 2010 payment.  The escrow shortage will be spread over a 12-month period, interest free.  If you need the shortage spread over an extended period, please call Brandy Treadway at 937-910-2130.

If you have further questions regarding this matter, please call me directly at 937-910-3476.

Sincerely,

Brian D. Swihart

Brian Swihart
Vice President
Mortgage Services

Enclosure

FOSTER0000116

# Exhibit 34

**⬤ PNC**MORTGAGE℠

PNC Mortgage
a Division of PNC Bank, National Association
3232 Newmark Drive
Miamisburg, Ohio 45342

PNC Loan Number:      0005771586
Investor Loan Number:  0005771586

Dear Borrower:

You are eligible for a modification of the terms of your mortgage loan.  The enclosed Loan Modification Agreement ("Agreement") reflects the proposed terms of the modified mortgage loan.  You must follow all instructions carefully.  To accept the loan modification offer, **all Borrowers must sign two copies of the Loan Modification Agreement in front of a notary public and you must return these completed agreements to PNC Mortgage** in the enclosed, prepaid envelope, **together with a certified check in the amount shown in item 5 below by the date shown in Section 3 below.  If we do not receive both signed and notarized Loan Modification Agreements and required funds by that date, we may exercise our rights and remedies under the existing loan documents.**  The required funds include the amount of the first payment under the Loan Modification Agreement.

On all pages where a signature is required, please sign your name exactly as it is typed below.  The county will not record the modification unless it is signed this way.

1)     **Using black ink only,  JEFFREY M FOSTER**

Must sign two (2) copies of the Loan Modification Agreement in the presence of an official notary, who will witness each signature.

2)      **SUMMARY**   Here is a summary of your modified mortgage:

To better understand the proposed terms of your modified mortgage loan, please read the summary below of your Modification Agreement.  Please note that this summary does not amend or replace the Loan Modification Agreement.   Please read the enclosed Modification Agreement carefully and make sure that you understand it and that the statement set forth in Section 7 of the Loan Modification Agreement is true and accurate.

**NEW PRINCIPAL BALANCE**.  Any past due amounts as of the Effective Date of the loan modification, unpaid interest, real estate taxes, insurance premiums, and certain assessments paid on your behalf to a third party, will be added to your mortgage loan balance.

[**INTEREST RATE**.  The interest rate on your modified loan will be adjusted as noted in the attached Modification Agreement in Section 2.]

[**TERM EXTENSION**.  To reduce your mortgage payment, we will extend the term of your mortgage. This means we will spread your payments over a longer period.]

[**ESCROW ACCOUNT**.  The terms of your Modification Agreement require PNC Mortgage to continue to set aside a portion of your new monthly payment in an escrow account for payment of your property taxes, **insurance premiums** and other required fees.  PNC Mortgage will draw on this account to pay your real estate taxes and insurance premiums as they come due.  Your escrow payment amount will continue to adjust if your taxes, insurance premiums and/or assessment amounts change, so the amount of your monthly payment that PNC Mortgage must place in escrow will also adjust as permitted by law.

This means that your monthly payment may change. Your initial monthly escrow payment will be $ 3318.33. This amount is included in the loan payment noted in Section 2 of the enclosed Modification Agreement; you do not need to remit this amount separately.]

[ESCROW SHORTAGE. Due to the timing of your tax and insurance payments, we have determined that there is a shortage of funds in your escrow account in the amount of $ 64333.83. You may pay this amount over a 5-year (60 months) period. This monthly payment has already been included in the monthly escrow payment stated above. If you wish to pay the total shortage now in a lump sum, please contact us. Paying this amount now in a lump sum will reduce your new monthly mortgage payment.]

PAYMENT SCHEDULE. The enclosed Modification Agreement includes a payment schedule in Section 2 showing your payment plan for the life of your modified loan.

[FEES. If there are fees associated with the Loan Modification Agreement, the amount you are required to pay is shown in Section 5 below.]

3) Sign and have notarized both copies of the Loan Modification Agreement. Return them in the enclosed self-addressed envelope. These documents must be returned to our office by 06/04/10. IF YOU DO NOT RETURN THE EXECUTED NOTARIZED AGREEMENTS AND ANY REQUIRED FEE IN SECTION 5, THE LOAN MODIFICATION AGREEMENT WILL NOT TAKE EFFECT ON THE EFFECTIVE DATE AND WILL BE NULL AND VOID.

4) We encourage you to make a copy of the Loan Modification Agreement for your records. A summary of the initial payment requirements for the loan modification are:

| | |
|---|---|
| Your first modified monthly payment is in the amount of | $ 6730.55 |
| Loan Modification closing costs (Title Fee) of | $ 6401.49 |
| Appraisal fee | $ 400.00 |

5) Please enclose certified funds in the amount of along with the two signed documents — $ 13532.04

If you have any questions regarding the Loan Modification Agreement or this letter, please call me at 1-800-367-9305, ext. # 53930

Sincerely,

Connie Shilt

PNC Mortgage
a Division of PNC Bank, National Association
Homeowners Assistance Department

PNC002237

# Exhibit 35