**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

Jeff Foster

Plaintiff,

vs.                                    No. 12 CV 3130

PNC Bank, National Association;

Defendants.

**PNC BANK, NATIONAL ASSOCIATION'S REPLY IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................................iii

I.     PRELIMINARY STATEMENT ...............................................................................1

II.    FOSTER'S ALLEGED DAMAGES ARE SPECULATIVE AND FOSTER
HAS NO EVIDENCE THAT HIS ALLEGED DAMAGES RESULT
FROM PNC'S CONDUCT ........................................................................................2

      A.    Foster Has No Evidence That He Was Ever Denied Credit Because of
PNC's Conduct Because Foster Never Applied for Credit, and Because He
Has No Admissible Evidence That He Would Have Been Denied Credit
Due to Anything PNC Did ..............................................................................3

      B.    Foster Cannot Connect His Alleged Damages to a Specific Contract ...........4

      C.    Foster's Alleged Damages Are Not Attributable to Any of PNC's Conduct...6

           1.    PNC did not restrict Foster from selling real estate ............................6

           2.    Foster was not prevented from collecting rental income...................8

      D.    Foster's Alleged Damages Regarding His Loss of Income from Inability to
Purchase Property Are Based Only on Speculation and Conjecture ..............9

III.   FOSTER'S OPPOSITION DOES NOT CREATE A GENUINE ISSUE
OF MATERIAL FACT AS TO ANY CLAIM INVOLVING THE
FLORIDA LOAN ...................................................................................................12

      A.    The Language in the Florida Mortgage Is Unambiguous ............................12

      B.    Foster Provides No Evidence That PNC Made Any False Statement to
Foster or That Foster Relied on Any Such Statement to His Detriment....................14

      C.    Foster's FCRA Claim Fails Because Foster Has No Evidence That PNC Did
Not Conduct a Reasonable Investigation and Because Foster Never Applied
For and Was Never Denied Credit ................................................................15

      D.    Foster's Conclusory Allegations About PNC's Servicing of the Florida Loan
Do Not Create a Genuine Issue of Material Fact..........................................16

           1.    The record contains no evidence that PNC ever obtained lender
placed general hazard insurance. Foster's conjecture about the letters
is not enough to create a genuine issue of material fact.................16

2.      There is no evidence that PNC accepted or retained funds that Foster did not owe under the Florida Loan Documents ................................16

3.      Even if PNC failed to pay the proper premium for flood insurance, PNC corrected any mistake and refunded the entire amount of the lender placed flood gap insurance premium .......................................17

E.      Foster Does Not Contest or Address PNC's Motion for Summary Judgment on Foster's Claim for Unjust Enrichment and Disgorgement (Count 8) ...................18

F.      The Release in the Florida Loan Is For Any Acts Prior to May 2010 ........................18

IV.      FOSTER'S SELF-SERVING AFFIDAVIT DOES NOT CREATE ANY MATERIAL ISSUE OF FACT AS TO THE ILLINOIS LOAN ...........................................18

A.      Foster's Self-Serving Affidavit Is Not Sufficient Evidence to Overcome the Notary Presumption........................................................................18

B.      The October 2011 Letter From Foster's Attorney Does Not Satisfy the Requirements of the Fair Credit Billing Act ("FCBA")....................................19

C.      Foster's FCRA Claim on the Illinois Loan Fails Because Foster Has No Evidence of Damages and No Evidence That PNC Behaved Unreasonably............20

V.      PNC IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIMS........................................................................20

VI.      CONCLUSION .........................................................................20

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)........................16

*Asset Mgmt. Holdings, LLC v. Assets Recovery Ctr. Invs. LLC*, 238 So. 3d 908 (Fla. Dist. Ct. App. 2018)........................................................................................................17

*Assocs. of Tampa, P.A. v. Sassano*, 664 So. 2d 1000 (Fla. Dist. Ct. App. 1995).........................................12

*Basith v. Cook Cnty.*, 241 F.3d 919 (7th Cir. 2001)................................................................................16

*BE & K Const. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756 (7th Cir. 1998) ...........................................................................................................................3

*Beerman v. Graff*, 250 Ill. App. 3d 632, 621 N.E.2d 173, Ill. Dec. 304 (1993) ...........................................3

*Bombard v. Fort Wayne Newspapers*, 92 F.3d 560 (7th Cir. 1996)............................................................4

*Carroll v. Lynch*, 698 F.3d 561 (7th Cir. 2012) .......................................................................................16

*Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469 (2d Cir. 1995).............................................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................................................3

*Colorado v. New Mexico*, 467 U.S. 310, 104 S. Ct. 2433, 81 L. Ed. 2d 247 (1984)....................................19

*Cunningham v. Bank One*, 487 F.Supp.2d 1189 (W.D. Wash. 2007) ........................................................20

*Dawson v. Jones*, 512 So.2d 311 (Fla. Dist. Ct. App. 1987) ......................................................................3

*Field v. TransUnion, LLC*, 2002 U.S. Dist. LEXIS 7973 (N.D. Ill. 2002) ................................................15

*Green v. Motorola Inc.*, No. 96 C 7654, 1998 U.S. Dist. LEXIS 3595 (N.D. Ill Mar. 20, 1998)..................................................................................................................................6

*Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, No. 00 C 0191, 2004 U.S. Dist. LEXIS 8357 (N.D. Ill. May 18, 2004) ..........................................................................3

*Houri v. Boaziz*, 196 So. 3d 383 (Fla. Dist. Ct. App. 2016) .....................................................................14

*Huie v. Dent & Cook, P.A.*, 635 So. 2d 111 (Fla Dist. Ct. App. 1994) .....................................................14

*Ins. Concepts & Design, Inc. v. Healthplan Servs.*, 785 So. 2d 1232 (Fla. Dist. Ct. App. 2001)..................................................................................................................................13

*Koukoulomatis v. Disco Wheels, Inc.*, 127 Ill. App. 3d 95, 468 N.E.2d 477 (1st Dist. 1984)......................20

*Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000) ........................................................................... 4

*Miami Beach Lerner Shops, Inc. v. Walco Mfg. of Florida, Inc.*, 106 So.2d 233 (Fla. Dist. Ct.
App. 1958) ............................................................................................................................... 3, 9

*Morgan Stanley & Co. v. Coleman (Parent) Holdings Inc.*, 95 So. 2d 1124 (Fla. Dist. Ct.
App. 2007) .................................................................................................................................... 14

*Murray v. Sunrise Chevrolet, Inc.*, 441 F.Supp.2d 940 (N.D. Ill. 2006) .......................................... 2

*Nebula Glass, Int'l Inc. v. Reichhold, Inc.* 454 F.3d 1203 (11th Cir. 2006) ..................................... 3

*Oakleaf of Illinois v. Oakleaf & Associates, Inc.*, 173 Ill. App. 3d 637, 527 N.E.2d. 926,
123 Ill. Dec. 288 (1988) ................................................................................................................ 2

*Rambarran v. Bank of Am., N.A.*, 609 F. Supp. 2d 1253 (S.D. Fla. Mar. 13, 2009) ..................... 15

*Resnick v. AvMed, Inc.*, 693 F.3d 1317 (11th Cir. 2012) ............................................................... 2

*Resolution Trust Corp. v. Hardisty*, 269 Ill. App. 3d 613, 646 N.E.2d 628, 207 Ill. Dec.
62 (Ill. App. Ct. 1995) .................................................................................................................. 19

*Rhodes v. BLP Assoc., Inc.*, 944 So.2d 527 (Fla. Dist. Ct. App. 2006) ....................................... 13

*Sepe v. City of Safety Harbor*, 761 So. 2d 1182 (Fla. Dist. Ct. App. 2000) ............................... 13

*USA Interactive v. Dow Lohnes & Albertson, P.L.L.C*, 328 F. Supp.2d 1294 (M.D. Fla.
2004) ............................................................................................................................................ 17

## STATUTES

15 U.S.C. § 1666(a) .......................................................................................................................... 20

15 U.S.C. § 1681(b) ........................................................................................................................... 2

15 U.S.C. §1640(a)(1)-(4) ................................................................................................................. 2

Fla. Stat. § 627.712 .......................................................................................................................... 13

## RULES

Fed. R. Civ. P. 56(c)(4) ................................................................................................................... 16

Fed. R. Evid. 801(c) ......................................................................................................................... 4

Fed. R. Evid. 802 ............................................................................................................................. 4

iv

## I.    PRELIMINARY STATEMENT

PNC Bank, National Association ("PNC") is entitled to summary judgment in this case. Foster's Opposition and Affidavit, although lengthy, fail to identify a single issue of material fact that a jury could resolve.  Foster identifies no admissible evidence whatsoever that supports his damages claims; that is an element of nearly all of his causes of action, and that failure is fatal to his case.  The Affidavit consists almost entirely of rank speculation, and inadmissible hearsay, that does not constitute admissible evidence; a party's proffer of inadmissible "evidence" can never defeat summary judgment.  Foster's assertions that PNC misapplied payments, or took actions with respect to wind, flood and hazard insurance that were not permitted by the contracts, are without support. PNC's Motion for Summary Judgment ("PNC's Motion"[1]), and the affidavit of Dorothy Thomas, demonstrated how PNC applied his payments and what PNC did with respect to insurance.  It also demonstrated, through citation to cases and the contractual documents, that it was entitled to do what it did.  Tellingly, Foster's Opposition is largely devoid of citation to any authority. Instead, it is replete with generalized complaints about PNC's customer service.  That is not enough.  The statutes at issue, the cases interpreting them, and the contracts between the parties govern whether a particular factual disagreement is material.  As PNC's Motion demonstrated, through citations Foster mostly ignores, those authorities establish that whatever quibbles Foster may believe he has with the way PNC handled his accounts do not create disputes of ***material*** facts.

One point deserves special mention: Foster's insistence that he did not sign the Illinois Loan Documents does not create a triable issue.  The Opposition ignores the standard of proof Foster must meet; to survive summary judgment, he must identify in the record ***clear and convincing evidence,*** from ***a disinterested witness,*** that the signature acknowledged by a notary is not actually his.  Foster, a self-described real estate tycoon who has signed many loan agreements with

---

[1] PNC's Motion refers to PNC's Memorandum in Support of PNC's Motion for Summary Judgment filed as ECF #158.

financial institutions, and who admits he knows that banks insist on written agreements to document loans, drew down on the credit line secured by the 2006 Illinois Mortgage, paid on the loan secured by that mortgage for years, and accepted the benefit of the release of the earlier 2003 Mortgage that secured the loan he refinanced in 2006. As if that were not enough, Foster offers no expert to rebut the expert testimony of PNC's witness. Evidence that he may have signed more than one version of the document (one containing the loan number and one not), and that he may have done so on different dates, simply does not, as a matter of law, suffice to create a triable issue on the standard of proof he must meet to overcome the presumption that his signature, which a notary acknowledged, is genuine.

Although there is ample reason to question Foster's credibility, given his strangely selective memory, his equally selective attention to details, and his inconsistent conduct, that is not what this Motion is about. Foster identifies no admissible record evidence that is sufficient to create a triable issue on any of his claims, and PNC is, accordingly, entitled to summary judgment on Foster's Complaint and PNC's Counterclaims.

## II.    FOSTER'S ALLEGED DAMAGES ARE SPECULATIVE AND FOSTER HAS NO EVIDENCE THAT HIS ALLEGED DAMAGES RESULT FROM PNC'S CONDUCT

Foster demands payment for alleged "damages" that he cannot show PNC actually caused. Proof of damages is a required element of nearly all of Foster's claims.[2] *See* PNC's Motion. To prove his damages, Foster must show that he suffered harm that is ***causally linked*** to the specific wrongful conduct alleged in his complaint. *See e.g.*, *Oakleaf of Illinois v. Oakleaf & Associates, Inc.* 173 Ill. App. 3d 637, 646, 527 N.E.2d. 926, 123 Ill. Dec. 288 (1988) (Illinois law); *see Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) (Florida law).

---

[2] Damages are an element of all of Foster's common law claims (Counts 3, 4, 5, 7, 8, 10). The Fair Credit Reporting Act ("FCRA") provides that if Foster cannot prove actual damages, he may seek statutory damages of not more than $1,000. *See* 15 U.S.C. § 1681(b); *Murray v. Sunrise Chevrolet, Inc.*, 441 F.Supp.2d 940 (N.D. Ill. 2006). The Fair Credit Billing Act ("FCBA") provides that an individual may recover statutory damages not greater than $4,000. 15 U.S.C. §1640(a)(1)-(4).

Foster has no evidence that PNC injured him. Both Illinois and Florida law require a plaintiff to prove damages by credible evidence to a reasonable certainty. *See Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, No. 00 C 0191, 2004 U.S. Dist. LEXIS 8357 (N.D. Ill. May 18, 2004); *Dawson v. Jones*, 512 So.2d 311 (Fla. Dist. Ct. App. 1987). Damages cannot be based on speculation or conjecture. *See BE & K Const. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756, 770 (7th Cir. 1998); *Miami Beach Lerner Shops, Inc. v. Walco Mfg. of Florida, Inc.*, 106 So.2d 233 (Fla. Dist. Ct. App. 1958). "Damages are speculative when uncertainty exists **as to the fact of damages**, rather than to the amount of such damages." *Beerman v. Graff*, 250 Ill. App. 3d 632, 639, 621 N.E.2d 173, 179, 190 Ill. Dec. 304 (1993)(emphasis added); *Nebula Glass, Int'l Inc. v. Reichhold, Inc.* 454 F.3d 1203, 1217 (11th Cir. 2006). Where a party fails to present sufficient evidence from which a reasonable factfinder could conclude that the party suffered damages, the moving party is entitled to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (summary judgment is proper where a party fails to establish an element essential to the party's claims). Foster has no admissible evidence demonstrating that he suffered any damages to a reasonable degree of certainty, and the Court should enter summary judgment in favor of PNC.

A. **Foster Has No Evidence That He Was Ever Denied Credit Because of PNC's Conduct Because Foster Never Applied for Credit, and Because He Has No Admissible Evidence That He Would Have Been Denied Credit Due to Anything PNC Did.**

Nearly all of Foster's alleged damages flow from his conclusory allegation that damage to his credit and resulting lower credit score ruined his business.[3] But Foster's contention that he could not obtain credit as a result of PNC's actions is nothing more than rank speculation. He points to no admissible evidence that shows either: (1) he would actually have been denied credit, or (2) any denial

---

[3] Foster alleges damages for losses related to sales of collectibles, antiques, and vehicles. (Foster Aff. ¶¶ 200-203.) Foster admitted that no one at PNC directed him to sell miscellaneous assets, paintings, or antiques. (Foster Dep. 312.) Furthermore, Foster could provide no information about how he calculated these alleged losses or why the auction prices were not a good indication of value. (Foster Dep. 309-313 (collectibles); Foster Dep. 273-276; 272-278 (vehicles).) Foster's self-serving testimony about these damages is speculative and not sufficient to survive summary judgment.

would be due to PNC's conduct. Foster even admits that he did not submit an application for a loan because he believed that he would be turned down. (Foster Aff. ¶ 192.)

The only information in the record about Foster's alleged credit applications[4] is inadmissible hearsay. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is not admissible unless it falls under one of the exceptions to the hearsay rule. *See* Fed. R. Evid. 802. A party may not rely on inadmissible hearsay in opposing a motion for summary judgment, just as it may not introduce hearsay evidence at trial. *See Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). A court should not consider statements in an affidavit or deposition submitted in connection with summary judgment that constitute inadmissible hearsay. *See Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996).

Foster's statements and deposition testimony relaying what he claims another person told him about whether and why he might not get a loan are classic hearsay. Foster's Affidavit contains several hearsay statements regarding his ability to obtain new loans. (Foster Aff. ¶¶ 191-192.) These statements in Foster's Affidavit are the only "evidence" that Foster was denied credit. However, these assertions rest on an out-of-court declarant's alleged statements to Foster and are being offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) and 802. These statements do not meet any exception to the hearsay rules and are inadmissible. Because Foster has no admissible evidence to demonstrate he was ever denied credit at all, let alone due to anything PNC did, he can prove no resulting damages from an alleged loss of credit.

### B. Foster Cannot Connect His Alleged Damages to a Specific Contract.

Foster has no evidence that his alleged damages are causally linked to his alleged breach of

---

[4] Foster self-serving testimony is not evidence that PNC's reporting to the CRAs *caused* any change to his credit score. His contention that PNC's actions were the reason his score went down is pure speculation. Indeed he offers no evidence of what his score was, either before, during, or after any of PNC's actions. (Foster Dep. 340-341) (Foster never received a FICO credit score between 2010 and today).

contract and not some other independent cause. During his deposition, Foster could not identify damages that were related to the claimed breach of the Florida Loan and on multiple occasions could not identify whether his own itemized damages calculations tied to the Florida Loan Documents, the Illinois Loan Documents, or the loan documents for his other properties[5] that are no longer part of this lawsuit:

> Q:   Mr. Foster, I want to focus your attention really on your claim for damages, but I want to focus specifically on issues relating to the Florida loan. So what I want to understand is the itemization of estimated damage amount that you listed beginning on Page 16 and moving on to Page 17.
> Are you able to break down which of those damages relate to your claims with respect to the Florida loan only?
> > MR STEIN: I object to the form of the question.
> > You can answer.
> A:   I would have to – I would take a lot time to review this to try to break that down for you.

(Foster Dep. 294-295.)

> Q:   All right. The next line item is something called "Overpayments on loans," $22,103.
> How is that different than unapplied funds for payments or overpayment of mortgage amounts or payments made to equity line that were never applied to the account?
> A:   Again, I will – to answer precisely, I'd have to go back and take a look at what I did so that I could explain it to you. I don't' – I can't tell you precisely the answer to the question off the top of my head.
> Q:   All right. So sitting here today, you're not able to tell me how you calculated that?
> A:   I'm not able to give you a sufficient answer on how I specifically came to that number.
> Q:   All right. Can you tell me which loans you're even referring to?
> A:   I cannot.

(Foster Dep. 313-314.)

> Q:   "Estimated money owed to Foster due to incorrect escrow balances, loan balance calculations at change dates to servicers, and after interest rate charges,: $19,000."
> > To which loan or loans does that apply?
> A:   Well, I could tell you for sure that it applies to 3716 Magnolia, 2156 North Racine, possibly 1022 Montana. Again, I would have to look at the – at the calculations that I did.
> > If you're asking me if it's the Florida loan, I'm guessing – I'm

---

[5] The Court dismissed the claims relating to Foster's properties at 2156 Racine, 1022 Montana, and 3716 Magnolia.

guessing no.

(Foster Dep. 314.)

> Q: It says, "Estimated money owed to Foster due to incorrect escrow balance, loan balance calculations… after interest rate changes," and these are on three loans that are no longer the subject of this lawsuit. Am I correct about that?
>
> A: It might include 6201 North Kilpatrick. Again, I'm going to have to go and calculate it and determine it exactly to give you a precise answer.

(Foster Dep. 315.)

Because Foster cannot tie his alleged damages calculations to the specific contracts, he cannot establish the causation necessary to prevail on his claims for breach of contract. Accordingly, PNC is entitled to summary judgment on the claims for breach of contract of the Florida and Illinois Loans.

### C. Foster's Alleged Damages Are Not Attributable to Any of PNC's Conduct.

Foster's alleged damages are in no way tied to anything he can show PNC did. To the extent Foster's self-serving Affidavit, which is rife with speculation, contradicts Foster's prior deposition testimony and interrogatory responses, it cannot serve to create an issue of material fact. A party cannot create an issue of fact by "submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Green v. Motorola Inc.*, No. 96 C 7654, 1998 U.S. Dist. LEXIS 3595, *2 (N.D. Ill Mar. 20, 1998) If an affidavit conflicts with prior sworn testimony "the affidavit is to be disregarded, unless it is demonstrable that the statement in the deposition was mistaken." *Id.*

### 1. PNC did not restrict Foster from selling real estate.

Foster claims that he lost significant income as a result of his inability to sell real estate. (Foster Aff. ¶ 196.) Yet, there is no evidence that he was restricted in any way from selling any real estate, much less that it was PNC who restricted him. Foster conceded in his deposition that he hadn't purchased a property since approximately 2005, prior to the origination of the Illinois Loan and one year after origination of the Florida Loan. (Foster Dep. 22; 317-318.) Foster testified that

he had listed only one of his five properties for sale since 2009[6], the property at 1022 Montana

Street, and that it was not PNC's fault that he didn't get any offers on that property:

> A:  Well, I was trying to sell the property to – for the 6201 Kilpatrick issue, but
> then when I rent the property, sometimes I put it on the market for a short
> time while I'm renting it before I get it rented.
>
> Q:  When's the last time it was on the market?
>
> A:  The last time that I had to re-rent it. Probably two years ago it was officially
> on the market for a short time while I was trying to find a tenant.
>
> Q:  How much were you asking for it?
>
> A:  $1,695,000.
>
> Q:  Did you get any offers?
>
> A:  None that I could consider.
>
> Q:  Did you get any offers?
>
> A:  No.
>
> Q:  Was that PNC's fault?
>
> A:  Is it PNC's fault that I didn't get an offer on my house?
>
> Q:  Yes.
>
> A:  No.

(Foster Dep. 318-319.)

> Q:  Has PNC ever taken any action that prevented you from selling a house?
>
> A:  Yes.
>
> Q:  What action did PNC take that prevented you from selling a house?
>
> A:  I cannot afford under my current financial situation due to my business being
> destroyed to even go months waiting for a sale or a closing. I have to rent
> the property because I cannot afford to not have that rent income for the
> month.
>
> Q:  Has anyone ever told you that you cannot sell a house while – or a property
> while there are tenants in it?
>
> A:  That's not true.
>
> Q:  Right. It's not true, is it?
>
> A:  But no one wants to –
>
> Q:  You can sell a property while there are tenants in it, can't you?
>                 … (Instructions from Plaintiff's Counsel)
>
> A:  Okay. Could you repeat the question, please?
>
> Q:  You can sell a property while there are tenants in it, can't you?
>
> A:  Yes.

(Foster Dep. 319-320.)

This concession by Foster affirms that his alleged damages for lost income and real estate

---

[6] It is unsurprising that Foster's alleged woes in his real estate business are coincident with the onset and aftermath of
the Great Recession; that coincidence likely explains any loss of income generated from his real estate business. That
alone, of course, would not be enough to entitle PNC to summary judgment, but it provides a telling context against
which to understand many of Foster's damages claims.

commissions has no merit because he was free to sell any of his real estate at any time. If he faced constraints, they were imposed by economic conditions, not PNC.

### 2. Foster was not prevented from collecting rental income.

Foster cannot show that he was, at any time, unable to collect rental income because of PNC. (Foster Aff. ¶ 198.) Foster conceded during his deposition that he was never required to remove a tenant:

Q: All right. The item above that, "Lost rent due to sale listing of 1022 West Montana in reliance on PNC loan payoff offer," "172,000", do you see that?
A: Yes.
Q: First of all what is the PNC loan payoff offer to which you are referring?
A: In March of 2009 PNC offered to take 70 percent of the loan balance to make it paid in full, and in February of 2010 they offered to take 60 percent of the loan balance to make it paid in full.
Q: Okay. And am I correct that you did not offer – or you did not tender either 70 percent or 60 percent in response to those offers?
A: Correct.
Q: What does that have to do with a sale listing of the 1022 West Montana?
A: At that time I was receiving numerous credit reporting – erroneous credit reporting on all four of the other loans that I had with PNC, and I was trying to think of a way to – to pay that 60 and 70 percent but could not refinance because of my credit and tried to sell 1022 Montana to come up with the funds.
Q: Did you in fact eject any tenants of 1022 Montana?
A: I did not have a choice but to try to sell the property and had to insist on selling it rather than renting it to try to get out of a jam that I found myself in.
Q: That's not what I asked you.
    Had there been tenants that you ejected while you were trying to sell the property?
A: That I ejected?
Q: Did you evict anyone?
A: No.
Q: Did you refuse to take any actual prospective tenants who asked to rent the property?
A: It's an option that I could not – I could not take, so I could not move forward with a tenant.

(Foster Dep. 302-304.)

Given his previous concession that he could sell property even if he had a tenant in it, Foster's decision not to rent the Montana Street property because he needed to sell it was his own

doing and not a result of PNC's conduct.

**D.** **Foster's Alleged Damages Regarding His Loss of Income from Inability to Purchase Property Are Based Only on Speculation and Conjecture.**

Foster contends that he was damaged by the fact that there were multiple properties he would have "worked to purchase" but could not. (Foster Aff. ¶ 193.) But these types of speculative, lost opportunities are not sufficient as a basis for damages. *See e.g.*, *Miami Beach Lerner Shops, Inc. v. Walco Mfg. of Florida, Inc.*, 106 So.2d 233 (Fla. Dist. Ct. App. 1958). Foster only vaguely identifies the properties at issue:

> Q: All right. I'll try it again.
> "Approximate equity/net worth loss from identified properties lost," have you found that?
> A: Yes.
> Q: When you say "identified," what precisely do you mean?
> A: Seeing two-to four-flats on the market over the years.
> Q: Do you have an actual list in your possession of those properties?
> A: An actual list in my possession, no.
> Q: All right. So if I were to ask you today to tell me specifically which properties they were, would you be able to do that?
> A: Not with the property addresses today.
> Q. Could you do it in any way?
> A. Yes.
> Q: How would you do it?
> A: I would tell you the types of properties that I've seen over a number of years that I probably would have purchased. I've purchased a lot of buildings over the years, and just estimating, that's –that's a conservative number in my opinion.
> Q: All right. So maybe—maybe there's some confusion here.
> Do you have, whether it's written down or not, specific properties that form the basis of this calculation?
> A: I do have some specific properties that form the –that form the calculation, yes.
> Q: And is that in writing? Do you have a list written down someplace?
> A: It's—no.
> Q: All right. So what are those specific properties that form the basis of this calculation?
> A: Three of them would be the property five doors down from my property at 2156 Racine, 2158 North Racine, 1211 West Webster, a Greystone two doors down from my property at 3716 North Magnolia.
> Q: Any others?
> A: Not that I can name off the top of my head.

(Foster Dep. 329-331.)

Even more speculative is his calculation of the profits he says he lost when he did not buy more properties:

Q:    "Approximate equity/net worth from identified properties lost,"
      $2,000,0000.
      What's that referring to?
A:    It is referring to the fact that I have identified many properties that were
      great buys for me that I could not buy due to my credit.
Q:    Which properties?
A:    One property is five doors down from my property at 2156 Racine.
Q:    What's the address?
A:    You know, I forgot the address off the top of my head. It's five doors down.
Q:    When was it on the market?
A:    2011
Q:    For how much was it listed?
A:    I believe $899,000
Q:    Did it sell?
A:    Yes.
Q:    Do you know for how much?
A:    Pretty much the asking price.
Q:    How much would you have been willing to pay for the property?
A:    It was – that's –that was a very good deal. I would have paid asking price.
Q:    How do you know that there wouldn't have been a bidding war?
A:    There could have been.
Q:    How do you know you would have actually succeeded in purchasing the
      property?
A:    I would have been very motivated because I needed that property for its
      four-car garage which is four doors down from my building without a garage.
Q:    You would agree with me, wouldn't you, that sometimes potential buyers get
      into bidding wars and the seller accepts a bid other than yours even if the bid
      might have been lower, right?
A:    Without the opportunity to do so, I do not know what would have
      happened.
Q:    I am asking you if this can happen.
A:    A lot of things can happen in real estate.
Q:    Right. Sitting here today, you can't tell me that you know you would have
      purchased –you would have been able to purchase that property at $899,000
      or any price at all, is that correct?
A:    I am telling you today that I would have done what I had to do to buy that
      property.
Q:    And you do not know what that would have entailed, right?
A:    I don't know the exact price.

(Foster Dep. 321-323.)

Q:    All right. Let's start with the first one you named other than the one you
      already talked about [2158 Racine]. When was that on the market?

10

A:     It's been on the market a couple times.  Recently two years ago in 2016.

Q:     What was the listing price?

A:     Approximately 1.6 million.

Q:     Did it sell?

A:     Yes.

Q:     For how much?

A:     I cannot tell you that at this time.

Q:     How much would you have been willing to pay for the property?

A:     I'm not sure at this time.

Q:     Do you know if it sold for less than that or more than that?

A:     Approximately that.

Q:     It sold for approximately what you would have been willing to pay for it, but you're not sure what it sold for, correct?

A:     It sold somewhere around 1.5 million.

Q:     How do you know?

A:     That is what I have been told.

Q:     By whom?

A:     A neighbor.  It was a deal that was not done in the MLS, so that's why I cannot give you a precise number or I would know the precise number.

Q:     And so have you ever seen any actual documentation that would establish the sales price for that property?

A:     No.

Q:     Some neighbor told you what it sold for, and that's all you've got, am I correct?

A:     Correct.

(Foster Dep. 331-332.)

Q:     How about the next property [1211 West Webster]?  When was that property on the market?

A:     2016.

Q:     What did it sell for?

A:     I do not know.

Q:     What was the listing price?

A:     I do not know.

(Foster Dep. 332-333.)

Q:     What's the next property again?

A:     It is a greystone that's a couple doors down from a greystone that I own on Magnolia.

Q:     Do you know the address?

A:     I could get that for you.  I don't know off the top of my head.

Q:     When was it on the market?

A:     I believe 2012.

Q:     What did it sell for?

A:     And I'm guessing, Marcel, in the 8s.

Q:     You're guessing?

A:     I'm guessing, yes.

Q:     Do you have any actual knowledge of what it sold for?

A:      I cannot tell you as I sit here.
Q:      Have you written it down someplace?
A:      I've not written it down but I've kept track of the properties.
Q:      What I'm trying to understand is if it's not written down and it's not in your head, where is it?
A:      It is in my head.
Q:      So it's in your head, but right now you can't tell me?
A:      The address.
Q:      No, I mean the sale price.
A:      I cannot tell you the sale price.
Q:      Okay.  What was the listing price?
A:      In the 8s, I believe.
Q:      What's the fair market value as of the time it sold?  Not today, in 2012.
A:      I cannot tell you that at this point.
Q:      All right.  I just want to summarize: You can't tell me how much it sold for and you can't tell me its fair market value at the time, correct?
A:      At this time, no.

(Foster Dep. 334-335.)

Because Foster cannot show his alleged loss of income with any reasonable certainty, PNC is

entitled to summary judgment.

## III.  FOSTER'S OPPOSITION DOES NOT CREATE A GENUINE ISSUE OF MATERIAL FACT AS TO ANY CLAIM INVOLVING THE FLORIDA LOAN

### A.      The Language in the Florida Mortgage Is Unambiguous.

Try as he might, Foster cannot create an issue of fact when the interpretation of an

unambiguous contract is a legal issue.  As discussed at length in PNC's Motion, the Florida

Mortgage permits PNC to require Foster to have comprehensive wind insurance for the Florida

Property.  "When the terms of a voluntary contract are clear and unambiguous, … the contracting

parties are bound by those terms, and a court is powerless to rewrite the contract to make it more

reasonable or advantageous for one of the contracting parties."  *Assocs. of Tampa, P.A. v. Sassano*, 664

So. 2d 1000, 1003 (Fla. Dist. Ct. App. 1995).  There is no ambiguity in Section 5 of the Florida

Mortgage, and the fact that wind insurance is not specifically identified as a type of coverage, does

not, in any way, create an ambiguity.  Foster also does not offer any substantive rebuttal to PNC's

citation of *Curtis v. Cenlar FSB*, which interpreted an identical mortgage provision under Florida law

12

finding the lender had the right to obtain lender placed wind insurance because wind and hurricanes are a hazard.

Foster's Opposition also misstates well-established case law on contract interpretation. Foster argues that parties may modify a written contract with subsequent conduct or course of dealing. (Opposition p. 18.) But Foster completely omits the Court's language that states that such a modification can occur ***only*** where there is mutual consent and reasonable consideration is exchanged. *See Rhodes v. BLP Assoc., Inc.*, 944 So.2d 527, 530 (Fla. Dist. Ct. App. 2006). The record is clear that there was no such mutual consent or reasonable consideration sufficient to modify the Florida Mortgage.

There is no provision in the Florida Mortgage that requires PNC to provide notice to a borrower of a basis for requiring wind insurance, and Foster's attempt to read in such a requirement is of no consequence. The implied covenant of good faith and fair dealing "cannot override an express contractual term." *See Ins. Concepts & Design, Inc. v. Healthplan Servs.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001). Moreover, the limit paced on a party's discretion "is not great." *See Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. Dist. Ct. App. 2000). "[U]nless no reasonable party … would have made the same discretionary decision …, it seems unlikely that [the party's] decision would violate the covenant of good faith…." *Sepe*, 761 So. 2d at 1185. PNC treated Foster in the same way it treated all of its borrowers as it requires wind insurance coverage on all real estate secured loans. (SOF ¶ 13.) Moreover, the Florida Legislature, by statute, required all homeowner's insurance policies in Florida to require wind insurance and instituted beginning in 2007. [7] As of 2007, Foster had coverage for wind insurance for the Florida Property. (*See* Exhibit 1).[8] The

---

[7] Fla. Stat §627.712 was enacted in 2007, after the origination of the Florida Loan. This legislation provides that an individual can turn down hurricane or windstorm coverage, but if that property is subject to a mortgage, the individual may only exclude that coverage with the consent of the lender.

[8] Foster produced his own records which demonstrate that Foster maintained wind insurance on the Florida Property in 2007, 2008, and 2009.

requirement that Foster maintain wind insurance on the Florida Property is not unreasonable simply because Foster did not want to pay for coverage.

### B. Foster Provides No Evidence That PNC Made Any False Statement to Foster or That Foster Relied on Any Such Statement to His Detriment.

Although Foster accuses PNC of fraud, he has not identified (much less offered evidence of) any specific false statement PNC allegedly made. A plaintiff must plead and prove fraud with specificity, meaning he must identify the time, place and manner in which the representations were made. *See Houri v. Boaziz*, 196 So. 3d 383, 393 (Fla. Dist. Ct. App. 2016). Foster has not done this as evidenced by the fact that Foster fails to cite to a single citation to the record identifying the alleged false statement. (Opposition p. 25-26.)

Foster also has no evidence that he chose to forego certain actions or undertake actions that substantially changed his position to his detriment. *See Morgan Stanley & Co. v. Coleman (Parent) Holdings Inc.*, 95 So. 2d 1124, 1132 (Fla. Dist. Ct. App. 2007) (plaintiff must prove injury or loss caused by reliance on false statement). Foster has no evidence that he experienced a detrimental change in position based on any alleged false statement by PNC and fails to cite to a single citation to the record as evidence that he relied on any statement by PNC or that he was damaged as a result of that reliance. (Opposition p. 25-26.)

The fraud claim fails for an additional independent reason: under Florida law a party may not recover damages for both breach of contract and fraud, unless that party establishes that the damages from the fraud are separate or distinguishable from the damages arising from the breach of contract. *See Huie v. Dent & Cook, P.A.*, 635 So. 2d 111, 113 (Fla Dist. Ct. App. 1994) (plaintiff cannot proceed with fraud claim where damages duplicate damages for breach of contract). Foster makes no attempt to demonstrate that the damages from the alleged fraud are separate and distinct from the damages he attributes to the breach of contract claim for the Florida Loan. PNC is entitled to summary judgment on the fraud claim for this reason alone.

14

**C.     Foster's FCRA Claim Fails Because Foster Has No Evidence That PNC Did Not Conduct a Reasonable Investigation and Because Foster Never Applied For and Was Never Denied Credit.**

Foster has no evidence that PNC did not take the steps necessary to conduct a reasonable investigation in response to his dispute to the CRAs and his speculation does not preclude this Court from entering summary judgment in favor of PNC.  PNC provided evidence explaining what it did upon the receipt of the disputes from the CRAs and the information it provided back to the CRAs. (SOF ¶ 54-55.)  Foster rebuts this evidence with nothing; this section of the Opposition does not contain a single citation to any part of the record. (Opposition p. 27-28.)  The only evidence in the record demonstrates that PNC complied with the FCRA's investigation requirement by promptly reviewing its records and reporting its finding to the CRAs.  Accordingly, Foster's claim fails.

Foster's bare allegation that PNC's actions prevented him from obtaining credit with which to purchase properties does not establish any actual damages.  Courts reviewing similar issues in the context of FCRA claims have held that alleged damages based on the inability to obtain credit where no application for credit is made are too speculative to withstand summary judgment.  *See e.g. Rambarran v. Bank of Am., N.A.*, 609 F. Supp. 2d 1253, 1266 (S.D. Fla. Mar. 13, 2009); *see also Field v. TransUnion, LLC*, 2002 U.S. Dist. LEXIS 7973 (N.D. Ill. 2002).  In *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 475 (2d Cir. 1995), the Second Circuit affirmed a grant of summary judgment in favor of a credit holder and finding that the plaintiff's lost opportunity damages were too speculative.  Although the plaintiff was "actively seeking to purchase a home," she had not made any credit applications toward that end.  *Id.* at 476.  Without an application to obtain and subsequent denial by potential creditors, there was no evidence that plaintiff was even deprived of credit or a loan.  *Id.*

Like the plaintiff in *Casella*, Foster has no evidence he was ever denied credit.  Indeed, Foster has presented no evidence that any potential creditor even received his credit report, much less that it relied on it to Foster's detriment.  On this record, Foster has failed to demonstrate any actual

damages, and PNC is entitled to summary judgment on Foster's FCRA claim on the Florida Loan.

**D.    Foster's Conclusory Allegations About PNC's Servicing of the Florida Loan Do Not Create a Genuine Issue of Material Fact.**

Foster's myriad conclusory allegations in his self-serving Affidavit are not enough to create a genuine issue on a material fact, regardless of how long it is or how detailed it may, at first blush, appear to be. "The mere existence of a factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the cause of action to survive." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) "The underlying substantive law governs whether a factual dispute is material: 'irrelevant or unnecessary' factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248).

**1.    The record contains no evidence that PNC ever obtained lender placed general hazard insurance. Foster's conjecture about the letters is not enough to create a genuine issue of material fact.**

Foster's conclusory allegations about general lender placed hazard insurance (as opposed to comprehensive wind insurance) have no basis in the record and do not preclude summary judgment. Conclusory allegations, not based on a party's personal knowledge, are insufficient to thwart summary judgment. *See* Fed. R. Civ. P. 56(c)(4); *see also Basith v. Cook Cnty.*, 241 F.3d 919, 928 (7th Cir. 2001) (finding that conclusory allegations and self-serving affidavits, unsupported by the record will not preclude summary judgment). PNC produced verified discovery responses demonstrating that it ***did not*** obtain lender placed hazard insurance on the Florida Loan. (PNC Motion at Ex. C., Int. No. 1.) Foster's self-serving affidavit, and speculation about the meaning of PNC's business records, without more, does not negate PNC's properly supported evidence.

**2.    There is no evidence that PNC accepted or retained funds that Foster did not owe under the Florida Loan Documents.**

PNC followed the terms of the Florida Note and Loan Modification in applying Foster's

payments to the Loan, including the June 2010 payment. Foster does not dispute that his June 2010 payment of $6,730.55 was applied to the Florida Loan, but contends that "PNC has not properly accounted for the $730.29 that Foster overpaid in June 2010." (Opposition p. 23.) The modified principal balance due under the Loan Modification included not only unpaid principal, but also unpaid and deferred interest, fees, escrow advances and other costs. (Thomas Aff. ¶ 14; Ex. 6.) The Florida Note makes clear that additional amounts received from any payment "shall first be applied to late charges, second to any other amounts due under this Security Interment, and then to reduce the principal balance of the Note." (Thomas Aff. Ex. 2; ¶ 2.) Any additional amounts remitted by Foster reduced the escrow shortage, a shortage that Foster owed to PNC, and were properly applied consistent with the terms of the Florida Note. (Thomas Aff. Ex. 17.) That Foster was confused about the application of payments does not raise a genuine issue of material fact and does not preclude summary judgment in PNC's favor.

### 3. Even if PNC failed to pay the proper premium for flood insurance, PNC corrected any mistake and refunded the entire amount of the lender placed flood gap insurance premium.

Even accepting as true Foster's complaints about PNC's handling of the flood insurance and escrow account, there is no breach of contract or breach of fiduciary duty because Foster has no evidence that he suffered any resulting harm. The essential elements of a breach of fiduciary duty claim require that a plaintiff prove "that the breach of the duty resulted in and was the proximate cause of a loss suffered by the Plaintiff." *USA Interactive v. Dow Lohnes & Albertson, P.L.L.C*, 328 F. Supp.2d 1294, 1308 (M.D. Fla. 2004); *see also Asset Mgmt. Holdings, LLC v. Assets Recovery Ctr. Invs. LLC*, 238 So. 3d 908 (Fla. Dist. Ct. App. 2018) (plaintiff must prove damages resulting from breach of contract).

Assuming arguendo that PNC did fail to pay an increased premium, and then issued lender placed gap insurance, there is no evidence that Foster suffered any harm as a result. As soon as it

received written proof of proper coverage, PNC refunded the total amount of the lender placed gap insurance coverage. (SOF ¶¶ 49-40.) During May – August 2011, PNC continued to report to the credit reporting agencies that the Florida Loan was current. (Thomas Aff. ¶ 53.)

That Foster's payment increased as a result of the escrow analysis is explicitly permitted by the Florida Mortgage. The Florida Mortgage states that the total amounts due on the Loan may change over the life of the Loan as a result in regular changes in the amounts due for taxes and insurance. (Thomas Aff. Ex. 5, ¶ 3.) Given that the flood insurance premium increased, Foster's monthly payment amount increased as well to account for the increased premium for flood insurance. Foster's attribution of this to PNC, or his failure to understand it, does not create an issue of material fact.

### E. Foster Does Not Contest or Address PNC's Motion for Summary Judgment on Foster's Claim for Unjust Enrichment and Disgorgement (Count 8).

Foster neither addressed nor opposed any of PNC's grounds upon which it moved for summary judgment on Foster's claim for unjust enrichment and disgorgement. For the reasons set forth in PNC's Motion, PNC respectfully requests that the Court grant it summary judgment on Count 8 of Foster's Complaint.

### F. The Release in the Florida Loan Is For Any Acts Prior to May 2010.

There is no genuine issue of material fact about the plain language in the Release in the Florida Modification, which specifically exempts PNC from liability based on its actions that occurred prior to May 2010. To the extent that Foster's claims are based on conduct occurring before May 2010, those acts cannot form the basis of any claim on the Florida Loan.

## IV. FOSTER'S SELF-SERVING AFFIDAVIT DOES NOT CREATE ANY MATERIAL ISSUE OF FACT AS TO THE ILLINOIS LOAN

### A. Foster's Self-Serving Affidavit Is Not Sufficient Evidence to Overcome the Notary Presumption.

Foster has no evidence from any disinterested party about the execution of the Illinois Loan

Documents and cannot overcome the presumption that his signature on the notarized Illinois Mortgage is authentic. As set forth in PNC's Motion, in Illinois, the act of notarization tends to prove the authenticity of the witness' signature. PNC's Motion at 19-21. The party seeking to impeach the notary acknowledgment must do so by *clear and convincing evidence* from a *disinterested witness*. *See Resolution Trust Corp. v. Hardisty*, 269 Ill. App. 3d 613, 646 N.E.2d 628, 631, 207 Ill. Dec. 62 (Ill. App. Ct. 1995). Clear and convincing evidence is that which places "in the ultimate fact-finder an abiding conviction that the truth of factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S. Ct. 2433, 81 L. Ed. 2d 247 (1984) (citation omitted)

Clear and convincing evidence is a high standard of proof, and Foster has not met it. Foster, who is an interested party, cannot, as a matter of law, overcome the acknowledgment of the notary on the Illinois Mortgage through his own testimony. Foster's contention that the "documents speak for themselves" is equally insufficient to overcome the notary presumption.

Any conjecture and speculation by Foster about what happened at closing is not only inadmissible, but at odds with the record evidence. Foster, a self-described real estate professional, claims to have extensive experience buying and selling property. (Foster Dep. 20.). As a well-seasoned actor in the real estate field, Foster admitted that he understands that banks only do business in writing and that he would not expect a bank to extend a loan or credit through an oral promise (Foster Dep. 90.) Foster also does not dispute that he drew down $700,000 on the line of credit. (SOF Foster Response ¶ 65). Given Foster's experience in real estate, his acknowledgement that he drew down almost three quarters of a million dollars in additional funds from PNC while asserting he believed there was no written agreement permitting him to do so is fatal to his efforts to deny the validity of his signature.

### B. The October 2011 Letter From Foster's Attorney Does Not Satisfy the Requirements of the Fair Credit Billing Act ("FCBA").

The October 2011 letter from Foster's counsel to Thomas Bell does not constitute notice to

PNC of a billing error for purposes of the FCBA. (Foster Aff. Ex. 27.) First, the letter does not point out any specific error on any billing statement. Second, even had the letter identified a billing error, which it does not, it is untimely. Foster's alleged billing error was the original extension of consumer credit in 2006, and the 60 day period for disputing extension of credit had long since passed. *See* 15 U.S.C. § 1666(a); *Cunningham v. Bank One*, 487 F.Supp.2d 1189, 1193 (W.D. Wash. 2007). For these reasons, Foster's FCBA claim fails.

### C. Foster's FCRA Claim on the Illinois Loan Fails Because Foster Has No Evidence of Damages and No Evidence That PNC Behaved Unreasonably.

Foster's FCRA claim on the Illinois Loan fails for the same reason as the Florida Loan. Foster has no evidence to refute PNC's evidence that its investigation was reasonable. (Morris Aff. ¶¶ 22-24.) Foster also has no evidence that he was ever denied credit, and therefore has no damages for purposes of the FCRA claim on the Illinois Loan. *See* Section III.C.

## V. PNC IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIMS

Foster offers no evidence refuting the events of default on the Illinois Loan and his general denials of the event of default is insufficient to prevent summary judgment. *See Koukoulomatis v. Disco Wheels, Inc.*, 127 Ill. App. 3d 95, 101, 468 N.E.2d 477, 482 (1st Dist. 1984) (non-moving party must present a bona-fide factual defense to default and not merely hide behind general denials). Foster also offers no evidence to dispute that he has failed to pay back the amounts due and owing on the Florida Loan. For these reasons, PNC is entitled to summary judgment on its Counterclaims.

## VI. CONCLUSION

Foster's litany of customer service complaints do not form the basis of any cause of action because he did not suffer any harm that was attributable to the conduct of PNC. Foster has no evidence that PNC caused any of his alleged damages, and PNC is entitled to summary judgment on Foster's claims and PNC's counterclaims.

Respectfully submitted,

PNC BANK, NATIONAL ASSOCIATION

By:     */s/ Marcel C. Duhamel*
One of its Attorneys

September 9, 2019

Marcel C. Duhamel (Ohio Bar No. 0062171 *pro hac vice*)
Lindsay Doss Spillman (Ohio Bar No. 0086849 *pro hac vice*)
Vorys Sater, Seymour and Pease LLP
200 Public Square, Suite 1400
Cleveland, OH 44114
(216) 479-6100
mcduhamel@vorys.com
ldspillman@vorys.com

James M. Crowley (ARDC 6182597)
John F. Sullivan (ARDC 6205900)
Plunkett Cooney, PC
221 N. LaSalle Street, Suite 1550
Chicago, IL 60601
(312) 670-6900
jcrowley@plunkettcooney.com
jsullivan@plunkettcooney.com

21