## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JEFF FOSTER,

Plaintiff,

v.

PNC BANK, N.A.,

Defendant.

Case No. 12-cv-3130

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Jeff Foster filed this lawsuit against PNC Bank related to five loans on properties in Chicago and Florida that he obtained from PNC Bank and its predecessors. The case was narrowed following the Court's ruling on PNC's motion to dismiss. At issue now on summary judgment are two loans, the eight remaining counts in Foster's complaint, and PNC's counterclaims.

For the reasons stated below, PNC's motion for summary judgment [157] is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are

material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). In doing so, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

## BACKGROUND

### I.    Parties and Procedural History

Plaintiff, Jeffrey Foster ("Foster"), is self-employed, and has been a licensed real estate broker since 1983. (DSOF ¶2).[1] He owns the two properties at issue in this litigation: 6201 Kilpatrick Avenue, Chicago, Illinois and 56 Fiesta Way, Fort Lauderdale, Florida. (*Id*.). Defendant PNC Bank, National Association ("PNC") is a national banking association, and the successor to MidAmerica Bank, FSB. (*Id*. ¶1). On December 14, 2015, the Court granted in part and denied in part PNC Bank's

---

[1] The facts in this Background section are undisputed unless otherwise noted. PNC's Statement of Facts (Dkt. 159) is "DSOF".

motion to dismiss portions of Foster's second amended complaint. (Dkt. 94). Foster

filed his Third Amended Complaint on December 28, 2015. (Dkt. 95, "TAC").[2]

## II.    The Loans

### A. The Florida Loan

Foster obtained a first lien mortgage in the original principal amount of $1.1

million (the "Florida Loan") to purchase a second home located at 56 Fiesta Way, Fort

Lauderdale, Florida 33301 (the "Florida Property"). (DSOF ¶5). The Florida Loan is

evidenced by an adjustable rate note dated January 30, 2004 (the "Florida Note") in

favor of MidAmerica Bank, FSB. The Florida Note is secured by a mortgage dated

January 30, 2004 (the "Florida Mortgage") against the Florida Property. (*Id*.). Foster

does not dispute that he signed the Florida Note or the Florida Mortgage or that he

received the funds from the Florida Loan. (*Id*. ¶6). Pursuant to the terms of the

Florida Mortgage, Foster agreed to be responsible for separately paying his property

taxes and all insurances required by PNC for the Florida Property. (*Id*. ¶7).

The parties entered a Loan Modification Agreement dated May 20, 2010 extending

the term of the Florida Loan 40 years and reducing the interest rate ("Florida

Modification"). (*Id*. ¶¶8-9). As part of the Florida Modification, Foster was required

to escrow payments for property taxes and flood insurance. (*Id*. ¶9). He remained

responsible for obtaining and separately paying for his own hazard insurance

---

[2] In addition to the federal question jurisdiction under the FCBA and FCRA, it is undisputed that there is diversity jurisdiction over the state law claims in this case as PNC is a Delaware citizen and Foster is a Florida citizen. (DSOF ¶3). There is also no dispute that Florida law applies to the state law claims as to the Florida Property, and Illinois law as to the Illinois property.

coverage. (*Id*.). Section 5 of the Florida Mortgage details Foster's obligations to maintain insurance on the Florida Property. (*Id*. ¶12). It provides, in pertinent part:

> Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably . . . . If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Lender is under no obligation to purchase any particular type of amount of coverage…Borrower acknowledges that the cost of insurance coverage so obtained might significantly exceed the cost of insurance Borrower could have obtained….

> (*Id*.; Thomas Aff. (Dkt. 157-1), Exh. 5).

Under the Florida Modification, Foster's monthly payment amount included funds for flood insurance and property taxes. (DSOF ¶31). In March 2011, PNC sent Foster a letter notifying him that his flood insurance was not sufficient under the National Flood Insurance Program because his coverage was less than $250,000. (*Id*. ¶36). PNC sent Foster a second letter to this effect in April 2011. (*Id*. ¶37). In May 2011, PNC obtained lender placed flood gap insurance and advanced funds from Foster's escrow account in the amount of $647.28. (*Id*. ¶38). In 2012, pursuant to the Florida Note, PNC sent Foster a letter dated April 17, 2012 providing notice of the default and intent to accelerate the Loan unless the default was cured. (*Id*. ¶52).[3] PNC

---

[3] According to PNC, beginning in April 2012 Foster remitted partial payments. (DSOF ¶ 48). PNC returned those funds for a time and then started depositing them in a suspense account. (*Id*. at ¶¶ 48-49).

asserts (though Foster disputes) that the Florida Loan remains due and owing for the February 1, 2012 payment and all payments thereafter. (*Id*. ¶50).

## B. The Illinois Loan

In 2002, Foster obtained an equity line of credit in the original principal amount of $1.2 million from National City Bank ("2002 Loan"). (DSOF ¶59). One year later, Foster refinanced the 2002 Loan with MidAmerica Bank in the amount of $1.89 million (the "2003 Loan"). (*Id*. ¶60). The 2003 Loan was paid off in 2006. (*Id*. ¶63). (The parties dispute whether Foster then signed a 2006 note and mortgage agreement on the Illinois Property for Home Equity Line of Credit in the amount of $1.89 million, *see id*. ¶61). In 2009, Foster contacted PNC about payments on the Kilpatrick Home, and PNC offered, and Foster accepted, a written Short Term Repayment Modification Program ("Repayment Program"). (*Id*. ¶68).[4] PNC advised Foster in writing that his monthly account payment would return to being calculated according to the normal terms of the original contract after April 7, 2011. (*Id*. ¶69). In 2012, PNC sent Foster a Notice of Default dated April 24, 2012 advising him that he had 30 days to cure the default on the Illinois Note. (*Id*. ¶76). PNC asserts (though Foster disputes) that Foster failed to cure the default on the Illinois Loan. (*Id*. ¶78).

## III.    Foster's Claims and PNC's Counterclaims

PNC seeks summary judgment in its favor on Foster's claims remaining in this case for violation of the Fair Credit Billing Act ("FCBA") (Illinois Loan (Equity Line)) (Count I); violation of the Fair Credit Reporting Act ("FCRA") (Illinois Loan and

---

[4] Foster disputes, however, that this Repayment Program was based on the Illinois Loan or Illinois Note. (Dkt. 165 ¶68).

Florida Loan) (Count II); breach of contract (Illinois Loan) (Count III); breach of contract (Florida Loan) (Count IV); breach of implied duty of good faith and fair dealing (Florida Loan) (Count V); fraud (Florida Loan) (Count VII); unjust enrichment and disgorgement (Florida Loan) (Count VIII); and breach of fiduciary duty (Florida Loan) (Count X). PNC also moves for summary judgment on its counterclaims: for judgment on the Florida Note and judgment on the Illinois Note and foreclosure of the Illinois Mortgage.

## ANALYSIS

PNC argues that Foster's claims do not have merit and he has no evidence that he suffered any damages as a result any PNC conduct. PNC also contends that Foster is in default on the Florida and Illinois loans and therefore it is entitled to summary judgment on its counterclaims including the equitable remedy of foreclosure on the Illinois Property. (Dkt. 158 at 7).[5] Foster responds that PNC's motion should be denied because there are numerous genuine issues of fact about his claims and PNC's counterclaims. (Dkt. 164).

## I. Fair Credit Reporting Act-Illinois and Florida Loans (Count II)

In Count II Foster alleges PNC violated the Fair Credit Reporting Act. 15 U.S.C. §§ 1681-1681u. "Under that Act, when a credit-reporting agency notifies a debt collector of a disputed debt, the debt collector (called a 'furnisher' under the statute) must 'conduct an investigation with respect to the disputed information.'" *Walton v. EOS CCA*, 885 F.3d 1024, 1028 (7th Cir. 2018) (quoting 15 U.S.C. § 1681s-2(b)(1)(A)).

---

[5] Page numbers are taken from the CM/ECF header at the top of filings.

Generally the "reasonableness" of a furnisher's procedures "cannot be resolved on summary judgment unless the reasonableness or unreasonableness of the procedures is beyond question." *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001). In addition, a showing of damages is required because "the Fair Credit Reporting Act is not a strict liability statute." *Walton v. BMO Harris Bank N.A.*, 761 F. App'x 589, 592 (7th Cir. 2019).

PNC argues that it conducted a reasonable investigation in accordance with its internal procedures in reviewing the disputes it received from the credit reporting agencies (CRAs). (Dkt. 158 at 21–22, 31). As PNC points out (*id*. at 21), its duty to investigate is triggered only when a CRA notifies it of a dispute. *Gulley v. Pierce & Assocs.*, P.C., 436 F. App'x 662, 665 (7th Cir. 2011) ("absent a formal notice from a credit reporting agency, [the bank's] duty to investigate was never triggered"). Regarding the Illinois Loan, in January 2012, PNC received a single notice of dispute from a CRA. (DSOF ¶ 72). Foster also identifies only this one dispute. (Foster Aff. (Dkt. 166), ¶ 183). Although he argues that this was "one of many such disputes that Foster submit[ed] [sic] regarding PNC's incorrect reporting" (Dkt. 165 at 49, citing Foster Aff., ¶¶ 179, 181-183), he does not provide any evidence of any other disputes that PNC received from a CRA for the Illinois Loan.

Regarding the Florida Loan, PNC received notices of dispute from two CRAs in January 2012. (DSOF ¶ 54). Foster identifies the same January 2012 disputes. (Foster Aff., ¶ 185). He argues again that there were "many such disputes" but, again,

does not provide any evidence of any other disputes that PNC received from a CRA for the Florida Loan. (Dkt. 165 at 37, citing Foster Aff., ¶¶ 179, 181, 184-185).

PNC argues that Foster's FCRA claim fails as a matter of law because he has no evidence that he suffered any damages. (Dkt. 158 at 31-32). The Court agrees. Foster does not provide any evidence that he suffered damages because of PNC's alleged failure to investigate his January 2012 disputes to the CRAs. *See Crabill,* 259 F.3d at 664 ("Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages'"); *Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 604 (7th Cir. 2006) ("rather than delving into a reasonableness inquiry before one is necessary, we begin our analysis with damages.").

Foster does not provide evidence that he was ever denied credit or a loan as a result of PNC not reasonably investigating his January 2012 disputes to the CRAs. He refers generally to a "drop in my credit score related to the negative reporting from PNC." (Foster Aff., ¶ 191). But he does not provide evidence that the drop in his credit score was linked to PNC's alleged failure to reasonably investigate his disputes. In fact the date he says that his credit score decreased, November 2011, is *before* his January 2012 disputes to the CRAs. (Foster Aff., ¶ 190). Foster also claims that lenders indicated to him they wanted to help him but that a loan would not be possible, and Foster "did not waste the lender's time putting together an application that we both knew was going to be turned down." (*Id.*, ¶¶ 191-92). This admission that he never applied for a loan belies his assertion that he was harmed by PNC's

alleged failure to investigate his disputes to the CRAs. *See Momient v. Nw. Collectors, Inc.*, 666 F. App'x 531, 536 (7th Cir. 2016) ("Momient lacks evidence that Northwest's alleged failure to investigate his accusations that two major credit bureaus were given misinformation caused him any harm.").[6]

Because Foster has failed to provide any evidence of damages caused by PNC's alleged FCRA violations, the Court need not reach the question of the reasonableness of PNC's investigation. *See Bagby*, 162 F. App'x at 603-4 (on summary judgment, reasonableness inquiry unnecessary until plaintiff has shown she suffered damages); *Waletzko v. Corelogic Credco, LLC*, 2016 U.S. Dist. LEXIS 140304 (W.D. Wis. Oct. 7, 2016).[7] Judgment is entered in PNC's favor on Count II.

## II. Illinois Loan

### a. Fair Credit Billing Act (Count I)

The Court previously held that the only portion of Count I that may proceed is directed at the Equity Line on the Illinois Property. (Dkt. 94 at 6, 23). The FCBA

---

[6] The Court also agrees with PNC that statements in Foster's Affidavit that lenders told him they could not give him a loan are hearsay because they are offered for the truth of the matter asserted—that Foster was denied credit. "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.*" Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

[7] Foster argues that a reasonable investigation by PNC would have uncovered "numerous inaccurate reports." (Dkt. 164 at 32). To the extent Foster attempts to bring a FCRA claim based on PNC allegedly transmitting inaccurate information, that claim fails. *See Walton,* 761 F. App'x at n.1 ("Walton cannot bring an individual claim against BMO Harris for transmitting inaccurate information; only the Federal Trade Commission (or a state agency) may bring such a claim. Therefore, Walton is limited to challenging the bank's investigation procedures.") (citation omitted); *see also Momient*, 666 F. App'x at 536 (consumers cannot privately enforce duty of furnisher to give credit bureaus accurate information).

requires creditors who offer open-end credit plans to communicate with consumers to resolve billing errors. 15 U.S.C. § 1666. Under § 1666(a):

> If a creditor, within sixty days after having transmitted to an obligor a statement of the obligor's account in connection with an extension of consumer credit, receives…a written notice…from the obligor in which the obligor—
>
> (1) sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor,
> (2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and
> (3) sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error.

15 U.S.C. § 1666(a). *See also Pinner v. Schmidt*, 805 F.2d 1258, 1264 (5th Cir. 1986) ("To trigger the creditor's obligation to reinvestigate and verify the billing, the debtor must give written notice of the specific dispute within sixty days of receipt of the statement."); *Trang Nguyen v. USAA Fed. Sav. Bank*, 2008 U.S. Dist. LEXIS 59738, at *12 (S.D. Ind. July 28, 2008) ("The United States Code and the Code of Federal Regulations both clearly state that only timely notice of a billing error will trigger a creditor's obligations under FCBA."); *Jeffries v. Dutton & Dutton P.C.*, 2006 U.S. Dist. LEXIS 32439, at *20 (N.D. Ill. May 11, 2006) ("notice [under § 1666(a)] must be in writing and include the consumer's name and account number, his belief that the statement contains a billing error, the reasons for his belief, and the amount of the error.").

Foster argues that his attorney's October 13, 2011 letter to Mr. Thomas Bell of PNC Bank "dispute[s] PNC's efforts to enforce the May 31, 2006 documents related to loan for the Kilpatrick Home as late as October 13, 2011." (Dkt. 164 at 16). The

October 13, 2011 letter is the only document he identifies as allegedly satisfying the written notice requirement of the FCBA. (*Id.*). But this letter does not satisfy the requirements of the FCBA. It does not refer to a specific billing statement, identify a specific billing error or the amount of any error, and it does not demonstrate that it was sent 60 days after Foster received a specific statement. Therefore judgment will be entered on Count I in PNC's favor.

### b. Breach of Contract (Count III)

In Foster's TAC, he alleges breach of contract by PNC as to the Equity Line on the Illinois Property. (TAC, pp. 42-43). Foster's response brief (Dkt. 164) does not address or argue this breach of contract claim. As the Seventh Circuit explained in *Rozumalski v. W.F. Baird & Assocs.*,

> It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered, and if she loses the motion, she cannot make novel points on appeal. We apply waiver even if the issue may have been before the district court in more general terms, still holding a party to its responsibility to make a specific argument.

937 F.3d 919, 925 (7th Cir. 2019) (internal quotations and citations omitted).

In addition, the court "has no obligation to research and construct the legal arguments open to the parties." *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 62 F. App'x 122, 124 (7th Cir. 2003) (citation omitted). Therefore Foster has waived any argument in support of his breach of contract claim in Count III and judgment will be entered in favor of PNC on that count.

### III.   Foster's Affidavit

Before proceeding to Foster's claims related to the Florida Loan and PNC's counterclaims, the Court addresses PNC's objections to Foster's Affidavit. Under Federal Rule of Civil Procedure 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.Pro. 56(c)(4). PNC objects to the affidavit as being self-serving and based on speculation, conjecture, and inadmissible hearsay. (Dkt. 171). The first critique is not convincing as "most evidence can be called self-serving, but a witness's self-interest does not prevent a trier of fact from crediting a statement based on personal knowledge." *Koger v. Dart*, 2020 U.S. App. LEXIS 5639, at *6 (7th Cir. Feb. 25, 2020).

However PNC's other critiques are well-founded. Rule 56(c)(4) requires an affidavit to set out facts that would be admissible in evidence, and a party "may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). In addition, merely conclusory allegations do not preclude summary judgment. *See RB&W Mfg. LLC v. Buford*, 263 F. App'x 486, 490 (7th Cir. 2008) (affidavit only providing conclusory allegations insufficient to prevent summary judgment); *Young v. Monahan*, 420 F. App'x 578, 583 (7th Cir. 2011) (plaintiff cannot survive summary judgment by substituting conclusory allegations in the complaint with conclusory allegations from affidavits). A plaintiff also cannot rely on statements that are outside his personal knowledge or

based on speculation or conjecture to avoid summary judgment. *See Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) ("statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this requirement [in Rule 56]"); *Landale Signs & Neon, Ltd. v. Runnion Equip. Co.*, 2019 U.S. Dist. LEXIS 28889, at *8 (N.D. Ill. Feb. 25, 2019) (same). Foster's affidavit contains many conclusory statements without supporting documentation with regards to his providing proof of insurance (*see e.g.* Foster Aff. ¶125) and being current on his loan payments (*e.g. id.* ¶¶172-76) and never signing the 2006 Illinois loan documents (*e.g. id.* ¶¶31, 81). The Court will not rely on conclusory statements to defeat summary judgment.

## IV. Florida Loan

### a. Breach of Contract (Count IV)

Foster argues that PNC breached its contract with Foster by improperly obtaining force-placed flood insurance and by requiring wind insurance. (Dkt. 164 at 18–20). Foster says he "does not dispute that PNC has the right to purchase force-placed insurance under certain circumstances [but he] disputes that those circumstances existed here." (*Id.* at 18). Indeed he does not dispute that the terms of the Florida Mortgage required him to be responsible for "all insurances required by PNC for the Florida Property." (DSOF ¶7; Dkt. 165 ¶7). As to the flood insurance, he argues that when PNC acquired the force-placed insurance, a gap in the required coverage did not exist. (*Id.* at 20). PNC, on the other hand, contends that Foster failed to provide proof of flood gap coverage or sufficient flood insurance. (Dkt. 158 at 11). PNC also

argues that Foster has failed to provide evidence that any of his alleged damages were caused by a breach of contract. (*Id.* at 31-32).

Under Florida law, proving a breach of contract requires: "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006). "In Florida, a breach of contract claim requires a party to show that *damages resulted from* the breach." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) (emphasis in original). In addition, Section 5 of the mortgage "allows a lender to purchase necessary insurance in the event that a borrower fails to carry such insurance, and it allows the lender to pass the cost of that insurance on to the borrower. It does not obligate a lender to shop around and find the lowest-cost insurance, nor does it preclude a lender from charging a reasonable commission." *Edwards v. Green Tree Servicing, LLC*, 2015 U.S. Dist. LEXIS 151377, at *10 (N.D. Fla. Oct. 22, 2015) (interpreting the same language as Section 5 of the mortgage here).

### 1. Flood Insurance

Foster concedes that PNC had the right to obtain flood insurance under the mortgage, but argues that PNC obtained the insurance in May 2011 when he already had it. PNC provided a sworn affidavit that Foster did not submit proof of sufficient flood insurance so it obtained flood insurance for him, and once he provided proof of the insurance, PNC refunded the total amount of the premium advanced. (Thomas Affidavit, ¶¶41-43; *see also* Dkt. 171 at 23). Foster does not dispute that he received PNC's March 2011 letter advising that his flood insurance coverage was not sufficient

but contends that he never received PNC's April 2011 letter warning that it would obtain the flood insurance for him. (Dkt. 165, ¶¶36-37). Foster also asserts that PNC already knew he had sufficient flood insurance because of his calls to PNC. (Dkt. 164 at 11). He states that he talked "with a PNC representative named Ari, but was not able to obtain a response from PNC." (Dkt. 165, ¶36). By May 2011, Foster says he "had provided proof of flood insurance to PNC, speaking with PNC on at least two occasions regarding the issue and my resolution of it." (Foster Aff., ¶125).

Foster does not provide any documentary evidence that PNC had proof of his flood insurance in spring 2011 nor does he attest that he had personal knowledge of the records in PNC's possession at the time. Foster's vague references to conversations with PNC do not establish that PNC had such proof. *See RB&W Mfg. LLC*, 263 F. App'x at 490 (conclusory allegation did "nothing more that relate Buford's understanding of what happened, rather that state facts that would allow a court to make a legal determination--that is, who said what to whom."); *see also Firestone Fin., LLC v. Meyer*, 2017 U.S. Dist. LEXIS 25208, at *36-37 (N.D. Ill. Feb. 23, 2017) (collecting cases). Therefore Foster cannot overcome PNC's sworn statement that it did not receive proof of sufficient flood insurance before it obtained the force-placed insurance in May 2011.[8]

---

[8] Foster argues that PNC's letters advising him about hazard insurance raises genuine issues of fact about whether PNC obtained lender-placed hazard insurance. (Dkt. 164 at 24). PNC provided verified discovery responses stating that it did not obtain lender placed hazard insurance on the Florida Loan. (Dkt. 171 at 21; Dkt. 157-3). Foster's conjecture in his affidavit and response brief do not raise a genuine issue of material fact about whether PNC obtained lender-placed hazard insurance. Foster also argues that PNC's letters about hazard insurance at a minimum show PNC breached "its duties under the contracts" by

Also, Foster fails to explain what damages he suffered as a result of PNC obtaining force-placed flood insurance. Foster states that he had to pay a $82.00 shortfall for March 2011, and then when PNC acquired the flood insurance in May 2011, it "charged Foster $647.28 for it." (Dkt. 164 at 11, 20). Although not entirely clear, Foster apparently contends that these amounts are the damages resulting from PNC's alleged breach as to the force-placed flood insurance. In any event, Foster admits that under the Florida Modification in 2010, he was required to escrow payments for flood insurance. (Dkt. 165 at ¶9). Foster also admits that the $647.28 premium was "reasonably priced force-placed insurance." (Dkt. 164 at 23). Foster's damages discussion is otherwise very general and does not link any specific damages to the alleged breach based on the force-placed flood insurance. (Dkt. 164 at 32-33). Because he failed to show any genuine issue for trial about whether PNC breached the mortgage agreement by obtaining force-placed flood insurance and because he failed to provide evidence of damages resulting from this alleged breach, both essential elements of his claim, Foster's breach of contract claim based on the flood insurance does not survive summary judgment. *See Celotex,* 477 U.S. at 322-23.

### 2. Wind Insurance

As to the wind insurance, Foster argues that paragraph 5 of the mortgage does not identify wind insurance as a requirement of the mortgage. (Dkt. 165 at 6). He states that he learned PNC required comprehensive wind insurance coverage in November 2011. (*Id.*; Foster Aff., ¶ 151). Although he believed he was not required to

---

failing to adequately monitor his accounts. (Dkt. 164 at 24). Foster does not develop this argument or cite to any particular contractual provision that PNC breached in this way.

do so by PNC, Foster maintained wind insurance from 2004 to 2009. (Dkt. 165 at 7). Foster also contends that "the parties' practice was not to require wind insurance." (Dkt. 164 at 21).

To argue that the mortgage required wind insurance, PNC relies on *Curtis v. Cenlar FSB*, 2014 U.S. Dist. LEXIS 157172, at *9 (S.D.N.Y. Nov. 5, 2014) *aff'd* 654 F. App'x 17 (2d Cir. 2016). In *Curtis*, a district court in the Southern District of New York, interpreting Florida state law, found that a term in a mortgage agreement, identical to the one in paragraph 5 of the mortgage here, encompassed wind insurance. The Court interpreted the provision as requiring wind insurance both under the both the "extended coverage" and "any other hazard" language. Foster argues that PNC cannot rely on that case because it is a 2014 case, but the *Curtis* court interpreted a 2008 mortgage agreement. Foster does not explain why this analysis would not apply to the 2004 mortgage and 2010 loan modification agreements. Given that the *Curtis* court was analyzing the same language at issue here under Florida law, the fact that the Second Circuit Court of Appeals affirmed the district court decision, and the fact that Foster has not cited any contrary authority, this Court follows the *Curtis* court's interpretation of the provision in the mortgage, and finds that PNC did not breach its agreement with Foster when it required wind insurance.

Foster also argues that the parties' conduct modified the contract. (Dkt. 164 at 21-22). "A written agreement may be modified by the subsequent conduct or course of dealing of the parties. Of course, no such modification can occur *unless it is by mutual*

*consent*, and *supported by consideration.*" *Rhodes v. BLP Assocs.*, 944 So. 2d 527, 530 (Fla. Dist. Ct. App. 2006) (emphasis added) (citations omitted). Foster has not provided evidence of mutual consent or consideration to support the contention that PNC and Foster modified the contract to not require wind insurance.

Therefore, Foster failed to provide any evidence that PNC breached the Florida Mortgage agreement by requiring wind insurance. For these reasons, judgment on Count IV will be entered in PNC's favor.

### b. Breach of Implied Duty of Good Faith and Fair Dealing (Count V)

Foster argues that PNC breached its duty of good faith because of the "egregious costs" of the force-placed flood and wind insurance. (Dkt. 164 at 22-23).[9] "[T]he implied covenant of good faith and fair dealing is a part of every contract under Florida law." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001). "One party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Id.*

"A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurion Air Cargo v. UPS Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005). "[A] claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Id*. One of the limitations on a breach of implied covenant of good faith and

---

[9] Foster focuses his good faith and fair dealing claim on the wind insurance. His brief mention of the flood insurance issue (Dkt. 162 at 22-23) is underdeveloped and therefore waived. *See Rozumalski,* 937 F.3d at 925; *Vakharia*, 62 F. App'x at 124.

fair dealing claim is "where there is no accompanying action for breach of an express term of the agreement." *Herrera v. Bank of Am., N.A.*, 2016 U.S. Dist. LEXIS 117431, at *32 (S.D. Fla. Aug. 31, 2016).

In response to the summary judgment motion, Foster does not identify an express contractual provision that PNC breached. Foster argues that the mortgage agreement did not permit PNC to obtain force-placed wind insurance, but this Court has ruled that under Section 5 of the mortgage, PNC was permitted to obtain force-placed wind insurance. Foster otherwise does not claim a breach of any express term of the Florida Mortgage.[10] *See Herrera*, 2016 U.S. Dist. LEXIS 117431, at *32-33 (granting summary judgment for defendant bank where there was "no accompanying action for breach of an express term of the agreement, [and so] Plaintiff may not separately maintain a claim for breach of the implied covenant of good faith"). In addition, Foster does not provide any evidence of commissions, kickbacks, or bad faith on the part of PNC, or the marketprice for wind insurance in the relevant timeframe. *See Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 607 F.3d 742, 747 (11th Cir. 2010) (because plaintiff did not offer evidence that any of defendant's alleged errors were

---

[10] The Court notes that in Foster's TAC, he cited Section 9 of the Florida Mortgage in his allegations related to his good faith and fair dealing claim ("[i]f Borrower fails to perform the covenants and agreements. . . then Lender may do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property Lender's rights.") (Dkt. 157-1, Exh. 5, § 9.). Foster does not reference Section 9 in his summary judgment response or Local Rule 56.1 statements. Even if Foster had referenced his complaint, simply relying on that allegation would not be sufficient at this stage. *See Mack v. City of Chi.*, 2019 U.S. Dist. LEXIS 48554, at *12 (N.D. Ill. Mar. 25, 2019) (plaintiff's Local Rule 56.1 statement citing only to unverified pleadings rather than evidence in the summary judgment record could not to avoid summary judgment) (citing *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018) ("It is the [non-movant's] responsibility to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.")).

intentional or made in bad faith, affirming summary judgment on plaintiff's breach of implied covenant and fair dealing claim); *see also Ernie Haire Ford, Inc.*, 260 F.3d at 1291 ("Yet, the limit placed on a party's discretion is not great…Unless no reasonable party…would have made the same discretionary decision…, it seems unlikely that [the party's] decision would violate the covenant of good faith….") (internal citations and quotations omitted).

In 2011, PNC obtained force-placed wind insurance for the Florida Property at a premium of $37,730. (PNC Resp.[11] ¶ 21; DSOF ¶17). In 2012, Foster obtained his own wind insurance for $4,457. (Dkt. 165 ¶46). In 2014, PNC obtained lender-placed wind insurance coverage for $37,625 and in 2015, it was $15,192.42. (DSOF ¶¶22-23). Foster also received quotes for wind coverage on the property that did not exceed $6,000.00 per year. (PNC Resp. ¶22). Foster actually attaches only two quotes to his affidavit and they are for the same general period, for February 2013-2014 and May 2013-2014. (Foster Aff., Exh. 51). Thus while PNC's 2011 and 2014 premiums appear to be more than the 2012 premium Foster obtained or the 2013-2014 quotes, Foster does not provide any evidence that PNC acted in bad faith or was receiving any commissions or kickbacks when it obtained the wind insurance.[12] Thus Foster's

---

[11] PNC's response to Foster's additional statement of facts (Dkt. 172) is abbreviated as "PNC Resp."

[12] As Foster points out, although PNC argues that American Security Insurance Company filed its rates with and had the approval of the Florida Office of Insurance Regulation, that only applies to the 2015 coverage. Before that, the wind coverage placed by PNC was obtained from Voyager Indemnity Insurance Company. (Dkt. 165 ¶25; Thomas Aff., Exhs. 10-14). And those documents state that the policy rates are not approved by a Florida regulatory agency. (Thomas Aff., Exs. 11, 14). Nevertheless, Foster does not explain how this fact creates a genuine issue of material fact that PNC breached the covenant of good faith and fair dealing.

argument that the price differential "suggests a breach of PNC's duties to act in good faith and deal fairly," (Dkt. 164 at 23), without any citation to any authority, does not help him avoid summary judgment.

In short, Foster has failed to base his good faith and fair dealing claim on an accompanying breach of an express term of the parties' agreement and even if he did, he failed to offer any evidence of bad faith, kickbacks or commissions received by PNC. Foster therefore has not shown that there is a genuine issue of fact for a jury to decide about whether PNC's conduct violated the covenant of good faith and fair dealing. PNC's summary judgment motion as to Count V is granted.

### c. Fraud (Count VII)

Under Florida law, the elements of a fraud claim are: "(1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So. 2d 13, 15 (Fla. Dist. Ct. App. 2002). Foster does not identify a specific false statement by PNC that gives rise to his fraud claim. Nor does he cite to any part of the record when arguing in general terms that PNC made false statements. (Dkt. 164 at 28-29). The most specific argument the Court can discern about his fraud claim is: "when PNC told Foster that it had to acquire that force-placed insurance because Foster had no other flood insurance, PNC made a false statement that it knew or should have known was false." (*Id*. at 29). This is not enough to survive summary judgment.

First, "[i]t is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment." *Platinum Supplemental Ins., Inc. v. Guarantee Tr. Life Ins. Co.*, 2019 U.S. Dist. LEXIS 202467, at *11-12 (N.D. Ill. Nov. 21, 2019). Second, even assuming Foster cited to a specific statement that PNC made about the flood insurance, Foster does not provide any evidence that the statement was false, that PNC knew that statement was false or that PNC intended to induce Foster's reliance on the statement.

Foster has not provided evidence of fraud to survive summary judgment and judgment on Count VII will be entered in PNC's favor.

### d. Unjust Enrichment and Disgorgement (Count VIII)

Foster does not respond to any of PNC's arguments (Dkt. 158 at 23-24) about why his unjust enrichment claim fails. As discussed above related to Count III, Foster must inform the Court of the reasons why summary judgment should not be entered. *See Rozumalski,* 937 F.3d at 925; *Vakharia*, 62 F. App'x at 124. Foster has waived any argument in support of his unjust enrichment and disgorgement claim in Count VIII and judgment will be entered in favor of PNC on that count.

### e. Breach of Fiduciary Duty (Count X)

To prove breach of fiduciary duty, Florida law requires: "the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Mahdavieh v. Suntrust Mortg., Inc.*, 2014 U.S. Dist. LEXIS 47775, at *13 (S.D. Fla. Apr. 7, 2014). Foster argues that his breach of fiduciary duty

claim should survive summary judgment based on PNC's handling of the escrow account and failing to pay the proper premium for flood insurance in March 2011. (Dkt. 164 at 29-30).[13]

Foster does not point to evidence of damages resulting from the alleged breach of fiduciary duty. Foster relies on *Mahdavieh,* in which the court explained that under Florida law an escrow holder can breach its fiduciary duty to plaintiffs by charging them for unnecessary and excessive force-placed insurance. *Id*. at *15–16. That case was decided on a motion to dismiss. It did not require the court to decide whether the insurance was unnecessary and excessive or whether plaintiff provided evidence of damages proximately caused by the breach of fiduciary duty.

Foster also does not provide evidence or even allege that PNC breached its fiduciary duty "by selecting an overpriced [flood] insurance policy in order to line its own pockets." *Edwards*, 2015 U.S. Dist. LEXIS 151377, at *24. Foster claims only that PNC erroneously obtained flood insurance for one month when he actually had flood insurance. Indeed he admits that the $647.28 premium was "reasonably priced force-placed insurance." (Dkt. 164 at 23). He does not cite any authority that PNC's conduct as to the flood insurance constitutes a breach of fiduciary duty. He also does not explain specifically what damages arose from this alleged breach. Judgment is granted in favor of PNC on Count X.

---

[13] Foster's brief argument does not discuss wind insurance. The Court will not construct Foster's argument for him as to wind insurance or search the record for evidence to defeat the summary judgment motion on that issue. *Vakharia*, 62 F. App'x at 124; *Platinum Supplemental Ins.*, 2019 U.S. Dist. LEXIS 202467, at *11-12.

## V.  PNC's Counterclaims

### a.  Florida Loan

As to the Florida Loan, PNC argues Foster defaulted under the Florida Note and Modification and thus PNC requests that judgment be entered against Foster in the amount of $1,754,030.15. (Dkt. 158 at 33-34). Foster does not dispute that PNC has standing to enforce the Florida Loan Documents. (*see* Dkt. 158 at 33; Dkt. 164). PNC provided a sworn affidavit detailing the history of the Florida Loan and Modification, and providing the amount due on the Loan and attaching a PNC payoff statement. (Thomas Aff.).

Foster generally argues that there are issues of fact about PNC's accounting for Foster's payments and handling of the escrow account. (Dkt. 164 at 33). But the Court has already found that Foster has not shown any genuine issues of material fact about PNC's right to obtain and escrow monies for wind and flood insurance or about the costs of that insurance. Foster contends that "PNC made numerous mistakes with its calculations regarding the amounts of Foster's payments" on the Florida Loan. (Dkt. 165 ¶53). And in his affidavit, Foster makes conclusory statements such as that "it appeared that PNC did not properly credit [his] payments" and PNC "continued to have issues properly applying [his] payments." (Foster Aff. ¶¶111, 118). These conclusory allegations, not supported by any documentation, do not create a genuine issue of material fact as to PNC's counterclaim on the Florida Loan.[14]

---

[14] Foster has not raised affirmative defenses to PNC's counterclaim on the Florida Loan (*see* Dkt. 42) and even if he did, he would have the burden of proving the affirmative defense. *See Custer Med. Ctr. v. United Auto. Ins. Co.*, 62 So. 3d 1086, 1096 (Fla. 2010).

Foster has not presented admissible evidence precluding summary judgment on PNC's counterclaim as to the Florida Loan. Therefore judgment on the Florida Loan in favor of PNC is warranted. Given PNC's representation that it is holding in suspense $341,787.30 remitted from Foster (DSOF ¶58), that amount will be deducted from PNC's judgment amount.

### b. Illinois Loan

As to the Illinois Loan, PNC argues that because Foster defaulted on his obligations under the Illinois Note and Mortgage, and because PNC is the holder of the Note and the Mortgagee, PNC is entitled to foreclose its interest in the Illinois Property. PNC contends that it is entitled to: (i) judgment against Foster for all amounts due in connection with the Illinois Note and (ii) entry of a judgment allowing the foreclosure of the Illinois Mortgage on the Illinois Property, to be submitted after judgment is entered in favor of PNC. Foster argues that there are questions about whether Foster ever executed the 2006 documents for the Illinois Property and about PNC's application of payments.

### 1. Equitable Estoppel

PNC argues that Foster is equitably estopped from denying that he is bound by the terms of the Illinois Loan. (Dkt. 158 at 26). In Illinois the elements of equitable estoppel are:

> "(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the

party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof."

*Bayview Loan Servicing, LLC v. Szpara*, 2015 IL App (2d) 140331, ¶ 36, 46 N.E.3d 950, 958 (2015). PNC argues that Foster "acted as though the loan closed" by drawing down credit and seeking a modification on the loan. But PNC does not identify a misrepresentation of material fact Foster made to PNC, does not claim that Foster knew at the time that his misrepresentation was untrue, that PNC relied on a specific misrepresentation, or that PNC would be prejudiced by its reliance on Foster's representations. Thus Foster is not equitably estopped from arguing he did not sign the Illinois Note and Mortgage. However Foster's arguments fail.

### 2. Judgment and Foreclosure

PNC asserts that the Illinois Loan is evidenced by a note dated May 31, 2006 from Foster in favor of MidAmerica Bank in the principal amount of $1.89 million (the "Illinois Note"), and the Illinois Loan is secured by an Equity Cash Line Credit Mortgage, executed by Foster, notarized, and recorded with the Cook County Recorder of Deeds as Document No. 0617308074 on June 22, 2006 (the "Illinois Mortgage"). (DSOF ¶ 61). PNC says it is the holder of the Note and is the Mortgagee under Illinois law. (Dkt. 158 at 34).

Under the Illinois Mortgage Foreclosure Law, the court may enter a judgment of foreclosure "upon motion supported by an affidavit stating the amount which is due the mortgage . . . where all the allegations of fact in the complaint have been proved by verification of the complaint or affidavit." 735 ILCS 5/15-1506(a)(2). "In Illinois,

evidence of a holder's possession of both a mortgage and promissory note establishes a *prima facie* case of foreclosure in favor of the holder." *Amos Fin. LLLC v. Sneed*, 2017 U.S. Dist. LEXIS 226914, at *4 (N.D. Ill. Oct. 3, 2017) (citing Illinois law) (citation omitted). Under Illinois law, a "mortgagee" means "(i) the holder of an indebtedness or obligee of a non-monetary obligation secured by a mortgage or any person designated or authorized to act on behalf of such holder and (ii) any person claiming through a mortgagee as successor." 735 ILCS 5/15-1208. Foster does not dispute that PNC is the successor to MidAmerica Bank FSB. (DSOF ¶ 1). *See CitiMortgage, Inc. v. Trsinski*, 2017 IL App (2d) 160283-U, ¶ 2 (2017) ("A successor bank that merges with the original mortgagee obtains the mortgage rights possessed by the original bank as a matter of law…plaintiff's unrefuted allegations and exhibits established that it was the successor by merger to the original lender, ABN AMRO, and therefore had standing to file the foreclosure action.").

Here, PNC has established a prima facie case of foreclosure in its favor by attaching a true and accurate copy of the note and mortgage to the Morris Affidavit. The Morris Affidavit also establishes the total amount owed by Foster: $1,910,557.77. *See HSBC Bank USA v. Davis*, 2018 U.S. Dist. LEXIS 35147, at *5 (N.D. Ill. Mar. 5, 2018) ("HSBC satisfies those requirements [of the Illinois Mortgage Foreclosure Law]: it attached the mortgage, Davis' promissory note, and an 'Assignment of Mortgage' to its complaint, [], and also filed multiple affidavits establishing Davis' default on her mortgage and the amount she owes because of that default)[15]; *see also*

---

[15] In *HSBC Bank USA*, the Court also noted that even if HSBC had omitted the Assignment of Mortgage and attached only the note to its complaint, HSBC would have

*Amos Fin., LLC v. Sneed*, 2020 U.S. App. LEXIS 6687, at *6 (7th Cir. Mar. 3, 2020) ("Given the documentation that Amos provided to the district court...the court properly determined that Amos had standing to initiate foreclosure.").

Foster's defense to PNC's counterclaim is that he did not sign the 2006 note and mortgage and those documents do not contain a loan number. (Dkt. 164 at 8, 14). Foster says that he signed "some documents" on May 31, 2006 (*id.* at 8), both not the note and mortgage. But PNC provided expert testimony by a Forensic Document Examiner, and in her report she concluded that "it is highly probable/probable" that the person who signed the documents that Foster admits to signing also signed the documents at issue. (Expert Report of Ellen Mulcrone Schuetzner, Dkt. 157, Exh. E). Foster has not provided any rebuttal expert report. In addition, the mortgage is notarized. *See Butler v. Encyclopedia Britannica, Inc.*, 41 F.3d 285, 294-95 (7th Cir. 1994) ("A notary public's certificate of acknowledgment, regular on its face, carries a strong presumption of validity [and] to overcome this presumption, clear and convincing evidence is required."); *Ashland Ave. Invs., LLC v. Marquette Nat'l Bank*, 2016 U.S. Dist. LEXIS 194892, at *8 (N.D. Ill. Apr. 29, 2016) ("to rebut the presumption of validity, Toy must prove, by clear and convincing evidence from a disinterested witness, that she did not sign the Guarantee"). Foster's speculation that PNC did not know what happened in 2006 is not clear and convincing evidence that

---

made a prima facie showing that it owns the note, thus shifting the burden to Davis to prove that HSBC has no interest in her mortgage. 2018 U.S. Dist. LEXIS 35147, at *6-7.

can overcome the presumption of validity of the notarized signature. And his own testimony that he did not sign is not testimony by a disinterested witness.[16]

Finally, Foster's conclusory statements that he "did not fail to make payments to PNC" (Dkt. 165 ¶75) do not overcome PNC's sworn affidavit about the amount owed and attaching a PNC payoff statement. (Morris Aff.).

PNC's motion for summary judgment as to the Illinois Loan is granted.

## CONCLUSION

For the stated reasons, Defendant PNC's summary judgment motion [157] is granted. Summary judgment is granted in PNC's favor on all of Plaintiff Foster's claims. PNC's motion for summary judgment on its counterclaims as to the Florida Loan and Illinois Loan is also granted. As to the Florida Loan, given PNC's representation that it is holding in suspense $341,787.30 from Foster, that amount will be deducted from PNC's judgment, so the total judgment amount is $1,412,242.85. There being no just reason to delay, the Court enters partial final judgment under Federal Rule of Civil Procedure 54(b) as to the claims related to the Florida Loan. As to the Illinois Loan, PNC's counsel shall submit a proposed order, as to the requested judgment for foreclosure on the Illinois Property, to this Court's

---

[16] Further, Foster does not cite any authority for the proposition that an incorrect loan number on a loan document bars enforcement of the note and mortgage. And as with the Florida Loan, Foster did not raise any affirmative defense to the PNC counterclaim on the Illinois Loan. (Dkt. 42). A lack of standing affirmative defense is the borrower's burden to plead and prove. *Deutsche Bank Nat'l Tr. Co. v. Iordanov*, 2016 IL App (1st) 152656, ¶ 34, 407 Ill. Dec. 769, 777, 64 N.E.3d 147, 155 (2016); *see also Amos Fin., LLC*, 2020 U.S. App. LEXIS 6687, at *6.

proposed order inbox (Proposed_Order_Rowland@ilnd.uscourts.gov) on or before May

1, 2020.[17]

E N T E R:

Dated: March 25, 2020

_____
MARY M. ROWLAND
United States District Judge

---

[17] While this Court will enter a foreclosure order, any ensuing foreclosure will need to be conducted in compliance with any emergency orders regarding foreclosures then in place per the Governor of Illinois (*see* State of Illinois COVID-19 Executive Orders) or the Mayor of Chicago (*see* City of Chicago Coronavirus Response Center, https://www.chicago.gov/city/en/sites/covid-19/home.html) in light of the coronavirus pandemic.